UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,



**INDICTMENT**

v.

GABRIEL ADAM ALEXANDER LUTHOR,
a.k.a. GABRIEL ADAM ALEXANDER
LANGFORD, and
ELIZABETH CHRISTINE BROWN,

18 U.S.C. § 1343
18 U.S.C. § 1957
18 U.S.C. § 2

Defendants.

SCANNED
MAR 0 6 2025
U.S. DISTRICT COURT MPLS

THE UNITED STATES GRAND JURY CHARGES:

**INTRODUCTION**

1.    From 2018 to the present, Defendants Gabriel Adam Alexander Luthor and

Elizabeth Christine Brown devised and carried out a scheme to overbill Medicare,

Medicaid, and other insurers for neurofeedback therapy and other medical services

provided through Luthor and Brown's Minnesota company Golden Victory Medical LLC

("GVM").  Their conduct caused a loss of more than $15 million.

2.    Luthor and Brown lied to insurers through medical billing codes.  Medical

codes are meant to communicate to insurers the medical services that have been provided

to patients.  But Brown and Luthor caused GVM to falsely bill insurers for any code that

might induce an insurer to pay the company, even when GVM had not actually provided

the relevant service or was not entitled to payment.

3.    GVM's false billings included codes that by definition did not cover the

neurofeedback services that GVM provided, combinations of codes that by definition could

United States v. Luthor

not be combined, and codes that indicated that patients received a longer duration of services than they actually did.  Through this scheme, Luthor and Brown caused GVM to submit hundreds of thousands of false claims to insurers, many of which the insurers paid.

4.      Luthor and Brown's false billing practices continued after repeated warnings. In 2020 and 2021, insurers repeatedly denied large portions of GVM's claims due to coding problems.  In January 2022, the Center for Medicare and Medicaid Services ("CMS") suspended GVM from Medicare because GVM's bills "misrepresented" its services.  Then, in the spring of 2022, an outside auditor found that more than 90% of GVM's medical-service codes were improper and that the company was a "compliance nightmare."  In spite of these warnings, Luthor and Brown continued to direct that GVM submit false billing codes.

5.      Luthor and Brown—who were in a relationship together—carried out the fraudulent scheme in part by enlisting the help of Luthor's other girlfriends.  Luthor and Brown used fraud proceeds to supply Luthor's girlfriends with housing at Luthor and Brown's Eden Prairie mansion and to pay their living expenses.

6.      Millions of dollars in profits from the fraud were transferred from bank account to bank account, then retained by Luthor and Brown.

**COUNTS 1–6**
(Wire Fraud)

7.      Paragraphs 1 through 6 are incorporated herein.

United States v. Luthor

8.     From in or about 2018 until the present, in the State and District of Minnesota and elsewhere, the defendants,

**GABRIEL ADAM ALEXANDER LUTHOR,**
**a.k.a. GABRIEL ADAM ALEXANDER LANGFORD, and**
**ELIZABETH CHRISTINE BROWN,**

each aiding and abetting one another, and being aided and abetted by one another and by others known and unknown to the grand jury, knowingly devised and intended to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and by concealment of material facts, as further described below.

**The Medical Coding System**

9.     In the United States, medical providers bill patients and insurers using a coding system that rests on federal law.  The Medicare and Medicaid Act of 1965 permits reimbursement only for "reasonable and necessary" medical expenses.  42 U.S.C. § 1395y. In the decades since Medicare's enactment, the "reasonable and necessary" requirement has been interpreted by the Secretary of Health and Human Services in numerous national and local coverage determinations, called LCDs and NCDs, that explain "whether or not a particular item or service is covered."  *Id.* § 1395ff(f)(1)(B), (2)(B).

10.     Using these administrative interpretations, in the 1960s the American Medical Association ("AMA") created a coding system to facilitate medical billing published in a book titled Current Procedural Terminology ("CPT").  The CPT designated and defined codes that could be used by providers in bills to more easily communicate to

United States v. Luthor

insurers which medical services had been provided to the patient and why those services were covered by Medicare.

