JHT:hcs

AO 106 (Rev. 04/10) Application for a Search Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

Case No. 21-mj-96 (TNL)

## APPLICATION FOR A SEARCH WARRANT

I, Julie S. Barrows, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;
X contraband, fruits of crime, or other items illegally possessed;
X property designed for use, intended for use, or used in committing a crime;
___ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 2421 | Mann Act |
| Title 18, United States Code, Sections 1956 and 1957 | Money Laundering |
| Title 18, United States Code, Section 1343 | Wire Fraud |
| Title 18, United States Code, Section 371 | Conspiracy |

The application is based on these facts:

**See Affidavit, incorporated here**

X Continued on the attached sheet.

*Applicant's Signature*

Julie S. Barrows, Postal Inspector
United States Postal Inspection Service
*Printed Name and Title*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime/Zoom and email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: January 29, 2021

*Judge's Signature*

City and State: St. Paul, MN

The Honorable Tony N. Leung
United States Magistrate Judge
*Printed Name and Title*

Exh. 1
U.S. v. Luthor
25-cr-88(1)

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN THE MATTER OF THE SEARCH OF INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

Case No. 21-mj-96 (TNL)

**Filed Under Seal by Order of the Court**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, being first duly sworn, do state the following is true and correct to the best of my knowledge and belief:

1. I make this Affidavit in support of an Application for a Search Warrant for information associated with Instagram accounts luthorgabriel ("**Subject Account 1**"), liz_brownxoxo ("**Subject Account 2**"), wilsjade ("**Subject Account 3**"), and empress_lafay ("**Subject Account 4**") (collectively, the "Subject Accounts") that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a social-networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A, which is incorporated herein by reference. This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook Inc. to disclose to the Government records and other information in its possession, pertaining to the Subject Accounts.

2. I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS) and have been since March 2020, before which I was a Special Agent with the Internal Revenue Service – Criminal Investigations and the Office of Inspector General for the U.S. Department of Agriculture. I have been a federal agent for 11 years. My duties include investigating fraud and other financial crimes in violation of federal criminal statutes. My duties also include investigating potential cases of child exploitation. In this capacity, I have been involved in investigating violations of various statutes relating to child pornography and sex trafficking, among others. I have gained knowledge and experience through training and everyday work in conducting these types of investigations. During the course of numerous investigations, I have conducted searches pursuant to federal search warrants covering physical premises as well as electronic service providers.

3. The facts in this Affidavit come from my training and experience, information provided by witnesses, and information provided to me by other law enforcement officers. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that located in the Subject Accounts are evidence, fruits, and/or contraband relating to violations of the following federal statutes: 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C.

§ 371 (conspiracy). There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. This is an investigation into a commercial sex and money laundering operation. As explained below, the Eden Prairie Police Department has received multiple tips that Gabriel Langford, also known as Gabriel Luthor, and others appear to be involved in sex trafficking and related offenses.

### A. Eden Prairie Police received a tip about Langford's sex trafficking in May 2019

6. In May 2019, the Eden Prairie Police Department received a tip that Gabriel Langford may be involved in sex trafficking. The tip came from the spa manager at a hair salon and spa located in Eden Prairie ("Individual S.M."). Individual S.M. reported that on the morning of May 7, 2019, two adult women arrived together for hairstyle appointments. The women were both new clients. The women drew attention because they were dressed in "sexy" attire and wore full makeup for their appointments. Individual S.M. said their attire was unlike that typically worn to a hair salon and more like the type of clothes a woman would wear to a nightclub. One of the women—Elizabeth Brown—had blond hair and appeared to be in her thirties. The other woman had brown hair and appeared to be in her early twenties. Individual S.M. said that Brown appeared to be in charge and that she answered all of the questions about the younger woman's hair and made the decisions about her salon services.

7. While the women were receiving their salon services, a man arrived with a third woman who appeared to be in her early twenties. The man, who Individual S.M. later identified as Gabriel Langford, was an approximately 35-year old African American man with manicured facial hair and eyebrows. According to Individual S.M., Langford appeared to be in charge of all three women. Langford and the women all left together.

8. After the appointment, Individual S.M. looked up Brown's Instagram account and found that she was using **Subject Account 2**. Individual S.M. viewed **Subject Account 2** and confirmed that it belonged to Brown and that Brown was one of the women present at the salon. Individual S.M. recognized photos of the African American male who came into the salon on **Subject Account 2**. Comments on **Subject Account 2** showed that the man had his own Instagram account, **Subject Account 1**.

