JHT:hcs

AO 106 (Rev. 04/10) Application for a Search Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

Case No. 21-mj-102 (KMM)

## APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

____ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 2421 | Mann Act |
| Title 18, United States Code, Sections 1956 and 1957 | Money Laundering |
| Title 18, United States Code, Section 1343 | Wire Fraud |
| Title 18, United States Code, Section 371 | Conspiracy |

The application is based on these facts:

**See Affidavit, incorporated here**

X Continued on the attached sheet.

[signature]
*Applicant's Signature*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime/Zoom and email) pursuant to Fed. R. Crim. P. 41(d)(3)

Julie Barrows, Postal Inspector
United States Postal Inspection Service
*Printed Name and Title*

Date: Feb. 1, 2021

[signature]
*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Katherine M. Menendez
United States Magistrate Judge
*Printed Name and Title*

Exh. 2
U.S. v. Luthor
25-cr-88(1)

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-mj-102 (KMM)<br><br>**Filed Under Seal by Order of the Court** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, being first duly sworn, do state the following is true and correct to the best of my knowledge and belief:

1. I make this Affidavit in support of an Application for a Search Warrant for information associated with Facebook accounts GABRIELSTYLES ("**Subject Account 7**"), LIZ.BROWN1982 ("**Subject Account 8**"), and JADE.WILSON.773 ("**Subject Account 9**") (collectively, the "Subject Accounts") that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a social-networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A, which is incorporated herein by reference. This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook Inc. to disclose to the Government records and other information in its possession, pertaining to the Subject Accounts.

2. I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS) and have been since March 2020, before which I was a Special Agent with

the Internal Revenue Service – Criminal Investigations and the Office of Inspector General for the U.S. Department of Agriculture. I have been a federal agent for 11 years. My duties include investigating fraud and other financial crimes in violation of federal criminal statutes. My duties also include investigating potential cases of child exploitation. In this capacity, I have been involved in investigating violations of various statutes relating to child pornography and sex trafficking, among others. I have gained knowledge and experience through training and everyday work in conducting these types of investigations. During the course of numerous investigations, I have conducted searches pursuant to federal search warrants covering physical premises as well as electronic service providers.

3. The facts in this Affidavit come from my training and experience, information provided by witnesses, and information provided to me by other law enforcement officers. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that located in the Subject Accounts are evidence, fruits, and/or contraband relating to violations of the following federal statutes: 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy). There is also probable cause to search the information described

in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. This is an investigation into a commercial sex and money laundering operation. As explained below, the Eden Prairie Police Department has received multiple tips that Gabriel Langford, also known as Gabriel Luthor, and others appear to be involved in sex trafficking and related offenses.

### A. Eden Prairie Police received a tip about Langford's sex trafficking in May 2019

6. In May 2019, the Eden Prairie Police Department received a tip that Gabriel Langford may be involved in sex trafficking. The tip came from the spa manager at a hair salon and spa located in Eden Prairie ("Individual S.M."). Individual S.M. reported that on the morning of May 7, 2019, two adult women arrived together for hairstyle appointments. The women were both new clients. The women drew attention because they were dressed in "sexy" attire and wore full makeup for their appointments. Individual S.M. said their attire was unlike that typically worn to a hair salon and more like the type of clothes a woman would wear to a nightclub. One of the women—Elizabeth Brown—had blond hair and appeared to be in her thirties. The other woman had brown hair and appeared to be in her early twenties. Individual S.M. said that Brown appeared to be in charge and that she answered all of the questions about the younger woman's hair and made the decisions about her salon services.

7. While the women were receiving their salon services, a man arrived with a third woman who appeared to be in her early twenties. The man, who Individual S.M. later identified as Gabriel Langford, was an approximately 35-year old African American man with manicured facial hair and eyebrows. According to Individual S.M., Langford appeared to be in charge of all three women. Langford and the women all left together.

8. After the appointment, Individual S.M. looked up Brown's Instagram account and found that she was using the account liz_brownxoxo ("**Subject Account 2**). Individual S.M. viewed **Subject Account 2** and confirmed that it belonged to Brown and that Brown was one of the women present at the salon. Individual S.M. recognized photos of the African American male who came into the salon on **Subject Account 2**. Comments on **Subject Account 2** showed that the man had his own Instagram account, luthorgabriel ("**Subject Account 1**).

9. Individual S.M. told police she believed the man had a sex trafficking relationship with the women. She explained that the women did not appear to be able to speak for themselves and the man seemed so controlling about their look. She also found their sexy clothing and makeup to be unusual and suspicious in light of the time and circumstances of their appointment.

10. Individual S.M. later told Eden Prairie police that the women had returned for additional appointments in 2019. Individual S.M. learned that the other two women present during the initial (and later) appointments were Jade

Wilson and Brianna Hughes. During later appointments, Brown described herself as a psychiatrist who traveled to Nevada frequently.

