JHT:hcs

AO 106 (Rev. 04/10) Application for a Search Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF THE SINGLE-FAMILY HOME DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. 23-mj-15 (DJF)

## APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

___ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 1341 | Mail Fraud |
| Title 18, United States Code, Section 1343 | Wire Fraud |
| Title 18, United States Code, Section 1347 | Government Healthcare Benefits Program Fraud |
| Title 18, United States Code, Section 1349 | Conspiracy |
| Title 18, United States Code, Section 1956/1957 | Money Laundering |

The application is based on these facts:

**See Affidavit, incorporated here**

X Continued on the attached sheet.

*Applicant's Signature*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime, Zoom and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Julie Barrows, Postal Inspector
USPIS

*Printed Name and Title*

Date: Jan. 9, 2023

*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Dulce J. Foster
United States Magistrate Judge

*Printed Name and Title*

Exh. 3
U.S. v. Luthor
25-cr-88(1)

JHT:hcs

AO 93 (Rev. 12/09) Search and Seizure Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF THE SINGLE-FAMILY HOME DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. 23-mj-15 (DJF)

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the State and District of Minnesota:

**See Attachment A, incorporated here.**

The person or property to be searched, described above, is believed to conceal:

**See Attachment B, incorporated here.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before January 23, 2023
*(not to exceed 14 days)*

X in the daytime 6:00 a.m. to 10 p.m. _ at any time in the day or night as I find reasonable cause has been established.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the current United States Magistrate Judge on duty.

Date and Time issued: Jan. 9, 2023 - 2:51 PM

[signature]
*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Dulce J. Foster
United States Magistrate Judge
*Printed Name and Title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ________________

________________________
Executing officer's signature

________________________
Printed Name and Title

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime, Zoom and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

________________________
United States Magistrate Judge

________________
Date

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 11631 WELTERS WAY, EDEN PRAIRIE, MINNESOTA 55347 | Case No. 23-mj-15 (DJF)<br><br>**Filed Under Seal Pursuant to Order** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Julie Barrows, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS) and have been since March 2020, before which I was a special agent with the Internal Revenue Service – Criminal Investigations and the Office of Inspector General for the U.S. Department of Agriculture. I have been a federal law enforcement officer since October 2009.

2. My primary duties as a postal inspector include investigating allegations of violations of Title 18, United States Code, Section 1341 (mail fraud). My experience includes training in and investigation of mail fraud and other related offenses, including wire fraud and money laundering. My duties also include investigating potential cases of child exploitation. In this capacity, I have been involved in investigating violations of various statutes relating to child pornography and sex trafficking, among others. I have gained knowledge and experience through training and everyday work in conducting these types of investigations. During the course of numerous investigations, I have conducted searches pursuant to federal

search warrants covering physical premises and electronic devices, as well as electronic service providers.

3. Based upon my work experience and training, as well as discussions with law enforcement agents, I know that:

a. Businesses generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are usually kept and maintained for extended periods of time, often several years, at the place of business or residence. I know from previous investigations that such records are also often maintained at the residence of subjects.

b. Individuals, including those receiving income from fraud schemes, often maintain within their residence records of assets and financial transactions. These items often include financial statements, receipts, invoices, bank statements and records, bank money order and cashier's check receipts, property records, investment records, assets, stock and bond records, tax records, correspondence, diaries, and handwritten notes. These records are often maintained for extended periods of time, often several years.

c. Due to the increasing prevalence of electronic communications and storage, paper records can be converted and stored electronically. As a result, any record or document could be found in either paper or electronic format.

d. Almost all wire transfers, even intrastate wire transfers, cross state lines.

4. This affidavit is submitted in support of an application for a warrant to search:

a. The single-family home located at 11631 Welters Way, Eden Prairie, Minnesota, as further described in Attachment A ("**Subject Premises**");

for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering) (together, the "**Subject Offenses**").

5. This affidavit is based on my personal knowledge, interviews of witnesses, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a search warrant for the **Subject Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, instrumentalities, and fruits of violations of the **Subject Offenses** are located at the **Subject Premises**.

## I. OVERVIEW

6. This is a health care fraud investigation. As explained below, individuals residing at the **Subject Premises**, including but not limited to Gabriel LUTHOR, also known as Gabriel Langford, and Elizabeth BROWN, have engaged in

a large-scale scheme to fraudulently obtain reimbursements from Medicare for unnecessary or ineffective mental health services. Specifically, LUTHOR and BROWN are operating a company called Golden Victory Medical, LLC (GVM) that purports to perform "Psychiatric Medication Management & Neurofeedback" therapies, but is actually providing unnecessary, ineffective, unrequested, and/or excessive services, and then submitting fraudulent and inflated bills for same to Medicare and private insurance companies. To date, the conspirators have misappropriated millions of dollars in Medicare funds to benefit a lavish lifestyle.

## II. LOCATION TO BE SEARCHED

7. The **Subject Premises** is a single-family home located at 11631 Welters Way, Eden Prairie, Minnesota. The **Subject Premises** is the residence of LUTHOR and BROWN, and several others. According to Minnesota Secretary of State records, the **Subject Premises** is also the registered office address and principal place of business for Golden Victory Medical.

8. According to county property records, on or about March 22, 2019, BROWN purchased the **Subject Premises** for approximately $994,900 on contract for deed from Flip Funding, LLC, with a down payment of $315,000.

9. According to county property records, on or about April 29, 2022, Banken Holdings, LLC, purchased the **Subject Premises** for $1,700,000 with a $595,000 down payment. According to the records of the Minnesota Secretary of State, Flip Funding, LLC and Banken Holdings, LLC, have the same managing individual.

10. According to county property records, on or about April 29, 2022, Olympia, LLC, purchased the **Subject Premises** on contract for deed from Banken

Holdings, LLC, for $1,883,000 with a $633,000 down payment. According to records of the Minnesota Secretary of State, BROWN is the registered agent of Olympia, LLC, with an office address located at the **Subject Premises**.

11. On November 2, 2022, at approximately 12 p.m., Eden Prairie Police Officers went to the **Subject Premises**. LUTHOR answered the door. Body-worn camera footage also showed BROWN, and two of LUTHOR's girlfriends ("J.W." and "B.H.") inside the residence.

