ESM:coo

AO 106 (Rev. 04/10) Application for a Search Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. 23-mj-567 (DJF)

## APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

___ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 2421 | Mann Act |
| Title 18, United States Code, Section 1951 | Sex Trafficking |
| Title 18, United States Code, Section 1956 and 1957 | Money Laundering |
| See Affidavit for the full list of violations | |

The application is based on these facts:

**See Affidavit, incorporated here**

X Continued on the attached sheet.

*Applicant's Signature*

Julie Barrows, Postal Inspector
U.S. Postal Inspection Services
*Printed Name and Title*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime, Zoom and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: July 19, 2023

*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Dulce J. Foster
United States Magistrate Judge
*Printed Name and Title*

Exh. 4
U.S. v. Luthor
25-cr-88(1)

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES DESCRIBED IN ATTACHMENT A | Case No. 23-mj-567 (DJF)<br><br>**Filed Under Seal by Order of the Court** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Julie Barrows, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Postal Inspector with the U.S. Postal Inspection Service (USPIS) and have been since March 2020, before which I was a special agent with the Internal Revenue Service – Criminal Investigations and the Office of Inspector General for the U.S. Department of Agriculture. I have been a federal law enforcement officer since October 2009.

2. My primary duties as a postal inspector include investigating allegations of violations of Title 18, United States Code, Section 1341 (mail fraud). My experience includes training in and investigation of mail fraud and other related offenses, including wire fraud and money laundering. My duties also include investigating potential cases of child exploitation. In this capacity, I have been involved in investigating violations of various statutes relating to child pornography and sex trafficking, among others. I have gained knowledge and experience through training and everyday work in conducting these types of investigations. During the course of numerous investigations, I have conducted searches pursuant to federal

search warrants covering physical premises and electronic devices, as well as electronic service providers.

3. The facts in this Affidavit come from my training and experience, information provided by witnesses, and information provided to me by other law enforcement officers. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that information located in the electronic devices listed in Attachment A (the "**Subject Devices**") are evidence, fruits, and/or contraband relating to violations of the following federal statutes: 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy). There is also probable cause to search the electronic devices listed in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## I. OVERVIEW

5. This investigation began in or about May 2019, when the Eden Prairie Police Department started receiving multiple tips about GABRIEL LUTHOR, also known as GABRIEL LANGFORD, and others allegedly involved in sex trafficking and related offenses (*see* Facebook search warrants 21-mj-96 and 21-mj-102, and Google search warrant 21-mj-97). Shortly after the investigation began, a review of bank records determined LUTHOR and one of his girlfriends, ELIZABETH BROWN,

received millions of dollars into their personal bank accounts from a business account for GOLDEN VICTORY MEDICAL ("GVM"), a company operated by LUTHOR and BROWN that purports to perform "Psychiatric Medication Management & Neurofeedback" therapies. The investigation further determined that LUTHOR, BROWN and others have engaged in a large-scale scheme to fraudulently obtain reimbursements from Medicare for unnecessary or ineffective mental health services (*see* premises search warrants 23-mj-15 and 23-mj-92 and electronic device search warrant 23-mj-37).

6. After executing the premises and electronic device search warrants in January 2023 and beginning a review of the very first electronic device available for review, it was determined there is probable cause to search the electronic devices listed in Attachment A for evidence and contraband or fruits of the **Subject Offenses**, as described in Attachment B. All of the electronic devices were seized from LUTHOR and his girlfriend's residence in January 2023, and have been in federal custody since the time of their seizure. It should be noted the review of that phone was stopped and no other devices seized from the premises were reviewed pending the request for this additional search warrant.

## II. BEHAVIOR OF LUTHOR AND HIS GIRLFRIENDS DURING WARRANT EXECUTION

7. During the execution of the premises search warrant in January 2023 at the Eden Prairie, Minnesota, residence of LUTHOR and his girlfriends, BROWN, J.W., B.H., and B.M., the females acted strangely around LUTHOR. For example, later in the day, LUTHOR seemed to dictate to the females the decision to leave the

premises as well as how that would happen and which vehicle they would take. Specifically, LUTHOR told B.H. what to do, instructing her to leave the premises without retrieving her winter coat.

