FILED
JAN 11 2023
US DISTRICT COURT
DISTRICT OF NEVADA

# SEALED

**Office of the United States Attorney**
District of Nevada
501 Las Vegas Boulevard, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

Exh. 6
U.S. v. Luthor
25-cr-88(1)

JASON M. FRIERSON
United States Attorney
Nevada Bar Number 7709
JIM W. FANG
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Email: jim.fang@usdoj.gov
*Attorneys for the United States of America*

FILED
JAN 11 2023
US DISTRICT COURT
DISTRICT OF NEVADA

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>2870 S Maryland Pkwy, Suites 200 and 220<br>Las Vegas, NV 89109<br><br>COUNTY OF CLARK<br>STATE OF NEVADA | **Case No.** 2:23-mj-00025-NJK<br><br>**Affidavit in Support of an Application for a Search Warrant**<br><br>**(Under Seal)** |

I, Justin D. Steele, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this Affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search warrant for the following residential property, which is located in the District of Nevada and further described in Attachment A, incorporated herein by reference: 2870 S Maryland Pkwy, Suite 200 and 220, Las Vegas, NV 89109 (hereafter, the "**Subject Premises**").

2. This is a health care fraud investigation. As explained below, Gabriel LUTHOR, also known as Gabriel Langford, and Elizabeth BROWN, have engaged in a large-scale scheme to fraudulently obtain reimbursements from Medicare for unnecessary or ineffective mental health services. Specifically, LUTHOR and BROWN are operating a company called Golden Victory Medical, LLC ("GVM") that purports to perform "Psychiatric Medication

Management & Neurofeedback" therapies, but is actually providing unnecessary, ineffective, unrequested, and/or excessive services, and then submitting fraudulent and inflated bills for same to Medicare and private insurance companies. To date, the conspirators have misappropriated millions of dollars in Medicare funds to benefit a lavish lifestyle.

3. This affidavit is based on my personal knowledge, interviews of witnesses, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a search warrant for the **Subject Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering) (together, the "Subject Offenses") are located at the **Subject Premises**.

## AGENT BACKGROUND

4. I am a United States Postal Inspector assigned to the Phoenix Division of the United States Postal Inspection Service, and have been so employed since August 2015. I am currently assigned to the External Crimes Team in Las Vegas, NV. As part of my duties on the External Crimes Team, I am assigned to investigate postal related crimes including the theft of United States Mail, United States Postal Service related robberies and burglaries, identity theft, and check and credit card fraud.

5. I have the following education and training: I received a Bachelor's Degree in Chemistry from Benedictine College in Atchison, KS. I received federal law enforcement training from the Inspection Service in the areas of mail fraud, mail theft, identity theft, and

credit card fraud. I have investigated cases involving theft of mail, robberies, identity theft, check fraud, and credit card fraud. I have interviewed witnesses and cooperating individuals regarding mail theft and identity theft and have read official reports of other officers. During the course of numerous investigations, I have conducted searches pursuant to federal search warrants covering physical premises and electronic devices, as well as electronic service providers.

6. The facts set forth in this affidavit are based upon my review of reports and other documents related to this investigation, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## APPLICABLE LAWS

7. This warrant relates to an ongoing investigation into a scheme to defraud the United States Department of Health and Human Services' ("HHS'") Medicare and Medicaid programs.

### A. The Federal Medicare Program

8. Historically, the Medicare Program has generally functioned as a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs. Medicare is available to most individuals 65 years of age and older. Medicare has also been extended to persons under age 65 who are receiving disability benefits from Social Security or the Railroad Retirement Board and those having End Stage Renal Disease. 42 U.S.C. § 1395 et seq.

9. HHS is responsible for administration and supervision of the Medicare program. The Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, is directly responsible for administering the Medicare program.

10. The Medicare program is comprised of four parts. Medicare Part B ("Medical Insurance") is a federal-subsidized, voluntary insurance program that covers the fee schedule amount for services, outpatients care, medical supplies, and laboratory services. 42 U.S.C. § 1395j-w-5.

11. Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). Separate payments are made by those intermediaries for each CPT procedural code listed on the Medicare Part B claims. See 45 C.F.R. §§ 162.1000, 162.1002, 162.1011.

12. To participate in the Medicare program, a healthcare provider must file an agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The agreement requires compliance with the requirements that the Secretary deems necessary for participation in the Medicare program in order to receive reimbursement from Medicare.

13. Among other things, professionals providing mental health services to Medicare recipients are required to observe rules designed to ensure quality of care, medical necessity, and only bill for services actually provided, for medically necessary services, and/or for services performed by a properly supervised or qualified employee.

**B. <u>The Federal Medicaid Program</u>**

14. The federal Medicaid program provides medical care and services to low-income persons ("recipients"), who meet certain income and other eligibility criteria.

15. HHS is responsible for administration and supervision of the Medicaid program. And CMS is also directly responsible for administering the Medicaid program.

16. Like with respect to the federal Medicare program, professionals providing mental health services to Medicaid recipients are required to observe rules designed to ensure quality of care, medical necessity, and only bill for services actually provided, for medically necessary services, and/or for services performed by a properly supervised or qualified employee.

**PROBABLE CAUSE**

**A. Golden Victory Medical, LLC ("GVM")**

17. This warrant is related to the improper billing for services purportedly provided to Medicare beneficiaries by GVM. As described below, GVM's clinics are all located outside of the state of Minnesota, and purport to provide mental health services to clients outside of the state of Minnesota.

18. According to the Nevada Secretary of State, GVM was formed on April 24, 2018. On May 31, 2019, the filing was updated to reflect BROWN as Manager of GVM. On March 12, 2020, the filing was updated to reflect LUTHOR as Manager of GVM.

