UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-88(2) (ECT/LIB)

United States of America,

    Plaintiff,

**REPLY TO GOVERNMENT RESPONSE TO MOTIONS TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE**

v.

Elizabeth Christine Brown (2),

    Defendant.

    The Defendant, Elizabeth Christine Brown, by and through her attorneys, Andrew S. Garvis and Erica E. Davis, respectfully reply to the government's response to her motion to suppress any physical evidence obtained as a result of a search and seizure. Ms. Brown moved to suppress evidence obtained for various social media accounts, her home and place of employment, as well as digital media taken in various searches of the home and place of employment. (ECF 56: Exhibits a–g).[1] Ms. Brown's co-defendant, Mr.

---

    a. 21-mj-96: Instagram account of Liz_BrownXOXO;
    b. 21-mj-97: Google account for IzzyBanks09@gmail.com ;
    c. 21-mj-102: Facebook account Liz.Brown1982;
    d. 23-mj-15: 11631 Welters Way, Eden Prairie, MM 55347;
    e. 2:23 mj-25: 2870 S. Maryland Pkway, Las Vegas, NV 89109, Suite 200 and 220;
    f. 23-mj-37: Electronic devices seized as part of Exhibit A to 11631 Welters Way, Eden Prairie, MN 55347 search warrant; and
    g. 23-mj-567: Subsequent search warrant related to all digital media seized at 11631 Welters Way.

1

Garbriel Adam Alexander Luthor, also moved to suppress evidence obtained from five (5) of the same warrants. (*Compare* ECF 56 *with* ECF 63). The government responded *jointly* to the suppression warrants.² (ECF 69). Moreover, Mr. Luthor has already submitted his memorandum of law related to those five search warrants, and Ms. Brown adopts the legal reasoning as set out in the arguments of co-counsel for Mr. Luthor related to all the warrants, and requests suppression based upon those arguments. (*See* ECF 72, referencing ECF 63). Ms. Brown supplements that argument as set out below.

> *The social media warrants lacked any evidence whatsoever that Mr. Luthor and Ms. Brown were engaged in forced trafficking over state lines.*

The government actually puts forth an argument that, at the time of the issuance of the Facebook, Instagram and Google warrants, there was probable cause that Mr. Luthor and Ms. Brown were engaged in violating the Mann Act. (Ex. a, b, and c to ECF 56 ["hereinafter [social media warrants"])³; (ECF 69: Gov't Response at 12).

The government noted that:

> with respect to the Mann Act, federal law prohibits a defendant from knowingly transporting a person across a state line or national border with the intent that the person engage in prostitution or certain other illegal sexual activity. 18 U.S.C. § 2421(a). Similarly, one form of sex trafficking

---

² Ms. Brown also challenged a search warrant for two Gmail accounts, one of which was controlled by Ms. Brown. (ECF 56; Ex. b. (21-mj-97 (TNL)). Further, Ms. Brown challenged seven electronic devices found in the search of the home. (ECF 56; Ex. f. (23-mj-37 (ECW)). The government notes that Exhibit f relates to items seized not from Ms. Brown's "room," but two unindicted investigative subjects. (Gov't Response at 4). If the items seized were not those of Ms. Brown and nothing is being offered related to those seized items, then Ms. Brown withdraws her challenge to suppress items taken pursuant to Exhibit f.

³ All three of the social media warrants are from within two (2) days of each other, January 29, 2021, and February 1, 2021.

prohibited by federal law is providing (or participating in a venture that provides) a person to engage in commercial sex and causing that person to engage in commercial sex by "means or force, threats of force, fraud, coercion . . . , or any combination of such means." 18 U.S.C. § 1591(a).

(ECF 69 at 11).

In essence, it requires some form of proof that an individual is being *trafficked over state lines* for *forced* prostitution. (ECF 69: Gov't Response at 11–12 (emphasis added)).