11.    The CPT became the gold standard for medical billing, even for private insurers. The AMA updated and republished the CPT annually. In 1983, CMS formally adopted the CPT.

12.    Today, the CPT remains the leading authority for medical coding. At all times relevant to this Indictment, medical providers and insurers in the United States used CPT codes as a method for providers to communicate services provided to patients for purposes of submitting claims for payment and reimbursement.

**Neurofeedback Therapy**

13.    One of the main medical services that GVM claimed to provide to its patients was neurofeedback.

14.    Neurofeedback is a therapy where a medical provider places sensors on a person's scalp to broadcast live images of the person's brain waves on a computer screen. The visual depiction of the brain waves is used to show the patient the effects of various interventions, to teach the patient practices that might help control problematic mental episodes. For example, with neurofeedback a medical provider might guide a patient suffering from anxiety to generate brain patterns that correlate with a calmer state of mind, in an effort to teach the patient how to lessen symptoms of anxiety.

15.    Neurofeedback therapy is similar to but distinct from the more established practice of biofeedback therapy. With biofeedback, sensors are used to record and provide

United States v. Luthor

feedback about biological processes, such as breathing, heart rate, or muscle tension. By contrast, neurofeedback relates to neurological processes.

16.    Neurofeedback remains a subject of debate. The FDA has approved several neurofeedback devices as safe, and the CDC has approved neurofeedback for children with ADHD, but controlled trials have failed to establish that neurofeedback is significantly more effective than a placebo.

**In 2018, Luthor and Brown formed GVM.**

17.    In 2018, Luthor and Brown were in a relationship with each other and living together in Nevada. Luthor and Brown met years earlier in Minnesota, where the couple had each been raised. Although Luthor and Brown were a couple, their arrangement permitted Luthor to have relationships with other women. Those women included Individuals A and B, each of whom also moved with Luthor and Brown from Minnesota to Nevada.

18.    Brown had bachelor's and master's degrees in nursing and obtained a Nevada license to serve as an advance-practice registered nurse, commonly known as a nurse practitioner. Her license authorized her to focus on family practice.

19.    Brown accepted a contract with a Nevada family practice focused on older and elderly patients. Brown's role with the practice was to make home visits to patients. At Brown's suggestion, the practice also hired Individual A to assist Brown.

20.    At first, Brown performed her work for the Nevada family practice as an independent contractor. Then in April 2018, Brown and Luthor formed GVM by submitting LLC registration documents to the Nevada Secretary of State. The registration

United States v. Luthor

documents listed Brown and Luthor as the company's managers. From that point forward, Brown and Individual A performed their work for the Nevada family practice through GVM. One of the various services that Brown and Individual A provided to patients through GVM was neurofeedback.

21.     Luthor immediately involved himself in GVM's business, including in decisionmaking as to what CPT codes GVM would list on its bills to insurers. On November 5, 2018, Luthor received his first transfer of funds from GVM—$20,000—to a bank account that he controlled.

**In 2019, GVM grew, and Brown and Luthor moved home to Minnesota.**

22.     In 2019, Brown ended GVM's work with the Nevada family practice after the practice's owner accused her of fraudulent billing. Brown took many of her patients with her to GVM.

23.     Luthor and Brown opened a brick-and-mortar GVM location in Nevada. The company's business grew, and its revenue exploded. In 2019 alone, through GVM Luthor and Brown billed over $16 million to Medicare, Medicaid, and other insurers. Over $4 million was received in revenue, even though GVM only had one medical provider— Brown. Brown alone billed over 28,000 patient services in 2019—an average of more than 76 services per day including weekends and holidays.

24.     Also in 2019, Brown and Luthor moved home from Nevada to Minnesota.

25.     In March of that year, Brown paid $1,050,000 to purchase an approximately 9,000 square-foot residence sitting on five-eighths of an acre on Welters Way in Eden

United States v. Luthor

Prairie, Minnesota.  Brown, Luthor, Individual A, and Individual B all moved into the house.