9. Individual S.M. told police she believed the man had a sex trafficking relationship with the women. She explained that the women did not appear to be able to speak for themselves and the man seemed so controlling about their look. She also found their sexy clothing and makeup to be unusual and suspicious in light of the time and circumstances of their appointment.

10. Individual S.M. later told Eden Prairie police that the women had returned for additional appointments in 2019. Individual S.M. learned that the other two women present during the initial (and later) appointments were Jade

Wilson and Brianna Hughes. During later appointments, Brown described herself as a psychiatrist who traveled to Nevada frequently.

### B. Eden Prairie Police received a second tip about Langford's sex trafficking in July 2020

11. In July 2020, the Eden Prairie Police Department received another report about potential sex trafficking involving Langford, Brown, and Wilson. Individual J.R. contacted the police department. Individual J.R. is a 34-year old woman from Las Vegas, Nevada. Individual J.R. explained that on June 18, 2020, she applied for a job as an office manager at Golden Victory Medical. Golden Victory Medical was a behavioral health company in Las Vegas that saw "at-home" patients. On or about July 10, 2020, Individual J.R. received a call from a Golden Victory Medical employee who identified herself as "Jade." As explained below, "Jade" was later identified as Jade Elizabeth Wilson. Wilson spoke with Individual J.R. about the position and Individual J.R.'s background and experience.

12. Wilson offered to speak with Individual J.R. via FaceTime to make her feel more comfortable. Individual J.R. had a FaceTime conversation with Wilson and another woman, Elizabeth Brown. Wilson and Brown explained they needed assistance in "revamping" the operations and billing through their Las Vegas office. Wilson and Brown asked to meet with Individual J.R. the following day in Minneapolis, Minnesota.

13. On July 10, 2020, Brown sent a non-disclosure agreement to Individual J.R. Brown sent the non-disclosure agreement via an electronic signing program

called DocuSign. The email directed any replies be sent to izzybanks09@gmail, also known as **Subject Account 5**.

**From:** Elizabeth Brown via DocuSign <dse@docusign.net>
**Date:** July 10, 2020 at 2:26:50 PM PDT
**To:** [redacted]
**Subject: Completed: Please DocuSign: Non-Disclosure Agreement.pdf**
**Reply-To:** "Elizabeth Brown" <izzybanks09@gmail.com>

DocuSign

Your document has been completed

VIEW COMPLETED DOCUMENT

Elizabeth Brown

izzybanks09@gmail.com

All parties have completed Please DocuSign: Non-Disclosure Agreement.pdf.

Hello, in the first section to avoid any confusion- it has several blank fields under where you would enter your name and those blanks are for your address: street, city, state, zip code.

14. The non-disclosure agreement was between Individual J.R. and Golden Victory Medical. It explained:

> Information will be disclosed to the Recipient to determine whether the Recipient could assist Golden Victory Medical, and upon working with or for the company the Recipient will be held to the same restrictions.
>
> The Owner has requested and the Recipient agrees that the Recipient will protect confidential material and information which may be disclosed between the Owner and Recipient.

15. Individual J.R. electronically signed the non-disclosure agreement. Brown signed the agreement on behalf of Golden Victory Medical.

16. That same day, Wilson sent an email with the subject line "Travel Information" from **Subject Account 6** (jwilson.nvd@gmail.com) to Individual J.R. The email contained information about the flight and hotel that had been booked for Individual J.R.

> **From:** Jade Wilson <jwilson.nvd@gmail.com>
> **Date:** July 10, 2020 at 3:17:23 PM PDT
> **To:** [redacted]
> **Subject: Travel information**
>
> Travel details:
>
> Flight from LAS to MSP 7/11/20, takeoff 9:15am landing 2:11pm. Confirmation #JP3CEA.Current status states a 10 minute delay in flight times. One carry on bag and one personal item included. Boarding pass attached.
>
> Hotel room booked at Radisson Blu at Mall of America, confirmation #W0KTNJ1. Checking in 7/11/20, checking out 7/13/20.
>
> Flight from MSP to LAS 7/13/20 takeoff 6:10pm landing 7:23pm. Same confirmation number, not able to check-in or view boarding pass until 24 hours prior to flight time.
>
> Please let me know if you have any questions!

17. Prior to flying to Minneapolis, Individual J.R. looked up Brown's National Provider Identifier number[1] and found that Brown had previously worked

[1] A National Provider Identifier is a unique 10-digit identification number issued to health care providers in the United States by the Centers for Medicare and Medicaid Services

with one of Individual J.R.'s professional contacts ("Individual D.F."). When Individual J.R. told Brown about the common connection, Brown warned her not to mention Individual D.F. to Langford, the owner of Golden Victory Medical, when she met with him the following day because they no longer did business with Individual D.F.