### B. Eden Prairie Police received a second tip about Langford's sex trafficking in July 2020

11. In July 2020, the Eden Prairie Police Department received another report about potential sex trafficking involving Langford, Brown, and Wilson. Individual J.R. contacted the police department. Individual J.R. is a 34-year old woman from Las Vegas, Nevada. Individual J.R. explained that on June 18, 2020, she applied for a job as an office manager at Golden Victory Medical. Golden Victory Medical was a behavioral health company in Las Vegas that saw "at-home" patients. On or about July 10, 2020, Individual J.R. received a call from a Golden Victory Medical employee who identified herself as "Jade." As explained below, "Jade" was later identified as Jade Elizabeth Wilson. Wilson spoke with Individual J.R. about the position and Individual J.R.'s background and experience.

12. Wilson offered to speak with Individual J.R. via FaceTime to make her feel more comfortable. Individual J.R. had a FaceTime conversation with Wilson and another woman, Elizabeth Brown. Wilson and Brown explained they needed assistance in "revamping" the operations and billing through their Las Vegas office. Wilson and Brown asked to meet with Individual J.R. the following day in Minneapolis, Minnesota.

13. On July 10, 2020, Brown sent a non-disclosure agreement to Individual J.R. Brown sent the non-disclosure agreement via an electronic signing program

called DocuSign. The email directed any replies be sent to izzybanks09@gmail ("**Subject Account 5**").

**From:** Elizabeth Brown via DocuSign <dse@docusign.net>
**Date:** July 10, 2020 at 2:26:50 PM PDT
**To:** [redacted]
**Subject: Completed: Please DocuSign: Non-Disclosure Agreement.pdf**
**Reply-To:** "Elizabeth Brown" <izzybanks09@gmail.com>

DocuSign

Your document has been completed

VIEW COMPLETED DOCUMENT

Elizabeth Brown

izzybanks09@gmail.com

All parties have completed Please DocuSign: Non-Disclosure Agreement.pdf.

Hello, in the first section to avoid any confusion- it has several blank fields under where you would enter your name and those blanks are for your address: street, city, state, zip code.

14. The non-disclosure agreement was between Individual J.R. and Golden Victory Medical. It explained:

> Information will be disclosed to the Recipient to determine whether the Recipient could assist Golden Victory Medical, and upon working with or for the company the Recipient will be held to the same restrictions.
>
> The Owner has requested and the Recipient agrees that the Recipient will protect confidential material and information which may be disclosed between the Owner and Recipient.

15. Individual J.R. electronically signed the non-disclosure agreement. Brown signed the agreement on behalf of Golden Victory Medical.

16. That same day, Wilson sent an email with the subject line "Travel Information" from jwilson.nvd@gmail.com ("**Subject Account 6**") to Individual J.R. The email contained information about the flight and hotel that had been booked for Individual J.R.

> **From:** Jade Wilson <jwilson.nvd@gmail.com>
> **Date:** July 10, 2020 at 3:17:23 PM PDT
> **To:** [redacted]
> **Subject: Travel information**
>
> Travel details:
>
> Flight from LAS to MSP 7/11/20, takeoff 9:15am landing 2:11pm. Confirmation #JP3CEA.Current status states a 10 minute delay in flight times. One carry on bag and one personal item included. Boarding pass attached.
>
> Hotel room booked at Radisson Blu at Mall of America, confirmation #W0KTNJ1. Checking in 7/11/20, checking out 7/13/20.
>
> Flight from MSP to LAS 7/13/20 takeoff 6:10pm landing 7:23pm. Same confirmation number, not able to check-in or view boarding pass until 24 hours prior to flight time.
>
> Please let me know if you have any questions!

17. Prior to flying to Minneapolis, Individual J.R. looked up Brown's National Provider Identifier number[1] and found that Brown had previously worked

---

[1] A National Provider Identifier is a unique 10-digit identification number issued to health care providers in the United States by the Centers for Medicare and Medicaid Services

with one of Individual J.R.'s professional contacts ("Individual D.F."). When Individual J.R. told Brown about the common connection, Brown warned her not to mention Individual D.F. to Langford, the owner of Golden Victory Medical, when she met with him the following day because they no longer did business with Individual D.F.

18. The following day—July 11, 2020—Individual J.R. flew first class from Las Vegas to Minneapolis. Golden Victory Medical paid for the flight. Individual J.R. felt uncomfortable going on the trip alone so her husband came with her on the trip. Prior to leaving, Individual J.R. also notified several family members of her destination and allowed them to access her cell phone's location.