12. On December 15, 2022, your affiant drove by the **Subject Premises** and observed a black Hummer with Minnesota license plate CUB161 and a black Mercedes-Benz with Minnesota license plate DJN868 parked in the driveway. According to Minnesota Driver and Vehicle Services, the black 2005 Hummer is registered to LUTHOR (under the name Gabriel Langford), and BROWN is the registered owner of the 2018 black Mercedes-Benz.

13. U.S. Postal Service records show that BROWN, LUTHOR, and GVM receive mail at the **Subject Premises**. LUTHOR received mail addressed to him at the **Subject Premises** as recently as January 2, 2023. BROWN received mail addressed to her at the **Subject Premises** as recently as January 2, 2023. GVM received mail addressed to it at the **Subject Premises** as recently as January 2, 2023.

## III. BACKGROUND

### A. The Federal Medicare Program

14. This warrant relates to an ongoing investigation into a scheme to defraud the United States Department of Health and Human Services' ("HHS")

Medicare program. 42 U.S.C. § 1395 et seq. Historically, the Medicare Program has generally functioned as a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs. Medicare is available to most individuals 65 years of age and older. Medicare has also been extended to persons under age 65 who are receiving disability benefits from Social Security or the Railroad Retirement Board and those having End Stage Renal Disease.

15. HHS is responsible for administration and supervision of the Medicare program. The Centers for Medicare & Medicaid Services (CMS), an agency within HHS, is directly responsible for administering the Medicare program.

16. The Medicare program is comprised of four parts. Medicare Part B ("Medical Insurance") is a federal-subsidized, voluntary insurance program that covers the fee schedule amount for services, outpatients care, medical supplies, and laboratory services. 42 U.S.C. § 1395j-w-5.

17. Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). Separate payments are made by those intermediaries for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011.

18. To participate in the Medicare program, a healthcare provider must file an agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The agreement requires compliance with the requirements that the Secretary deems necessary for

participation in the Medicare program in order to receive reimbursement from Medicare.

19. Among other things, professionals providing mental health services to Medicare recipients are required to observe rules designed to ensure quality of care, medical necessity, and only bill for services actually provided, for medically necessary services, and/or for services performed by a properly supervised or qualified employee.

### B. The Federal Medicaid Program

20. The federal Medicaid program provides medical care and services to low-income persons ("recipients"), who meet certain income and other eligibility criteria.

21. HHS is responsible for administration and supervision of the Medicaid program. And CMS is also directly responsible for administering the Medicaid program.

22. Like with respect to the federal Medicare program, professionals providing mental health services to Medicaid recipients are required to observe rules designed to ensure quality of care, medical necessity, and only bill for services actually provided, for medically necessary services, and/or for services performed by a properly supervised or qualified employee.

### C. Golden Victory Medical, LLC

23. This warrant is related to the improper billing for services purportedly provided to Medicare beneficiaries by GVM. As described below, GVM's clinics are all located outside of the state of Minnesota, and purport to provide mental health services to clients outside of the state of Minnesota.

24. According to the Nevada Secretary of State, GVM was formed on April 24, 2018. On May 31, 2019, the filing was updated to reflect BROWN as Manager of GVM. On March 12, 2020, the filing was updated to reflect LUTHOR as Manager of GVM.

25. According to the Minnesota Secretary of State, GVM filed as a registered Minnesota business on May 2, 2022. According to that filing, the registered officers for GVM are LUTHOR and BROWN, and the registered office, place of business, and address are all listed as the **Subject Premises**.

26. According to its website, as of January 5, 2023, GVM provides "high-quality, empathetic, personalized healthcare to as many patients as possible" in five locations: Delray Beach and Ponte Vedra, Florida; Las Vegas, Nevada; Stillwater, Oklahoma; and Wichita, Kansas. According to its website, the GVM team displays photos of many GVM employees. Included on the website is a photo of BROWN along with her biographical information to include her title as Chief Executive Officer (CEO) and co-owner of GVM.

27. Notably absent from GVM's website is any reference to the **Subject Premises**, LUTHOR, "J.W.," "B.H." or "B.M."

### 1. The Inception of GVM's Fraudulent Billing Practices in and around 2019

28. On or about January 29, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for one of BROWN's email accounts ("izzybanks09@gmail.com," referred to hereafter as "BROWN's Gmail Account"). *See* 21-MJ-97-TNL (D. Minn.).

29. One email sent to BROWN's Gmail Account on or about October 10, 2019, contained an attachment depicting a GVM brochure. According to the brochure, GVM performs "Psychiatric Medication Management & Neurofeedback." According to GVM's website on January 3, 2023, "[n]eurofeedback, also known as EEG (electroencephalogram) biofeedback, is a therapeutic intervention that provides immediate feedback from a computer-based program that assesses a client's brainwave activity. The program then uses sound or visual signals to reorganize or retrain these brain signals. By responding to this process, clients learn to regulate and improve their brain function and alleviate symptoms of various neurological and mental health disorders."

30. According to an expert in the field, neurofeedback can be a legitimate form of mental health treatment when it is offered in tandem with therapy in a multi-modal treatment approach. During the course of the investigation by law enforcement, including interviews with former GVM staff, former and current GVM patients, and based on law enforcement's review of GVM business records, GVM does not appear to practice neurofeedback in a manner consistent with the recommendations of the expert or BROWN's own statements and materials.

31. Featured on the GVM brochure is a photo of BROWN, her credentials and accomplishments, and her contact information. The brochure also identifies BROWN as the founder of GVM.




32. As depicted in the GVM brochure described and shown above, BROWN was the founder and face of GVM. BROWN is a nurse practitioner with Advanced Practice Registered Nurse (APRN) licensed in Nevada and Minnesota, with a focus on family medicine.

33. According to GVM's billing company's records, in 2019 (the first full year after GVM was first created, based on Nevada Secretary of State records), GVM billed over $16,000,000 to Medicare, Medicaid, and other private insurance companies; and collected over $4,000,000 of the amounts billed. At that time, BROWN and one other RN were the only "rendering providers" at GVM. In 2019 alone, BROWN billed for over 28,000 patient encounters. In other words, assuming BROWN was working

every day in 2019, according to the bills submitted by GVM, BROWN rendered services to over 76 patients a day.