## III. MESSAGES BETWEEN LUTHOR AND HIS GIRLFRIENDS

8. The phone number of Subject Device #9 on Attachment A, used by B.H., is 952-239-5353. LUTHOR's contact name in B.H.'s phone is "Great One" with phone number 507-363-2563. On or about July 5, 2018, B.H. texts the following message to "Great One," "Can I have a drink with girls," to which LUTHOR responds, "Yes." B.H. then asks LUTHOR, "Is food allowed," to which LUTHOR responds, "No" and "Sorry but I need you to keep pushing."

9. On or about July 17, 2018, B.H. again asks LUTHOR, "Can I have a drink," to which LUTHOR replies, "Yes."

10. On or about July 18, 2018, B.H. and LUTHOR share the following exchange:









11. In sum, B.H. texts LUTHOR, "I'm sorry I know what you do is to help and you see so much more in me then I can in myself....I feel dumb cause you keep carving a path and I keep stepping off it...I'm sorry." LUTHOR responds, "You are special," "but so many people have treated you badly in life," and "You will always be with me but" "the difference between men that are controlling and me is I want you to be successful," "In success you are free."

12. On or about July 24, 2018, B.H. and LUTHOR exchange text messages wherein B.H. asks LUTHOR if she still needs to ask if she can eat and/or drink anything besides water, to which LUTHOR tells B.H. she needs to keep asking him before eating or drinking anything besides water. He also tells her she needs to "step this up" and "start working out each day" because she has a "ways to go" to lose more weight.




13. Also located on B.H.'s phone are about 298 text messages with the word "Marco." A brief review of a few of these messages seem to indicate that "Marco" may be a code word for sex. For example, on or about August 4, 2022, there is a message

on B.H.'s phone "Marco I'm done showering." On or about September 28, 2022, there is a message on B.H.'s phone "Marco you." Most of the "Marco" messages on B.H.'s phone, however, simply state, "Marco."

14. Also located on B.H.'s phone are text messages with BROWN. It appears BROWN may be the highest-ranking girlfriend of LUTHOR, exerting control over his other girlfriends. For example, on or about June 1, 2021, B.H. texts BROWN "Are you able to Zelle me 805 for my month bills I asked Gabriel and he said to have you do it." On or about August 4, 2021, BROWN texts B.H. "Hey / no energy drinks or carbonated beverages on diet – ever None They inhibit progress- your diet plan lists the foods you can Have – water only and black coffee / tea till you reach goal." BROWN also texts B.H. "I need you to add the foods that are on the printed plan and remove the items in cart that are not – today was cheat day, tomorrow and rest of week back to plan-." B.H. responds, "Ok energy drink are off As food wise so no cereal or oatmeal?"

15. Also located on B.H.'s phone are text messages with J.W. On or about March 1, 2020, J.W. texts B.H., "It's alright, I'm trying to mentally prepare for what's coming when he gets back." B.H. responds, "Well mn is losing we can't change past but I told liz this if we have more of a link with each other we can be more aware of each other to prevent" and "Like Brittany warn my that a guy was googling eye me so I turn it down until he leave." J.W. then texts, "But I mean the limo thing, my purse. It's all just stupid mistakes that always happen no matter what we're doing, something always goes wrong. We have to be perfect all the time to be like the other timelines but I don't think we're capable. We're never going to make it like this."

16. On or about June 6, 2021, J.W. texts B.H., "If you wanna let Brittany know that Gabriel said it was okay to help with nfb, I just told her last night we weren't supposed to lol." B.H. responds, "Yep just did" and J.W. texts, "Okay thanks."

17. On or about August 27, 2022, B.H. texts J.W., "Did your u see Liz hit or pump Brittany?" J.W. responds, "No, I was sitting on the stairs facing the door and I saw Brittany fall against the wall but only after it happened."

18. On or about November 15, 2022, J.W. texts B.H., "Sorry if I said it wrong when I asked you to go upstairs, I didn't know how else to word it." B.H. responds, "At first it was like what I did wrong lol but then I'm like I didn't do anything wrong then you said he shouting down then I'm like ok I got cuz this is new way." J.W. responds, "Okay I saw the look on your face and wanted to make sure I didn't offend you or anything. But no, no one did anything wrong." B.H. responds, "Yea cuz this must be his new way of doing this cuz he did this at the last party where he send us girls first then do his thing and he did mention the when I say go up stairs to go with it and lest what I got on that note lol" and "Lol now I want popper I thing I'm going make them when everyone leaves oooo and let me know when I got grab Liz tomorrow." J.W. responds, "Yeah he's been doing it this way for awhile. I think you guys are usually already sleeping when it happens. And Liz gets in at 7:40pm tomorrow."