19. According to the Minnesota Secretary of State, GVM filed as a registered Minnesota business on May 2, 2022. According to that filing, the registered officers for GVM are LUTHOR and BROWN, and the registered office, place of business, and address are all listed as 11631 Welters Way, Eden Prairie, Minnesota ("GVM's Minnesota Address").

20. According to its website, as of January 5, 2023, GVM provides "high-quality, empathetic, personalized healthcare to as many patients as possible" in five locations: Delray Beach and Ponte Vedra, Florida; Las Vegas, Nevada; Stillwater, Oklahoma; and Wichita, Kansas. According to its website, the GVM team displays photos of many GVM employees.

Included on the website is a photo of BROWN along with her biographical information to include her title as Chief Executive Officer (CEO) and co-owner of GVM.

**1. <u>The Inception of GVM's Fraudulent Billing Practices in and around 2019</u>**

21. On or about January 29, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for one of BROWN's email accounts ("izzybanks09@gmail.com," referred to hereafter as "BROWN's Gmail Account"). See 21-MJ-97-TNL (D. Minn.).

22. One email sent to BROWN's Gmail Account on or about October 10, 2019, contained an attachment depicting a GVM brochure. According to the brochure, GVM performs "Psychiatric Medication Management & Neurofeedback." According to GVM's website on January 3, 2023, "[n]eurofeedback, also known as EEG (electroencephalogram) biofeedback, is a therapeutic intervention that provides immediate feedback from a computer-based program that assesses a client's brainwave activity. The program then uses sound or visual signals to reorganize or retrain these brain signals. By responding to this process, clients learn to regulate and improve their brain function and alleviate symptoms of various neurological and mental health disorders."

23. According to an expert in the field, neurofeedback can be a legitimate form of mental health treatment when it is offered in tandem with therapy in a multi-modal treatment approach. During the course of the investigation by law enforcement, including interviews with former GVM staff, former and current GVM patients, and based on law enforcement's review of GVM business records, GVM does not appear to practice neurofeedback in a manner consistent with the recommendations of the expert or BROWN's own statements and materials.

24. Featured on the GVM brochure is a photo of BROWN, her credentials and accomplishments, and her contact information. The brochure also identifies BROWN as the founder of GVM.




25. As depicted in the GVM brochure described and shown above, BROWN was the founder and face of GVM. BROWN is a nurse practitioner with Advanced Practice Registered Nurse (APRN) licensed in Nevada and Minnesota, with a focus on family medicine.

26. According to GVM's billing company's records, in 2019 (the first full year after GVM was first created, based on Nevada Secretary of State records), GVM billed over $16,000,000 to Medicare, Medicaid, and other private insurance companies; and collected over $4,000,000 of the amounts billed. At that time, BROWN and one other RN were the only "rendering providers" at GVM. In 2019 alone, BROWN billed for over 28,000 patient

encounters. In other words, assuming BROWN was working every day in 2019, according to the bills submitted by GVM, BROWN rendered services to over 76 patients a day.

27. Further, as of 2019, BROWN was not licensed to provide or supervise mental health services. Specifically, according to the Nevada State Board of Nursing, BROWN's APRN license permits her to prescribe medication, among other select treatments. In or around May 2022, BROWN was subject to disciplinary action by the Nevada State Board of Nursing for practicing outside of her focus population and for failing to obtain a license to practice in the area of mental health. BROWN admitted to these violations and agreed to complete courses to add the mental health focus to her APRN license.

28. Similarly, the Minnesota State Board of Nursing Review Panel also initiated action against BROWN's APRN license. On or about dated August 4, 2022, BROWN signed a Stipulation and Consent Order that placed her license in a conditional status until she completed the requirements of the Nevada State Board of Nursing.

**2. GVM's Excessive Billing Continues through 2021**

29. According to records provided by Noridian Healthcare Solutions of Nevada ("Noridian"),[1] in 2020 GVM billed the Medicare program approximately $47,000,000 (which may include duplicate claims) and Noridian paid out approximately $8,950,000 to GVM.

30. According to GVM's billing records, provided by GVM's former CEO Bryan Stewart, the 2021 GVM Charge Report for seven GVM providers, including BROWN, show that in 2021 GVM billed $2,900,884.69 to Medicare, Medicaid, and other private insurance companies.

---

[1] Noridian is a company based in North Dakota that, according to Noridian's website, "provid[es] high quality administrative services to Medicare." In other words, Noridian is the conduit through which federal Medicare monies are funneled, to benefit insured individuals in the state of Nevada.

31. According to Noridian records, BROWN and seven other providers were listed as a "rendering provider" at GVM in 2018, 2019, 2020 and 2021 (most recent documents provided). The rendering providers were listed based on their employment status with GVM and may not have been consistent through the entire time. During that time (January 2018 to March 2021), GVM billed for over 776,672 patient encounters. BROWN was listed as the rendering provider in 591,478 of those patient encounters. In 2020, BROWN was listed as the rendering provider in 164,791 patient encounters (billed at $26,694,020.35 and paid $4,782,422.08) In other words, assuming BROWN was working every day in 2020, according to the bills submitted by GVM, BROWN rendered services for over 451 patient encounters a day.

32. Some of the patient encounters billed by BROWN in 2020 appear to have occurred while BROWN was on vacation or otherwise posting on social media about traveling or partying. For example, according to Noridian records, BROWN billed for 204 patient encounters occurring between December 7, 2020 and December 10, 2020 (billed at $36,070.00 and paid at $6,279.89). However, according to a document in the GoogleDrive folder associated with BROWN's Gmail Account, BROWN, along with LUTHOR and others, booked a stay at a resort in Vail, Colorado for this time. According to the Google Drive document—which outlines in 12 pages the itinerary and plans for this trip—BROWN and LUTHOR's group retained a private chef for this stay.