Nothing whatsoever was presented in these social media warrants that supported such a derisive conclusion. Taken at its best, the information in the application shows nothing more than that Mr. Luthor was possibly in a polyamorous relationship with several "of age" individuals. Even that is not certain, as nothing is stated that these are his "partners," "spouses," or "concubines" outside of alleged innuendo. Moreover, no information was put forth that any of the women were so engaged in any sex acts. There are no texts or posts related to sex communication, offers of money for sex, or even sexual vocabulary by Ms. Brown, Mr. Luthor, or any of the other women living with them. Innuendo and supposition persist throughout these warrants with the intent, which was put forward by the officer, to purposely present facts in a way to create salacious constructs against Ms. Brown and Mr. Luthor. There was absolutely no evidence that these two trafficked anyone.

In fact, the only travel or sexual reference noted relates to the person J.R., who is cited in multiple warrants and who apparently did not like Mr. Luthor or Ms. Brown. J.R. was flown to Minneapolis (with her spouse) from Nevada in what appears to be an

attempt to impress her and possibly to get her to work for their legitimate business, Golden Victory Medical. They flew her out first class, picked her up at the airport, and she noted that they had a big house and a black Mercedes was in the driveway. (ECF 56, ex. a, b, c, at 7–8). These actions of showing some wealth are employed every day by people trying to impress someone or to get them to invest in their company. Yet, to J.R., the perception was different. For lack of a better term, she was "offput" by the whole interaction, so much so that she called 911 when she was back home, and went so far as to text one of the individuals and deride both Ms. Brown and Mr. Luthor.

She complained about how "weird" it was, and then she then went out of her way to attack personally both Ms. Brown and Mr. Luthor. (*Id.* at 9–10). She commented on Ms. Brown's attire, claiming it was "provocative," without noting who she thought Ms. Brown was trying to provoke or stimulate, (*id.* at 9), and furthermore, without having met or seen Ms. Brown and noting what her normal attire might be.

As to Mr. Luthor, she was concerned about his "controlling" demeanor and his looks, so much so that she personally attacked him, claiming he should "stop using a sharpie" on his eyes. (*Id.*). All of it was her own feelings and perception of the interaction, without any actual evidence of any illegal sex trafficking or fraud.[4]

The affidavit is replete with further examples of derisive comments and perceptions. (ECF 72 at 2–4; ECF 56, ex. a, b, and c):

---

[4] As noted in Mr. Luthor's response, J.R. not only made personal attacks, she made a claim that when she asked about Kareo, the billing software, no one seemed to know what it was. Yet, in subsequent search warrants, Kareo was noted prominently as a billing software that the used. (ECF 72 at 7 (referencing the warrant for the home, Ex. d)).

- The hairdresser's alert about how someone was dictating how a woman's hair should be cut.

Apparently, the hairdresser felt that Mr. Luthor and/or Ms. Brown were controlling the other individuals getting haircuts, and this was concerning to this person, but not so concerning that they actually made an effort to ask any of them about it.

- The plumbing inspector's note about the grotto tub and large shower that he had never seen before that he labeled a "gang shower."

As noted by Mr. Luthor, there is no such thing as a "gang shower." (ECF 72 at 3). More problematic is that it is clear that this term was being used to imply some form of illicit conduct in a shower, once again, without any proof of such and based purely on perception and not fact.

- Mail was pulled at that home and there was mail addressed to Brown there, as well as a prescription for antibiotics that Brown issued for Wilson that could be used for vaginal infections, and a contraceptive prescription addressed to Wilson

The affidavit baldly alleges that these things "may be" consistent with commercial sex, but without stating why or how these items could be related to such. (ECF 56, ex. a, at 13). There was just absolutely nothing in these "social media warrants" to demonstrate in even the slightest form that Mr. Luthor and Ms. Brown were engaged in trafficking individuals over state lines for prostitution.