### GVM established fraudulent billing practices.

26.     As GVM matured, it established a practice of fraudulent billing.

27.     GVM's billing process involved three steps:

a.     *First*, GVM's medical providers—doctors, nurse practitioners, physician assistants—provided services to the company's patients at GVM's offices and in patient homes in Florida, Kansas, Oklahoma, and Nevada.  After concluding a medical service, GVM's providers were expected to document their work using Kareo, a cloud-based clinical and financial software product for medical offices.[1]

b.     *Second*, GVM staff—often Individual A in Minnesota—would review the providers' notes from patient encounters and assign CPT codes for billing, again using Kareo.

c.     *Third*, after GVM staff had assigned CPT codes, GVM staff or an outside billing contractor would create a "super bill" of various unbilled claims, and submit the bill to insurers over the internet, via Kareo.  The bills were first then transferred to insurers, over the internet.

28.     At the second step—the medical-coding step—Luthor and Brown directed that GVM introduce fraudulent misstatements about its work.  Luthor and Brown's approach to coding was to have GVM submit whatever group of codes that would most

---

[1] In 2021, Kareo rebranded as Tebra after a merger with another medical-practice software company.

United States v. Luthor

likely result in the highest possible payment from an insurer, regardless of whether the code definitions actually fit the services provided by GVM or whether the codes could be appropriately billed according to CMS and AMA coding protocol. As a result, the company regularly and intentionally submitted bills containing codes that falsely communicated to insurers that the company was entitled to payments that it was not.

29. For example, GVM's fraudulent billings regularly included the three following improper coding practices:

a. *Biofeedback:* GVM's bills regularly included false claims under code 90901, which covered "biofeedback." But according to CMS and AMA authorities, biofeedback is by definition a therapy used to assist with bodily conditions, such as high blood pressure and incontinence, not to address emotional or mental-health conditions. Because GVM's provider notes indicated the company's patients received "neurofeedback" to address emotional and mental-health conditions, rather than biofeedback to address bodily conditions, GVM's claims for biofeedback under code 90901 were false.

b. *Improper Combinations of Codes:* GVM regularly included on its bills combinations of codes that by definition could not be billed together. A basic tenet of CPT coding is that a provider typically cannot bill for both an umbrella code covering a broad suite of services while also billing for a code covering a portion of the services covered by the broader code. GVM regularly violated this principle.

i. For example, GVM improperly included on its bills both code 96112, which covered psychological-test administration, evaluation, and interpretation,

United States v. Luthor

and code 96130, which covered psychological-test evaluation and interpretation, but not administration.

       ii.     GVM improperly combined on its bills code 96116, which covered neurobehavioral-test administration, evaluation, and interpretation, as well as code 96132, which covered only neurobehavioral-test evaluation and interpretation, but not administration.

       iii.     GVM often also improperly billed CPT 90785, which can be added to a bill when other billed services are complex, but not in combination with certain codes that are presumed complex, such as 96112, 96116, 96130, and 96132.  GVM regularly improperly appended 90785 when also claiming payment under codes that are presumed complex.

       iv.     And GVM improperly billed for CPT Modifier 59, which creates an exception authorizing the billing of a combination of codes that normally cannot be combined on a single bill.  The modifier is only appropriate if the combination of services were distinct services, for example if one service was performed on one part of the body and the other service was performed on a different part of the body.  GVM regularly violated this principle by billing for codes that could not be combined and appending Modifier 59 in an attempt to justify the combination, even though GVM had not actually provided the patient with truly separate services.

       c.    *Timed Codes:*  GVM also improperly billed for code combinations that contained a time requirement.  For example, the definitions for codes 96112, 96116, 96130, and 96132 all require that the covered services last at least 31 minutes in duration.

United States v. Luthor

If a combination of these codes is billed, the time requirements run consecutively—for example, if a provider were to bill for both 96112 and 96130, the encounter with the patient must have lasted at least 62 minutes. GVM's coding violated these timing requirements. For example, on April 14, 2022, GVM billed for both 96112 and 96116 even though the provider's notes indicated the duration of the encounter was less than 62 minutes. And on April 15, 2022, GVM billed for 96112, 96116, and 96130 even though the provider documented that the duration of the encounter was less than 93 minutes.