18. The following day—July 11, 2020—Individual J.R. flew first class from Las Vegas to Minneapolis. Golden Victory Medical paid for the flight. Individual J.R. felt uncomfortable going on the trip alone so her husband came with her on the trip. Prior to leaving, Individual J.R. also notified several family members of her destination and allowed them to access her cell phone's location.

19. Upon her arrival in Minneapolis, Individual J.R. was picked up in a limousine. The limousine ride was arranged by Golden Victory Medical. The limo took Individual J.R. to the Radisson Blu hotel at the Mall of America. According to Individual J.R., her hotel reservations were also made by Golden Victory Medical and Individual J.R. did not pay for the room. After Individual J.R. checked into the hotel, the limo drove her to a house located at 11631 Welters Way in Eden Prairie. Individual J.R.'s husband did not accompany her to the meeting.

20. Individual J.R. described 11631 Welters Way as a large house with two stone lions in the front. When Individual J.R. arrived for the meeting, a black Mercedes was parked in the driveway.

21. Individual J.R. met with Wilson, Brown, Langford, and an unknown female at the house. According to Individual J.R., Brown was dressed in provocative

clothing and Langford wore a suit. Individual J.R. said the other female had braces and appeared to be 16 to 18 years old.

22. According to Individual J.R., Langford ran the meeting. He talked about the company and the position. When Individual J.R. asked about everyone's role in the company, Langford responded "We are all together. Is that a problem?" Individual J.R. assured Langford it was not a problem, but she became uncomfortable. Individual J.R. talked about Kareo, a well-known company that provides software for medical offices but no one appeared to have any idea what she was talking about. This caused Individual J.R. to become suspicious about the legitimacy of their company (Golden Victory Medical).

23. Individual J.R. said that the women did not speak during the meeting. Individual J.R. believed that women were scared because they kept looking from person to person and looked pale. While at the house, Individual J.R. noticed that only a few of the rooms were furnished.

24. After about an hour and 15 minutes, Individual J.R. asked to leave and return to her hotel. Individual J.R. was required to sign a non-disclosure agreement before she left. Langford then left and Individual J.R. took an Uber back to her hotel. Once back at her hotel, Individual J.R. received a call from Langford, who explained that Individual J.R. was not a good fit for the company. Individual J.R. purchased return flights to Las Vegas for herself and her husband.

25. The day after she met with Langford, Individual J.R. sent a text to Wilson saying that the meeting was "weird as fuck" and "wasn't about business."

Individual J.R. told Wilson that she "look[ed] like you just got fucking kidnapped" and that she should "tell that dude [Langford] to stop using sharpies on his eyebrows." This description of Langford's eyebrows appears to be consistent with photos posted on the Subject Accounts.




26. Wilson responded by reminding Individual J.R. that she "signed an NDA" and that "Gabriel [Langford] is well known to enforce every contract." Wilson further said that "[a]ny attempt to harm the business will be dealt with through our legal team."

27. The following day (July 13, 2020), Individual J.R. called 911 to report Langford for potential human trafficking and fraud. Individual J.R. later provided copies of text messages she exchanged with Wilson prior to and after her trip to Minneapolis.

**C. The Langford House**

28. According to the city of Eden Prairie Inspections Division, Flip Funding, LLC, purchased 11631 Welters Way, Eden Prairie, Minnesota, on or about March 22, 2019, for approximately $994,900. Later that same day, Brown put down $315,000 in cash on a contract for deed from Flip Funding, LLC. The terms of the contract for deed show a purchase price of $1,049,000, with a balance owed of $734,700. With an interest rate of 7%, Brown would make monthly payments of $6,429 for 61 months with a balloon payment of $342,531 due on March 22, 2024. The residence is a 9,890 square foot single-family home.



29. On or about January 22, 2020, an Eden Prairie city building inspector contacted the Eden Prairie Police Department about possible sex trafficking or prostitution at 11631 Welters Way. The building inspector had been told about the activity by a city plumbing inspector. The plumbing inspector told officers that he had recently conducted a plumbing inspection at 11631 Welters Way. The inspection related to ongoing renovation work on the property. The plumbing inspector reported that he saw suspicious activity in the residence. Specifically, the basement had several unusual features, including a large "grotto-style" hot tub and what the inspector described as a large "gang shower" for multiple people to shower at the same time. The plumbing inspector said he had never seen anything like the gang shower. The basement also had a glassed-in solarium room with a door that the plumbing inspector believed to be a place to view and pick women.