19. Upon her arrival in Minneapolis, Individual J.R. was picked up in a limousine. The limousine ride was arranged by Golden Victory Medical. The limo took Individual J.R. to the Radisson Blu hotel at the Mall of America. According to Individual J.R., her hotel reservations were also made by Golden Victory Medical and Individual J.R. did not pay for the room. After Individual J.R. checked into the hotel, the limo drove her to a house located at 11631 Welters Way in Eden Prairie. Individual J.R.'s husband did not accompany her to the meeting.

20. Individual J.R. described 11631 Welters Way as a large house with two stone lions in the front. When Individual J.R. arrived for the meeting, a black Mercedes was parked in the driveway.

21. Individual J.R. met with Wilson, Brown, Langford, and an unknown female at the house. According to Individual J.R., Brown was dressed in provocative

clothing and Langford wore a suit. Individual J.R. said the other female had braces and appeared to be 16 to 18 years old.

22. According to Individual J.R., Langford ran the meeting. He talked about the company and the position. When Individual J.R. asked about everyone's role in the company, Langford responded "We are all together. Is that a problem?" Individual J.R. assured Langford it was not a problem, but she became uncomfortable. Individual J.R. talked about Kareo, a well-known company that provides software for medical offices but no one appeared to have any idea what she was talking about. This caused Individual J.R. to become suspicious about the legitimacy of their company (Golden Victory Medical).

23. Individual J.R. said that the women did not speak during the meeting. Individual J.R. believed that women were scared because they kept looking from person to person and looked pale. While at the house, Individual J.R. noticed that only a few of the rooms were furnished.

24. After about an hour and 15 minutes, Individual J.R. asked to leave and return to her hotel. Individual J.R. was required to sign a non-disclosure agreement before she left. Langford then left and Individual J.R. took an Uber back to her hotel. Once back at her hotel, Individual J.R. received a call from Langford, who explained that Individual J.R. was not a good fit for the company. Individual J.R. purchased return flights to Las Vegas for herself and her husband.

25. The day after she met with Langford, Individual J.R. sent a text to Wilson saying that the meeting was "weird as fuck" and "wasn't about business."

Individual J.R. told Wilson that she "look[ed] like you just got fucking kidnapped" and that she should "tell that dude [Langford] to stop using sharpies on his eyebrows." This description of Langford's eyebrows appears to be consistent with photos posted on the Subject Accounts.




26. Wilson responded by reminding Individual J.R. that she "signed an NDA" and that "Gabriel [Langford] is well known to enforce every contract." Wilson further said that "[a]ny attempt to harm the business will be dealt with through our legal team."

27. The following day (July 13, 2020), Individual J.R. called 911 to report Langford for potential human trafficking and fraud. Individual J.R. later provided copies of text messages she exchanged with Wilson prior to and after her trip to Minneapolis.

## C. The Langford House

28. According to the city of Eden Prairie Inspections Division, Flip Funding, LLC, purchased 11631 Welters Way, Eden Prairie, Minnesota, on or about March 22, 2019, for approximately $994,900. Later that same day, Brown put down $315,000 in cash on a contract for deed from Flip Funding, LLC. The terms of the contract for deed show a purchase price of $1,049,000, with a balance owed of $734,700. With an interest rate of 7%, Brown would make monthly payments of $6,429 for 61 months with a balloon payment of $342,531 due on March 22, 2024. The residence is a 9,890 square foot single-family home.



29. On or about January 22, 2020, an Eden Prairie city building inspector contacted the Eden Prairie Police Department about possible sex trafficking or prostitution at 11631 Welters Way. The building inspector had been told about the activity by a city plumbing inspector. The plumbing inspector told officers that he had recently conducted a plumbing inspection at 11631 Welters Way. The inspection related to ongoing renovation work on the property. The plumbing inspector reported that he saw suspicious activity in the residence. Specifically, the basement had several unusual features, including a large "grotto-style" hot tub and what the inspector described as a large "gang shower" for multiple people to shower at the same time. The plumbing inspector said he had never seen anything like the gang shower. The basement also had a glassed-in solarium room with a door that the plumbing inspector believed to be a place to view and pick women.

30. The plumbing inspector also inspected the upstairs bathroom. According to the plumbing inspector, Langford and a woman later identified as Brown stood in the staircase in a manner that appeared to be designed to deter the inspector from going upstairs. Although it was only 9:00 a.m., Brown was in full makeup. The inspector reported that there were approximately six women upstairs. The inspector said the women appeared to be 18-25 years old. The plumbing contractor was present with the plumbing inspector and told the inspector that the women were all Langford's girlfriends. The inspector told police he believed Langford was acting as a pimp for the women.

31. The plumbing inspector identified a photo of Langford as the man he saw. He also identified photos of Brown, Wilson, and Hughes as the women he saw at the residence.