34. Further, as of 2019, BROWN was not licensed to provide or supervise mental health services. Specifically, according to the Nevada State Board of Nursing, BROWN's APRN license permits her to prescribe medication, among other select treatments. In or around May 2022, BROWN was subject to disciplinary action by the Nevada State Board of Nursing for practicing outside of her focus population and for failing to obtain a license to practice in the area of mental health. BROWN admitted to these violations and agreed to complete courses to add the mental health focus to her APRN license.

35. Similarly, the Minnesota State Board of Nursing Review Panel also initiated action against BROWN's APRN license. On or about dated August 4, 2022, BROWN signed a Stipulation and Consent Order that placed her license in a conditional status until she completed the requirements of the Nevada State Board of Nursing.

**2. GVM's Excessive Billing Continues through 2021**

36. According to records provided by Noridian Healthcare Solutions of Nevada ("Noridian")[1], in 2020 GVM billed the Medicare program approximately $47,000,000 (which may include duplicate claims) and Noridian paid out approximately $8,950,000 to GVM.

---

[1] Noridian is a company based in North Dakota that, according to Noridian's website, "provid[es] high quality administrative services to Medicare." In other words, Noridian is the conduit through which federal Medicare monies are funneled, to benefit insured individuals in the state of Nevada.

37. According to GVM's billing records, provided by GVM's former CEO Bryan Stewart, the 2021 GVM Charge Report for seven GVM providers, including BROWN, show that in 2021 GVM billed $2,900,884.69 to Medicare, Medicaid, and other private insurance companies.

38. According to Noridian records, BROWN and seven other providers were listed as a "rendering provider" at GVM in 2018, 2019, 2020 and 2021 (most recent documents provided). The rendering providers were listed based on their employment status with GVM and may not have been consistent through the entire time. During that time (January 2018 to March 2021), GVM billed for over 776,672 patient encounters. BROWN was listed as the rendering provider in 591,478 of those patient encounters. In 2020, BROWN was listed as the rendering provider in 164,791 patient encounters (billed at $26,694,020.35 and paid $4,782,422.08) In other words, assuming BROWN was working every day in 2020, according to the bills submitted by GVM, BROWN rendered services for over 451 patient encounters a day.

39. Some of the patient encounters billed by BROWN in 2020 appear to have occurred while BROWN was on vacation or otherwise posting on social media about traveling or partying. For example, according to Noridian records, BROWN billed for 204 patient encounters occurring between December 7, 2020 and December 10, 2020 (billed at $36,070.00 and paid at $6,279.89). However, according to a document in the GoogleDrive folder associated with BROWN's Gmail Account, BROWN, along with LUTHOR and others, booked a stay at a resort in Vail, Colorado for this time. According to the Google Drive document—which outlines in 12 pages the itinerary

and plans for this trip—BROWN and LUTHOR's group retained a private chef for this stay.

40. According to records from BROWN's Instagram Account,[2] on or about December 12, 2020, BROWN also posted the below photo of herself with the following text: "#vailcolorado…@luthorgabriel love you so much – thank you for an amazing vacation."




41. According to an email from GVM's billing company, as of January 2021, GVM had collected over $5,000,000 from Medicare, Medicaid and private payers for services purportedly rendered by GVM in 2020.

42. According to Noridian records, nearly all of BROWN's "services" billed for in 2020 and 2021 were for mental health-related treatments. However, as

[2] On or about January 29, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for BROWN's Instagram Account ("liz_brownxoxo"). *See* 21-MJ-96-TNL (D. Minn.).

explained above, BROWN was not licensed to provide mental health services at that time.

43. Moreover, according to former GVM CEO Bryan Stewart, LUTHOR and/or BROWN repeatedly thwarted Stewart's efforts to end GVM's excessive billing practices. In a civil lawsuit filed by Stewart against GVM, Stewart asserts that—throughout late 2021 and early 2022 when Stewart was CEO—GVM improperly coded medical procedures and utilized flawed documentation practices, "resulting in overpayments to [GVM] by federal payers." According to Stewart, approximately 65% of the patients at Golden Victory are Medicare or Medicaid beneficiaries.

44. In February 2022, and while still GVM's CEO, Stewart authorized GVM's general counsel "to hire an independent third party to conduct a systematic audit of the coding and billing practices within the organization." Health Information Associates ("HIA") was selected to conduct the audit and on or about April 28, 2022, HIA informed GVM's management of the widespread erroneous coding and documentation practices HIA identified in a sampling of GVM's bills submitted to payers. For example, according to HIA's audit findings, GVM's coding and billing accuracy levels were in the 32.44% range, when the industry standard is for accuracy levels to fall within the 95% range.

45. According to Stewart, when Stewart attempted to address the issues presented in the HIA audit result, LUTHOR and BROWN both pushed back. According to Stewart, LUTHOR told Stewart he planned to falsely blame any errors on GVM's billing company to avoid any civil or criminal penalties.

### D. One of LUTHOR's "Girlfriends" Provides Unpaid Labor in Furtherance of GVM's Operations

46. This investigation started, in part, because in or around May 7, 2019, a salon manager observed LUTHOR and BROWN bringing in two clients for salon services, and LUTHOR was directing the hairstylist with respect to how these clients' hair should be cut and styled; while the clients said little to nothing about how they wanted their hair styled. The salon manager reported the encounter with LUTHOR to the Eden Prairie Police Department.

47. Additionally, a building inspector and certain contractors who have been to the **Subject Premises** have made similar reports about LUTHOR. For example, in or around January 22, 2020, one City of Eden Prairie building inspector reported to police that a number of younger women who appear to live at the **Subject Premises** were not permitted to move freely around the house while the contractors were working. Rather, LUTHOR directed the women's whereabouts, and appeared to provide permission before any of the women could speak.

48. Based on records from LUTHOR and BROWN's social media accounts,[3] LUTHOR and BROWN purport to be in romantic relationships with each other and with the other women who live at the **Subject Premises**. For example, on or about December 9, 2020, LUTHOR exchanged Facebook messages a Facebook contact, K.A.C. K.A.C. asked if LUTHOR was going to get married. LUTHOR responded, "No,

---

[3] In addition to the search warrant obtained for BROWN's Instagram Account, on or about January 21, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for LUTHOR's Facebook Account ("gabrielstyles"). *See* 21-MJ-102-TNL (D. Minn.).