## IV. LUTHOR SPENDS GVM FRAUDULENT PROCEEDS AT STRIP CLUBS

19. Records from Bank of America and US Bank show that approximately $14.7 million was deposited in GVM bank accounts between August 2018 and October

2022. Of that amount, approximately $9.6 million was transferred into the personal bank accounts of LUTHOR or BROWN.

20. According to the July to December 2021 Bank of America bank statements for LUTHOR's personal checking account ending in 4509, there was approximately $1,372,411.35 deposited and $1,353,247.48 debited during that six-month period. The balance on June 30, 2021, was $7,700.42 and the ending balance on December 31, 2021, was $27,464.29.

21. During that six-month period, LUTHOR spent approximately $453,370.24 at strip and/or night clubs in and around the areas of Minneapolis, Minnesota and Miami Beach, Florida.

22. During the same six-month period, LUTHOR spent approximately $96,381.42 at Minneapolis, Miami Beach and Las Vegas restaurants including Minneapolis restaurants Seven Sushi, Manny's, and Oceanaire.

23. During the same six-month period, LUTHOR also spent approximately $94,708.02 on Tinder and cash transfers via CashApp and Zelle to various women.

24. During the same six-month period, LUTHOR also spent approximately $42,500 on a 2021 Rolls Royce, making $8,500 monthly payments.

25. During the same six-month period, LUTHOR also spent approximately $22,889.90 on Minnesota sporting events.

26. LUTHOR's and BROWN's excessive spending on trips, restaurants, night clubs and other entertainment continued into 2022. According to records obtained from Bank of America, from between around January 2022 to May 2022,

BROWN and LUTHOR spent the following approximate amounts to maintain an extravagant lifestyle:

| DATE RANGE: JANUARY 2022-MAY 2022 | | | | | | |
|---|---|---|---|---|---|---|
| Payee | Payee Description | GVM 1472, 4198, 5822 | Luthor 0641, 3834, 4509 | Brown 1052, 2128, 3436 | Luthor/Brown JT 3574, 8540 | TOTAL |
| Cash & Other Withdrawals | | | $ 32,408.99 | $ 69,012.00 | $ 17,217.81 | $118,638.80 |
| RJP | Construction Company | | $ - | $ 33,600.00 | | $ 33,600.00 |
| Reign Mpls | Night Club | | $ 11,762.11 | | | $ 11,762.11 |
| The Armory-Mpls | Music Venue | | $ 18,365.27 | | | $ 18,365.27 |
| RCI Dining Svcs-Mpls | Rick's Cabaret/Seville Club | | $ 27,293.52 | | | $ 27,293.52 |
| Vendome | Night Club | | $ 9,542.70 | | | $ 9,542.70 |
| Miami Gardens | Tootsie's/Strip Club | | $ 14,276.94 | | | $ 14,276.94 |
| The River-Miami | Restaurant | | $ 5,420.00 | $ 6,000.00 | | $ 11,420.00 |
| Delta Airlines | Airline | $1,854.19 | $ 2,668.68 | $ 6,944.36 | | $ 11,467.23 |
| Daer Day Club-Hollywood FL | Night Club | | $ 4,050.75 | | | $ 4,050.75 |
| Sun Country Airlines | Airline | | $ 1,229.20 | $ 1,591.60 | | $ 2,820.80 |
| Sapphire Restaurant-Las Vegas | Restaurant | | $ 3,813.00 | | | $ 3,813.00 |
| | | $1,854.19 | $130,831.16 | $117,147.96 | $ 17,217.81 | $267,051.12 |

## V. RECENT STATEMENTS TO ABOUT LUTHOR'S ACTIVITIES WITH STRIPPERS OR PROSTITUTES

27. According to S.M., who was interviewed on or about January 12, 2023, she is a stripper. She met LUTHOR through L.F. about nine months prior at a different club than the one at which S.M. works. LUTHOR and S.M. started dating about six months prior. S.M. sometimes stays over at LUTHOR's house after she gets off work.