33. According to records from BROWN's Instagram Account,[2] on or about December 12, 2020, BROWN also posted the below photo of herself with the following text: "#vailcolorado…@luthorgabriel love you so much – thank you for an amazing vacation."

[2] On or about January 29, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for BROWN's Instagram Account




34. According to an email from GVM's billing company, as of January 2021, GVM had collected over $5,000,000 from Medicare, Medicaid and private payers for services purportedly rendered by GVM in 2020.

35. According to Noridian records, nearly all of BROWN's "services" billed for in 2020 and 2021 were for mental health-related treatments. However, as explained above, BROWN was not licensed to provide mental health services at that time.

36. Moreover, according to former GVM CEO Bryan Stewart, LUTHOR and/or BROWN repeatedly thwarted Stewart's efforts to end GVM's excessive billing practices. In a civil lawsuit filed by Stewart against GVM, Stewart asserts that—throughout late 2021 and early 2022 when Stewart was CEO—GVM improperly coded medical procedures and utilized flawed documentation practices, "resulting in overpayments to [GVM] by federal payers." According to Stewart, approximately 65% of the patients at Golden Victory are Medicare or Medicaid beneficiaries.

---

("liz_brownxoxo"). *See* 21-MJ-96-TNL (D. Minn.).

37. In February 2022, and while still GVM's CEO, Stewart authorized GVM's general counsel "to hire an independent third party to conduct a systematic audit of the coding and billing practices within the organization." Health Information Associates ("HIA") was selected to conduct the audit and on or about April 28, 2022, HIA informed GVM's management of the widespread erroneous coding and documentation practices HIA identified in a sampling of GVM's bills submitted to payers. For example, according to HIA's audit findings, GVM's coding and billing accuracy levels were in the 32.44% range, when the industry standard is for accuracy levels to fall within the 95% range.

38. According to Stewart, when Stewart attempted to address the issues presented in the HIA audit result, LUTHOR and BROWN both pushed back. According to Stewart, LUTHOR told Stewart he planned to falsely blame any errors on GVM's billing company to avoid any civil or criminal penalties.

### B. <u>One of LUTHOR's "Girlfriends" Provides Unpaid Labor in Furtherance of GVM's Operations</u>

39. This investigation started, in part, because in or around May 7, 2019, a salon manager observed LUTHOR and BROWN bringing in two clients for salon services, and LUTHOR was directing the hairstylist with respect to how these clients' hair should be cut and styled; while the clients said little to nothing about how they wanted their hair styled. The salon manager reported the encounter with LUTHOR to the Eden Prairie Police Department.

40. Additionally, a building inspector and certain contractors who have been to the residence located at GVM's Minnesota Address, and have made similar reports about LUTHOR. For example, in or around January 22, 2020, one City of Eden Prairie building inspector reported to police that a number of younger women who appear to live at the residence located at GVM's Minnesota Address were not permitted to move freely around the

house while the contractors were working. Rather, LUTHOR directed the women's whereabouts, and appeared to provide permission before any of the women could speak.

41. Based on records from LUTHOR and BROWN's social media accounts,[3] LUTHOR and BROWN purport to be in romantic relationships with each other and with the other women who live at the residence located at GVM's Minnesota Address. For example, on or about December 9, 2020, LUTHOR exchanged Facebook messages a Facebook contact, K.A.C. K.A.C. asked if LUTHOR was going to get married. LUTHOR responded, "No, I don't do marriage . . . I have a few girlfriends. All live with me. All date each other as well. Has been that way for 5 years."

42. One of LUTHOR's girlfriends, J.W.,[4] was born in May 1996, and is therefore about 10 and 14 years younger than LUTHOR and BROWN, respectively. According to law enforcement databases, J.W. has reported her address as the residence located at GVM's Minnesota Address since sometime in 2019.

43. According to social media accounts used by J.W. and law enforcement's review of email records seized to date, J.W. has been a "practice manager" or "administrator" for GVM since at least 2019. According to Minnesota Board of Nursing records, J.W. holds no nursing license in the state of Minnesota and the Minnesota Board of Nursing has no knowledge of or records regarding J.W.

---

[3] In addition to the search warrant obtained for BROWN's Instagram Account, on or about January 21, 2021, United States Magistrate Judge for the District of Minnesota Tony N. Leung issued a search warrant for LUTHOR's Facebook Account ("gabrielstyles"). *See* 21-MJ-102-TNL (D. Minn.).

[4] Since J.W. is a potential victim, her name will be anonymized in this Affidavit.

44. According to Kareo[5] records, J.W. had access to patient billing and notes for GVM in the Kareo software for billing federal and private health insurance payers, from in or around June 2018 to at least February 2021. During that time, J.W. was listed in the Kareo audit log as updating or creating 35,625 GVM patient files or notes. In comparison, between June 2018 and January 2021, BROWN was listed in the Kareo audit log as updating or creating 13,779 GVM patient files or notes. Additionally, another girlfriend of LUTHOR's, B.H.,[6] was listed in the Kareo audit log as updating or creating 3,320 GVM patient files or notes between in or around April 2019 and December 2019. And yet another girlfriend of LUTHOR's, B.M.,[7] was listed in the KAREO audit log as updating or creating 129 GVM patient files or notes between July 2019 and November 2019.