*The affidavit for the social media warrants were devoid of evidence of "fraud" and "money laundering."*

The government then further stated in its memorandum that the social media warrants showed Mr. Luthor and Ms. Brown were engaged in wire fraud and money laundering. To support it, it put forth that this was based upon the facts that:

5

- They "owned a purported healthcare business"
- J.R. stated "oddly Luthor and Brown were unfamiliar with Kareo billing software"
- They had and had purchased a "large expensive home;" and
- They had "suspicious transactions" between Mr. Luthor and Ms. Brown from bank records the agents had seized.

The truth was that Golden Valley Medical was a properly licensed business in Nevada, formed in 2018. Moreover, any argument about J.R.'s comment about Kareo could only related to Mr. Luthor, as J.R. stated that "he controlled and was the only one to speak during the meeting," (ECF 56, Ex. a, b, and c), so that could not have related to Ms. Brown. This statement is further belied by what is noted in subsequent search warrants about Golden Victory Medical using Kareo software extensively. (ECF 56, Ex. d; ECF 72 at 7).

Moreover, it is not apparent how personal Zelle transfers from 2018 between Ms. Brown and Mr. Luthor relate to anything of Golden Victory Medical three years later regarding fraud or money laundering. These two live together and clearly were equals in business. The warrants opine that they could only have afforded this home through some form of fraudulent means, without any justification of such a statement. Nothing was presented related to either Mr. Luthor's or Ms. Brown's income, savings, credit score, or that they manipulated someone to get them to sell them the home. As noted in Mr. Luthor's response, it is just assumed that they engaged in money laundering to buy the house. (ECF 72 at 19).

The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. CONST. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007); *see also United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (In reviewing the decision of the issuing court, this Court must ensure that the court had a substantial basis for concluding that probable cause exists.). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (quotation marks omitted). The social media warrants, as noted in exhibits a–c of ECF 56 were devoid of such "fair probability" that the suspects were engaged in forced commercial sex, wire fraud or money laundering.

Moreover, there was no probable cause put forth in the applications to warrant the extensive searches requested in exhibits a–c that either Ms. Brown or Mr. Luthor, through Golden Victory Medical, were engaging in fraudulent billing. *See Williams*, 477 F.3d at 557; *Oropesa*, 316 F.3d at 766 (reviewing court must ensure that issuing court had a substantial basis for concluding that probable cause existed). It appears that the social media warrants were just fishing expeditions to substantiate further action.

*There was no nexus for the social media warrants.*

The government also opined that neither Mr. Luthor nor Ms. Brown raised anything related to "nexus" regarding the social media warrants. (ECF 69 at 15 n.5). Nexus was raised, as it is noted above, that the social media warrants were completely without fair probability that Ms. Brown, or Mr. Luthor for that matter, were engaged in any "sex trafficking," "wire fraud," or "money laundering." The government credulously puts forth that, because the parties interacted on these accounts and communicated with each other, it somehow gives rise to allow the search. In the interconnected world in which we live today, that analysis would strip the meaning completely from the Fourth Amendment to show that the place to be searched actually has evidence of crime to be found. *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) ("In order to support an application for a search warrant, '[t]here must be evidence of a nexus between the contraband and the place to be searched.'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016); *see also United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). As further noted in *Johnson*, "[f]actors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *Id.* (quoting *Colbert*, 828 F.3d at 726); *see also United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999)). There just was no nexus for any of the social media warrants.

> *The search warrants for the home on Welter Way and the business were derived from the impermissible search warrants for the social media warrants, and when that information is removed, no probable cause existed to support the search warrants.*

The search warrants for the parties' home on Welter Way and business were obtained by the exploitation of the illegality of the social media warrants, and there was no independent source of fair probability that a crime occurred at the home or the business. A violation of the Fourth Amendment usually triggers exclusion of evidence obtained by way of the violation. *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir.2012) (quoting *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011)); *see also Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

The warrants for the home and business were similar, and the government attempted to put forth that there was limited information used from the social media warrants in those warrants. (ECF 69 at 15). It noted only a few paragraphs were used in both warrants and that independent other evidence supports probable cause even if the social media warrant information is removed. (*Id.*). As stated in Mr. Luthor's response, however:

> [T]he more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Nix v. Williams,* 467 U.S. 431, 442 (1984) (quoting *Wong Sun,* 371 U.S. at 488).