30.    GVM's false billing practices were widespread. For example, billing records of GVM's claims to Medicare alone—not including records for non-Medicare insurers— show that from GVM's beginnings in 2018 until it ceased doing business at the end of 2022 the company billed the following improper CPT codes the following number of times:

| GVM False Claims to Medicare: 2018–2022 | | |
| --- | --- | --- |
| Code(s) | Number of Claims | Total Requested Amount |
| 90901 | 21,396 | $1,131,591 |
| 96112 & 96130 | 2,445 | $1,185,283 |
| 96116 & 96132 | 715 | $250,101 |
| 90785 | 19,619 | $525,451 |
| Modifier 59 | 109,574 | $11,674,743 |

United States v. Luthor

31.    Although Medicare generally requires that providers charge patients a co-pay of approximately 20% of the overall cost of the medical services, at Luthor and Brown's direction GVM declined to bill for or collect co-pays from patients, so that patients would not complain about GVM's bills.

**In 2020 and 2021, GVM expanded.**

32.    In 2020 and 2021, Brown and Luthor expanded GVM's practice significantly. The company opened four new offices, acquiring pre-existing medical practices in Stillwater, Oklahoma; Wichita, Kansas; Delray Beach, Florida; and Ponte Verde, Florida.

33.    At each of GVM's locations, the company employed nurse practitioners, physician assistants, and other staff who together focused on three sets of services: (i) medication management, to determine a patient's needs for medication and to issue drug prescriptions; (ii) psychotherapy, to determine a patient's mental health; and (iii) neurofeedback. GVM also employed non-medical administrative staff. At its peak, GVM employed approximately 45 people nationwide.

34.    The company was run out of the Welters Way residence, where Luthor, Brown, Individual A, Individual B, and other of Luthor's girlfriends resided. Roles were established among the group:

a.    Luthor owned and controlled GVM. He managed the company by managing and providing direction to Brown, who acted as the company's day-to-day leader. Luthor also participated directly in GVM's most significant business meetings regarding

11

United States v. Luthor

personnel, real estate, and contracting.  Over GVM's lifetime, approximately $4 million of GVM revenues was transferred from GVM's accounts to Luthor's personal accounts.

      b.     Brown was a co-owner of GVM with Luthor.  She ran GVM's day-to-day operations, at times serving formally as CEO.  She frequently traveled to GVM's various locations, and personally hired almost all of GVM's staff.  She regularly provided GVM staff with orders and direction.  Over GVM's lifetime, approximately $6 million was transferred from GVM's accounts to Brown's personal accounts.  But all property kept in Brown's name was subject to Luthor's ultimate control.

      c.     Individual A served as Brown's deputy at GVM, and like Brown, was in a relationship with Luthor.  She did not materially profit from her work for GVM.  Instead, Luthor and Brown provided Individual A with housing at the Welters Way residence and paid for her necessities and living expenses.

      d.     Individual B and certain other girlfriends of Luthor's assisted with GVM administrative tasks.  Like Brown and Individual A, Individual B and Luthor's other girlfriends each had romantic and sexual relationships with Luthor.  Neither Individual B nor any of Luthor's girlfriends other than Brown materially profited from the work they performed for GVM.  But like Individual A, they were provided housing at the Welters Way residence. and Luthor and Brown paid for their necessities and living expenses.

**In 2021, insurers pushed back on GVM's billing.**

35.     By 2021, insurers were warning GVM and frequently denying the company's claims due to the insurers' concerns about overbilling and incorrect coding.

United States v. Luthor

36.     For example, in March 2021, Anthem BlueCross BlueShield wrote to Brown, warning that her "average utilization of CPT codes" was "higher than the expected billing distribution" for similarly situated providers with patients with "a history of Alzheimer's, dementia, and or Intellectual Developmental Disorder diagnosis."