30. The plumbing inspector also inspected the upstairs bathroom. According to the plumbing inspector, Langford and a woman later identified as Brown stood in the staircase in a manner that appeared to be designed to deter the inspector from going upstairs. Although it was only 9:00 a.m., Brown was in full makeup. The inspector reported that there were approximately six women upstairs. The inspector said the women appeared to be 18-25 years old. The plumbing contractor was present with the plumbing inspector and told the inspector that the women were all Langford's girlfriends. The inspector told police he believed Langford was acting as a pimp for the women.

31. The plumbing inspector identified a photo of Langford as the man he saw. He also identified photos of Brown, Wilson, and Hughes as the women he saw at the residence.

32. On or about January 25, 2021, an Eden Prairie Police officer conducted a trash pull at 11631 Welters Way. The officer recovered: (a) mail addressed to Brown; (b) a prescription for contraceptive addressed to Wilson; (c) a prescription issued by Brown to Wilson for an antibiotic that is used to treat, among other things, vaginal infections. In my training and experience, I know that possession of these sorts of prescriptions may be consistent with commercial sex.

**D. Golden Victory Medical LLC**

33. According to Nevada Secretary of State records, Golden Victory Medical LLC is a limited liability company located in Henderson, Nevada. Langford and Brown are listed as the company's managers. According to the company's Facebook page, Golden Victory Medical offers "medication management, neurofeedback, and psychological testing to patients of all ages for the Las Vegas and surrounding areas." Wilson's LinkedIn account identifies her as the "Practice Manager" at Golden Victory Medical.

34. Golden Victory Medical has a business account at Bank of America. Records obtained from Bank of America show that Langford and Brown are both signatories on the account. The signature card identified them both as a "managing member" of the company.

35. The government obtained records related to accounts held by Langford, Brown, and Wilson at Bank of America. A review of these account shows that

Langford, Brown, and Wilson regularly send money back and forth in a suspicious manner.

36. For example, in January 2018, Brown transferred nearly $9,000 to Langford via Zelle, an online payment app. This represented all of the deposits into Langford's account that month.

Bank of America

**Your checking account**

GABRIEL ADAM ALEXANDER LANGFORD | Account # [redacted] | December 23, 2017 to January 25, 2018

**We have a new requirement for making cash deposits to our consumer accounts.**
You will now need to be an owner or authorized user on the account to make a cash deposit to a personal checking or savings account with an associate in our financial centers. This change helps us reduce risks from cash transactions involving persons who are not authorized on an account.

## Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 01/08/18 | Zelle Transfer Conf# bdb77162a; BROWN, ELIZABETH | 1,000.00 |
| 01/08/18 | Zelle Transfer Conf# T04567B3P; ELIZABETH BROWN | 999.99 |
| 01/08/18 | Zelle Transfer Conf# 535cf571c; BROWN, ELIZABETH | 200.00 |
| 01/11/18 | Zelle Transfer Conf# T045HXH6Z; ELIZABETH BROWN | 1,000.00 |
| 01/16/18 | Zelle Transfer Conf# T045TM99V; ELIZABETH BROWN | 999.99 |
| 01/16/18 | Zelle Transfer Conf# 23acdf8c4; BROWN, ELIZABETH | 500.00 |
| 01/18/18 | Zelle Transfer Conf# 017b7105c; BROWN, ELIZABETH | 999.99 |
| 01/18/18 | Zelle Transfer Conf# T0467SX95; ELIZABETH BROWN | 999.99 |
| 01/22/18 | Zelle Transfer Conf# 066a59bee; BROWN, ELIZABETH | 999.99 |
| 01/22/18 | Zelle Transfer Conf# T046LK6YB; ELIZABETH BROWN | 999.99 |
| 01/22/18 | Zelle Transfer Conf# XXXXXXXXX; BROWN, ELIZABETH | 300.00 |
| **Total deposits and other additions** | | **$8,999.94** |

37. Similarly, in February 2019, Langford received more than $10,000 in cash transfers from Brown.

**Bank of America**

GABRIEL ADAM ALEXANDER LANGFORD | Account # [redacted] | February 23, 2019 to March 25, 2019

Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 02/25/19 | Zelle Transfer Conf# 00fea6c67; BROWN, ELIZABETH | 2,500.00 |
| 03/04/19 | Zelle Transfer Conf# a1cd3258a; BROWN, ELIZABETH | 1,500.00 |
| 03/04/19 | Zelle Transfer Conf# 18b6e7bc3; BROWN, ELIZABETH | 1,000.00 |
| 03/04/19 | Zelle Transfer Conf# 00ac27145; BROWN, ELIZABETH | 600.00 |
| 03/04/19 | Zelle Transfer Conf# d0543a005; BROWN, ELIZABETH | 400.00 |
| 03/08/19 | Zelle Transfer Conf# eadb485df; BROWN, ELIZABETH | 2,500.00 |
| 03/13/19 | Zelle Transfer Conf# ab28d3b9f; BROWN, ELIZABETH | 500.00 |
| 03/15/19 | Zelle Transfer Conf# 760fed6ee; BROWN, ELIZABETH | 2,000.00 |
| 03/18/19 | Zelle Transfer Conf# 3a5018578; BROWN, ELIZABETH | 1,800.00 |
| 03/20/19 | Zelle Transfer Conf# 7a1ba0349; BROWN, ELIZABETH | 500.00 |
| 03/20/19 | Zelle Transfer Conf# 89c3521c2; BROWN, ELIZABETH | 500.00 |
| 03/22/19 | Zelle Transfer Conf# 08f6ab564; BROWN, ELIZABETH | 500.00 |
| 03/25/19 | NV TLR transfer | 7,000.00 |
| **Total deposits and other additions** | | **$21,300.00** |

38. According to records obtained from Feldman Imports, Langford purchased a 2019 Mercedes Benz AMG GT Roadster for approximately $130,000 in July 2019. On the financing paperwork, Langford identified himself as the CEO of Golden Victory Medical and that he made $83,333 per month, which is equivalent to $999,961 a year.

**E. The Instagram Accounts**

39. The investigation has shown that Langford, Brown, Wilson, and Hughes all have Instagram accounts.

40. The government has reviewed **Subject Account 1**, which belongs to Langford. Langford has posted many photos of himself with Brown, Wilson, and Hughes on **Subject Account 1**. Brown, Wilson, and Hughes left comments about these photos on **Subject Account 1** using their own Instagram accounts. Brown and Wilson have left comments about these photos on **Subject Account 1**. For

example, on or about December 2, 2019, Brown (using **Subject Account 2**) commented on a photo of Langford and Brown posted on **Subject Account 1**. Brown (using **Subject Account 2**) left a comment about the photo on **Subject Account 1** that read "This guy, no one gives more, endless love and ambition, drive, and leaders--@luthorgabriel you're so much more than words can say. #lovehim #justdoit #drive #ambition."

41. On or about September 12, 2019, Langford posted a photo of himself and Wilson on **Subject Account 1**. Wilson (using **Subject Account 3**) commented about the photo on **Subject Account 1**. Wilson wrote "We so cute. #hestheman #babe #vegastrip."

42. On or about May 30, 2020, Brown posted photos of the pool at 11631 Welters Way on **Subject Account 2**. On or about October 13, 2019, Brown posted a photo of herself, Wilson, Hughes, and Mitchell on **Subject Account 2**. Brown wrote "Relaxing evening out with my ladies. #lovethem #gno." On or about May 30, 2020, Brown posted photos of the new pool at 11631 Welters Way on **Subject Account 2**.

43. On or about February 8, 2020, Brown posted to **Subject Account 2** a photo of her and Hughes. Brown also posted a message related to the photo: "Happy Birthday Beautiful Bri! To the most loving gentle patient soul I know . . . you have taught me to always have fun, be a mermaid, make a wish with every eyelash and dandelion you blow away, build a fort and sleep in it, have a pillow fight make everyday fun and never forget to dance, sing, and play I love you Bri . . ."

44. Hughes uses **Subject Account 4**. The homepage for **Subject Account 4** shows a photo of Hughes with Langford. The account is set to private.

45. In my training and experience on these types of social media posts, individuals often communicate on these platforms, including Instagram, to drive traffic to other sites, gather individuals for a common interest, and/or for marketing purposes.

## INSTAGRAM

46. From my review of publicly available information provided by Facebook about its Instagram service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Facebook and Instagram.

47. Instagram is a free-access social-networking website of the same name that can be accessed at http://www.instagram.com. Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

48. Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo, among other things: a caption; various "tags" that can be used to search for the photo (e.g., a user may add

the tag #scotus so that people interested in the United States Supreme Court (sometimes abbreviated as SCOTUS) can search for and find posts related to the Court); and location information. A user can also apply a variety of "filters" or other visual effects that modify the appearance of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

49. Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

50. Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

51. Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

52. Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user, "unfollow" users, that is, stop following them, or "block" them, which prevents the blocked user from following that user.

53. Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

54. Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

55. Users on Instagram may also search Instagram for other users or particular types of photos or other content.

56. For each user, Instagram also collects and retains "log file" information every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

57. Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile

device to allow Instagram to collect information about how a user uses Instagram. For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

58. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which include data files and other information that may identify the particular electronic device that was used to access Instagram.

59. Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

60. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

61. As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was accessed or used. For example, as described herein, Instagram logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Lastly, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of

guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

62. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Instagram to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

63. Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the Subject Accounts, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

64. Based on the foregoing, I request that the Court issue the proposed Search Warrant. Because the Warrant will be served on Facebook Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Julie Barrows
Postal Inspector
United States Postal Inspection Service

SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime/Zoom and
email) pursuant to Fed. R. Crim. P. 41(d)(3)
on January 29, 2021

THE HONORABLE TONY N. LEUNG
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## Property to Be Searched

This warrant applies to information associated with Instagram accounts luthorgabriel, liz_brownxoxo, wilsjade, and empress_lafay that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

## I. Information to be disclosed by Facebook, Inc. ("Facebook")

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Facebook, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or after January 29, 2021, Facebook is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and

information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, January 1, 2019, to January 29, 2021;

7. Privacy and account settings, including change history; and

8. Communications between Facebook and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the Account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, January 1, 2019, to January 29, 2021;

C. All content, records, and other information relating to communications sent from or received by the Account from January 1, 2019, to January 29, 2021, including but not limited to:

1. The content of all communications sent from or received by the Account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4. All associated logs and metadata;

D. All content, records, and other information relating to all other interactions between the Account and other Instagram users from January 1, 2019, to January 29, 2021, including but not limited to:

1. Interactions by other Instagram users with the Account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata;

E. All records of searches performed by the account from January 1, 2019, to January 29, 2021; and

F. All location information, including location history, login activity, information geotags, and related metadata from January 1, 2019, to January 29, 2021.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy), those violations involving Gabriel Langford, Elizabeth Brown, Jade Wilson, and Brianna Hughes and occurring after January 1, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence of sex trafficking and Mann Act violations, to include evidence of force, threats of force, fraud, or coercion; evidence of commercial sex work, to include advertisements and communication with commercial sex purchasers; evidence of travel, including travel between Las Vegas, Nevada, and Minneapolis, Minnesota;

(b) Evidence of the relationships between Gabriel Langford, also known as Gabriel Luthor, and Elizabeth Brown, Jade Wilson, and Brianna Hughes, to include their financial and professional relationships;

(c) Evidence about the business of Golden Victory Medical;

(d) The identity of the person(s) who communicated with the user ID about matters relating to sex trafficking, commercial sex work, money laundering, and health care/wire fraud including records that help reveal their whereabouts.

(e) Attribution evidence, to include the identity of the person(s) who created or used the user ID and records that help reveal the whereabouts of such person(s);

(f) Evidence of how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ______________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, Inc. ("Facebook"), and my title is ___________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b. such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

____________________ ____________________________________

Date Signature

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**
PETITION OF THE UNITED STATES FOR AN ORDER SEALING SEARCH WARRANT, AFFIDAVIT, RETURN, PETITION AND ORDER FOR SEALING

COMES NOW the United States of America by its undersigned attorneys and in support of its Petition for an Order Sealing Search Warrant, Affidavit, Return, and Petition in the above-captioned matter, states as follows:

1. On January 29, 2021, The Honorable Tony N. Leung issued a warrant authorizing the search of information stored in the servers that are associated with Instagram accounts luthorgabriel, liz_brownxoxo, wilsjade, and empress_lafay that are stored at premises controlled by Facebook Inc.

2. The Affidavit of Postal Inspector Julie S. Barrows, submitted in support of the search warrant, sets forth facts regarding an ongoing investigation into violations of the following federal statutes: 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy).

3. The search warrant documents presented to this Court for *in camera* review include detailed and highly sensitive investigative information. Disclosure of the information would jeopardize an ongoing investigation into alleged criminal offenses and the privacy of individuals unlikely to be, and/or who may ultimately not

be, indicted.

4. The Court's power to prevent disclosure of its files, especially for a limited period of time, is well established. This general power has been recognized by the United States Supreme Court.

> It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over some records and files and access has been denied where court files might have become a vehicle for improper purposes.

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).

5. The Eighth Circuit has recognized the Court's specific power to restrict access to search warrant documents like those at issue here:

> We hold that the qualified first amendment right of public access extends to the documents filed in support of search warrants and that the documents may be sealed if the district court specifically finds that sealing is necessary to protect a compelling government interest and that less restrictive alternatives are impracticable.