32. On or about January 25, 2021, an Eden Prairie Police officer conducted a trash pull at 11631 Welters Way. The officer recovered: (a) mail addressed to Brown; (b) a prescription for contraceptive addressed to Wilson; (c) a prescription issued by Brown to Wilson for an antibiotic that is used to treat, among other things, vaginal infections. In my training and experience, I know that possession of these sorts of prescriptions may be consistent with commercial sex.

**D. Golden Victory Medical LLC**

33. According to Nevada Secretary of State records, Golden Victory Medical LLC is a limited liability company located in Henderson, Nevada. Langford and Brown are listed as the company's managers. According to the company's Facebook page, Golden Victory Medical offers "medication management, neurofeedback, and psychological testing to patients of all ages for the Las Vegas and surrounding areas." Wilson's LinkedIn account identifies her as the "Practice Manager" at Golden Victory Medical.

34. Golden Victory Medical has a business account at Bank of America. Records obtained from Bank of America show that Langford and Brown are both signatories on the account. The signature card identified them both as a "managing member" of the company.

35. The government obtained records related to accounts held by Langford, Brown, and Wilson at Bank of America. A review of these account shows that

Langford, Brown, and Wilson regularly send money back and forth in a suspicious manner.

36. For example, in January 2018, Brown transferred nearly $9,000 to Langford via Zelle, an online payment app. This represented all of the deposits into Langford's account that month.

Bank of America

**Your checking account**

GABRIEL ADAM ALEXANDER LANGFORD | Account # [redacted] | December 23, 2017 to January 25, 2018

**We have a new requirement for making cash deposits to our consumer accounts.**
You will now need to be an owner or authorized user on the account to make a cash deposit to a personal checking or savings account with an associate in our financial centers. This change helps us reduce risks from cash transactions involving persons who are not authorized on an account.

## Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 01/08/18 | Zelle Transfer Conf# bdb77162a; BROWN, ELIZABETH | 1,000.00 |
| 01/08/18 | Zelle Transfer Conf# T04567B3P; ELIZABETH BROWN | 999.99 |
| 01/08/18 | Zelle Transfer Conf# 535cf571c; BROWN, ELIZABETH | 200.00 |
| 01/11/18 | Zelle Transfer Conf# T045HXH6Z; ELIZABETH BROWN | 1,000.00 |
| 01/16/18 | Zelle Transfer Conf# T045TM99V; ELIZABETH BROWN | 999.99 |
| 01/16/18 | Zelle Transfer Conf# 23acdf8c4; BROWN, ELIZABETH | 500.00 |
| 01/18/18 | Zelle Transfer Conf# 017b7105c; BROWN, ELIZABETH | 999.99 |
| 01/18/18 | Zelle Transfer Conf# T0467SX95; ELIZABETH BROWN | 999.99 |
| 01/22/18 | Zelle Transfer Conf# 066a59bee; BROWN, ELIZABETH | 999.99 |
| 01/22/18 | Zelle Transfer Conf# T046LK6YB; ELIZABETH BROWN | 999.99 |
| 01/22/18 | Zelle Transfer Conf# XXXXXXXXX; BROWN, ELIZABETH | 300.00 |
| **Total deposits and other additions** | | **$8,999.94** |

37. Similarly, in February 2019, Langford received more than $10,000 in cash transfers from Brown.

**Bank of America**

GABRIEL ADAM ALEXANDER LANGFORD | Account # [redacted] | February 23, 2019 to March 25, 2019

## Deposits and other additions

| Date | Description | Amount |
|---|---|---|
| 02/25/19 | Zelle Transfer Conf# 00fea6c67; BROWN, ELIZABETH | 2,500.00 |
| 03/04/19 | Zelle Transfer Conf# a1cd3258a; BROWN, ELIZABETH | 1,500.00 |
| 03/04/19 | Zelle Transfer Conf# 18b6e7bc3; BROWN, ELIZABETH | 1,000.00 |
| 03/04/19 | Zelle Transfer Conf# 00ac27145; BROWN, ELIZABETH | 600.00 |
| 03/04/19 | Zelle Transfer Conf# d0543a005; BROWN, ELIZABETH | 400.00 |
| 03/08/19 | Zelle Transfer Conf# eadb485df; BROWN, ELIZABETH | 2,500.00 |
| 03/13/19 | Zelle Transfer Conf# ab28d3b9f; BROWN, ELIZABETH | 500.00 |
| 03/15/19 | Zelle Transfer Conf# 760fed6ee; BROWN, ELIZABETH | 2,000.00 |
| 03/18/19 | Zelle Transfer Conf# 3a5018578; BROWN, ELIZABETH | 1,800.00 |
| 03/20/19 | Zelle Transfer Conf# 7a1ba0349; BROWN, ELIZABETH | 500.00 |
| 03/20/19 | Zelle Transfer Conf# 89c3521c2; BROWN, ELIZABETH | 500.00 |
| 03/22/19 | Zelle Transfer Conf# 08f6ab564; BROWN, ELIZABETH | 500.00 |
| 03/25/19 | NV TLR transfer | 7,000.00 |
| **Total deposits and other additions** | | **$21,300.00** |

38. According to records obtained from Feldman Imports, Langford purchased a 2019 Mercedes Benz AMG GT Roadster for approximately $130,000 in July 2019. On the financing paperwork, Langford identified himself as the CEO of Golden Victory Medical and that he made $83,333 per month, which is equivalent to $999,961 a year.