I don't do marriage . . . I have a few girlfriends. All live with me. All date each other as well. Has been that way for 5 years."

49. One of LUTHOR's girlfriends, J.W.,[4] was born in May 1996, and is therefore about 10 and 14 years younger than LUTHOR and BROWN, respectively. According to law enforcement databases, J.W. has reported her address as the **Subject Premises** since sometime in 2019.

50. According to social media accounts used by J.W. and law enforcement's review of email records seized to date, J.W. has been a "practice manager" or "administrator" for GVM since at least 2019. According to Minnesota Board of Nursing records, J.W. holds no nursing license in the state of Minnesota and the Minnesota Board of Nursing has no knowledge of or records regarding J.W.

51. According to Kareo[5] records, J.W. had access to patient billing and notes for GVM in the Kareo software for billing federal and private health insurance payers, from in or around June 2018 to at least February 2021. During that time, J.W. was listed in the Kareo audit log as updating or creating 35,625 GVM patient files or notes. In comparison, between June 2018 and January 2021, BROWN was listed in the Kareo audit log as updating or creating 13,779 GVM patient files or notes. Additionally, another resident of the **Subject Premises** and girlfriend of LUTHOR's, B.H.[6], was listed in the Kareo audit log as updating or creating 3,320

[4] Since J.W. is a potential victim, her name will be anonymized in this Affidavit.

[5] Kareo is an EHR/EMR (electronic health records/electronic medical records) system for entering clinical notes of patient visits and coding and billing for medical services provided.

[6] Since B.H. is a potential victim, her name will be anonymized in this Affidavit.

GVM patient files or notes between in or around April 2019 and December 2019. And yet another resident of **Subject Premises** and girlfriend of LUTHOR's, B.M.[7], was listed in the KAREO audit log as updating or creating 129 GVM patient files or notes between July 2019 and November 2019.

52. According to GVM's former CEO Stewart, J.W. worked for GVM, regularly managing LUTHOR's affairs, scheduling patient visits, and coordinating with other members of GVM management, or communicating with GVM staff. This understanding is corroborated by other former-employee statements (discussed further below) and the email records seized by law enforcement to date. For example, on or about April 11, 2022, Stewart sent an email to J.W.'s GVM email account. Stewart stated, "See below summary for Q1 and tee up for goals for Q2." The email contains information about the financial performance of GVM and about one doctor who is on the payroll but who Stewart believed was "doing whatever he pleases day to day" and "costing [GVM] both $ and credibility." J.W. responded to this email, "Hi Bryan, thank you for providing this information. I will be sure to pass it along to Gabriel this afternoon. Regards, [J.W.] Administrator Golden Victory Medical– Las Vegas."

53. Based on law enforcement officers' review of GVM records contained in BROWN and J.W.'s email accounts, J.W. was never issued a Form W-2 or Form 1099 for any work performed for GVM in 2020 or 2021. Stewart's records also contained a GVM "employee list" from 2022, and absent from that list is any reference to J.W.

---

[7] Since B.M. is a potential victim, her name will be anonymized in this Affidavit.

54. Law enforcement has been unable to identify any records to suggest that GVM has compensated J.W. for her work performed for GVM. Instead, based on a review of Bank of America records for accounts belonging to LUTHOR, BROWN, and J.W., J.W.'s only source of income appears to be from BROWN and/or LUTHOR's transfers to J.W. from BROWN and/or LUTHOR's own accounts.

55. Law enforcement has so far only identified bank accounts belonging to J.W. at Bank of America and Wells Fargo. According to Bank of America records, in 2018 Wilson received 47 Zelle transfers totaling approximately $8,555 from one of BROWN's checking accounts. In J.W.'s 2018 records, there are no other sources of income or deposits into J.W.'s account. In the same year, J.W. made 12 Zelle transfers totaling approximately $9,725 to LUTHOR's Bank of America checking account ending in 4509. Between January 2019 and early 2021, the main sources of deposits into J.W.'s Bank of America account (ending in 7972) came from Zelle transfers from LUTHOR ($24,530), BROWN ($10,960) and unidentified Zelle transfers ($56,393). And as of around February 2021, J.W. had a balance of approximately $334 in her Bank of America checking account.

56. According to Wells Fargo records, on July 23, 2020, J.W. opened Wells Fargo Savings account ending in 3363. On the customer application, she listed the **Subject Premises** as her address and that she was employed by Code 3 Urgent Care. On the same day, there is a $100,000 deposit into the account with a Bank of America cashier's check from BROWN. The source of the $100,000 was traced to GVM's Bank of America account ending 1472.

57. In March 2021, J.W. still had approximately $100,056 in her savings account ending in 3363 and approximately $1,762 in her checking account ending in 4797. By June 30, 2021, J.W.'s savings account had a balance of $42,048.65—the remaining almost $60,000 was largely transferred to GVM's Bank of America account ending in 1472. Between September 2021 and September 2022, J.W.'s Wells Fargo account ending in 3363 made $28,000 in transfers to BROWN's accounts, a $500 transfer to B.M., and on May 13, 2022 a Zelle transfer to Jarvis Omersa for $3,500. Omersa is believed to be a security guard for LUTHOR. Thus, the majority of the $100,000 (at least $88,000) that J.W. previously received from BROWN went to benefit BROWN, LUTHOR and/or GVM.

58. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe J.W.'s bank records demonstrate that J.W. has little to no financial independence, and her accounts are used for the benefit of LUTHOR and/or BROWN.

**E. Former Employees of GVM Confirm GVM's Excessive Billing**

59. Several former GVM employees have been interviewed by law enforcement officers as part of this investigation. According to T.E., a former nurse practitioner employed by GVM, she had just received her certification to practice as a psychiatric mental health practitioner in January 2020, around when she saw a GVM posting on Indeed advertising a salary of $150,000 to $175,000 per year. T.E. thought she'd be lucky to earn $100,000, so that advertisement enticed her to submit her resume. BROWN and LUTHOR (who T.E. referred to as "Gabe") asked T.E. to

come to Minnesota for "training," which T.E. felt "weird" about, so initially, T.E. accepted a different position.