28. According to L.F., who was interviewed on or about January 12, 2023, she has known LUTHOR for about five years. She used to be a dancer but then she was a club marketer. She moved in with LUTHOR in or about August 2022. LUTHOR recently hired her as his personal assistant. She will start that job as soon as LUTHOR's pending lawsuit is over. L.F. denied having a romantic relationship with LUTHOR, stating he is like her cousin.

29. According to J.T., who was interviewed on or about December 22, 2022, LUTHOR traveled to Las Vegas every week or every other week, bringing with him $20,000 in cash to spend on prostitutes. J.T. had seen LUTHOR pay girls for their sex services and J.T. had seen LUTHOR pay girls to provide sex services to other men he was trying to impress.

30. According to B.M., who was interviewed on or about May 22, 2023, she moved into the residence with LUTHOR and his other girlfriends J.W., B.H. and BROWN on April 7th of the year she turned 21. She had been dancing at the King of Diamonds, a strip club in Inver Grove Heights, Minnesota, and LUTHOR had been coming into the club to see her for about two months before she decided to move in with him. B.M. said she and the other girlfriends had their own private sexual relationships with LUTHOR. B.M. didn't work during the time she lived with LUTHOR. LUTHOR or BROWN would give B.M. as much money as she needed to cover her basic expenses, like her car payment or if she needed something at Target. B.M. said she always had to ask for money. She said she hated asking for money, so she restricted herself and would never ask for more than what she felt she needed. B.M. also stated that at the beginning of their relationship LUTHOR paid off her student debt, which was approximately $8,000.

31. According to I.A., who was interviewed by law enforcement on or about June 16, 2023, a specific manager of several nightclubs and concert venues in Minneapolis would troll the line of individuals waiting to get into particular nightclubs, looking for young females who could be groomed into performing sex

work. Once identified, the manager would bring these girls into the V.I.P. section of the nightclub to be further groomed by another male. LUTHOR became friends with this manager, who would introduce LUTHOR to the women. It was common for women from the club to end up at LUTHOR's home for after-parties. According to J.T. during an interview with law enforcement on or about December 7, 2022, LUTHOR regularly held after-parties from the strip clubs. LUTHOR would spend $18,000 per night at the strip clubs. LUTHOR spent large amounts of money to impress young adults he wanted to party with. J.T. said that LUTHOR preferred to hang out with 18- to 21-year old college students. According to I.A. and J.T., LUTHOR had several fake identification cards that showed him to be in his 20s, so that the women he met would feel more comfortable with him. Additionally, I.A. reported that the manager would "pimp" the women and that LUTHOR is a client. I.A. said that LUTHOR controls the women living with him by providing money, drugs and alcohol.

## VI. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based upon my knowledge, training, experience, and the experience of other law enforcement personnel, I know that computer hardware and computer software may be utilized to store records which include, but are not limited to: those relating to business activities, criminal activities, associate names and addresses, victims' names, addresses, and images, the identity and location of assets illegally gained through criminal activity, and other information related to criminal activity.

33. *Forensic evidence.* There is probable cause to believe that this forensic electronic evidence will be on the **Subject Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy"

while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example,

information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

34. I know that when an individual uses a computer to commit a crime the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of

crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

35. *Necessity of seizing or copying entire computers or storage media.* Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, all computer equipment, should be processed by a qualified computer specialist in a laboratory or other competent setting. This is due to:

a. *The volume of evidence.* Computer storage devices (like hard disks, removable media, optical media, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names, or use encryption or steganography software. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site;

b. *The technical requirements.* Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly

controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze a system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (from external sources or destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis. Further, when a user deletes a file on a computer, only the pointer (a tool that tells the operating system where the file is located on the media) to the file is deleted. The actual file may remain on the media for a long period of time, possibly years. Forensics examiners can use software tools that can locate and partially and/or fully recover deleted files;

c. *System functionality.* Computer systems are very complicated and the proper operation of the system may be dependent upon the hardware that is connected to it. For this reason, it is usually necessary to seize all hardware connected to the equipment in order to ensure the proper operation of the system during the analysis process.

d. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities

to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

36. Based on the facts set forth above, and based on my training, experience, and knowledge, there is probable cause to believe that the parties referenced herein, and others, have committed the **Subject Offenses**, and there is probable cause to believe that evidence, fruits, and instrumentalities of those violations, as described in Attachment B, can be found in the electronic devices listed in Attachment A.