45. According to GVM's former CEO Stewart, J.W. worked for GVM, regularly managing LUTHOR's affairs, scheduling patient visits, and coordinating with other members of GVM management, or communicating with GVM staff. This understanding is corroborated by other former-employee statements (discussed further below) and the email records seized by law enforcement to date. For example, on or about April 11, 2022, Stewart sent an email to J.W.'s GVM email account. Stewart stated, "See below summary for Q1 and tee up for goals for Q2." The email contains information about the financial performance of GVM and about one doctor who is on the payroll but who Stewart believed was "doing whatever he pleases day to day" and "costing [GVM] both $ and credibility." J.W. responded to this email, "Hi Bryan,

[5] Kareo is an EHR/EMR (electronic health records/electronic medical records) system for entering clinical notes of patient visits and coding and billing for medical services provided.

[6] Since B.H. is a potential victim, her name will be anonymized in this Affidavit.

[7] Since B.M. is a potential victim, her name will be anonymized in this Affidavit.

thank you for providing this information. I will be sure to pass it along to Gabriel this afternoon. Regards, [J.W.] Administrator Golden Victory Medical– Las Vegas."

46. Based on law enforcement officers' review of GVM records contained in BROWN and J.W.'s email accounts, J.W. was never issued a Form W-2 or Form 1099 for any work performed for GVM in 2020 or 2021. Stewart's records also contained a GVM "employee list" from 2022, and absent from that list is any reference to J.W.

47. Law enforcement has been unable to identify any records to suggest that GVM has compensated J.W. for her work performed for GVM. Instead, based on a review of Bank of America records for accounts belonging to LUTHOR, BROWN, and J.W., J.W.'s only source of income appears to be from BROWN and/or LUTHOR's transfers to J.W. from BROWN and/or LUTHOR's own accounts.

48. Law enforcement has so far only identified bank accounts belonging to J.W. at Bank of America and Wells Fargo. According to Bank of America records, in 2018 J.W. received 47 Zelle transfers totaling approximately $8,555 from one of BROWN's checking accounts. In J.W.'s 2018 records, there are no other sources of income or deposits into J.W.'s account. In the same year, J.W. made 12 Zelle transfers totaling approximately $9,725 to LUTHOR's Bank of America checking account ending in 4509. Between January 2019 and early 2021, the main sources of deposits into J.W.'s Bank of America account (ending in 7972) came from Zelle transfers from LUTHOR ($24,530), BROWN ($10,960) and unidentified Zelle transfers ($56,393). And as of around February 2021, J.W. had a balance of approximately $334 in her Bank of America checking account.

49. According to Wells Fargo records, on July 23, 2020, J.W. opened Wells Fargo Savings account ending in 3363. On the customer application, she listed the **Subject Premises** as her address and that she was employed by Code 3 Urgent Care. On the same day, there is a

$100,000 deposit into the account with a Bank of America cashier's check from BROWN. The source of the $100,000 was traced to GVM's Bank of America account ending 1472.

50. In March 2021, J.W. still had approximately $100,056 in her savings account ending in 3363 and approximately $1,762 in her checking account ending in 4797. By June 30, 2021, J.W.'s savings account had a balance of $42,048.65—the remaining almost $60,000 was largely transferred to GVM's Bank of America account ending in 1472. Between September 2021 and September 2022, J.W.'s Wells Fargo account ending in 3363 made $28,000 in transfers to BROWN's accounts, a $500 transfer to B.M., and on May 13, 2022 a Zelle transfer to Jarvis Omersa for $3,500. Omersa is believed to be a security guard for LUTHOR. Thus, the majority of the $100,000 (at least $88,000) that J.W. previously received from BROWN went to benefit BROWN, LUTHOR and/or GVM.

51. Based on my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I believe J.W.'s bank records demonstrate that J.W. has little to no financial independence, and her accounts are used for the benefit of LUTHOR and/or BROWN.

C. **<u>Former Employees of GVM Confirm GVM's Excessive Billing</u>**

52. Several former GVM employees have been interviewed by law enforcement officers as part of this investigation. According to T.E., a former nurse practitioner employed by GVM, she had just received her certification to practice as a psychiatric mental health practitioner in January 2020, around when she saw a GVM posting on Indeed advertising a salary of $150,000 to $175,000 per year. T.E. thought she'd be lucky to earn $100,000, so that advertisement enticed her to submit her resume. BROWN and LUTHOR (who T.E. referred to as "Gabe") asked T.E. to come to Minnesota for "training," which T.E. felt "weird" about, so initially, T.E. accepted a different position.

53. After T.E. didn't like the first job she accepted, in or around August 2020, T.E. reached out to BROWN again, who flew T.E. to Minneapolis for "training." T.E. met with BROWN and J.W., who T.E. described as BROWN's "sidekick." This was the only time T.E. met anyone at GVM in person. According to T.E., there was not much training provided, but BROWN and J.W. gave T.E. a list of patients to visit with over the phone. BROWN instructed T.E. to visit with 40 patients per day, which T.E. described as not possible. According to T.E., she never even came close to visiting with 40 patients in one day, and the most T.E. could visit with in one day was maybe 20.

54. At one point, T.E. reviewed documentation in Kareo and noticed that on at least one patient visit there were services listed that she did not provide. This experience was the last straw for T.E. with GVM and she resigned shortly after. According to T.E., while she was employed by GVM, she would enter her notes to document patient visits in Kareo, GVM's health-records-management system. Once the visit was submitted in Kareo, it was sent to someone else at GVM for coding and billing. Then the submission would be sent back to T.E. for T.E.to sign, before it was billed out to Medicare or Medicaid or another payer, but at that stage in the process, T.E. could not actually see what she was signing.

55. T.E. resigned after three months of working at GVM.

56. According to a former third-party biller for GVM, G.G., J.W. was responsible for coding, notes and super billing for GVM.