(ECF 73 at 22).

It is plain that, without the social media warrants, the "continued investigation would not have been undertaken if the affiant had not obtained a panoply of communications from the accounts of Luthor and Brown with the initial, invalid warrants." (*Id.* at 23). Moreover, as argued by Mr. Luthor, no independent purge of the primary taint existed to allow the warrants for the home and business to be supported by fair probability of probable cause. (*Id.*).

At the time of the warrants for the home on Welter Way and the business, two years had elapsed since the initial social media warrants. Interestingly, at that time, the government no longer believed that Mr. Luthor or Ms. Brown were engaged in forced trafficking over state lines for prostitution. (ECF 56, Ex. d and e). Although there was no longer a belief that they were engaged in such forced trafficking over state lines for prostitution, the warrants still included information related to the parties and the social media accounts, noting travel and leisure they took. (*Id.*).

*There was no nexus to search the home that was over a thousand miles away from Nevada.*

The search warrant application set out no details as to why or how the home on Welter Way was involved in the fraud or money laundering. Only vague allegations of fraud at the *business located in Nevada* were offered, based upon accusations of gross money billed by an independent billing company employed by Golden Victory Medical, as well as one vague statement of a former employee.[5] Moreover, the warrant itself

---

[5] The government also states that patients alleged fraud, but as noted by Mr. Luthor, "[n]o patient said Medicare was billed for services the patient did not receive. No employee described a crime to the agent. (ECF 73 at 25).

10

implies that the basis for the charges against Golden Victory Medical related to a police officer's review of the top 15 patients and that the business was not doing "neurofeedback" pursuant to "a brochure that Ms. Brown used as marketing." (ECF 56, Ex. d, at 24). Not only was he not qualified to make such a claim, the fraud allegations were not based upon any factual allegations but upon the fact that Ms. Brown and Mr. Luthor took money out of their business:

> No patient said Medicare was billed for services the patient did not receive. No employee described a crime to the agent. The former-CEO lawsuit makes salacious allegations, but is a plaintiff's civil complaint, untested by litigation. The CEO did not tell the agent those things directly, when lying would be a crime. Instead, the agent lifted the worst allegations from a civil complaint and then did no follow-up with the person.

(ECF 72 at 25).

Most importantly, the government's response noted *nothing* related to why the home would contain anything illegal:

> [W]itnesses and experts indicated "GVM does not appear to practice neurofeedback in a manner consistent with the recommendations of" the expert consulted by investigators; GVM billing records indicated abnormally large billings for the company—e.g., Brown billed for 28,000 patient encounters in 2019, the equivalent of 76 patient encounters per day; Nevada nursing board records showed that Brown was sanctioned for practicing nursing outside the scope of her license; GVM's former CEO told investigators that Brown repeatedly thwarted his attempts to end GVM's excess billing of insurers; the former CEO and auditor records indicated an auditor warned Brown and Luthor about overbilling, and Luthor planned to falsely pass blame to a contractor; J.W.'s email and social media, witness interviews, and bank records together indicated J.W. was working for GVM but not being paid; several former employees and patients of GVM told investigators that GVM engaged in excessive false billing practices . . . .

(ECF 69 at 15–16).