37.     In September 2021, Cenpatico rejected a number of GVM's claims.  That summer, GVM had billed Cenpatico—a Medicaid contractor—for claimed services provided to Florida patient R.R. on multiple days.  The bill included multiple claims under codes 90901, 96116, and 96130.  GVM requested payment of approximately $1,655 for each day of services to R.R., for a total of $26,998.  Cenpatico denied $25,608 of the claims—nearly the entire bill.  Cenpatico's reasons were code specific.  For example, for 90901 and 96138, Cenpatico said the GVM medical provider was "not contracted for this service."  And for 96116 and 96130, Cenpatico said the procedures were "inappropriate for provider specialty."  Other codes were denied as duplicates.  The few codes not denied wholesale were still reduced because GVM requested payment beyond the "maximum allowable . . . by prime [insurance]."

38.     In September 2021, Ambetter from Sunshine Health denied payment for the entirety of a $30,527 bill for services provided to certain Florida patients.  GVM's services were "not covered per HMO/EPO policy."

**GVM hired a CEO who warned Luthor and Brown about improper billing.**

39.     Luthor and Brown sought help running the company from the outside. Through a public posting, they hired B.S. to serve as CEO.  B.S. was a former officer in

United States v. Luthor

the U.S. military and had an MBA and significant healthcare business experience. He started as CEO in November 2021.

40.    Once at the helm, B.S. reviewed the company's records. He noticed GVM's high rate of billing rejections, and concluded that either the company was not executing well in its coding and billing functions, or worse, the company's billing practices were inappropriate and possibly illegal.

41.    Two months after B.S. started, in January 2022, CMS served GVM with a notice suspending Medicare payments. The notice stated that payments to GVM were being suspended pursuant to 42 C.F.R. § 405.371(a)(2), which authorizes the suspension of payments to a provider in the case of suspected fraud. The notice said GVM had "misrepresented services" in bills to Medicare, "submitted claims . . . for services that are medically unnecessary and/or not rendered," and "submitted claims for telehealth services that are not medically necessary." As examples, the notice identified five billed services that CMS had found medically unnecessary.

42.    Luthor and Brown quickly learned of Medicare's suspension notice, but initially withheld information about the notice from B.S.

43.    Eventually, B.S. learned of the Medicare suspension. He was alarmed. He contacted GVM's recently hired general counsel and directed him to engage an independent auditor to review the company's billing practices.

14

United States v. Luthor

**An outside auditor identified massive billing inaccuracies.**

44.    In March 2022, at B.S.'s direction, GVM engaged Health Information Associates ("HIA"), a South Carolina consulting and audit firm, to conduct an audit into GVM's billing practices.

45.    During the audit, HIA's consultants reviewed a total of 66 GVM bills and supporting documentation dating from February 16 to April 11, 2022.  The goal was to review "overall coding compliance."

46.    HIA's consultants were shocked by GVM's coding practices.  One HIA consultant emailed another stating that GVM was a "compliance nightmare": "They don't follow CPT guidelines, Medicare guidelines, really any guidelines.  They will have multiple CPT codes that are time based and either have no time documented or one time documented and no documentation of the services being provided.  . . .  They are a compliance nightmare."

47.    HIA completed its audit and delivered its results in a presentation to B.S., Luthor, Brown, and other company leaders on May 2, 2022.  HIA found that only 32.4% of the reviewed GVM's billing codes were approved by insurers.  When isolating to just CPT codes relating to medical services, GVM's accuracy dropped to 9.45%.  This was far below the industry standard of 90–95% accuracy.

48.    HIA also provided Luthor, Brown, and GVM with written coding and compliance reports.  HIA's reports included detailed analyses of GVM billings.  For each of these billings, HIA identified each code that GVM billed and re-printed the relevant provider notes from the underlying patient encounter.  HIA then compared the codes and

United States v. Luthor

the notes with the authoritative CPT definitions for the relevant codes, and offered conclusions and recommendations as to the propriety of GVM's billing.

49.     HIA's report identified repeated errors in GVM's billings, including (i) improperly billing code 90901 for biofeedback even though GVM was providing neurofeedback, (ii) improperly combining un-combinable codes such as 96112 and 96130, 96116 and 96132, 90875 and presume-complex codes, and modifier 59 when multiple truly separate services had not been provided; and (iii) improperly billing for timed codes that exceeded the time indicated by the provider documentation.