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

6. The Eighth Circuit and district courts within the Circuit have recognized that the circumstances surrounding ongoing investigations constitute compelling government interests warranting the sealing of search warrant documents. For example, the Eighth Circuit has approved sealing search warrant documents that "describe[d] in detail the nature, scope and direction of the government's investigation and the individuals and specific projects involved," resulting in "substantial probability that the government's on-going investigation would be severely compromised if the sealed documents were released." *Gunn*, 855

F.2d at 574. Moreover, the Eighth Circuit has recognized that search warrant affidavits permeated with references to individuals other than the subjects of the search warrant and/or with information revealing the nature, scope and direction of the government's ongoing investigation may be sealed not only because they present compelling government interests justifying sealing, but also because less restrictive alternatives to sealing are in such circumstances impracticable. *Id.*

7. Based upon the foregoing and all the files and proceedings to date, the United States respectfully requests that this Court issue an Order Sealing the Warrant, Application, Affidavit of Postal Inspector Julie S. Barrows, Return, this Petition, and the Sealing Order until the close of business on July 29, 2021, unless a compelling interest is shown by the United States for a continuation of the sealing.

Dated: January 29, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
EMILY A. POLACHEK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

ORDER FOR SEALING

This Court, having reviewed the Petition of the United States herein, finds that the United States has shown a compelling interest in the sealing of documents in the above-captioned matter because:

a. Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised.

b. Nondisclosure of the search warrant documents is necessary to protect the privacy of an individual who may ultimately remain unindicted.

This Court also finds that less restrictive alternatives to sealing are impracticable or not appropriate.

It is therefore:

ORDERED that all documents filed in the above-captioned matter are hereby sealed until the close of business on July 29, 2021.

IT IS FURTHER ORDERED that these documents will be unsealed at the above time unless further compelling interest is shown by the United States for continuing this Order for an additional period of time.

January 29, 2021
Date

Tony N. Leung
The Honorable Tony N. Leung
United States Magistrate Judge

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

**APPLICATION FOR ORDER COMMANDING FACEBOOK INC. NOT TO NOTIFY ANY PERSON OF THE EXISTENCE OF WARRANT**

The United States requests that the Court order Facebook Inc. not to notify any person (including the subscribers or customers of the account(s) listed in the warrant) of the existence of the attached warrant until July 29, 2021.

1. Facebook Inc. is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2). Pursuant to 18 U.S.C. § 2703, the United States obtained the attached warrant, which requires Facebook Inc. to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.*

2. In this case, such an order would be appropriate because the attached warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to

the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

3. WHEREFORE, the United States respectfully requests that the Court grant the attached Order directing Facebook Inc. not to disclose the existence or content of the attached warrant until July 29, 2021, except that Facebook Inc. may disclose the attached warrant to an attorney for Facebook Inc. for the purpose of receiving legal advice.

4. The United States further requests that the Court order that this application and any resulting order be sealed until July 29, 2021. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Dated: January 29, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
EMILY A. POLACHEK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

**ORDER**

The United States has submitted an application pursuant to 18 U.S.C. § 2705(b), requesting that the Court issue an Order commanding Facebook Inc., an electronic communications service provider and/or a remote computing service, not to notify any person (including the subscribers or customers of the account(s) listed in the warrant) of the existence of the attached warrant until July 29, 2021.

The Court determines that there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5).

IT IS THEREFORE ORDERED under 18 U.S.C. § 2705(b) that Facebook Inc. shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, until July 29, 2021, except that Facebook Inc. may disclose the attached warrant to an attorney for Facebook Inc. for the purpose of receiving legal advice.

IT IS FURTHER ORDERED that the application and this Order are sealed until July 29, 2021.

January 29, 2021
Date

Tony N. Leung
The Honorable Tony N. Leung
United States Magistrate Judge

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

APPLICATION OF THE UNITED STATES FOR AN EXTENSION OF TIME TO EXECUTE SEARCH WARRANT

COMES NOW the United States of America, by its undersigned attorneys and in support of an application for an Order extending the time by which Facebook Inc. must execute the search warrant:

1. On January 29, 2021, The Honorable Tony N. Leung issued the attached search warrant authorizing the search of information maintained by Facebook Inc. The search warrant commanded law enforcement to execute the search warrant within 14 days of the issuance of the warrant pursuant to Federal Rule of Criminal Procedure 41—*i.e.*, by February 12, 2021. The Affidavit of Postal Inspector Julie S. Barrows submitted in support of the search warrant sets forth facts regarding an ongoing criminal investigation. The factual allegations in this application are also based on information provided from Postal Inspector Julie S. Barrows.