### E. Langford's Cell Phone Contacts with Women Involved in Commercial Sex Work

39. During the investigation, the government obtained toll records of all incoming and outgoing calls to Langford's cell phone. The government then compared these records to records obtained from a law enforcement database that compiles advertisements for commercial sex work from online websites such as backpage.com. The search showed that Langford had telephone contact with several women involved in commercial sex work. For example, on or about January 9, 2020,

Langford had 9 cell phone contacts with a woman who advertised herself as "Jenna" and "Emma." Law enforcement located an online commercial sex advertisement for "Jenna." The ad included, among other things, nine photographs of "Jenna/Emma" in provocative poses and in various states of undress, including topless. The ad also included Jenna's rates for a variety of explicit sex acts, including "100 Dollars day/night f[**]k my soft p[***]y."

40. Similarly, on or about May 3 and 4, 2019, Langford had 5 contacts with a phone number with a (507) area code. Law enforcement located an online commercial advertisement related to this number. The ad included, among other things, photographs of the woman in provocative poses wearing lingerie. The ad said "[s]o if U know how to have Fun hit me up Im waiting No cops No low baller and my picture are real I dont send picture of less u want to pay for them . . ."

41. On or about May 9, 2019, Langford had 5 contacts with a phone number with a (702) area code. Law enforcement located an online commercial advertisement related to this number. The ad included, among other things, photographs of the woman in provocative poses. In the ad, the woman said "I am an elite companion and I remain drug and disease free. . . . Luxury and discretion will give you the freedom to relax and fulfill your deepest desires and fantasies!"

**F. The Instagram Accounts**

42. The investigation has shown that Langford, Brown, Wilson, and Hughes all have Instagram accounts.

43. The government has reviewed **Subject Account 1**, which belongs to Langford. Langford has posted many photos of himself with Brown, Wilson, and

Hughes on **Subject Account 1**. Brown, Wilson, and Hughes left comments about these photos on **Subject Account 1** using their own Instagram accounts. Brown and Wilson have left comments about these photos on **Subject Account 1**. For example, on or about December 2, 2019, Brown (using **Subject Account 2**) commented on a photo of Langford and Brown posted on **Subject Account 1**. Brown (using **Subject Account 2**) left a comment about the photo on **Subject Account 1** that read "This guy, no one gives more, endless love and ambition, drive, and leaders--@luthorgabriel you're so much more than words can say. #lovehim #justdoit #drive #ambition."

44. On or about September 12, 2019, Langford posted a photo of himself and Wilson on **Subject Account 1**. Wilson used her own account, wilsjade ("**Subject Account 3**") commented about the photo on **Subject Account 1**. Wilson wrote "We so cute. #hestheman #babe #vegastrip."

45. On or about May 30, 2020, Brown posted photos of the pool at 11631 Welters Way on **Subject Account 2**. On or about October 13, 2019, Brown posted a photo of herself, Wilson, Hughes, and Mitchell on **Subject Account 2**. Brown wrote "Relaxing evening out with my ladies. #lovethem #gno." On or about May 30, 2020, Brown posted photos of the new pool at 11631 Welters Way on **Subject Account 2**.

46. On or about February 8, 2020, Brown posted to **Subject Account 2** a photo of her and Hughes. Brown also posted a message related to the photo: "Happy Birthday Beautiful Bri! To the most loving gentle patient soul I know . . . you have taught me to always have fun, be a mermaid, make a wish with every eyelash and

dandelion you blow away, build a fort and sleep in it, have a pillow fight make everyday fun and never forget to dance, sing, and play I love you Bri . . ."

47. Hughes uses the Instagram account empress_lafay ("**Subject Account 4**"). The homepage for **Subject Account 4** shows a photo of Hughes with Langford. The account is set to private.

48. On January 29, 2021, Magistrate Judge Tony N. Leung issued federal search warrants for the contents of **Subject Accounts 1-6**.

**G. The Facebook Accounts**

49. The investigation has shown that Langford, Brown, and Wilson all have Facebook accounts.

50. **Subject Account 7** is Langford's Facebook account. The profile photo on **Subject Account 7** shows a photo of Langford and Brown as well as a photo of a black Mercedes Benz sedan parked in front of 11631 Welters Way.