60. After T.E. didn't like the first job she accepted, in or around August 2020, T.E. reached out to BROWN again, who flew T.E. to Minneapolis for "training." T.E. met with BROWN and J.W., who T.E. described as BROWN's "sidekick." This was the only time T.E. met anyone at GVM in person. According to T.E., there was not much training provided, but BROWN and J.W. gave T.E. a list of patients to visit with over the phone. BROWN instructed T.E. to visit with 40 patients per day, which T.E. described as not possible. According to T.E., she never even came close to visiting with 40 patients in one day, and the most T.E. could visit with in one day was maybe 20.

61. At one point, T.E. reviewed documentation in Kareo and noticed that on at least one patient visit there were services listed that she did not provide. This experience was the last straw for T.E. with GVM and she resigned shortly after. According to T.E., while she was employed by GVM, she would enter her notes to document patient visits in Kareo, GVM's health-records-management system. Once the visit was submitted in Kareo, it was sent to someone else at GVM for coding and billing. Then the submission would be sent back to T.E. for T.E.to sign, before it was billed out to Medicare or Medicaid or another payer, but at that stage in the process, T.E. could not actually see what she was signing.

62. T.E. resigned after three months of working at GVM.

63. According to a former third-party biller for GVM, G.G., J.W. was responsible for coding, notes and super billing for GVM.

64. According to a former GVM office manager, D.C., GVM did not adequately prevent the cloning of patient notes in Kareo. D.C. also said that Rodessa Kraus, BROWN and J.W. managed the daily operation of GVM. Finally, D.C. understood that J.W. would alter practitioner notes in Kareo.

65. According to T.E., Stewart, and other witnesses interviewed, GVM also employs "technicians" who visit patients in their homes to perform the neurofeedback "treatments." According to T.E., the technicians are supposed to visit each patient three times per week.

66. Law enforcement officers have interviewed three former GVM "technicians." These technicians stated they received no training in neurofeedback other than following another technician for a day or two before going out on their own,and/or did not ever understand how the neurofeedback equipment they used on GVM patients actually worked. Nevertheless, according to the interviewed technicians, GVM technicians are expected by GVM to schedule 10 patients per day, or 50 per week.

**F. Former Patients of GVM Confirm GVM's Excessive Billing**

67. Several current and former GVM patients have been interviewed by law enforcement officers as part of this investigation. Some patient witnesses never requested services from GVM and were uncertain how or why GVM technicians started visiting them to render any services. Some patient witnesses tried to stop GVM services and had a difficult time doing so.

68. For example, in an interview on January 3, 2022, Patient 1 (a Medicare and Medicaid recipient) said she sees GVM 2-3 times each week for neurofeedback treatments and has been doing so for about three years. Patient 1 said she struggles with agoraphobia, depression and anxiety and the neurofeedback treatments are supposed to rewire the routes in her brain to help with those conditions. Patient 1 believes the treatments are helping with her conditions. In addition to her 2-3 neurofeedback treatments each week, Patient 1 visits with a GVM provider via phone once a week to discuss her neurofeedback results and every Tuesday she has a call with GVM to discuss her mental health. Based on her review of her records, Patient 1 noticed that GVM bills her insurance company even when she doesn't answer GVM's calls.

69. In an interview on January 6, 2022, Patient 2 (a former GVM patient who is also a Medicare recipient) said in 2019 or 2020, a doctor she was seeing for back pain referred her to GVM for a senility or Alzheimer's test. Patient 2 said she is 82 years old but still all there mentally. Patient 2 agreed to the tests. A GVM technician came to her home to administer the tests, for which they put electrodes on her head and asked her "stupid," common sense questions. Patient 2 did this for about two years. She started doing it three times each week at first but then cut back to once a week. When Patient 2 cut back to twice a week, a woman from GVM called her and was "pushy," trying to get her to go back to three times a week. Patient 2 stopped doing it completely in late November or early December 2021. She stopped because she got tired of doing it and she didn't need it.

### G. BROWN's own Description of Neurofeedback Therapy Confirms GVM's Excessive Billing

70. An email dated July 30, 2019, seized from BROWN's Gmail Account was sent from BROWN to "The Shade Tree" (a shelter for abused women located in North Las Vegas, Nevada). BROWN stated, "EEG Neurofeedback or brain wave biofeedback is a non-medical, general training that takes advantage of the body's ability to self-regulate and seek balance. Noninvasive sensors or electrodes are connected to specific sites on the surface of the head with paste or a brain cap and gel. The sensors enable the brain wave patterns to be picked up and displayed on a computer screen. The computer assists the brain in recognizing normal rhythmic patterns and produces proportional auditory and/or visual feedback that reinforces more optimal brain wave generation."

71. BROWN's email continued, "[w]e generally expect a positive response within the first 12-15 sessions, if there is to be one. If no improvement is achieved in that time, we would recommend suspending treatment." The email concludes by stating, "While there are often improvements in the first few sessions, Neurofeedback training usually requires at least 25, and most commonly 3-50 sessions with a small number of follow-up reinforcement sessions for permanent changes to take place."

72. According to Noridian records, from about January 1, 2018, to March 22, 2021, Noridian reimbursed GVM for the "treatment" provided to approximately 3,059 patients. When the information from Noridian is sorted by patient last name and the total amount paid out by Noridian on behalf of each patient, the payments on behalf of the "top" 15 patients during that time total approximately $4.3 million.

73. Based on a review of the "top" 15 GVM patients identified in the Noridian records, GVM does not follow the neurofeedback guidelines outlined in BROWN's email. For example, Patient 1 was seen by GVM for biofeedback a total of approximately 277 times between April 12, 2019, and February 3, 2021. Patient 3 was seen by GVM for biofeedback a total of approximately 479 times in that period. Patient 4 was seen by GVM for biofeedback a total of approximately 259 times in that period. And Patient 5 was seen by GVM for biofeedback a total of approximately 444 times.

## IV. LUTHOR AND BROWN DIVERTED MILLIONS IN FEDERAL AND PRIVATE PAYER FUNDS FOR THEIR OWN FINANCIAL GAIN

74. Bank records from Bank of America show that approximately $6.7 million was deposited in GVM bank accounts between August 29, 2018 and June 29, 2020, about $5 million of which were federal Medicare funds deposited by Noridian (for Nevada-based claims). During this same time frame, GVM's account received approximately $1.7 million from other payers (i.e., Medicare program administered by Florida, Medicaid, and private health insurance payers).