Dated: July 19, 2023

Respectfully submitted,

Julie Barrows
Postal Inspector
United States Postal Inspection Service

SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime and
Email) pursuant to Fed. R. Crim. P. 41(d)(3)
on July 19, 2023

THE HONORABLE DULCE J. FOSTER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## DESCRIPTION OF THE DEVICES TO BE SEARCHED

The property to be searched is the following 23 devices seized from 11631 Welters Way, Eden Prairie, Minnesota, on January 12, 2023:

| | |
|---|---|
| 1 | Apple iPhone pearl white |
| 2 | Gray iPhone with case |
| 3 | Samsung tablet model GTN8013EA S/N R32CA010MKN |
| 4 | Apple iPad model A2316 S/N GG7DM8T0Q16P |
| 5 | Asus laptop and charger model UX534F |
| 6 | Asus laptop (pink) and charger model 5532F S/N L7N0CX12680730C |
| 7 | Lenovo laptop model Legion 5 S/N 15IMH05 |
| 8 | Apple laptop model A1278 S/N C1MH8KZYDV13 |
| 9 | Apple iPhone in black/clear case (believed to be B.H.'s phone) |
| 10 | Alienware gaming tower Service tag IG8VT53 with two thumb drives |
| 11 | Apple iPad model A1459 S/N DMPKQPF188 in purple case |
| 12 | Apple iPad model A2315 S/N GG7612WQ16Q in a galaxy case |
| 13 | Sky Tech gaming tower S/N 88200907071 |
| 14 | Dell laptop S/N 9GGN562 found in black laptop bag with GVM documents |
| 15 | Lenovo laptop model 80T S/N PF0XW623 |
| 16 | Acer laptop model N16Q2 S/N NXGRYAA0018320B1A97600 |
| 17 | Apple iPhone green and gold case |
| 18 | iPhone in speckled case |
| 19 | iPad in marbled white and black case |
| 20 | Samsung in clear case IMEI 356544760907706 |
| 21 | Samsung Galaxy S10 in sparking white case |
| 22 | iPad Mini in red case |
| 23 | Dell laptop S/N 30LQTW2 |

# ATTACHMENT B

## PROPERTY TO BE SEIZED

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy) (collectively referred to as the "**Subject Offenses**"), and related offenses, as further described in the Affidavit of Probable Cause that occurred from the time period 2018 to the present including, but not limited to:

a. Financial transaction records, electronic communications, and photos or other records showing use of force, threats of force, fraud, or coercion of suspected victims of the **Subject Offenses**;

b. Advertisements or evidence of attempts to advertise for commercial sex work, to include any communications or agreements with online or other platforms used for advertising such work;

c. Records, documents, photos and communications related to travel of LUTHOR and/or BROWN and/or J.W., B.H., B.M. and/or any suspected victims of the **Subject Offenses**, including travel between Nevada, Minnesota, and Florida;

d. Records of any bank or mobile payment service accounts to facilitate commission of the **Subject Offenses**;

e. Client or customer lists or client- or customer-related logs maintained to commit the **Subject Offenses**;

f. Evidence of communications with or records related to any suspected victim of the **Subject Offenses**.

## SEARCH WARRANT ADDENDUM

1. In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2. If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3. Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4. The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

ESM:coo

AO 93 (Rev. 12/09) Search and Seizure Warrant 2020R00187

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. 23-mj-567 (DJF)

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the State and District of Minnesota:

**See Attachment A, incorporated here.**

The person or property to be searched, described above, is believed to conceal:

**See Attachment B, incorporated here.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before August 2, 2023
*(not to exceed 14 days)*

X in the daytime 6:00 a.m. to 10 p.m. _ at any time in the day or night as I find reasonable cause has been established.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the current United States Magistrate Judge on duty.

Date and Time issued: July 19, 2023 5:08 PM

*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Dulce J. Foster
United States Magistrate Judge
*Printed Name and Title*

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

**Return**

| *Case No.:* | *Date and time warrant executed:* | *Copy of warrant and inventory left with:* |
|---|---|---|

*Inventory made in the presence of :*

*Inventory of the property taken and name of any person(s) seized:*

**Certification**

*I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: ____________

____________________
*Executing officer's signature*

____________________
*Printed Name and Title*

*SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime, Zoom and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)*

____________________
United States Magistrate Judge

____________
Date