57. According to a former GVM office manager, D.C., GVM did not adequately prevent the cloning of patient notes in Kareo. D.C. also said that Rodessa Kraus, BROWN and J.W. managed the daily operation of GVM. Finally, D.C. understood that J.W. would alter practitioner notes in Kareo.

58. According to T.E., Stewart, and other witnesses interviewed, GVM also employs "technicians" who visit patients in their homes to perform the neurofeedback "treatments." According to T.E., the technicians are supposed to visit each patient three times per week.

59. Law enforcement officers have interviewed three former GVM "technicians." These technicians stated they received no training in neurofeedback other than following another technician for a day or two before going out on their own,and/or did not ever understand how the neurofeedback equipment they used on GVM patients actually worked. Nevertheless, according to the interviewed technicians, GVM technicians are expected by GVM to schedule 10 patients per day, or 50 per week.

**D. <u>Former Patients of GVM Confirm GVM's Excessive Billing</u>**

60. Several current and former GVM patients have been interviewed by law enforcement officers as part of this investigation. Some patient witnesses never requested services from GVM and were uncertain how or why GVM technicians started visiting them to render any services. Some patient witnesses tried to stop GVM services and had a difficult time doing so.

61. For example, in an interview on January 3, 2022, Patient 1 (a Medicare and Medicaid recipient) said she sees GVM 2-3 times each week for neurofeedback treatments and has been doing so for about three years. Patient 1 said she struggles with agoraphobia, depression and anxiety and the neurofeedback treatments are supposed to rewire the routes in her brain to help with those conditions. Patient 1 believes the treatments are helping with her conditions. In addition to her 2-3 neurofeedback treatments each week, Patient 1 visits with a GVM provider via phone once a week to discuss her neurofeedback results and every Tuesday she has a call with GVM to discuss her mental health. Based on her review of her records,

Patient 1 noticed that GVM bills her insurance company even when she doesn't answer GVM's calls.

62. In an interview on January 6, 2022, Patient 2 (a former GVM patient who is also a Medicare recipient) said in 2019 or 2020, a doctor she was seeing for back pain referred her to GVM for a senility or Alzheimer's test. Patient 2 said she is 82 years old but still all there mentally. Patient 2 agreed to the tests. A GVM technician came to her home to administer the tests, for which they put electrodes on her head and asked her "stupid," common sense questions. Patient 2 did this for about two years. She started doing it three times each week at first but then cut back to once a week. When Patient 2 cut back to twice a week, a woman from GVM called her and was "pushy," trying to get her to go back to three times a week. Patient 2 stopped doing it completely in late November or early December 2021. She stopped because she got tired of doing it and she didn't need it.

## E. **<u>BROWN's own Description of Neurofeedback Therapy Confirms GVM's Excessive Billing</u>**

63. An email dated July 30, 2019, seized from BROWN's Gmail Account was sent from BROWN to "The Shade Tree" (a shelter for abused women located in North Las Vegas, Nevada). BROWN stated, "EEG Neurofeedback or brain wave biofeedback is a non-medical, general training that takes advantage of the body's ability to self-regulate and seek balance. Noninvasive sensors or electrodes are connected to specific sites on the surface of the head with paste or a brain cap and gel. The sensors enable the brain wave patterns to be picked up and displayed on a computer screen. The computer assists the brain in recognizing normal rhythmic patterns and produces proportional auditory and/or visual feedback that reinforces more optimal brain wave generation."

64. BROWN's email continued, "[w]e generally expect a positive response within the first 12-15 sessions, if there is to be one. If no improvement is achieved in that time, we would recommend suspending treatment." The email concludes by stating, "While there are often improvements in the first few sessions, Neurofeedback training usually requires at least 25, and most commonly 3-50 sessions with a small number of follow-up reinforcement sessions for permanent changes to take place."

65. According to Noridian records, from about January 1, 2018, to March 22, 2021, Noridian reimbursed GVM for the "treatment" provided to approximately 3,059 patients. When the information from Noridian is sorted by patient last name and the total amount paid out by Noridian on behalf of each patient, the payments on behalf of the "top" 15 patients during that time total approximately $4.3 million.

66. Based on a review of the "top" 15 GVM patients identified in the Noridian records, GVM does not follow the neurofeedback guidelines outlined in BROWN's email. For example, Patient 1 was seen by GVM for biofeedback a total of approximately 277 times between April 12, 2019, and February 3, 2021. Patient 3 was seen by GVM for biofeedback a total of approximately 479 times in that period. Patient 4 was seen by GVM for biofeedback a total of approximately 259 times in that period. And Patient 5 was seen by GVM for biofeedback a total of approximately 444 times.

### F. <u>LUTHOR and BROWN Diverted Millions in Federal and Private Payer Funds for their own Financial Gain</u>

67. Bank records from Bank of America show that approximately $6.7 million was deposited in GVM bank accounts between August 29, 2018 and June 29, 2020, about $5 million of which were federal Medicare funds deposited by Noridian (for Nevada-based claims). During this same time frame, GVM's account received approximately $1.7 million

from other payers (i.e., Medicare program administered by Florida, Medicaid, and private health insurance payers).

68. Bank records from Bank of America show that more than half of the funds deposited into GVM's accounts were almost immediately deposited into BROWN or LUTHOR's personal accounts. From around November 2018 to June 2020, bank records show that nearly $4 million was transferred to BROWN and/or LUTHOR's personal checking or savings accounts.

| **Bank Account(s))** | **Account holder** | **Amount Transferred (approximate)** |
|---|---|---|
| Bank of America Checking Account (ending '1052) | BROWN | $2.3 million |
| Bank of America Checking Account (ending '4509) | LUTHOR | $1 million |
| Bank of America Savings Account (ending '3574) | BROWN and LUTHOR | $90,000 |
| Bank of America Savings Account (ending '3436) | BROWN | $259,900 |
| | **Total** | **$3.6 million** |

69. Although it appears the largest volume of transfers from GVM's accounts were diverted into BROWN's accounts—many of those funds were subsequently moved from BROWN's account into LUTHOR's account. For example, according to Bank of America, from 2018 to 2019, BROWN transferred approximately $161,000 from BROWN's account ending '1052 into LUTHOR's account ending 4509.