In addition to probable cause, the Fourth Amendment also requires that a search warrant must describe with particularity the place to be searched and the things to be seized. U.S. CONST. amend. IV; FED. R. CRIM. P. 41; *United States v. Davis*, 723 F. Supp. 3d 677, 686 (E.D. Mo. 2022), *aff'd*, 126 F.4th 610 (8th Cir. 2025). The particularity requirement protects against "wide-ranging exploratory searches" unsupported by probable cause. *Davis*, 723 F. Supp. 3d at 686 (citing *United States v. Rosa*, 626 F.3d 56, 61 (2d Cir. 2010)); *see also Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Nothing in the warrants related to probable cause as to why Mr. Luthor and Ms. Brown's home over a thousand of miles away should or would contain evidence of a crime but for the desire to seize devices found in the home.[6]

The warrant for the home stated that electronic devices and computers may contain relevant information. (ECF 56, Ex. d and e). This was nothing more than a very broad and general statement, and nothing was presented as to why Golden Victory Medical's information would be located at the home or why seizing any and all electronic devices would yield information related to any allegation of fraud thousands of miles away. (Ex. d. at 28–37, ¶¶ 87–93). The warrant was a generalized warrant to search the home at

---

[6] As touched upon above, apparently the first seven electronic devices were not those of Mr. Brown or Mr. Luthor, but such was not clear from the warrants, returns, or any reports. Obviously, if those devices are not those of Mr. Luthor or Ms. Brown, then the search of them is not objectionable, *but* they were seized pursuant to the search warrant at the home on Welter Way owned by Mr. Luthor and Ms. Brown. The government puts forward a similar argument related to the additional 23 devices for which likewise owners were not listed, but like the seven devices found in Ex f, they were seized from the home on Welter Way. The government has returned several of those items to Ms. Brown and is well aware that several in the return are her personal property. *See* Items 3–6 in the return, attached hereto.

Welter Way and not based upon fair probability that evidence of a crime would be found there.

The warrant for the business in Nevada suffers from the same faulty analysis of fraud that is found in the warrant for the home. (ECF 56, Ex. e). The warrant from Nevada is extremely similar to that of the warrant for the home, putting forward the same derisive allegations of the "lifestyles" of Mr. Luthor and Ms. Brown. The warrant again uses a marketing brochure to make claims that "neurofeedback" was not being done "appropriately" and that Ms. Brown traveled to various locations and went on ski trip. (Ex. e at 7 and 9). Again, the fraud allegations consisted of vague arguments about "over billing." (*Id.*).

> As so aptly put in Mr. Luthor's reply:
>
> In both warrants, the Court is left with two people who own a medical business, that is open for business hours, and has patients and employees. The patients confirm they got the services billed, but complain about pushiness. The employees provide the services billed for, but complain about management and training styles. Luthor and Brown have a polyamorous and financially irresponsible lifestyle, and their other girlfriends are emotionally and financially dependent on them to some degree. However, they are not prostitutes and Luthor and Brown are not pimps. There is no commercial sex ever alleged to have occurred by the girlfriends at the behest of Luthor or Brown, nor for the financial benefit of Luthor nor Brown. Thus, all the salacious allegations are wasted ink, that served only to prejudice a reviewing Court against Luthor and Brown for improper, e.g. morality policing reasons.
>
> These warrants therefore also fail to rise to a fair probability of describing criminal activity afoot that the warrants will uncover. With the fruit of the poisonous tree excised, the warrants for the home and office were so wholly void of probable cause that the *Leon* good faith exception does not apply to prevent suppression. 468 U.S. 897, 922 (1984).

(ECF 72 at 25–26).

*The search warrant for the 23 digital items taken in the search at Welters Way was not supported by probable cause.*

The subsequent search warrant for items taken attached from the home, related to all digital media seized at Welters Way, was not supported by any probable cause related to the specific devices owned by Ms. Brown, any wire fraud in violation of 18 U.S.C. § 1343, or money laundering per 18 U.S.C. § 1956 and 1957. (ECF 56, Ex. g). The warrant for the 23 devices then added back Mann Act violation allegations related to Mr. Luthor, and purported to set out salacious innuendo and supposition about Mr. Luthor and his lifestyle. (*Id.*). The application did not pertain to any aspects of wire fraud of Ms. Brown whatsoever, and is just a warrant to allow the government to rummage through Ms. Brown's iPhone, various iPads, and laptops. This is a general warrant specifically prohibited by the Constitution and case law. *See* U.S. CONST. amend. IV. "Particularity prohibits the government from conducting general, exploratory rummaging of a person's belongings." *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014) (quoting *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992)) (internal quotation marks omitted).