50.     Additionally, HIA's report found that GVM was simply billing for many codes not supported by provider documentation. There was a lack of documentation.

51.     HIA recommended that going forward GVM should follow authoritative "coding instructional notes," conduct an "ongoing periodic review" of the company's coding, and maintain "ongoing review" of AMA and other coding literature "when each new issue of the publication is received."

52.     After learning about HIA's conclusions, GVM's outside billing contractor grew concerned. The billing contractor's role did not include the substantive work of choosing which medical codes to place on bills, but ultimately performed the administrative task of assembling and submitting GVM's fully coded bills.

53.     B.S. responded to HIA's audit by planning to reform GVM's coding practices. On May 16, 2022, he emailed GVM larger staff, sharing HIA's conclusions and directing updates to the company's coding and billing practices.

United States v. Luthor

54.    16 days later, on June 1, 2022, GVM terminated B.S.'s employment.  Brown assumed the title of CEO.

55.    Meanwhile, in the wake of HIA's report, Brown transferred $400,000 in fraud proceeds from GVM's bank account to a third-party for the purpose of funding a drilling-truck investment in Zambia and the Democratic Republic of the Congo.

**Brown rejected B.S.'s post-audit billing reforms.**

56.    After B.S. was fired, GVM's outside billing contractor remained concerned about improper billing practices.

57.    On June 14, 2022, a staff member with the billing contractor wrote a GVM employee, CCing Brown.  He announced certain billing changes:  "[T]here are a few CPTs will not bill if service performed by audio only. . . .  Henceforth, team will bill according to telehealth type (Audio or Audio/Video)."

58.    Brown quickly responded and rejected the proposed change:  "All billing codes are to remain the same unless given authorization in writing."

59.    The billing contractor's CEO replied to Brown, pushing back on her direction to maintain the status quo coding practices.  In support of his position, he cited and attached a document reflecting B.S.'s coding reforms from the company's "old" practices to its "new" practices.

60.    Brown wrote back again:  "Where is this new coding coming from?  Please advise who or what changed the code all together and who's identified these?  I am concerned that all coding has been significantly reduced without my knowledge.  Who authorized the change in CPT codes?"

United States v. Luthor

61.    The friction between Brown and the billing contractor continued.  On July 25, 2022, the billing contractor's CEO texted Brown and said that the contractor refused to adjust and re-submit denied reimbursement claims where the reason for the denial was failure to obtain pre-authorization.  His explained that if "[a]uth has to be obtained prior to service," then "[r]etro auth is not possible."  Brown responded, "We need to fight for the money and resend and call the insurances."

**GVM's false billing practices continued after HIA's audit.**

62.    Luthor and Brown ignored HIA's warnings.

63.    After receiving the report of HIA's audit on or around May 2, 2022, and with full knowledge of the report's findings, Luthor and Brown caused GVM to continue to bill the same codes and combinations of codes that HIA had warned were improper.

18

United States v. Luthor

64.    For example, GVM billing records show that from May 3, 2022—the day after Luthor and Brown were briefed by HIA—until the company ceased doing business at the end of 2022, the company billed Medicare the following codes the following number of times:

| GVM False Claims to Medicare:  May 3–Dec. 31, 2022 | | |
|---|---|---|
| Code(s) | Number of Claims | Total Amount Requested |
| 90901 | 479 | Unknown |
| 96112 & 96130 | 95 | $36,480 |
| 96116 & 96132 | 180 | $62,820 |
| 90785 | 1,856 | $20,873 |
| Modifier 59 | 1,050 | $363,976 |

**In late 2022, mounting fraud accusations ground GVM's business to a halt.**

65.    At the end of the summer of 2022, GVM received a much more detailed and specific insurer warning from BlueCross BlueShield of Oklahoma ("BCBSOK").   On August 7, 2022, a BCBSOK investigator wrote a GVM physician assistant regarding "Inappropriate Billing."  The investigator said he reviewed the physician assistant's billing and found serious problems—GVM had regularly billed BCBSOK improperly using a combination of 10 codes, including 90901, 96112, 96116, 96130, and 96132.  Based on the time requirements in the code definitions, the investigator found it "would take at least 6

United States v. Luthor

hours per patient" per day for the physician assistant to complete all of the billed services. For certain days, the physician assistant billed BCBSOK for more than eight hours of services. This analysis was suggestive of "fraudulent billing," in the investigator's view, because the physician assistant's hours were eight hours a day, and the investigator's analysis did not even include any patient services that may have been billed to other insurers; it only included BCBSOK billings.