2. Production by service providers such as Facebook Inc. pursuant to search warrant routinely occurs outside Rule 41's 14-day period for execution. Indeed, production often occurs more than 30 days after service of a warrant on the service provider. Reasons for delay in production are outside the government's control, and may include the complexity or volume of data requested in the warrant itself, as well

as the volume of other requests for information received by Facebook Inc.

3. On June 26, 2019, a panel of the Eighth Circuit Court of Appeals issued an opinion in *United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019). The Eighth Circuit addressed the question of when a warrant issued to Facebook was executed for purposes of Federal Rule of Criminal Procedure 41: "The district court thought the warrant was executed when the officers delivered it to Facebook," while "Nyah counters that the warrant was not executed until the officers seized the evidence from Facebook." *Id.* at 699. In dicta, the *Nyah* court observed that "the text of Rule 41 suggests that a warrant is not fully executed until officers have seized the property that they are authorized to take" and "the authorized seizure of property under the warrant constitutes part of the execution of the warrant." *Id.* The court, however, concluded that it did not need to "definitively" determine whether the warrant was "executed" within fourteen days after the warrant was issued because even if there were a violation of Rule 41, there was no basis for suppression. *Nyah*, however, recommends a remedy to any Rule 41 problem, which is to "simply obtain a fresh warrant with a renewed period of fourteen days within which to execute the warrant." *Id.* at 700.

4. Although *Nyah* does not contain a *holding* that a Rule 41 violation occurs when providers like Facebook produce records in response to a search warrant more than 14 days after the warrant is issued, Judge Colloton's opinion strongly suggests such an interpretation. The United States disagrees with this interpretation, and contends that, as the Sixth Circuit held in *United States v.*

*Farrad*, 895 F.3d 859, 890 & n.23 (6th Cir. 2018), a warrant directed to a service provider is executed when an officer serves it on the provider. *Nyah* also conflicts with the Eighth Circuit's earlier decision in *United States v. Welch*, 811 F.3d 275, 280-81 (8th Cir. 2016). In considering when the time limit for providing notice of a search warrant under Fed. R. Crim. P. 41(f) began to run, the *Welch* court pinned the timing of a warrant's execution to the date when officers served the warrant on the provider (via installation of software on a server). Nevertheless, *Nyah* is the only Eighth Circuit opinion to speak directly to when execution is complete under Rule 41, and therefore the United States seeks to comply with it in an abundance of caution.

5. Recognizing both the *Nyah* court's suggestion that "execution" of a warrant occurs only after the provider produces the records sought to the law enforcement agent, and that prior experience has shown that production often occurs after the 14-day requirement provided by Rule 41 has lapsed, the government hereby moves for an Order pursuant to Rule 45(b)(1)(A) to extend the period of time for execution "before the originally prescribed or previously extended time expires." Accordingly, the government seeks an Order extending the period by which the

warrant must be executed from 14 days from the issuance of the warrant—February 12, 2021—until the government obtains the records produced by Facebook Inc. in response to the warrant.

Dated: January 29, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
EMILY A. POLACHK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-96 (TNL)

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LUTHORGABRIEL, LIZ_BROWNXOXO, WILSJADE, AND EMPRESS_LAFAY THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

ORDER EXTENDING TIME TO EXECUTE SEARCH WARRANT

The Court has reviewed the Application of the United States for an extension of time to execute the accompanying search warrant. Although the Court does not believe an extension is needed if the government executes the search warrant by serving it on the provider within 14 days of its issuance, *see United States v. Farrad*, 895 F.3d 859, 890 & n.23 (6th Cir. 2018) (stating that a warrant directed to a service provider is executed when an officer serves it on the provider), the Court understands the government's concerns about statements made in dicta in *United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019).

Therefore, the Court finds that the United States has shown good cause for the requested order. The United States must serve the above-captioned Search Warrant on Facebook Inc. within 14 days of issuance. To the extent that "execution" of the Search Warrant under Federal Rule of Criminal Procedure 41(e)(2)(A)(1) includes production of records by Facebook Inc. in response to the Search Warrant, it is ORDERED pursuant to Federal Rule of Criminal Procedure 45(b)(1)(A), that the date by which law enforcement

must execute this warrant is extended from February 12, 2021, to the date the government obtains the records produced by Facebook Inc. in response to the warrant.

January 29, 2021
Date

Tony N. Leung
The Honorable Tony N. Leung
United States Magistrate Judge