51. Langford has posted photos of himself with both Brown and Wilson on **Subject Account 7**. On December 10, 2020, Langford posted a photo of himself and Wilson on **Subject Account 7**. The following day—December 11, 2020—Langford posted a photo of himself and Brown on **Subject Account 7**.

52. **Subject Account 8** is Brown's Facebook account. The profile photo on **Subject Account 8** is a photo of Brown and Langford. Brown posted this profile photo on December 24, 2020. Brown had previously posted another profile photo for **Subject Account 8** on December 9, 2020. That photo was also a photo of Brown and Langford.

53. Brown regularly posts photos of herself and Langford on **Subject Account 8**. For example, she posted photos of herself and Langford to **Subject Account 8** on or about September 26 and November 18, 2020.

54. **Subject Account 9** is Wilson's Facebook account. Wilson's profile photo on **Subject Account 9** is a photo of her and Langford. Wilson posted that profile photo on December 10, 2020. Wilson's prior profile photo on **Subject Account 9** was also a photo of her and Langford. Wilson posted that photo on or about October 19, 2020.

55. In my training and experience on these types of social media posts, individuals often communicate on these platforms, including Facebook, to drive traffic to other sites, gather individuals for a common interest, and/or for marketing purposes.

## FACEBOOK

56. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

57. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip

code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

58. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

59. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

60. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status"

updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

61. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

62. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or

item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

63. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

64. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

65. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

66. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

67. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

68. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

69. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

70. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

71. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information

may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

72. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

73. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

74. Based on the information above, the computers of Facebook are likely to contain all the material described above with respect to the Subject Accounts, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

75. Based on the foregoing, I request that the Court issue the proposed Search Warrant. Because the Warrant will be served on Facebook Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Julie Barrows
Postal Inspector
United States Postal Inspection Service

SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime/Zoom and email) pursuant to Fed. R. Crim. P. 41(d)(3)
on February 1st, 2021

THE HONORABLE KATE M. MENENDEZ
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with the Facebook user IDs GABRIELSTYLES, LIZ.BROWN1982, and JADE.WILSON.773 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B
## Particular Things to be Seized

## I. Information to be disclosed by Facebook, Inc. ("Facebook")

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including user IDs GABRIELSTYLES, LIZ.BROWN1982, and JADE.WILSON.773: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2019 to February 1, 2021;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 1, 2019 to February 1, 2021, including Exchangeable Image

File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from January 1, 2019 to February 1, 2021, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from January 1, 2019 to February 1, 2021;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy), those violations involving Gabriel Langford, Elizabeth Brown, Jade Wilson, and Brianna Hughes and occurring after January 1, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence of sex trafficking and Mann Act violations, to include evidence of force, threats of force, fraud, or coercion; evidence of commercial sex work, to include advertisements and communication with commercial sex purchasers; evidence of travel, including travel between Las Vegas, Nevada, and Minneapolis, Minnesota;

(b) Evidence of the relationships between Gabriel Langford, also known as Gabriel Luthor, and Elizabeth Brown, Jade Wilson, and Brianna Hughes, to include their financial and professional relationships;

(c) Evidence about the business of Golden Victory Medical;

(d) The identity of the person(s) who communicated with the user ID about matters relating to sex trafficking, commercial sex work, money laundering, and health care/wire fraud including records that help reveal their whereabouts.

(e) Attribution evidence, to include the identity of the person(s) who created or used the user ID and records that help reveal the whereabouts of such person(s);

(f) Evidence of how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner; and

(h) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ______________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, Inc. ("Facebook"), and my title is __________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of ____________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b. such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

____________________ ______________________________________

Date Signature

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

PETITION OF THE UNITED STATES FOR AN ORDER SEALING SEARCH WARRANT, AFFIDAVIT, RETURN, PETITION AND ORDER FOR SEALING

COMES NOW the United States of America by its undersigned attorneys and in support of its Petition for an Order Sealing Search Warrant, Affidavit, Return, and Petition in the above-captioned matter, states as follows:

1. On February 1, 2021, The Honorable Katherine M. Menendez issued a warrant authorizing the search of information stored in the servers that are associated with Facebook accounts gabrielstyles, liz.brown1982, and jade.wilson.773 that are stored at premises controlled by Facebook Inc.

2. The Affidavit of Postal Inspector Julie Barrows, submitted in support of the search warrant, sets forth facts regarding an ongoing investigation into violations of the following federal statutes: 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy).

3. The search warrant documents presented to this Court for *in camera* review include detailed and highly sensitive investigative information. Disclosure of the information would jeopardize an ongoing investigation into alleged criminal

offenses and the privacy of individuals unlikely to be, and/or who may ultimately not be, indicted.

4. The Court's power to prevent disclosure of its files, especially for a limited period of time, is well established. This general power has been recognized by the United States Supreme Court.

> It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over some records and files and access has been denied where court files might have become a vehicle for improper purposes.