75. Bank records from Bank of America show that more than half of the funds deposited into GVM's accounts were almost immediately deposited into BROWN or LUTHOR's personal accounts. From around November 2018 to June 2020, bank records show that nearly $4 million was transferred to BROWN and/or LUTHOR's personal checking or savings accounts.

| **Bank Account(s))** | **Account holder** | **Amount Transferred (approximate)** |
|---|---|---|
| Bank of America Checking Account (ending '1052) | BROWN | $2.3 million |
| Bank of America Checking Account (ending '4509) | LUTHOR | $1 million |
| Bank of America Savings Account (ending '3574) | BROWN and LUTHOR | $90,000 |
| Bank of America Savings Account (ending '3436) | BROWN | $259,900 |
| | **Total** | **$3.6 million** |

76. Although it appears the largest volume of transfers from GVM's accounts were diverted into BROWN's accounts—many of those funds were subsequently moved from BROWN's account into LUTHOR's account. For example, according to Bank of America, from 2018 to 2019, BROWN transferred approximately $161,000 from BROWN's account ending '1052 into LUTHOR's account ending 4509.

77. According to Bank of America accounts, between the end of 2018 and 2021, LUTHOR and BROWN had no other sources of income except for the transfers they received from GVM bank accounts.

78. According to Noridian records, from around June 2020 through March 2021, Noridian paid out over $6 million in additional Nevada-administered federal Medicare funds to GVM.

79. Bank of America records show that in 2021 and 2022, transfers of funds continued from GVM Bank of America accounts ending in 5822, 1472 and 4198 to Bank of America accounts associated with BROWN and LUTHOR. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $1,300,000 to LUTHOR's Bank of America accounts ending in 0641, 3834, 4509. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $1,500,000 to BROWN's Bank of America accounts ending in 1052, 2128 and 3436. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $33,000 to shared BROWN and LUTHOR Bank of America accounts ending in 3574 and 8540.

## V. LUTHOR AND BROWN USED THE DIVERTED FEDERAL AND PRIVATE PAYER FUNDS ON LUXURY ITEMS AND EXCESSIVE ENTERTAINMENT

80. Bank records also show that BROWN and LUTHOR quickly spent the funds they diverted from GVM on their own lavish lifestyle.

81. For example, according to the August 2021 Bank of America bank statement for BROWN's personal checking account ending in 1052, there was approximately $120,195.75 deposited and $121,517.32 debited that month. The beginning balance was $9,800.77 and the ending balance was $8,479.20. During this time, BROWN purchased travel to Florida, Nashville, and Las Vegas, including the booking of flights, hotels and limousine services.

82. According to the August 2021 Bank of America bank statement for LUTHOR's personal checking account ending in 4509, there was approximately

$199,412.80 deposited and $207,948.38 debited that month. The beginning balance was $10,226.33 and the ending balance was $1,690.75.

83. During that one-month period, LUTHOR spent approximately $99,306.02 at strip and/or night clubs in and around the areas of Minneapolis, Minnesota.

84. During the same one-month period, LUTHOR spent approximately $32,227.08 at Minneapolis restaurants including Seven Sushi, Flemings, Union, and Manny's.

85. During the same one-month period, LUTHOR also spent approximately $5,130 in Tinder and CashApp transfers to various women.

86. LUTHOR's and BROWN's excessive spending on trips, restaurants, night clubs and other entertainment continued after August 2021. According to records obtained from Bank of America, from between around September 2021 to May 2022, BROWN and LUTHOR spent the following approximate amounts to maintain an extravagant lifestyle:

| PAYEE | PAYEE DESCRIPTION | GOLDEN VICTORY #1472, #4198, #5822 | LUTHOR #0641, #3834, #4509 | BROWN #1052, #2128, #3436 | LUTHOR/BROWN JT #3574, #8540 | TOTAL EXPENDITURES |
|---|---|---|---|---|---|---|
| Cash & Other Withdrawals | | $8,500.00 | $50,030.94 | $117,036.00 | $20,503.00 | $196,059.94 |
| RJP | Construction Company | | | $120,275.00 | | $120,275.00 |
| Reign-Mpls | Night club | | $119,977.14 | | | $119,977.14 |
| The Armory-Mpls | Music venue | | $94,808.04 | | | $94,808.04 |
| TrueAir Charter | Private jet | | | $73,268.28 | | $73,268.28 |
| E11Even-Miami | Night club | | $63,474.98 | | | $63,474.98 |
| RCI Dining Svcs-Mpls | Rick's Cabaret/Seville Club | | $54,619.87 | $828.00 | $1,766.90 | $57,214.77 |
| G.T. Consulting Group LLC | | | $3,500.00 | $40,000.00 | | $43,500.00 |
| Vendome-Miami/Miami Beach | Night club | | $32,132.90 | | | $32.132.90 |
| Miami Gardens Sq-Miami Gardens | Tootsie's/Strip club | | $30,928 29 | | | $30,928.29 |
| The River-Miami | Restaurant | | $22,809.00 | $6,000.00 | | $28,809.00 |
| Delta Airlines | | $2,807.42 | $1,731.48 | $22,501.63 | | $27,040.53 |
| Fredrikson & Byron PA-MN | Attorneys | | | $25,000.00 | | $25,000.00 |
| Daer Day Club-Hollywood, FL | Night club | | $16,129.50 | | | $16,129.50 |
| Spencer Dior Puckett | Individual payee | | | $14,500.00 | | $14,500.00 |
| Sun Country Airlines | | | $1,213.20 | $11,782.40 | | $12,995.60 |
| LIV-Miami Beach | Night club | | $12,014.32 | | | $12,014.32 |
| Sapphire Restaurant-Las Vegas | | | $9,957.00 | $1,200.00 | | $11,157.00 |
| Minnesota Timberwolves | | | $10,500.00 | | | $10,500.00 |
| MN Twins/Twins Ballpark | | | $10,235.17 | | | $10,235.17 |
| CLK Entertainment Inc | | | | $10,175.00 | | $10,175.00 |

## VI. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

87. Based upon my knowledge, training, experience, and the experience of other law enforcement personnel, I know that computer hardware and computer software may be utilized to store records which include, but are not limited to: those relating to business activities, criminal activities, associate names and addresses, victims' names, addresses, and images, the identity and location of assets illegally gained through criminal activity, and other information related to criminal activity.