70. According to Bank of America accounts, between the end of 2018 and 2021, LUTHOR and BROWN had no other sources of income except for the transfers they received from GVM bank accounts.

71. According to Noridian records, from around June 2020 through March 2021, Noridian paid out over $6 million in additional Nevada-administered federal Medicare funds to GVM.

72. Bank of America records show that in 2021 and 2022, transfers of funds continued from GVM Bank of America accounts ending in 5822, 1472 and 4198 to Bank of America accounts associated with BROWN and LUTHOR. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $1,300,000 to LUTHOR's Bank of America accounts ending in 0641, 3834, 4509. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $1,500,000 to BROWN's Bank of America accounts ending in 1052, 2128 and 3436. Between May 2021 and April 2022, GVM Bank of America accounts ending in 5822, 1472 and 4198 transferred approximately $33,000 to shared BROWN and LUTHOR Bank of America accounts ending in 3574 and 8540.

**G. <u>LUTHOR and BROWN Diverted Millions in Federal and Private Payer Funds for their own Financial Gain</u>**

73. Bank records also show that BROWN and LUTHOR quickly spent the funds they diverted from GVM on their own lavish lifestyle.

74. For example, according to the August 2021 Bank of America bank statement for BROWN's personal checking account ending in 1052, there was approximately $120,195.75 deposited and $121,517.32 debited that month. The beginning balance was $9,800.77 and the

ending balance was $8,479.20. During this time, BROWN purchased travel to Florida, Nashville, and Las Vegas, including the booking of flights, hotels and limousine services.

75. According to the August 2021 Bank of America bank statement for LUTHOR's personal checking account ending in 4509, there was approximately $199,412.80 deposited and $207,948.38 debited that month. The beginning balance was $10,226.33 and the ending balance was $1,690.75.

76. During that one-month period, LUTHOR spent approximately $99,306.02 at strip and/or night clubs in and around the areas of Minneapolis, Minnesota.

77. During the same one-month period, LUTHOR spent approximately $32,227.08 at Minneapolis restaurants including Seven Sushi, Flemings, Union, and Manny's.

78. During the same one-month period, LUTHOR also spent approximately $5,130 in Tinder and CashApp transfers to various women.

79. LUTHOR's and BROWN's excessive spending on trips, restaurants, night clubs and other entertainment continued after August 2021. According to records obtained from Bank of America, from between around September 2021 to May 2022, BROWN and LUTHOR spent the following approximate amounts to maintain an extravagant lifestyle:

| PAYEE | PAYEE DESCRIPTION | GOLDEN VICTORY #1472, #4198, #5822 | LUTHOR #0641, #3834, #4509 | BROWN #1052, #2128, #3436 | LUTHOR/BROWN JT #3574, #8540 | TOTAL EXPENDITURES |
|---|---|---|---|---|---|---|
| Cash & Other Withdrawals | | $8,500.00 | $50,030.94 | $117,036.00 | $20,503.00 | $196,069.94 |
| RJP | Construction Company | | | $120,275.00 | | $120,275.00 |
| Reign-Mpls | Night club | | $119,977.14 | | | $119,977.14 |
| The Armory-Mpls | Music venue | | $94,808.04 | | | $94,808.04 |
| TrueAir Charter | Private jet | | | $73,268.28 | | $73,268.28 |
| E11Even-Miami | Night club | | $63,474.98 | | | $63,474.98 |
| RCI Dining Svcs-Mpls | Rick's Cabaret/Seville Club | | $54,619.87 | $828.00 | $1,766.90 | $57,214.77 |
| G.T. Consulting Group LLC | | | $3,500.00 | $40,000.00 | | $43,500.00 |
| Vendome-Miami/Miami Beach | Night club | | $32,132.90 | | | $32,132.90 |
| Miami Gardens Sq-Miami Gardens | Tootsie's/Strip club | | $30,928.29 | | | $30,928.29 |
| The River-Miami | Restaurant | | $22,809.00 | $6,000.00 | | $28,809.00 |
| Delta Airlines | | $2,807.42 | $1,731.48 | $22,501.63 | | $27,040.53 |
| Fredrikson & Byron PA-MN | Attorneys | | | $25,000.00 | | $25,000.00 |
| Daer Day Club-Hollywood, FL | Night club | | $16,129.50 | | | $16,129.50 |
| Spencer Dior Puckett | Individual payee | | | $14,500.00 | | $14,500.00 |
| Sun Country Airlines | | | $1,213.20 | $11,782.40 | | $12,995.60 |
| LIV-Miami Beach | Night club | | $12,014.32 | | | $12,014.32 |
| Sapphire Restaurant-Las Vegas | | | $9,957.00 | $1,200.00 | | $11,157.00 |
| Minnesota Timberwolves | | | $10,500.00 | | | $10,500.00 |
| MN Twins/Twins Ballpark | | | $10,235.17 | | | $10,235.17 |
| CLK Entertainment Inc | | | | $10,175.00 | | $10,175.00 |

## H. <u>Location to be Searched</u>

80. The **Subject Premises** is a medical clinic currently used by GVM and located on the second floor, in adjoining Suites 200 and 220, of a three-story office building located at 2870 S Maryland Pkwy, Las Vegas, Nevada. Based on my review of video footage made publicly available by the office building, and information obtained from other law enforcement officers in this investigation, Suites 210 and 230 are adjacent to one another, across the hallway from the **Subject Premises**.