Contrary to the government's reply to the motion to suppress the warrant, Ms. Brown and Mr. Luthor surely have standing to challenge those devices taken. Mr. Luthor clearly addressed this red-herring argument in his memorandum after noting the Supreme Court test as to whether a person has a legitimate expectation of privacy in the place to be searched:

> Here, Luthor asserts a privacy interest in the phones, tablets, computers and electronic devices found in his home, other than those which belonged to

14

others. One's privacy interest in one's electronic devices in one's home is plainly an objectively reasonable expectation of privacy. *Monie,* 907 F.2d at 794, *see also United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991).

The home was Ms. Brown's, as well, and she has an expectation of privacy in those things taken from it, and as already set out supra, Ms. Brown has already been given back several of those items. Moreover, the search warrant for the devices does not purge the taint of the illegal search of the home. *Segura v. United States*, 468 U.S. 796, 804–05 (1984) (Evidence obtained by the exploitation of the illegality is excluded as a "fruit" of the prior illegality.). The devices would not have been seized but for the illegal search of the Welters Way home, and as such, the subsequent search of them should be suppressed. *Nardone v. United States*, 308 U.S. 338, 341 (1939); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

Furthermore, any argument that the warrant was "reasonable given the circumstances," (ECF 69 at 18), is not the proper analysis, but rather whether there was fair probability that crimes associated with Ms. Brown, as set out in the warrant, would be found. In particular, as to the Welters Way warrant, the application was devoid of any real information related to Ms. Brown about the Mann Act, wire fraud, and money laundering violations, and therefore the devices were not taken and subsequently searched with the support of probable cause or purged of their initial taint.

Leon *does not save these warrants.*

The government's reliance on the *Leon* doctrine as the failsafe does not save these warrants. The government, in its memorandum in support of the warrants, provided:

> Here, the seven warrants were all supported by probable cause. But even if they weren't, there was a weighty amount of indicia to allow a reasonable officer to believe that probable cause was present. Five different magistrate judges agreed. District of Minnesota Magistrate Judges Menendez, Leung, Cowan Wright, and Foster, and a District of Nevada judge all signed warrants in this matter. Their authorizations were relied upon in good faith.

(ECF 69 at 19).

The Fourth Amendment expressly imposes two requirements. First, all searches and seizures must be reasonable, and second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity. *Kentucky v. King*, 563 U.S. 452, 459 (2011). The exclusionary rule is a judicially crafted remedy for a government's violation of the Fourth Amendment. *Leon* is a limitation of that rule, but *Leon's* good-faith inquiry is confined to the "objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal" despite the issuing judge's authorization. *United States v. Puckett,* 466 F.3d 626, 630 (8th Cir 2006). The rationale for the good-faith exception was that "no justification exists to exclude evidence 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)).

But an officer's reliance is not absolute. *Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in

16

support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon*, 468 U.S. at 923; *Puckett*, 466 F.3d at 630. In this instance, the seven warrants[7] challenged are not saved by *Leon*, as they wholly lacked indicia of probable cause and were derived almost exclusively from unsupported conclusory statements related to the lifestyle of Mr. Luthor and Ms. Brown, making the reliance by any officer unreasonable. (ECF 72 at 30).

Moreover, Ms. Brown adopts the argument of Mr. Luthor specifically related to *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and how its analysis casts doubt on *Leon's* limitations for exclusion for violating the Fourth Amendment.