66.    The physician assistant was shocked by the BCBSOK letter, because he did not involve himself in billing; he relied on Brown and other GVM staff to code his work.

67.    The physician assistant forwarded the letter to Brown. Brown quickly requested a phone call with the physician assistant. On the phone, Brown falsely blamed the billing problems documented in the BCBSOK on B.S. and on GVM's outside billing contractor.

68.    When the outside billing contractor learned of the letter from BCBSOK, the contractor's owner emailed Brown expressing continued concern about GVM billing practices. He proposed that the contractor and GVM develop a joint "plan of action on resolving [the] coding issues." He said that until then his company would "not submit any new claim to any location with current codes."

69.    Within days, GVM terminated the contract for the billing contractor.

70.    After the letter from BCBSOK, GVM's revenue dropped significantly. In December 2022, Brown made a note to herself—Luthor was "about to just close everything down."

United States v. Luthor

71.    In early 2023, law enforcement executed a search warrant at the Welters Way residence.  It became plain that GVM was under investigation.  GVM ceased doing business, and Luthor, Brown, Individual A, Individual B, and another girlfriend of Luthor's fled Minnesota.

United States v. Luthor

### Wire Allegations

72.     On or about the dates listed below, the defendants, as set forth below, each aiding and abetting one another, and being aided and abetted by one another and by others known and unknown to the grand jury, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, signals, and sounds, as follows:

| Count | Defendants | Date (on or about) | Wire Details |
|---|---|---|---|
| 1 | LUTHOR, BROWN | June 1, 2022 | Text message from Brown to Chanell Allen stating, "I have reinstated myself fully as CEO effective immediately." |
| 2 | LUTHOR, BROWN | June 7, 2022 | The internet submission of claim control number 332222171249570 by GVM to Noridian Healthcare Solutions. |
| 3 | LUTHOR, BROWN | June 14, 2022 | Email from Brown to Richard Wilson, Kalpesh Soni, and Mark Thomas stating, "All billing codes are to remain the same unless given authorization in writing." |
| 4 | LUTHOR, BROWN | June 15, 2022 | The internet submission of claim control number 332222181059590 by GVM to Noridian Healthcare Solutions. |
| 5 | LUTHOR, BROWN | July 25, 2022 | Text message from Brown to Kalpesh Soni stating, "We need to fight for the money and resend and call the insurances." |
| 6 | LUTHOR, BROWN | August 7, 2022 | Text message from Brown to S.M. Nicholson stating, "Hi Nick give me a call when you get this." |

All in violation of Title 18, United States Code, Sections 1343 and 2.

United States v. Luthor

## COUNT 7
(Section 1957 Money Laundering)

73.    Paragraphs 1 through 72 are incorporated herein.

74.    On or about May 10, 2022, in the State and District of Minnesota,

**GABRIEL ADAM ALEXANDER LUTHOR,**
**a.k.a. GABRIEL ADAM ALEXANDER LANGFORD, and**
**ELIZABETH CHRISTINE BROWN,**

did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the wire transfer of $400,000 in U.S. currency, such property having been derived from a specified unlawful activity, that is, wire fraud, all in violation of Title 18, United States Code, Sections 1957 and 2.

### FORFEITURE ALLEGATIONS

75.    If convicted of any of Counts 1 through 6 of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to Counts 1 through 6 of the Indictment, and pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to Counts 1 through 6 of the Indictment.

76.    If Convicted of Count 7 of this Indictment, the defendants shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

United States v. Luthor

77.    If convicted of any of Counts 1 through 7 of the Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), any firearms, ammunition, and accessories involved in or used in the commission of such violations.

78.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
ACTING UNITED STATES ATTORNEY            FOREPERSON