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).

5. The Eighth Circuit has recognized the Court's specific power to restrict access to search warrant documents like those at issue here:

> We hold that the qualified first amendment right of public access extends to the documents filed in support of search warrants and that the documents may be sealed if the district court specifically finds that sealing is necessary to protect a compelling government interest and that less restrictive alternatives are impracticable.

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

6. The Eighth Circuit and district courts within the Circuit have recognized that the circumstances surrounding ongoing investigations constitute compelling government interests warranting the sealing of search warrant documents. For example, the Eighth Circuit has approved sealing search warrant documents that "describe[d] in detail the nature, scope and direction of the government's investigation and the individuals and specific projects involved," resulting in "substantial probability that the government's on-going investigation

would be severely compromised if the sealed documents were released." *Gunn*, 855 F.2d at 574. Moreover, the Eighth Circuit has recognized that search warrant affidavits permeated with references to individuals other than the subjects of the search warrant and/or with information revealing the nature, scope and direction of the government's ongoing investigation may be sealed not only because they present compelling government interests justifying sealing, but also because less restrictive alternatives to sealing are in such circumstances impracticable. *Id.*

7. Based upon the foregoing and all the files and proceedings to date, the United States respectfully requests that this Court issue an Order Sealing the Warrant, Application, Affidavit of Postal Inspector Julie Barrows, Return, this Petition, and the Sealing Order until the close of business on August 1, 2021, unless a compelling interest is shown by the United States for a continuation of the sealing.

Dated: February 1, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
EMILY A. POLACHEK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

ORDER FOR SEALING

This Court, having reviewed the Petition of the United States herein, finds that the United States has shown a compelling interest in the sealing of documents in the above-captioned matter because:

a. Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised.

b. Nondisclosure of the search warrant documents is necessary to protect the privacy of an individual who may ultimately remain unindicted.

This Court also finds that less restrictive alternatives to sealing are impracticable or not appropriate.

It is therefore:

ORDERED that all documents filed in the above-captioned matter are hereby sealed until the close of business on August 1, 2021.

IT IS FURTHER ORDERED that these documents will be unsealed at the above time unless further compelling interest is shown by the United States for continuing this Order for an additional period of time.

Feb. 1, 2021
Date

The Honorable Katherine M. Menendez
United States Magistrate Judge

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

**APPLICATION FOR ORDER COMMANDING FACEBOOK INC. NOT TO NOTIFY ANY PERSON OF THE EXISTENCE OF WARRANT**

The United States requests that the Court order Facebook Inc. not to notify any person (including the subscribers or customers of the account(s) listed in the warrant) of the existence of the attached warrant until August 1, 2021.

1. Facebook Inc. is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2). Pursuant to 18 U.S.C. § 2703, the United States obtained the attached warrant, which requires Facebook Inc. to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.*

2. In this case, such an order would be appropriate because the attached warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to

the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

3. WHEREFORE, the United States respectfully requests that the Court grant the attached Order directing Facebook Inc. not to disclose the existence or content of the attached warrant until August 1, 2021, except that Facebook Inc. may disclose the attached warrant to an attorney for Facebook Inc. for the purpose of receiving legal advice.

4. The United States further requests that the Court order that this application and any resulting order be sealed until August 1, 2021. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good

cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Dated: August 1, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*
BY: JOSEPH H. THOMPSON
EMILY A. POLACHEK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

# ORDER

The United States has submitted an application pursuant to 18 U.S.C. § 2705(b), requesting that the Court issue an Order commanding Facebook Inc., an electronic communications service provider and/or a remote computing service, not to notify any person (including the subscribers or customers of the account(s) listed in the warrant) of the existence of the attached warrant until August 1, 2021.

The Court determines that there is reason to believe that notification of the existence of the attached warrant will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5).

IT IS THEREFORE ORDERED under 18 U.S.C. § 2705(b) that Facebook Inc. shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, until August 1, 2021, except that Facebook Inc. may disclose the attached warrant to an attorney for Facebook Inc. for the purpose of receiving legal advice.

IT IS FURTHER ORDERED that the application and this Order are sealed until August 1, 2021.

Feb. 1, 202
Date

The Honorable Katherine M. Menendez
United States Magistrate Judge

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773
THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

APPLICATION OF THE UNITED
STATES FOR AN EXTENSION OF TIME TO EXECUTE SEARCH WARRANT

COMES NOW the United States of America, by its undersigned attorneys and in support of an application for an Order extending the time by which Facebook Inc. must execute the search warrant:

1. On February 1, 2021, The Honorable Katherine M. Menendez issued the attached search warrant authorizing the search of information maintained by Facebook Inc. The search warrant commanded law enforcement to execute the search warrant within 14 days of the issuance of the warrant pursuant to Federal Rule of Criminal Procedure 41—*i.e.*, by February 15, 2021. The Affidavit of Postal Inspector Julie Barrows submitted in support of the search warrant sets forth facts regarding an ongoing criminal investigation. The factual allegations in this application are also based on information provided from Postal Inspector Julie Barrows.