88. As described above and in Attachment B, this application seeks permission to search for records that might be found at the **Subject Premises**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

**Probable Cause to Seize Electronic Devices at Subject Premises**

89. I submit that if a computer, cellular telephone, or other storage medium is found at the **Subject Premises**, and reasonably determined to be within the possession, control, or ownership of LUTHOR and/or BROWN, then there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To

give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, including emails obtained through search warrants, I am aware that computer equipment was used to carry out this fraud scheme. There is reason to believe that there is a computer system currently located on the **Subject Premises**.

90. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Premises** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-

mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers

typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

91. I know that when an individual uses a computer to commit a crime the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

92. *Necessity of seizing or copying entire computers or storage media.* Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, all computer equipment, should be processed by a qualified computer specialist in a laboratory or other competent setting. This is due to:

a. *The volume of evidence.* Computer storage devices (like hard disks, removable media, optical media, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names, or use encryption or steganography software. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site;

b. *The technical requirements.* Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze a system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even

hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (from external sources or destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis. Further, when a user deletes a file on a computer, only the pointer (a tool that tells the operating system where the file is located on the media) to the file is deleted. The actual file may remain on the media for a long period of time, possibly years. Forensics examiners can use software tools that can locate and partially and/or fully recover deleted files;

c. *System functionality.* Computer systems are very complicated and the proper operation of the system may be dependent upon the hardware that is connected to it. For this reason, it is usually necessary to seize all hardware connected to the equipment in order to ensure the proper operation of the system during the analysis process.

d. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

93. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

94. Thus, the warrant I am applying for would permit law enforcement personnel to use the biometric unlock features of a device with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant. As set forth above, the **Subject Premises** are locations from which fraudulent companies are being run and where multiple individuals who, together, commit fraud

together may be found. In my training and experience, I know that business locations often contain a variety of electronics, to include computers and cellular telephones. I further know that in this case, such electronic are being actively used to carry out the fraud scheme. Digital devices found at the **Subject Premises** may or may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the **Subject Premises** during the execution of the search: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## CONCLUSION

95. Based on the facts set forth above, and based on my training, experience, and knowledge, there is probable cause to believe that the parties referenced herein, and others, have committed the **Subject Offenses**, and there is probable cause to believe that evidence, fruits, and instrumentalities of those violations, as described in Attachment B, can be found at the **Subject Premises**, as further described in Attachment A.

Dated: January 9, 2023

Respectfully submitted,

Julie Barrows
Postal Inspector
United States Postal Inspection Service

SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime/Zoom and Email) pursuant to Fed. R. Crim. P. 41(d)(3)
on January 9, 2023

THE HONORABLE DULCE J. FOSTER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The property to be searched is 11631 Welters Way, Eden Prairie, Minnesota 55347, further described as a large, tan, brick, three-story, single-family home with a gated and curved driveway leading to the front door and a second driveway leading to the attached garages, further identified as Hennepin County, Minnesota Parcel ID Number 26-116-22-12-0032 (the "**Subject Premises**"), as shown below:





The search of the **Subject Premises** shall include any and all garages, attachments, storage units, appurtenances thereto, and all other areas within the curtilage. The search of the **Subject Premises** shall also include a search of any and all containers, clothing, or personal items (*e.g.*, safes, vehicles, digital devices, backpacks, wallets, briefcases, and bags) within the **Subject Premises** at the time of the execution of the search warrant.

# ATTACHMENT B

## PROPERTY TO BE SEIZED

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering) (collectively referred to as the "**Subject Offenses**"), and related offenses, as further described in the Affidavit of Probable Cause that occurred from the time period 2018 to the present including:

a. Medical Insurance Records: All records involving Medicare, Medicaid, and private healthcare insurance companies, including records of Explanations of Benefits (EOBs), payments, deposits, correspondence, applications, claims, documents in support of claims, audits, denials, documents in support of denials, and appeals;

b. Business Records: All records relating to Golden Victory Medical, LLC, Olympia, LLC, and other business entities owned or operated by ELIZABETH BROWN or GABRIEL LUTHOR aka GABRIEL LANGFORD, including incorporation papers, shareholder information or agreements, documents identifying executive leadership and/or board membership, organization charts, meeting minutes, mission statements, financial documents, employee payroll documents, correspondence, payments, invoices, and receipts;

c. Digital devices, including computers, wireless phones, and storage medium that are reasonably determined to be used by or in the possession, control, or ownership of BROWN and/or LUTHOR, that could contain evidence of the **Subject Offenses**;

d. Tax records, including copies of personal or business tax returns involving BROWN or LUTHOR or any other party;

e. Stored cash; safe deposit boxes and items related to safe deposit boxes, such as keys and account records for any safety deposit boxes maintained at a financial institution such as a bank or credit union;

f. Financial records (including records involving Bank of America, Wells Fargo, U.S. Bank, MoneyGram, Green Dot, Zelle, and CashApp, including customer account records, receipts, checks, bank and savings and loan records of deposit, loans, lines of credit, withdrawal and wire transfer, statements and other bank records, credit card statements, money orders, debit cards, cashier's checks, cancelled checks, certificates of deposit, customer account information, income and expense summaries, cash disbursement journals, and financial statements;

g. All items associated with the use of cryptocurrency whether those items are handwritten or typed, on paper or in electronic form, or located in software, hardware or a mobile application, including wallets, public or private keys or addresses, notes, ledgers, journals, receipts, invoices,

lists of payors and payees, and records of transfers, deposits, withdrawals, and exchanges;

h. Records to track the receipt and payment of proceeds involving the **Subject Offenses** whether those records are handwritten or typed or paper or electronic, including notes, ledgers, journals, receipts, invoices, and lists of payors and payees;

i. Records relating to the business activities of BROWN and LUTHOR, and others in furtherance of the **Subject Offenses**, such as correspondence, loans/promissory notes, memoranda, incorporation records, customer account statements, typed and/or handwritten notes, ledgers, appointment calendars, address books, diaries, photographs, and recorded messages, whether in audio or video, contracts, invoices, agreements, financial statements, advertising materials, corporate brochures, documents provided to financial institutions, all personnel records, all internal or external reviews by auditors, all audits, insurance records, bank records, settlement agreements, sales addenda, corporate resolutions, and correspondence;

j. Records showing the acquisition of assets (or the use and disposition of assets) by BROWN and LUTHOR, and others in furtherance of the **Subject Offenses**; and

k. All items that demonstrate the ownership or use of accounts used by BROWN and LUTHOR, and others in furtherance of the **Subject**

**Offenses**, including telephone records, email and domain registration records, financial account records, and cable/internet service provider records.