81. On September 29, 2022, at approximately 10:52 a.m., an Eden Prairie Police Officer went to the office building located at 2870 S Maryland Pkwy, Las Vegas, Nevada, and observed the directory on the first floor. The directory lists "Golden Victory Medical" in Suites 200 and 220.

82. The Eden Prairie Police Officer then went upstairs to the **Subject Premises.** A sign outside Suite 200 listed "Golden Victory Medical" with hours of operation Monday through Friday from 9:00 a.m. to 5:00 p.m. and closed for lunch from 1:00 p.m. to 2:00 p.m.

Inside the **Subject Premises**, the Eden Prairie Police Officer observed several patients sitting in the waiting room and several employees working behind the reception desk.

83. The Eden Prairie Officer also observed the desk depicted in the below GVM photo (accessed through a Google Photo search), and based on his observations while visiting the clinic, believes the desk is located within "Suite 200" of the **Subject Premises**, and background space depicts "Suite 220" of the **Subject Premises**.



84. The Eden Prairie Police Officer also observed laptop and/or desktop computers appeared to be used by employees working at the **Subject Premises**.

85. On October 18, 2022, law enforcement officers interviewed former CEO for Golden Victory Medical, Bryan Stewart. According to Stewart, the former Office Manager, among other high-level employees for GVM, worked remotely from home at times, using their personal laptops.

86. Stewart also said Golden Victory Medical had recently moved into the **Subject Premises** when he began employment on November 10, 2021. When he visited the **Subject Premises**, he said the Golden Victory Medical office may have been in two adjoining suites. He said there were maybe 10 or fewer individuals at the clinic during his visit, including two patients.

87. According to a spreadsheet of Golden Victory Medical clinic locations and Lease Agreements compiled and provided by Stewart, Golden Victory Medical executed the Lease Agreement for the term of 40 months for the **Subject Premises** beginning November 1, 2021.

88. U.S. Postal Service records show that Golden Victory Medical, LLC receives mail at **Subject Premises**. GVM received mail addressed to it at **Subject Premises** as recently as January 3, 2023. U.S. Postal Service records do not show any mail directed to Suite 220 within the **Subject Premises**, as any mail directed to GVM is addressed to Suite 200.

89. On January 5, 2023, a Las Vegas Metro Metropolitan Police Department Officer walked the office building's hallway next to the **Subject Premises**, and observed the same placard described above on the wall outside of the **Subject Premises**, which reads, "Golden Victory Medical Internal Medicine and Mental Health Services." There was no separate placard for Suite 220.

90. Therefore, investigators believe the **Subject Premises** is currently used by GVM in furtherance of the **Subject Offenses**. Investigators also have reason to believe that the devices currently located at the **Subject Premises** have been used in furtherance of the **Subject Offenses**, because, as described further above, GVM's billing and patient records are electronically generated and maintained. In addition, communications sent and received by BROWN and LUTHOR and their suspected co-conspirators, in furtherance of the **Subject Offenses** have occurred, at least in part, over text, e-mail, and social-media-messaging applications.

## TECHNICAL TERMS

91. Based on my training and experience, and information acquired from other law enforcement officials with technical experience, I know the terms described below have the following meanings:

a. "Digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central-processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as USB flash drives, hard disk drives, compact disks, and other magnetic or optical media, and memory chips; and security devices.

b. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions. Tablets also contain apps.

c. A "storage medium" is any physical object upon which electronic data can be recorded. Examples include USB flash drives, hard disks, RAM, flash memory, CD-ROMs, and other magnetic or optical media

d. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data

security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

**SEIZURE OF DIGITAL DEVICES[8] AND FORENSIC ANALYSIS**

92. As described above and in Attachment B, this application seeks permission to seize electronic devices that might be found at the **Subject Premises** that might contain evidence, fruits, contraband, instrumentalities, and information related to the Subject Offenses. Thus, the warrant applied for would authorize only the seizure of digital devices and electronic storage media or, potentially, the on-site copying of digital devices, under Rule 41(e)(2)(B).

93. *Probable cause.* Based on my knowledge, training, and experience, and experience and information acquired from other law enforcement officials with technical experience, I submit that if any digital devices are found at the **Subject Premises**, there is probable cause to

---

[8] "Digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central-processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as USB flash drives, hard disk drives, compact disks, and other magnetic or optical media, and memory chips; and security devices.

believe those records will be stored on the aforementioned digital devices, for at least the following reasons:

a. I know that electronic files on a digital device and related electronic storage media can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is because when a person "deletes" a file on a digital device-or any other electronic storage media, the data contained in the file does not always actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, certain cellular telephones' (i.e. smartphones) and computers' operating systems may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, cellular telephones and computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a cellphone or computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, including spreadsheets, schedules, and billings records, I am aware that computer equipment was used to generate, store, and print documents used in the fraud scheme. There is reason to believe that there is a computer system currently located on the **Subject Premises**.

94. *Necessity of seizing or copying entire digital device, or storage media*. In most cases, a thorough search of a premises for information that might be stored on a digital device or storage media often requires the seizure of the physical digital device or storage media and later off-site review consistent with a warrant. In lieu of removing a digital device or storage media from the premises, it is sometimes possible to make an image copy of the digital device or storage media. Generally speaking, imaging is the taking of a complete electronic picture of the digital device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device or storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of digital device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **Subject Premises**. However, taking the digital device or storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

95. *Authorization of Examination to be later Sought*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging,

or otherwise copying digital devices and storage media, but does not authorize a later review of the media. Any later searches will be conducted in accordance with any procedures outlined in a warrant obtained in the District where the investigation will continue.

96. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what digital devices and storage media must be seized or copied, and what digital devices and storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize digital devices and storage media, to reduce the extent of disruption. If, after inspecting the digital devices and storage media, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

97. GVM ("the Company") is a functioning company that may conduct legitimate business. The seizure of the Company's digital devices may limit the Company's ability to conduct any possible legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what digital devices or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

98. I respectfully submit that this affidavit supports probable cause to search the subject premises described in Attachment A and seize the items listed in Attachment B.

JUSTIN D. STEELE
Postal Inspector
UNITED STATES POSTAL
INSPECTION SERVICE

SWORN TO AND SUBSCRIBED
before me this 11th day of January, 2023.

NANCY J. KOPPE

THE HONORABLE NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

I hereby attest and certify on 1/11/2023
that the foregoing document is a full true and correct copy of the original on file in my office, and in my legal custody.

NANCY J. KOPPE
U.S. MAGISTRATE JUDGE
DISTRICT OF NEVADA

By ______ Deputy Clerk

# ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

The property to be searched is 2870 S Maryland Pkwy, in adjoining Suites 200 and 220, Las Vegas, Nevada, further described as a medical office on the second floor of a three-story office building. The office building is called the Partell Medical Center.



Golden Victory Medical is listed in Suites 200 and 220 in the directory on the first floor.






Golden Victory Medical has a sign outside its door on the second floor. The sign lists "Golden Victory Medical" with hours of operation Monday through Friday from 9:00 a.m. to 5:00 p.m. and closed for lunch from 1:00 p.m. to 2:00 p.m.



The search of the **Subject Premises** shall include any and all attachments, storage units, appurtenances thereto, and all other areas within the curtilage. The search of the **Subject Premises** shall also include a search of any and all containers, clothing, or personal items (*e.g.*, safes, digital devices, backpacks, wallets, briefcases, and bags) within the **Subject Premises** at the time of the execution of the search warrant.

For clarity purposes, the search described above do not include containers, clothing, or personal items belonging to patients or other individuals located at the subject premises who are not owners, officers, or employees of Golden Victory Medical, LLC, Olympia, LLC, and other business entities owned or operated by ELIZABETH BROWN or GABRIEL LUTHOR aka GABRIEL LANGFORD.

**ATTACHMENT B**

**PROPERTY TO BE SEIZED**

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering) (collectively referred to as the "Subject Offenses"), as further described in the Affidavit of Probable Cause for the time period from January 1, 2018 through the present, including, but not limited to:

a. Medical Insurance Records: All records involving Medicare, Medicaid, and private healthcare insurance companies, including records of Explanations of Benefits (EOBs), payments, deposits, correspondence, applications, claims, documents in support of claims, audits, denials, documents in support of denials, and appeals;

b. Business Records: All records relating to Golden Victory Medical, LLC, Olympia, LLC, and other business entities owned or operated by ELIZABETH BROWN or GABRIEL LUTHOR aka GABRIEL LANGFORD, including incorporation papers, shareholder information or agreements, documents identifying executive leadership and/or board membership, organization charts, meeting minutes, mission statements, financial documents, employee payroll documents, correspondence, payments, invoices, and receipts;

c. Digital devices, including wireless phones, and storage medium that could contain evidence of the Subject Offenses;

d. Tax records, including copies of personal or business tax returns involving BROWN or LUTHOR or any other party;

e. Stored cash; safe deposit boxes and items related to safe deposit boxes, such as keys and account records for any safety deposit boxes maintained at a financial institution such as a bank or credit union;

f. Financial records (including records involving Bank of America, Wells Fargo, U.S. Bank, MoneyGram, Green Dot, Zelle, and CashApp, including customer account records, receipts, checks, bank and savings and loan records of deposit, loans, lines of credit, withdrawal and wire transfer, statements and other bank records, credit card statements, money orders, debit cards, cashier's checks, cancelled checks, certificates of deposit, customer account information, income and expense summaries, cash disbursement journals, and financial statements;

g. All items associated with the use of cryptocurrency whether those items are handwritten or typed, on paper or in electronic form, or located in software, hardware or a mobile application, including wallets, public or private keys or addresses, notes, ledgers, journals, receipts, invoices, lists of payors and payees, and records of transfers, deposits, withdrawals, and exchanges;

h. Records to track the receipt and payment of proceeds involving the Subject Offenses whether those records are handwritten or typed or paper or electronic, including notes, ledgers, journals, receipts, invoices, and lists of payors and payees;

i. Records relating to the business activities of BROWN and LUTHOR, and others in furtherance of the Subject Offenses, such as correspondence, loans/promissory notes, memoranda, incorporation records, customer account statements, typed

and/or handwritten notes, ledgers, appointment calendars, address books, diaries, photographs, and recorded messages, whether in audio or video, contracts, invoices, agreements, financial statements, advertising materials, corporate brochures, documents provided to financial institutions, all personnel records, all internal or external reviews by auditors, all audits, insurance records, bank records, settlement agreements, sales addenda, corporate resolutions, and correspondence;

As used herein, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central-processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as USB flash drives, hard disk drives, compact disks, and other magnetic or optical media, and memory chips; and security devices.

For clarity purposes, the items to be seized described above do not include documents, devices, and other property belonging to patients or other individuals located at the subject premises who are not owners, officers, or employees of Golden Victory Medical, LLC, Olympia, LLC, and other business entities owned or operated by ELIZABETH BROWN or GABRIEL LUTHOR aka GABRIEL LANGFORD.

**This warrant expressly incorporates the Affidavit submitted in support of the Application for Warrant as though set forth fully herein.**