*Dobbs* held that there was no right to an abortion under the previously crafted "privacy" right that had been applied to the states via the Due Process clause of the Fourteenth Amendment in *Roe v. Wade*, 410 U.S. 113 (1973). *Dobbs* upended 50 years of precedent related to the right to an abortion. The Supreme Court, as it is currently configured, once again looked to history to see if protecting the right to an abortion was a right engrained the time of the making of the Constitution. After noting that it was not, the majority stated:

> On occasion, when the Court has ignored the [a]ppropriate limits imposed by respect for the teachings of history, it has fallen into the freewheeling judicial policymaking that characterized discredited decisions . . . . The Court must not fall prey to such an unprincipled approach. Instead, guided

---

[7] Arguably, only six warrants, considering the warrant for the seven devices which appear not to be those of Mr. Luthor or Ms. Brown. (ECF 56, Ex. f).

> by the history and tradition that map the essential components of our Nation's concept of ordered liberty, we must ask what the *Fourteenth Amendment* means by the term "liberty." When we engage in that inquiry in the present case, the clear answer is that the Fourteenth Amendment does not protect the right to an abortion.

*Dobbs*, 597 U.S. at 241.

This analysis, in part, focused in on how the Court in *Roe* "was remarkably loose in its treatment of the constitutional text." *Id.* at 235. It noted how abortion was not mentioned in the Constitution, was crafted out of a right to privacy that also was not mentioned in the Constitution, and is not set out in or part of the 14th Amendment's Due Process clause. *Id.*

*Dobbs* is just one in a string of recent decisions wherein the Supreme Court has "adopted a 'history and tradition' test in a variety of constitutional contexts, breaking from its own history where its precedent diverged from that interpretive method." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 117 (3d Cir. 2023), *cert. granted*, *judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706, 219 L. Ed. 2d 1313 (2024); *see also, e.g., Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (interpreting the Free Exercise clause and overruling *Lemon v. Kurtzman*, 403 U.S. 602 (1971); *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) (explaining Article III standing); *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 129 (2019) (interpreting the Establishment clause); *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (no historical analogues existed to restrict law abiding citizens from carrying a firearm in public); *United States v. Rahimi*, 602 U.S. 680 (2024) (historical analogues existed to disarm

those at the time of foundation to allow firearm restriction for someone subjected to a domestic restraining order).[8]

The *Dobbs* analysis, along with the other recent Supreme Court cases, cast doubt on *Leon's* continued efficacy of limiting excluded evidence obtained in violation of the Fourth Amendment based upon "good faith." *Leon* finds no support in the contextual framework of the Constitution, nor is it "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs*, 597 U.S. at 231 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). As such, the "catchall" of *Leon* should not apply.[9]

---

[8] Counsel for Ms. Brown is aware that this Court, as mentioned in Mr. Luthor's argument, has ruled that it is bound by precedent and that *Leon* remains good law. *United States v. Brown*, No. 24-CR-26 (ECT/LIB), 2025 WL 830077, at *12 (D. Minn. Mar. 13, 2025).

[9] Counsel anticipates the argument presented by the government will be that exclusionary rule is not found in the Constitutional text, and although true, it was crafted to protect individuals as a practical consequence for governmental violation of the Fourth Amendment. Without it, the Fourth Amendment would be nothing more than words on paper without force.

## CONCLUSION

For the foregoing reasons, Ms. Brown respectfully asks the Court to suppress all the evidence derived from the warrants.

Dated: November 19, 2025            Respectfully submitted,

KOCH & GARVIS, LLC

/s/ *Andrew S. Garvis*
Andrew S. Garvis, Att'y #257989
3109 Hennepin Avenue South
Minneapolis, MN 55408
612-827-8101
andrew@uptownlawyer.com

DAVIS AND EGBERG, PLLC

/s/ *Erica E. Davis*
Erica E. Davis, Att'y #393610
3109 Hennepin Avenue South
Minneapolis, MN 55408
612-351-2155
erica@davisandegberg.com

*Attorneys for Defendant Brown*