2. Production by service providers such as Facebook Inc. pursuant to search warrant routinely occurs outside Rule 41's 14-day period for execution. Indeed, production often occurs more than 30 days after service of a warrant on the service provider. Reasons for delay in production are outside the government's control, and may include the complexity or volume of data requested in the warrant itself, as well

as the volume of other requests for information received by Facebook Inc.

3. On June 26, 2019, a panel of the Eighth Circuit Court of Appeals issued an opinion in *United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019). The Eighth Circuit addressed the question of when a warrant issued to Facebook was executed for purposes of Federal Rule of Criminal Procedure 41: "The district court thought the warrant was executed when the officers delivered it to Facebook," while "Nyah counters that the warrant was not executed until the officers seized the evidence from Facebook." *Id.* at 699. In dicta, the *Nyah* court observed that "the text of Rule 41 suggests that a warrant is not fully executed until officers have seized the property that they are authorized to take" and "the authorized seizure of property under the warrant constitutes part of the execution of the warrant." *Id.* The court, however, concluded that it did not need to "definitively" determine whether the warrant was "executed" within fourteen days after the warrant was issued because even if there were a violation of Rule 41, there was no basis for suppression. *Nyah*, however, recommends a remedy to any Rule 41 problem, which is to "simply obtain a fresh warrant with a renewed period of fourteen days within which to execute the warrant." *Id.* at 700.

4. Although *Nyah* does not contain a *holding* that a Rule 41 violation occurs when providers like Facebook produce records in response to a search warrant more than 14 days after the warrant is issued, Judge Colloton's opinion strongly suggests such an interpretation. The United States disagrees with this interpretation, and contends that, as the Sixth Circuit held in *United States v.*

*Farrad*, 895 F.3d 859, 890 & n.23 (6th Cir. 2018), a warrant directed to a service provider is executed when an officer serves it on the provider. *Nyah* also conflicts with the Eighth Circuit's earlier decision in *United States v. Welch*, 811 F.3d 275, 280-81 (8th Cir. 2016). In considering when the time limit for providing notice of a search warrant under Fed. R. Crim. P. 41(f) began to run, the *Welch* court pinned the timing of a warrant's execution to the date when officers served the warrant on the provider (via installation of software on a server). Nevertheless, *Nyah* is the only Eighth Circuit opinion to speak directly to when execution is complete under Rule 41, and therefore the United States seeks to comply with it in an abundance of caution.

5. Recognizing both the *Nyah* court's suggestion that "execution" of a warrant occurs only after the provider produces the records sought to the law enforcement agent, and that prior experience has shown that production often occurs after the 14-day requirement provided by Rule 41 has lapsed, the government hereby moves for an Order pursuant to Rule 45(b)(1)(A) to extend the period of time for execution "before the originally prescribed or previously extended time expires." Accordingly, the government seeks an Order extending the period by which the

warrant must be executed from 14 days from the issuance of the warrant—February 15, 2021—until the government obtains the records produced by Facebook Inc. in response to the warrant.

Dated: August 1, 2021

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
EMILY A. POLACHK
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-102 (KMM)

IN THE MATTER OF THE SEARCH OF FACEBOOK ACCOUNTS GABRIELSTYLES, LIZ.BROWN1982, AND JADE.WILSON.773 THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.

**SEALED BY ORDER OF THE COURT**

ORDER EXTENDING TIME TO EXECUTE SEARCH WARRANT

The Court has reviewed the Application of the United States for an extension of time to execute the accompanying search warrant. Although the Court does not believe an extension is needed if the government executes the search warrant by serving it on the provider within 14 days of its issuance, *see United States v. Farrad*, 895 F.3d 859, 890 & n.23 (6th Cir. 2018) (stating that a warrant directed to a service provider is executed when an officer serves it on the provider), the Court understands the government's concerns about statements made in dicta in *United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019).

Therefore, the Court finds that the United States has shown good cause for the requested order. The United States must serve the above-captioned Search Warrant on Facebook Inc. within 14 days of issuance. To the extent that "execution" of the Search Warrant under Federal Rule of Criminal Procedure 41(e)(2)(A)(1) includes production of records by Facebook Inc. in response to the Search Warrant, it is ORDERED pursuant to Federal Rule of Criminal Procedure 45(b)(1)(A), that the date by which law enforcement

must execute this warrant is extended from February 15, 2021, to the date the government obtains the records produced by Facebook Inc. in response to the warrant.

Feb. 1, 2021
Date

The Honorable Katherine M. Menendez
United States Magistrate Judge