2. All of the above noted records may be stored on magnetic or electronic media including hard drives, diskettes, tapes, or other media in the form readable by computer. These records include media maintained as archive or backup copies. Also included in magnetic or electronic media are electronic data processing and storage devices, computers, and computer systems including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disks and diskettes, tape drives and tapes, optical storage devices such as keyboards, printers, video display monitors, optical readers, and related communication devices such as modems. Computer equipment, as needed, is defined as follows:

a. Hardware. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but it not limited to, any data processing devices; internal and peripheral storage devices; peripheral input/output devices (such as keyboards, printers, scanners); related communication devices (such as modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. Software. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communication devices.

c. Documentation. Computer related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure hardware, software, or related items.

d. Handwritten or printed notes regarding passwords, finding the file or directory names of important data, operating the hardware or software, identifying the suspect's electronic or telephone connections with co-conspirators and victims, or finding login names or accounts.

# SEARCH WARRANT ADDENDUM

1. In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2. If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3. Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4. The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall

between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 23-mj-15 (DJF)

IN THE MATTER OF THE SEARCH OF THE SINGLE-FAMILY HOME DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

PETITION OF THE UNITED STATES FOR AN ORDER SEALING SEARCH WARRANT, AFFIDAVIT, RETURN, PETITION AND ORDER FOR SEALING

COMES NOW the United States of America by its undersigned attorneys and in support of its Petition for an Order Sealing Search Warrant, Affidavit, Return, and Petition in the above-captioned matter, states as follows:

1. On January 9, 2023, The Honorable Dulce J. Foster issued a warrant authorizing the search of the single-family home described in Attachment A.

2. The Affidavit of Postal Inspector, Julie Barrows submitted in support of the search warrant, sets forth facts regarding an ongoing investigation into violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering).

3. The search warrant documents presented to this Court for *in camera* review include detailed and highly sensitive investigative information. Disclosure of the information would jeopardize an ongoing investigation into alleged criminal offenses and the privacy of individuals unlikely to be, and/or who may ultimately not be indicted.

4. Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised. Immediate public filing of the search warrant documents would, *inter alia*, compromise details about the nature, extent, and scope of the investigation.

5. The search warrant documents contain identifying information of and circumstances relating to an individual involved in criminal activity in some way who may not be indicted in this case. Nondisclosure of the search warrant documents at this stage is necessary to protect the person's identity and/or to minimize the substantial risk that revelation of details set forth in the search warrant documents could cause to the person's reputation.

6. The Court's power to prevent disclosure of its files, especially for a limited period of time, is well established. This general power has been recognized by the United States Supreme Court.

> It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over some records and files and access has been denied where court files might have become a vehicle for improper purposes.

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).

7. The Eighth Circuit has recognized the Court's specific power to restrict access to search warrant documents like those at issue here:

> We hold that the qualified first amendment right of public access extends to the documents filed in support of search warrants and that the documents may be sealed if the district court specifically finds that sealing is necessary to protect a compelling government interest and that less restrictive alternatives are impracticable.

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

8. The Eighth Circuit and district courts within the Circuit have recognized that the circumstances surrounding ongoing investigations constitute compelling government interests warranting the sealing of search warrant documents. For example, the Eighth Circuit has approved sealing search warrant documents that "describe[d] in detail the nature, scope and direction of the government's investigation and the individuals and specific projects involved," resulting in "substantial probability that the government's on-going investigation would be severely compromised if the sealed documents were released." *Gunn* at 574. Other compelling interests have similarly been recognized as justifying sealing. *Certain Interested Individuals, John Does I-V, Who Are Employees of McDonnell Douglas Corporation v. Pulitzer Publishing Co.*, 895 F.2d 460, 466 (8th Cir. 1990) ("[w]here no indictments have issued against persons allegedly involved in criminal activity, there is a clear suggestion that whatever their truth, the Government cannot prove these allegations. . . .All citizens, whatever their real or imagined past history, are entitled to the protection of a grand jury proceeding.").

9. Moreover, the Eighth Circuit has recognized that search warrant affidavits permeated with references to individuals other than the subjects of the search warrant and/or with information revealing the nature, scope and direction of the government's ongoing investigation may be sealed not only because they present compelling government interests justifying sealing, but also because less restrictive

alternatives to sealing are in such circumstances impracticable. *Gunn*, 855 F.2d at 574.

10. Based upon the foregoing and all the files and proceedings to date, the United States respectfully requests that this Court issue an Order Sealing the Warrant, Application, Affidavit of Postal Inspector, Julie Barrows, Return, this Petition, and the Sealing Order until the close of business on January 9, 2024, unless a compelling interest is shown by the United States for a continuation of the sealing.

Dated: January 9, 2023

Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Joseph H. Thompson*

BY: JOSEPH H. THOMPSON
ESTHER S. MIGNANELLI
Assistant U.S. Attorneys

2020R00187

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 23-mj-15 (DJF)

IN THE MATTER OF THE SEARCH OF THE SINGLE-FAMILY HOME DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

ORDER FOR SEALING

This Court, having reviewed the Petition of the United States herein, finds that the United States has shown a compelling interest in the sealing of documents in the above-captioned matter because:

a. Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised.

b. Nondisclosure of the search warrant documents is necessary to protect the privacy of an individual who may ultimately remain unindicted.

This Court also finds that less restrictive alternatives to sealing are impracticable or not appropriate.

It is therefore:

ORDERED that all documents filed in the above-captioned matter are hereby sealed until the close of business on January 9, 2024.

IT IS FURTHER ORDERED that these documents will be unsealed at the above time unless further compelling interest is shown by the United States for continuing this Order for an additional period of time.

Jan. 9, 2023
Date

The Honorable Dulce J. Foster
United States Magistrate Judge