UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                      Case No. 25-cr-88 (ECT/LIB)

      Plaintiff,

                                    **ORDER AND**

v.                                             **REPORT AND RECOMMENDATION**

Gabriel Adam Alexander Luthor (1),
Elizabeth Christine Brown (2),

      Defendants.

      Pursuant to a general assignment made in accordance with 28 U.S.C. § 636, this matter comes before the undersigned United States Magistrate Judge upon Defendant Luthor's and Defendant Brown's various pretrial Motions. Pursuant to request of the parties, the Court took the Defendants' Motions under advisement upon the parties' written submissions.

      For the reasons discussed herein, Defendant Brown's Motion to Preserve Rough Notes, [Docket No. 54], Defendant Luthor's Motion for Disclosure of Brady, Giglio, and Impeachment Information, [Docket Nos. 59, 60, 61], and Defendants' Motions to Produce 404(b) Evidence, [Docket Nos. 55, 58] are **GRANTED**. However, Defendant Brown's Motion for Disclosure of Confidential Informants, [Docket No. 52], is **GRANTED**, in part, and **DENIED**, in part, and Defendants' Motions for Early Disclosure of Jencks Material, [Docket Nos. 53, 62], are **DENIED**.

      Further, for the reasons discussed herein, it is recommended that Defendants' Motions to Suppress Evidence, [Docket Nos. 56, 63], be **DENIED**.

## I.    Defendant Brown's Motion for Disclosure of Confidential Informants, [Docket No. 52].

      Defendant Brown requests an Order from the Court compelling the Government to disclose

the identity of any confidential informants, reporting persons, or witnesses involved in the Government's investigation underlying the present case. (Def.'s Mot. [Docket No. 52]). Specifically, Defendant Brown requests disclosure of the names of any reporting persons, informants, or witnesses providing information for this case; any and all promises of payment made to such persons in this or any other case; all promises or any other benefit made to such persons; all promises of immunity, leniency, preferential treatment, or other inducements made to such persons as part of this or any other case; any record of payment to such persons; all information relating to any such person's prior testimony in this or any other proceeding; and all evidence of any such person's psychiatric treatment or any addiction or propensity to use or abuse controlled substances. (Id.).

The Government contends Defendant Brown's Motion should be denied as moot given this case does not involve confidential informants. (Gov't.'s Response [Docket No. 69] at 2). However, the Government additionally indicates their intention to abide by their obligations under Rule 16, Brady, Giglio, and their progeny. (Id.).

"[T]here is no litmus test for determining when disclosure [of an informant's identity] is required[.]" United States v. Lapsley, 334 F.3d 762, 764 (8th Cir. 2003); see Roviaro, 353 at 62 ("We believe that no fixed rule with respect to disclosure is justifiable."). However, the Eighth Circuit has indicated a court ruling on a motion for disclosure of an informant's identity "must weigh the defendant's right to information against the government's privilege to withhold the identity of its confidential informants." Lapsley, 334 F.3d at 763–64 (internal quotation marks and citations omitted).

In the case presently before the Court, the balance is best served by requiring the Government to disclose to Defendant Brown the identity of any informants whose testimony the

Government intends to introduce at trial in the present case. The Government will not be required, at this time, to disclose the identity of <u>all</u> informants, such as, those informants who are mere tipsters, who are not alleged to have participated in the charged offense, and whose testimony the Government does not intend to introduce at the trial in the present case, unless such informant's identity is otherwise discoverable.[1]

Therefore, Defendant Brown's Motion for Disclosure of Confidential Informants, [Docket No. 52], is **GRANTED in part**, and **DENIED in part**. The Government shall disclose to Defendant Brown the identity of those informants it intends to call as witnesses at trial, if any, by no later than twenty-one (21) days before trial.

## II.    Defendant Brown's Motion to Preserve Rough Notes, [Docket No. 54].

Defendant Brown requests an Order from the Court requiring any law enforcement agent, including any confidential reliable informants, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records on the following grounds: "[d]estruction of rough notes by law enforcement officials usurps the judicial function of determining what evidence must be produced" and "[t]he rough notes may contain facts favorable to the defense." (<u>See</u> Def.'s Mot. [Docket No. 54]).

The Government does not object to Defendant's request for the preservation of rough notes. (Gov't.'s Response [Docket No. 69] at 3).

Defendant Brown's Motion for Government Agents to Preserve Rough Notes, [Docket No. 54], is **GRANTED** as to retention only at this time. If Defendant Brown seeks production or

---

[1] The Government is independently obligated to disclose CIs whose identity may otherwise be discoverable under <u>Brady</u>, <u>Giglio</u>, and their progeny.

disclosure of rough notes, Defendant Brown will need to bring a separate motion for such production.

### III. Defendant Luthor's Motions for Disclosure of **Brady**, **Giglio**, and Impeachment Information, [Docket Nos. 59, 60, 61].

Defendant Luthor seeks disclosure of favorable evidence which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and their progeny, as well as impeachment information. (See Def.'s Mots. [Docket Nos. 59, 60, 61]). Specifically, Defendant requests the disclosure of the past criminal convictions of any and all informants utilized and of the substance of any agreements between the Government and the informants; evidence favorable to the defendant and material to either guilt or punishment; disclosure of witnesses favorable to the defendant; identification of persons other than the defendant by eyewitnesses to criminal activity alleged in the Indictment; fingerprints, handwriting, or scientific evidence which is not identified with the defendant; evidence of items seized from parties not named in the Indictment which tends to identify them with the commission of the crime; evidence detracting from the credibility or probative value of both testimony and other evidence used by the Government; evidence of promises made to any Government witness, disclosure of the witnesses to be called at trial, and any contradictory statements they have made; and evidence of misconduct by Government witnesses. (Id.).[2]

---

[2] Defendant Luthor's Motion for Disclosure of Impeaching Information, [Docket No. 61], specifically requests: any and all records of felony convictions, guilty verdicts, juvenile adjudications, information revealing prior misconduct or "bad acts" attributed to any Government witnesses; any and all consideration or promises of consideration given to or on behalf of the witness or asked for by the witness; any and all threats or coercion made or directed against any witness; evidence of the existence and identification of each occasion the witness has testified before any court, grand jury, or other tribunal or body in relation to Defendant, the investigation, or the facts of this case; evidence of the existence and identification of each occasion when each witness who was an informer or accomplice has testified before any court, grand jury, or other tribunal body; any and all personnel files for the witness and existence and identity of any investigation files relating to each witness who was or is a law enforcement officer; any and all other records and/or information helpful or useful to the defense in impeaching or detracting from the Government's evidence; and the same records requested in items one through eight with respect to each non-witness declarant whose statements are offered in evidence. (See Def.'s Mot. [Docket No. 61]).

In its written response, the Government acknowledges its duty to disclose responsive materials and information under Brady, Giglio, and their progeny, and asserts that Defendant's Motions are moot given the Court has already ordered the Government to produce all materials required under Brady and its progeny. (Gov't.'s Response [Docket No. 69] at 3–4).

To the extent they seek materials responsive to Brady, Giglio, and their progeny, Defendant Luthor's Motions for Disclosure of Brady, Giglio, and impeachment information, [Docket Nos. 59, 60, 61], are **GRANTED**, as set forth herein. The Government will disclose any and all remaining or subsequently discovered, obtained, or obtainable material covered by its representations set forth above and any materials responsive to Brady to the Defense as soon as said responsive materials are discovered by the Government.[3] The Government will disclose materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial by no later than seven (7) days before trial or when the presiding trial judge requires disclosure of trial witnesses, whichever is earlier.[4]

## IV.    Defendants' Motions for Early Disclosure of Jencks Material, [Docket Nos. 53, 62].

Defendants Luthor and Brown move the Court for an Order requiring the Government to disclose Jencks Act materials before trial. (See Defs.' Mots. [Docket Nos. 53, 62]). Defendant Brown requests that such information be disclosed at least two (2) weeks prior to the

---

[3] The Court notes that, in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril." Id. Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations. However, a defendant should not view the granting of their Motions in any way as this Court expanding the Government's disclosure obligations beyond the scope required by Brady, Giglio, and their progeny.

[4] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

commencement of trial. (<u>See</u> Def.'s Mot. [Docket No. 53]).[5]

The Government objects to the Defendants' requests, arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials. (Gov't.'s Response [Docket No. 69] at 2).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures. However, Defendants provide no citation to authority that would allow the Court to <u>require</u> early disclosure of Jencks Act material. Generally, the case law provides that the Court may <u>not</u> require the Government to make early disclosure of Jencks Act material. <u>See</u> e.g., <u>United States v. Sturdivant</u>, 513 F.3d 795, 803 (8th Cir. 2008); <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendants' Motions for Early Disclosure of Jencks Act Material, [Docket Nos. 53, 62], are **DENIED**.[6]

## V.     Defendants' Motions to Produce 404(b) Evidence, [Docket Nos. 55, 58].

Both Defendants seek disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404. (<u>See</u> Defs.' Mots. [Docket Nos. 55, 58]). Defendants request that this disclosure be ordered to occur immediately. (<u>Id.</u>).

In its written response, the Government acknowledges its obligation to comply with Rule

---

[5] Defendant Luthor's Motion for Early Disclosure of Jencks Material, [Docket No. 62], requests only an "early" disclosure of Jencks Material with no specific timeframe. (<u>See</u> Def.'s Mot. [Docket No. 62]).

[6] Nevertheless, the Government voluntarily agreed to provide all Jencks Act materials to the Defense by no later than three (3) days before trial. (Gov't.'s Response [Docket No. 69] at 3). The Court encourages such voluntarily agreements.

404(b). (Gov't.'s Response [Docket No. 69] at 3). Rule 404(b) does not specify the necessary timing limits of disclosure. Fed. R. Evid. 404(b). As such, the Government suggests that such disclosures be made no later than three (3) weeks before trial. (Id.).

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendants' Motions for Disclosure of Rule 404(b) Evidence, [Docket Nos. 55, 58], are **GRANTED**, as set forth herein. As soon as practicable, and in no event later than twenty-one (21) calendar days before trial, the Government shall disclose to Defendants formal notice of any specific 404(b) evidence it intends to offer, as well as the purpose for which it intends to offer 404(b) evidence at trial.[7]

## VI.    Defendants' Motions to Suppress, [Docket Nos. 56, 63].

Defendant Luthor and Defendant Brown also seek an Order of this Court suppressing all evidence resulting from the following search warrants: the Instagram, Facebook, and Email Search Warrants (hereafter "Social Media Search Warrants"); the Welters Way Search Warrant; the GVM Search Warrant; and the Twenty-Three Device Search Warrant. (See Defs.' Mots. [Docket Nos. 56, 63].[8] In support of this request, Defendant Brown and Defendant Luthor argue the affidavits

---

[7] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

[8] Defendant Luthor and Defendant Brown initially moved to suppress the Seven Device Search Warrant, (Def.'s Ex. 4 [Docket No. 56-4]). Both Defendants have since withdrawn that Motion. (Def.'s Mem. [Docket No. 72] at 2; Def.'s Mem. [Docket No. 74] at 2). Defendant Brown alone challenges the Email Search Warrant to the extent that the Search Warrant obtained information from the izzybanks@gmail.com Email account. (See Def.'s Mem. [Docket No. 72] at 1). Defendant Brown and Defendant Luthor challenge the Instagram and Facebook warrants to the extent that they

submitted in support of the respective applications for the Social Media Search Warrants did not contain a basis upon which to find probable cause in support of the issuance of said search warrants. (See Id.)

Defendants further argue that, because the Welters Way; GVM; and Twenty-Three Device Search Warrants are derivative of the allegedly insufficient Social Media Search Warrants, any information within the derivative warrant's respective affidavits found pursuant to the execution of the Social Media Warrants must be excised. (Def.'s Mot. [Docket No. 56] at 4; Def.'s Mot. [Docket No. 63] at 4). With the exclusion of the evidence obtained pursuant to the Social Media Warrants, Defendants assert the Welters Way; GVM; and Twenty-Three Device Search Warrants would then lack a basis upon which to find probable cause in support of their issuance. (Id.; Id.).

### B.  Facts[9]

Defendant Luthor and Defendant Bown are co-owners of Golden Valley Medical Center, LLC, (hereafter "GVM"), located in Henderson, Nevada. (Def.'s Ex. 1 [Docket No. 56-1] at 16).[10] Based on information from its Facebook page, GVM offers "medication management, neurofeedback, and psychological testing to patients of all ages for the Las Vegas and surrounding areas." (Id.). Defendant Luthor and Defendant Brown are both signatories on GVM's business account at Bank of America, and they are both identified as a "managing member" of the company. (Id.).

---

obtained information from their own respective accounts. (See Def.'s Mem. [Docket No. 72]; Def.'s Mem. [Docket No. 74]).

[9] The facts contained in this section are derived from Defendant Brown's Exhibits admitted in the present case. (See Def.'s Mot. to Suppress [Docket No. 56]). Where the Court cites to Defendant Brown's exhibits, it refers to the page numbers found in the top-right corner.

[10] Defendant's Exhibit 1 is the warrant application, supporting affidavit, and warrant to search for information associated with Defendant Luthor's, luthorgabriel, Defendant Brown's, liz_brownxoxo, J.W.'s, and B.H.'s Instagram accounts. (See Def.'s Ex. 1 [Docket No. 56-1]).

In May 2019, Eden Prairie Police received a tip regarding Defendant Luthor's alleged involvement in sex trafficking from the manager (hereafter "S.M.") at a hair salon and spa. (Id. at 6).[11] On May 7, 2019, S.M. observed two adult women dressed in "'sexy' attire" with "full makeup" arrive at the salon for hair appointments. (Id.). One of the women was Defendant Brown, and she answered all the questions and made the decisions about the other women's hair and salon services. (Id.). While the women were receiving their salon services, a man, later identified by S.M. to be Defendant Luthor, arrived with another woman. (Id. at 7). S.M. believed that Defendant Luthor was "in charge" of the three women, and they all left together. (Id.). S.M. then searched for Defendant Brown's Instagram, and discovered her account with the username liz_brownxoxo. (Id.). S.M. identified Defendant Luthor in some of the photos, and found his Instagram account, luthorgabriel, through comments left on Defendant Brown's account. (Id.).

S.M. notified the police of her suspicion that Defendant Luthor was engaging in sex trafficking. (Id.). S.M. felt the women accompanying Defendant Luthor "did not appear to be able to speak for themselves" and "the man seemed so controlling about their look." (Id.). The individuals returned for additional appointments throughout 2019, and S.M. learned the two other women were named J.W. and B.H. (Id.).[12] Defendant Brown described herself to S.M. as a "psychiatrist who traveled to Nevada frequently." (Id. at 7, 8).

In July 2020, the Eden Prairie Police Department received a separate report about potential sex trafficking involving Defendant Luthor, Defendant Brown, and J.W. (Id. at 8). A woman (hereafter "J.R.") from Las Vegas, Nevada, applied for a job as an office manager at GVM. (Id.).

---

[11] The Government in the various search warrants refers to many of the individuals associated with the present case by their initials. For the sake of consistency, the Court will do the same.

[12] J.W. and B.H., as well as B.M. who has not yet been referenced, will be referred to frequently throughout this Report and Recommendation. They have all been identified as Defendant Luthor's "girlfriends," and "employees" of GVM. (See Def.'s Exs. 1–7 [Docket Nos. 56-1–56-7]).

On or about July 10, 2020, J.R. spoke with J.W. over the phone regarding the position. (Id.). J.R. then had a FaceTime call with Defendant Brown and J.W., where they asked to meet with J.R. in Minneapolis, Minnesota. (Id.). On July 10, 2020, Defendant Brown emailed J.R. a non-disclosure agreement using the account izzybanks@gmail.com. (Id. at 8, 9).[13] Defendant Brown signed the agreement on behalf of GVM. (Id. at 10). Later that day, J.W. emailed J.R. confirmation for her flight to Minneapolis and hotel accommodations that had been booked for the following day. (Id.).

On July 11, 2020, J.R. flew first class from Las Vegas to Minneapolis. (Id.). J.R.'s husband accompanied her as she "felt uncomfortable" going on the trip alone. (Id.). GVM arranged a limousine to pick J.R. up from the airport, brought her to check into the hotel, and then drove her to a home at XXXXX Welters Way in Eden Prairie. (Id.).[14] J.R. met with J.W., Defendant Brown, Defendant Luthor, and an unknown woman. (Id.). J.R. noted Defendant Brown was "dressed in provocative clothing," Defendant Luthor "wore a suit," and the unknown female "had braces and appeared to be 16 to 18 years old." (Id. at 11, 12).

Defendant Luthor "ran the meeting," while all the women stayed silent. (Id. at 12). J.R. inquired about everyone's role within the company, to which Defendant Luthor responded, "[w]e are all together. Is that a problem?" (Id.). J.R. stated it was not a problem, but noted Defendant Luthor's comment made her uncomfortable. (Id.). J.R. became suspicious of GVM's legitimacy

---

[13] The non-disclosure agreement was between J.R. and GVM and stated, "[i]nformation will be disclosed to the Recipient to determine whether the Recipient could assist Golden Valley Medical, and upon working with or for the company the Recipient will be held to the same restrictions. The Owner has requested and the Recipient agrees that the Recipient will protect confidential material and information which may be disclosed between the Owner and the Recipient." (Def.'s Ex. 1 [Docket No. 56-1] at 9).

[14] J.R. described the house as "large," with two stone lions in the front and a black Mercedes parked in the driveway. (Id.). Only a few of the rooms inside the home were furnished. (Id. at 12). The property was discovered to have been purchased by Flip Funding, LLC, for approximately $994,900 on March 22, 2019. (Id. at 14). That same day, Defendant Brown put down $315,000 in cash on a contract for deed from Flip Funding, LLC, for a purchase price of $1,049,000. (Id.).

when she asked about Kareo, a software company commonly used by health care providers, and none of the individuals knew of the software program. (Id.).

J.R. believed the other women were scared as they continuously looked from person to person and "looked pale." (Id.). After about an hour and fifteen minutes, J.R. asked to leave the interview. (Id.). J.R. was required to sign another NDA before leaving the home. (Id.). Upon returning to her hotel, Defendant Luthor called J.R. and said she "was not a good fit for the company." (Id.).

The next day, J.R. texted J.W., stating the meeting "wasn't about business," and was "weird [as fuck]." (Id. at 13). J.R. additionally noted that J.W. looked like she had "just got[sic] fucking kidnapped." (Id. at 13). J.W. responded by reminding J.R. of the NDA she signed and stated that "[Defendant Luthor] is well known to enforce every contract." (Id.). J.R. called 911 to report Defendant Luthor for human trafficking and fraud on July 13, 2020. (Id.).

On or about January 22, 2020, an Eden Prairie city building inspector contacted the Eden Prairie Police Department about possible sex trafficking or prostitution at the XXXXX Welters Way residence after a plumbing inspector had informed him of suspicious activity. (Id. at 15). The plumbing inspector had recently conducted an inspection of the home and had observed a large "grotto-style" hot tub and a large "gang shower." (Id.). The basement also contained a "glassed in solarium room" that the inspector believed to be "a place to view and pick women." (Id.). The plumbing inspector then went to inspect the upstairs bathroom. (Id.). However, Defendant Luthor and Defendant Brown stood on the staircase "in a manner that appeared to be designed to deter the inspector from going upstairs." (Id.). Defendant Brown was in full makeup, which the plumbing inspector thought was odd given it was only 9:00 a.m. (Id.). There were six women upstairs who the inspector believed to be between 18–25 years old. (Id.). A plumbing contractor, who was also

then present in the home, informed the plumbing inspector that the women were <u>all</u> Defendant Luthor's girlfriends. (<u>Id.</u>). The plumbing inspector believed Defendant Luthor was their pimp, and later identified photos of Defendant Luthor, Defendant Brown, J.W., and B.H. to law enforcement. (<u>Id.</u> at 15, 16).

On or about January 15, 2021, an Eden Prairie Police Officer conducted a trash pull at the Welters Way home. (<u>Id.</u> at 16). The Officer discovered: (1) mail addressed to Defendant Brown; (2) a prescription for a contraceptive addressed to J.W.; and (3) a prescription issued by Defendant Brown to J.W. for an antibiotic that is often used to treat, among other things, vaginal infections. (<u>Id.</u>).

Pursuant to the sex trafficking investigation, records of Defendant Luthor's, Defendant Brown's, and J.W.'s Bank of America accounts were obtained. (<u>Id.</u>). The recovered records revealed Defendant Luthor, Defendant Brown, and J.W. regularly sent money back and forth "in a suspicious manner," including transfers of varying amounts, many for $999.99. (<u>Id.</u> at 16–18). Throughout January 2018, and February 2019, the records documented transfers between Defendant Brown and Defendant Luthor via Zelle, an online payment app, totaling around $19,000. (<u>Id.</u> at 16–18).

Records obtained from an auto retailer, Feldman Imports, additionally revealed Defendant Luthor had purchased a 2019 Mercedes Benz AMG GT Roadster for approximately $130,000 in July 2019. (<u>Id.</u> at 18). The paperwork noted Defendant Luthor had identified himself as the CEO of GVM, and that his current income was $83,333 per month, totaling $999,961 per year. (<u>Id.</u>).

The sex trafficking investigation continued into Defendant Luthor's, Defendant Brown's, and J.W.'s Instagram accounts. Defendant Luthor's account contains many photos of himself with Defendant Brown, J.W., and B.H. (<u>Id.</u>). Defendant Brown, J.W., and B.H. all left comments on

those photos. (Id.). For example, around December 2, 2019, Defendant Brown commented on a photo of herself with Defendant Luthor, stating "[t]his guy, no one gives more, endless love and ambition, drive, and leaders--@luthorgabriel you're so much more than words can say. #lovehim #justdoit #drive #ambition." (Id. at 19).[15]

On January 29, 2021, Postal Inspector Julie S. Barrows (hereafter "PI Barrows") submitted an application for a search warrant for information associated with Defendant Luthor's, luthorgabriel, Defendant Brown's, liz_brownxoxo, J.W.'s, and B.H.'s Instagram accounts. (Id. at 3, 4).[16] In her affidavit submitted in support of the application for the January 29, 2021, Instagram search warrant (hereafter "Instagram Search Warrant"), PI Barrows provided details of law enforcement's sex trafficking investigation, including all the facts provided above. (See Id.). PI Barrows' affidavit in support of the Instagram Search Warrant also included additional information.

PI Barrows attested that, based on her training and experience, possession of the items that were found in the XXXXX Welters Way trash pull, a contraceptive prescription and an antibiotic used to treat vaginal infections, may be consistent with commercial sex. (Id. at 16). PI Barrows further attested that, based on her training and experience with the types of social media posts on the accounts in question, these individuals often communicate on these platforms, including Instagram, in order to "drive traffic to other sites, gather individuals for a common interest, and/or for marketing purposes." (Id. at 20).

---

[15] PI Barrows noted several additional comments on various Instagram photos: (1) J.W. commenting "[w]e so cute. #hestheman #babe #vegastrip," (2) Defendant Brown captioned a photo of herself, J.W., B.H., and another individual with "Relaxing evening out with my ladies. #lovethem #gno," (3) Defendant Brown captioned a photo of her and B.H. with "Happy Birthday Beautiful [B.H.]! To the most loving gentle patient soul I know . . . you have taught me to always have fun, be a mermaid, make a wish with every eyelash and dandelion you blow away, build a fort and sleep in it, have a pillow fight[,] make everyday fun and never forget to dance, sing, and play I love you [B.H.] . . . ." (Id.).
[16] The Instagram, Email, and Facebook Search Warrants include J.W.'s and B.H.'s Instagram usernames as well as J.W.'s Instagram username and email address. However, given their usernames could be used to identify J.W. and B.H. beyond their initials, the Court will refrain from including them here.

On January 29, 2021, the Honorable United States Magistrate Judge Tony N. Leung determined that probable cause existed to support the issuance of the Instagram Search Warrant. (Id. at 1). The Instagram Search Warrant authorized law enforcement to search the information stored in the servers that are associated with Defendant Luthor's, luthorgabriel, and Defendant Brown's, liz_brownxoxo, J.W.'s, and B.H.'s Instagram accounts. (Id. at 27).

Additionally, on January 29, 2021, PI Barrows submitted an application for a search warrant for information associated with Defendant Brown's, izzybanks@gmail.com, and J.W.'s email accounts. (See Def.'s Ex. 2 [Docket No. 56-2]).[17] In her affidavit submitted in support of the application for the January 29, 2021, search warrant (hereafter "Email Search Warrant"), PI Barrows again provided the details of law enforcement's sex trafficking investigation, including all the facts provided above. (See Id.). PI Barrows' affidavit was nearly identical to her affidavit submitted in support of the Instagram Search Warrant. (See Id.; Def.'s Ex. 1 [Docket No. 56-1]).

On January 29, 2021, the Honorable Magistrate Judge Leung determined that probable cause existed to support the issuance of the Email Search Warrant. (Id. at 1). The Email Search Warrant applied to all information associated with izzybanks09@gmail.com and J.W.'s email stored at Google, Inc. (Id. at 24).

The sex trafficking investigation had further shown that Defendant Luthor, Defendant Brown, and J.W. all have Facebook accounts. (Id. at 21). On February 1, 2021, PI Barrows submitted an application for a search warrant for information associated with Defendant Luthor's, GABRIELSTYLES, Defendant Brown's, LIZ.BROWN1982, and J.W.'s Facebook accounts. (See

---

[17] Defendant's Exhibit 2 is the warrant application, supporting affidavit, and warrant to search for information associated with izzybanks@gmail.com and J.W.'s email. (See Def.'s Ex. 2 [Docket No. 56-2]).

Def.'s Ex. 3 [Docket No. 56-3]).[18] In her affidavit submitted in support of the application for the February 1, 2021, search warrant (hereafter "Facebook Search Warrant"), PI Barrows once more provided the details of law enforcement's sex trafficking investigation, including all the facts provided above. (See Id.). PI Barrows' affidavit also included information concerning the subject Facebook accounts and Defendant Luthor's contacts with women involved in sex work. (See Id.).

The Government had obtained toll records of incoming and outgoing calls to Defendant Luthor's phone. (Id. at 18, 19). Those records were then compared to a law enforcement database that compiles commercial sex work advertisements. (Id. at 18). The comparison showed Defendant Luthor had been in contact with several women who were involved in advertising commercial sex work. (Id. at 18, 19).[19]

Defendant Luthor's Facebook account has a profile photo of Defendant Luthor and Defendant Brown with a black Mercedez Benz parked outside of the Welters Way home. (Id.). Defendant Luthor posted several photos of himself with both Brown and J.W. in December, 2020. (Id.). Defendant Brown's Facebook account has a profile photo, posted December 24, 2020, of Defendant Brown and Defendant Luthor. (Id.). Defendant Brown regularly posts photos with Defendant Luthor. (Id. at 22). J.W.'s Facebook profile photo, posted December 10, 2020, is of her and Defendant Luthor. (Id.). J.W.'s previous profile photo, posted on October 19, 2020, was also a photo of her and Defendant Luthor. (Id.).

---

[18] Defendant's Exhibit 3 is the warrant application, supporting affidavit, and warrant to search for information associated with Defendant Luthor's, GABRIELSTYLES, Defendant Brown's, LIZ.BROWN1982, and J.W.'s Facebook accounts. (See Def.'s Ex. 3 [Docket No. 56-3]).

[19] Specifically, the Government found that: (1) on or about January 9, 2020, Defendant Luthor had nine cell phone contacts with two women identified to be advertising commercial sex; (2) on or about May 3 and 4, 2019, Defendant Luthor had five contacts with a phone number that was linked to an online commercial sex advertisement; and (3) on or about May 9, 2019, Defendant Luthor had five contacts with a phone number linked to an online commercial sex advertisement. (Id. at 18, 19).

In her Facebook Search Warrant affidavit, PI Barrows attested that, based on her training and experience, individuals often communicate on these platforms, including Facebook, "to drive traffic to other sites, gather individuals for a common interest, and/or for marketing purposes." (Id.).

On February 1, 2021, the Honorable United States Magistrate Judge Katherine M. Menendez determined that probable cause existed to support the issuance of the Facebook Search Warrant. (Id. at 1). The Facebook Search Warrant applied to all information that is stored in the servers at Google Inc. associated with Defendant Luthor's, Defendant Brown's, and J.W.'s Facebook user IDs. (Id. at 24).

On January 9, 2023, PI Barrows submitted an application for a search warrant for the XXXXX Welters Way residence. (See Def.'s Ex. 4 [Docket No. 56-4]).[20] In her affidavit submitted in support of the application for the January 9, 2023, search warrant (hereafter "Welters Way Search Warrant"), PI Barrows provided the following details of the financial and healthcare fraud investigation. (See Id.).[21]

PI Barrows attested that Defendant Luthor and Defendant Brown, who reside at the Welters Way home, have engaged in a "large-scale scheme" through the operation of GVM to provide "unnecessary, ineffective, unrequested, and/or excessive services and then submitting fraudulent and inflated bills to Medicare and private insurance companies," and, to date, have "misappropriated millions of dollars in Medicare funds to benefit a lavish lifestyle." (Id. at 6, 7).

---

[20] Defendant's Exhibit 4 is the warrant application, supporting affidavit, and warrant to search for XXXXX Welters Way, Eden Prairie, Minnesota, residence. (See Def.'s Ex. 4 [Docket No. 56-4]).
[21] PI Barrows does also include some information from the prior sex trafficking search warrant applications in lesser detail, including the concerned tip from the salon manager and the reports from the building and plumbing inspectors. (Id. at 18).

According to the Nevada Secretary of State, GVM was formed on April 24, 2018. (Id. at 11). Defendant Brown was recorded as a Manager of GVM on May 31, 2019, and Defendant Luthor was later additionally recorded as a Manager of GVM on March 12, 2020. (Id.). GVM was registered as a Minnesota business on May 2, 2022. (Id.). Defendant Luthor and Defendant Brown were listed as GVM's registered officers. (Id.). As of January 5, 2023, GVM's website indicated the company provided services in five locations: "Delray Beach and Ponte Vedra, Florida; Las Vegas, Nevada; Stillwater, Oklahoma; and Wichita, Kansas." (Id.).

According to Minnesota Secretary of State Records, the Welters Way home is the registered office address and principal place of business for GVM. (Id. at 7). As stated above, Defendant Brown purchased the home from Flip Funding, LLC, in March 22, 2019, with a down payment of $315,000. (Id.). On or about April 19, 2022, Banken Holdings, LLC, purchased the home for $1,700,000. (Id.). On or about April 29, 2022, Olympia, LLC, purchased the home on contract for deed for $1,883,000 with a $633,000 down payment. (Id. at 7, 8). Defendant Brown is the registered agent of Olympia, LLC, which lists the Welters Way address as the registered office location. (Id. at 8).

On November 2, 2022, Eden Prairie Police visited the Welters Way residence. (Id.). Defendant Luthor answered the door, and body-worn camera footage showed Defendant Brown and two other women, identified as Defendant Luthor's "girlfriends," inside the residence. (Id.).

On December 15, 2022, PI Barrows drove past the residence and observed a black Hummer and a black Mercedes-Benz in the driveway. (Id.). Minnesota Driver and Vehicle Services Records denote Defendant Luthor as the registered owner of the Hummer, and Defendant Brown as the registered owner of the Mercedes-Benz. (Id.).

U.S. Postal Service records show Defendant Luthor, Defendant Brown, and GVM received mail at the Welters Way residence. (Id.). All three parties have received mail addressed to them as recently as January 2, 2023. (Id.).

As noted above, Magistrate Judge Leung issued a search warrant for one of Defendant Brown's email accounts, izzybanks09@gmail.com, on January 29, 2021. (Id. at 11). An email sent on October 10, 2019, which was recovered pursuant to the execution of the Email Search Warrant, contained an attachment of a GVM brochure. (Id. at 12). Defendant Brown, who is listed in the GVM brochure as the company's founder, is a nurse practitioner with Advanced Practice Registered Nurse (hereafter "APRN") licensed in Nevada and Minnesota, with a focus on family medicine. (Id. at 12, 13). The brochure noted that GVM performed "Psychiatric Medication Management & Neurofeedback," which, according to an expert in the field, can be a legitimate form of mental health treatment when "it is offered in tandem with therapy in a multi-modal treatment approach." (Id. at 12). Through law enforcement's financial and healthcare fraud investigation, including interviews with GVM staff and patients, and with a review of GVM's business records, GVM did not seem to be practicing neurofeedback in a manner consistent with expert recommendations. (Id.).

GVM's billing company's records in 2019, their first full year of operation, show GVM billing over $16,000,000 to Medicare, Medicaid, and other private insurance companies. (Id. at 13). GVM collected over $4,000,000 of the amount billed. (Id.). In 2019, Defendant Brown billed for over 28,000 patient encounters, which, assuming Defendant Brown worked every day in 2019, would total over 76 patients a day. (Id. at 13, 14).[22]

---

[22] As of 2019, Defendant Brown was not licensed to provide or supervise mental health services. (Id. at 14). In or around May 2022, the Nevada State Board of Nursing subjected Defendant Brown to disciplinary action in the form of additional courses to add the mental health focus to her APRN license given her unlicensed practice outside of her

In 2020, GVM billed the Medicare program approximately $47,000,000, which may include duplicate claims, resulting in a payout to GVM of $8,950,000. (Id. at 14). GVM's former CEO, Bryan Stewart, voluntarily provided GVM's billing records for 2021. (Id.). These records included $2,900,884.69 to Medicare, Medicaid, and other private insurance companies. (Id. at 15).

GVM had seven "rendering providers" in 2018, 2019, 2020, and 2021. (Id.). From January 2018, to March 2021, GVM billed for over 776,672 patient encounters, 591,478 of which listed Defendant Brown as the rendering provider. (Id.). In 2020, Defendant Brown was listed as the rendering provider for 164,791 patient encounters, billed at $26,694,020.35, which, assuming Defendant Brown worked every day, would mean Defendant Brown rendered services to 451 patients every day of 2020. (Id.).[23]

According to Bryan Stewart, Defendant Luthor and Defendant Brown repeatedly thwarted Stewart's attempts at ending GVM's deceptive billing practices. (Id. at 17). Stewart has filed a civil whistleblower lawsuit against GVM, asserting that throughout late 2021 and 2022 GVM improperly coded medical procedures and utilized flawed documentation practices which resulted in "overpayments to [GVM] by federal payers." (Id.). In February 2022, while still employed as CEO, Steward hired an independent third party, Health Information Associates (hereafter "HIA"), to audit the organization. (Id.). HIA discovered widespread "erroneous coding and documentation

---

focus population. (Id.). The Minnesota State Board of Nursing additionally placed Defendant Brown's APRN license in a "conditional status," pending the completion of the Nevada State Board of Nursing required courses. (Id.).

[23] Many of these encounters occurred while Defendant Brown was on vacation or posting on social media about traveling and partying. (Id. at 15). For example, between December 7, 2020, and December 10, 2020, Defendant Brown billed for 204 patient encounters. (Id. at 15, 16). But, during this time, Defendant Brown and Defendant Luthor had booked a stay at a resort in Vail, Colorado, which was documented by a twelve page itinerary for their trip, the private chef they retained, and an Instagram post on December 12, 2020, thanking Defendant Luthor for "an amazing vacation." (Id. at 16, 17).

practices," with accuracy levels in the 32.44% range despite an industry standard in the 95% range. (Id.).[24]

Based on records obtained pursuant to the Instagram Search Warrant, Defendant Luthor and Defendant Brown appeared to have been in romantic relationships with each other as well as the other women living at the Welters Way residence. (Id. at 18, 19). One of Luthor's girlfriends, J.W., reported her primary address as the XXXXX Welters Way residence, and she reported she has worked as a "practice manager" or "administrator" at GVM since at least 2019. (Id. at 19). There is no record of any nursing license associated with J.W., but she has updated and/or created 35,625 GVM patient files or notes. (Id.). B.H. and B.M., two of Defendant Luthor's other girlfriends and also residents of XXXXX Welters Way, have also been recorded updating and/or creating patient files or notes. (Id. at 19, 20).

According to former GVM CEO Stewart, J.W. worked for GVM. (Id. at 20). This has been corroborated by statements from other former-employees as well as email records seized by law enforcement. (Id.). However, J.W. was never issued a formal W-2 or Form 1009 for any work performed in 2021 or 2022. (Id.). J.W. was additionally absent from a 2022 employee list. (Id.). There is no evidence showing J.W. was ever compensated for her work at GVM, and based on Bank of America records, J.W.'s sole source of income seems to be sporadic transfers of varying amounts from either Defendant Luthor or Defendant Brown. (Id. at 21).

J.W. opened a Wells Fargo account in July 23, 2020. (Id.). On her application, J.W. listed her residence as XXXXX Welters Way, and her employment as Code 3 Urgent Care. (Id.). The same day the account was opened, a cashier's check of $100,000 from Defendant Brown was deposited into the account. (Id.). The $100,000 was traced back to GVM's Bank of America

---

[24] Defendant Luthor and Defendant Brown pushed back on the audit findings, with Defendant Luthor claiming he would blame any errors on GVM's billing company in order to avoid any civil or criminal penalties. (Id. at 17).

account. (Id.). Throughout 2021 and 2022, numerous transfers of varying amounts flowed from J.W.'s Wells Fargo Account to accounts held by Defendant Luthor and/or Defendant Brown. (Id. at 22). PI Barrows attested that, based on her training and experience and the training and experience of other law enforcement officers involved in the financial and healthcare fraud investigation, J.W.'s bank records demonstrate that she has had little to no financial independence, and her accounts were used for the principal benefit of Defendant Luthor and Defendant Brown. (Id.).

Several former GVM employees were interviewed in connection with the financial and healthcare fraud investigation. (Id.). One former nurse, T.E., applied to GVM and was flown to Minneapolis for "training." (Id. at 22, 23). T.E. was instructed to visit with forty patients per day. (Id. at 23). T.E. did not believe it was possible to adequately visit with forty patients per day. (Id.). The most patients T.E. was ever able to visit with in a single day was twenty. (Id.). T.E. left GVM after only three months when she noticed a patient she had visited with was billed for services that T.E. had not provided. (Id.). According to T.E., after she would visit with a patient, she would enter her notes into a records system called Kareo. (Id.). Those notes were sent to someone else at GVM for coding and billing purposes, and then returned to T.E. for her signature. (Id.). However, at that stage in the process, T.E. could no longer actually see what services she was signing for. (Id.).

Former patient interviews additionally indicate patients were being billed for services they had not received. (Id. at 24, 25). Patients have reported not signing up for services but still receiving bills for them, having difficulty terminating services, being billed for unanswered calls, and receiving push back from GVM employees when services were no longer needed. (Id.).

Defendant Brown, when describing the neurofeedback process over email, noted that neurofeedback training usually requires "at least 25, and most commonly 3-50 with a small number of follow-up reinforcement sessions for permanent changes to take place." (Id. at 26). However, upon review of the "top" 15 GVM patients, between April 12, 2019, and February 3, 2021, Patient One was purportedly seen approximately 277 times, Patient Three was described as having been seen approximately 479 times, Patient Four was reported to have been seen approximately 259 times, and Patient Five was also reported to have been seen approximately 444 times. (Id. at 27).

Bank records from Bank of America show that approximately $6,700,000 was deposited in GVM bank accounts between August 29, 2018, and June 29, 2020, with about $5,000,000 of that sum being received from federal Medicare funds. (Id.). Additionally, from June 2020, through March 2021, another $6,000,000 in Nevada-administered federal Medicare funds were received by GVM. (Id. at 28). GVM accounts also received approximately $1,700,000 from other payers such as the Medicare program by Florida, Medicaid, and private health insurance payers. (Id.). More than half of the funds received were immediately then deposited into either Defendant Brown's or Defendant Luthor's personal bank accounts. (Id.). According to Bank of America records, between the end of 2018 and 2021, the transfers from GVM to Defendant Luthor and Defendant Brown were their only sources of income. (Id.). Between May 2021, and April 2022, Bank of America records show transfers from GVM accounts to Defendant Luthor totaling approximately $1,300,000, to Defendant Brown totaling approximately $1,500,000, and to Defendant Luthor and Defendant Brown's joint accounts totaling approximately $33,000. (Id. at 29).

Bank records additionally show how Defendant Luthor and Defendant Brown used these deposits to support lavish personal purchases. (Id.). In August 2021, their expenses included travel

to Florida, Nashville, and Las Vegas, including flights, hotels, and limousine services; $99,306.02 at strip and/or night clubs in the Minneapolis area; $32,227.08 at Minneapolis restaurants including Seven Sushi, Flemings, Union, and Manny's; and $5,130 in Tinder and CashApp transfers to various women. (Id. at 29–31).

On January 9, 2023, the Honorable United States Magistrate Judge Dulce J. Foster determined that probable cause existed to support the issuance of the Welters Way Search Warrant (Id. at 1).

On January 11, 2023, Postal Inspector Justin D. Steele (hereafter "PI Steele") submitted an application for a search warrant for the GVM office at 2870 S Maryland Pkwy, including adjoining Suites 200 and 220, in Las Vegas, Nevada. (See Def.'s Ex. 5 [Docket No. 56-5]).[25]

PI Steele's affidavit submitted in support of the application for the January 11, 2023, search warrant (hereafter "GVM Search Warrant") is nearly identical to the affidavit submitted by PI Barrows in support of the Welters Way Search Warrant. (See Id.). PI Steele additionally attested that the GVM office to be searched is a medical clinic used by GVM. (Id. at 24). On September 29, 2022, an Eden Prairie Police Officer visited the office building and noted GVM was listed on the directory as Suites 200 and 220. (Id.). The Eden Prairie Officer observed several patients in the waiting room, employees behind the reception desk, and computers that the employees appeared to be using. (Id. at 25).

Former GVM CEO Stewart confirmed GVM's use of the 2870 S Maryland Pkwy office, and stated there were maybe 10 or less individuals at the clinic during his last visit, which included two patients. (Id.). GVM's office location in Nevada was additionally corroborated through GVM's Lease Agreement and U.S. Postal Service records. (Id. at 26).

---

[25] Defendant's Exhibit 5 is the warrant application, supporting affidavit, and warrant to search the GVM office in Las Vegas, Nevada. (See Def.'s Ex. 5 [Docket No. 56-5]).

Investigators believed the devices located within the office had been used in furtherance of the charged financial offenses given GVM's billing and patient records are all electronically generated and maintained. (Id.). Additionally, there had already been communications between Defendant Brown, Defendant Luthor, and "their suspected co-conspirators" occurring, at least in part, over text, e-mail, and social media messaging. (Id.).

On January 11, 2023, the Honorable United States Magistrate Judge Nancy J. Koppe, District of Nevada, determined that probable cause existed to support the issuance of the GVM Search Warrant (Id. at 32).

On January 12, 2023, Postal Inspector Kate E. Nichols (hereafter "PI Nichols") submitted an application for a search warrant for the content of the following electronic items found during the search of the Welters Way Residence on January 12, 2023: (1) a Samsung cell phone found in J.W.'s bedroom (hereafter "Device One"); (2) a Samsung galaxy s10+ found in J.W.'s bedroom (hereafter "Device Two"); (3) a Dell laptop found in J.W.'s bedroom (hereafter "Device Three"); (4) an iPad found in J.W.'s bedroom (hereafter "Device Four"); (5) an Apple iPhone found in B.M.'s bedroom (hereafter "Device Five"); (6) an Apple iPad found in B.M.'s bedroom (hereafter "Device Six"); and (7) an Apple iPhone carried by J.W. (hereafter "Device Seven"). (See Def.'s Ex. 6 [Docket No. 56-6]).[26]

PI Nichols' affidavit submitted in support of the application for the January 12, 2023, search warrant (hereafter "Seven Device Search Warrant") is nearly identical to the affidavit submitted by PI Barrows in support of the Welters Way Search Warrant, but it contains additional information regarding the execution of the Welters Way Search Warrant. (See Id.). When officers arrived to search the Welters Way home, residents were all asked to leave their rooms. (Id. at 31).

---

[26] Defendant's Exhibit 6 is the warrant application, supporting affidavit, and warrant to search the seven devices found pursuant to the execution of the Welters Way Search Warrant. (See Def.'s Ex. 6 [Docket No. 56-6]).

J.W. was observed holding Device Seven as she exited her bedroom. (Id.). While searching J.W.'s bedroom, officers located Devices One, Two, Three, and Four in a desk cabinet. (Id. at 29). The devices were found along with various financial records associated with J.W.'s bank accounts as well as notes believed to be related to GVM's operations. (Id. at 29–31). Based on PI Nichols' training and experience, her observations of the Welters Way home, and information obtained from other officers, PI Nichols believed J.W. conducted work for GVM from her bedroom, and was likely with Device Seven in her bedroom when officers arrived. (Id. at 31, 32).

While searching B.M.'s bedroom, officers discovered Devices Five and Six on a desk with handwritten notes that were related to GVM's operations. (Id. at 32). Based on the hand-written notes, her training and experience, and information from other officers involved in the investigation, PI Nichols believed B.M. was using one or both of Devices Five and Six to communicate with GVM patients in furtherance of the company's scheme. (Id.).

On January 12, 2023, the Honorable United States Magistrate Judge Elizabeth Cowan Wright determined that probable cause existed to support the issuance of the Seven Device Search Warrant (Id. at 1).

On July 19, 2023, PI Barrows submitted an application for a search warrant for twenty-three additional electronic devices seized from the search on the Welters Way home. (See Def.'s Ex. 7 [Docket No. 56-7]).[27] PI Barrows' affidavit submitted in support of the application for the July 19, 2023, search warrant (hereafter "Twenty-Three Device Search Warrant") contained the

---

[27] Defendant's Exhibit 7 is the warrant application, supporting affidavit, and warrant to search twenty-three devices found pursuant to the execution of the Welters Way Search Warrant. (See Def.'s Ex. 7 [Docket No. 56-7]).The devices seized include: pearl white Apple iPhone, gray iPhone with case, Samsung tablet, Apple iPad, Asus laptop, Asus laptop (pink), Apple laptop, Apple iPhone in black/clear case, Alienware gaming tower service tag, thumb drives, Apple iPad in purple case, Apple iPad in a galaxy case, Sky Tech gaming tower, Dell laptop, GVM documents, Lenovo laptop, Acer laptop, Apple iPhone with green and gold case, Apple iPhone in marbled white and black case, Samsung in clear case, Samsung Galaxy S10 in sparkling white case, iPad Mini in red case, and Dell laptop. (Id. at 1458).

following information. (See Id.).[28] During the execution of the Welters Way Search Warrant, the women acted "strangely" around Defendant Luthor. (Id. at 4). For example, Defendant Luthor made the decision for everyone to leave the residence, which car they would take, and specifically, that B.H. would leave without retrieving her winter coat. (Id. at 4, 5).

Officers had uncovered several text messages between Defendant Luthor and B.H. (Id. at 5). The messages consisted of B.H. asking Defendant Luthor for permission to eat and drink, Defendant Luthor confirming B.H. needed to ask for his permission before eating or drinking anything besides water, and that B.H. needed to "step this up" and "start working out each day" because she had a "ways to go." (Id. at 5, 6). There were additionally 298 text messages on B.H.'s phone containing the word "Marco," which is suspected to be a code word for "sex." (Id. at 6). Most of these messages simply state "Marco." (Id.). B.H. also had many text exchanges with Defendant Brown. (Id. at 7). B.H. would ask Defendant Brown for money transfers for B.H.'s monthly bills or Defendant Brown would comment on B.H.'s diet plan. (Id.). B.H. also texted J.W. on numerous occasions. (Id.). Some of those messages included J.W. stating "[w]e have to be perfect all the time to be like the other timelines but I don't think we're capable . . . . [w]e're never going to make it like this," and B.H. asking if J.W. saw "Liz hit or pump Brittany." (Id. at 7, 8).

PI Barrows additionally attested to Defendant Luthor's spending habits from July 2021, to December 2021. (Id. at 9). During that six-month period, Defendant Luthor spent approximately:

---

[28] The exact reason for why law enforcement applied for and obtained the Seven Device Search Warrant separate from the Twenty-Three Device Search Warrant is unclear. PI Barrows stated only the following: "After executing the premises and electronic device search warrants in January 2023 and beginning a review of the very first electronic device available for review, it was determined that probable cause existed to search the [Twenty-Three devices] . . . . seized from [Defendant Luthor and Defendant Brown's] residence in January 2023." (Def.'s Ex. 7 [Docket No. 56-7] at 4). The text messages included in the affidavit in support of the Twenty-Three Device Search Warrant are suspected to have been obtained from one of the devices recovered pursuant to the Welters Way Search Warrant, and searched pursuant to the Seven Device Search Warrant. (Def.'s Ex. 7 [Docket No. 56-7] at 4–7). Though it is less than clear which exact device this information was obtained from, Defendants have not taken issue with the source of the text messages.

$453,370.24 at strip and/or night clubs in Minneapolis; $96,381.42 at Minneapolis, Miami Beach and Las Vegas restaurants; $94,708.02 on Tinder and cash transfers via CashApp and Zelle to various women; $42,500 on a 2021 Rolls Royce, making $8,500 monthly payments; and $22,889.90 on Minnesota sporting events. (Id.).

The following individuals, L.F., S.M., J.T., and I.A., were all interviewed pursuant to the sex trafficking and financial investigations into Defendant Luthor and Defendant Brown. (See Def.'s Ex. 7 [Docket No. 56-7]). The extent of their connection to Defendant Luthor and Defendant Brown, outside of what is stated herein, is unknown.

On or about January 12, 2023, investigators interviewed L.F. (Id. at 10). L.F. stated she had known Defendant Luthor for about five years, and moved in with him around August 2022. (Id.). L.F. had been recently hired as Defendant Luthor's personal assistant, and planned to start that job once Defendant Luthor's pending civil lawsuit was over. (Id.).

S.M., a stripper, was also interviewed. (Id.). S.M. stated she began dating Defendant Luthor on or about July, 2023, after they were introduced by L.F. (Id.). S.M. would additionally sometimes stay over at Defendant Luthor's home. (Id.).

J.T., who was interviewed around December 22, 2022, noted Defendant Luthor traveled to Las Vegas almost every week. (Id. at 11). Defendant Luthor would bring $20,000 in cash to spend on prostitutes for himself or for other men. (Id.). According to J.T., Defendant Luthor regularly held after-parties and would spend large amounts of money to impress the 18–21-year-old college students that he would hang out with. (Id.).

I.A. was interviewed on or about June 16, 2023. (Id.). I.A. told law enforcement about a nightclub manager whom Defendant Luthor had befriended. (Id.). This manager would "troll" lines of nightclubs for young women, and then bring those women into the V.I.P. sections of the

nightclub. (Id. at 12). It was common for Defendant Luthor to bring these women back to his home for after-parties. (Id.). I.A. and J.T. both reported that Defendant Luthor had multiple fake identification cards showing his age in his twenties, so that the women would feel more comfortable. (Id.). I.A. stated that the aforementioned manager would "pimp" the young women, and that Defendant Luthor was his client. (Id.). Defendant Luthor would then control the women by providing money, drugs, and alcohol. (Id.).

On July 19, 2023, the Honorable United States Magistrate Judge Dulce J. Foster determined that probable cause existed to support the issuance of the Twenty-Three Device Search Warrant. (Id. at 1).

### B.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v.

Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).

Courts use a "totality of the circumstances test . . . to determine whether probable cause exists."

United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted); see United States v.

Wells, 347 F.3d 280, 287 (8th Cir. 2003). The sufficiency of a search warrant affidavit is examined

using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627,

632 (8th Cir. 2007) (citation and internal quotations omitted); United States v. Kennedy, 427 F.3d

1136, 1141 (8th Cir. 2005).

"In ruling on a motion to suppress, probable cause is determined based on 'the information

before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009)

(quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the

[issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that

information which is found in the four corners of the affidavit may be considered in determining

the existence of probable cause.'" United States v. Wiley, No. 9-cr-239 (JRT/FLN), 2009 WL

5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting United States v. Solomon, 432 F.3d 824, 827

(8th Cir. 2005)) (alterations in Wiley).

In addition, the issuing court's "determination of probable cause should be paid great

deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S.

410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had

a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones

v. United States, 362 U.S. 257, 271 (1960)).

**C. Analysis**

Defendant Luthor and Defendant Brown seek an Order of this Court suppressing all

evidence of alleged financial fraud resulting from the search of various social media accounts

which were searched pursuant to the Social Media Search Warrants; all evidence resulting from the search of the Welters Way residence and the GVM office which were searched pursuant to the Welters Way Search Warrant and the GVM Search Warrant; and all evidence resulting from the search of digital devices obtained from the search of the Welters Way residence which were searched pursuant to the Twenty-Three Device Search Warrant. (Defs.' Mots. [Docket Nos. 56, 63]).[29]

In support of these requests, Defendant Brown and Defendant Luthor argue that the affidavits submitted in support of the at-issue warrants do not satisfy the Fourth Amendment particularity requirement, fail to establish a sufficient nexus between the crimes alleged and the devices and properties to be searched, and lack a reasonable basis upon which to find that probable cause existed to support the issuance of the respective search warrants. (See Def.'s Mem. [Docket No. 72]; Def.'s Mem. [Docket No. 74]).[30] Specifically, Defendants assert the Welters Way, GVM, and Twenty-Three Device Search Warrants are all derivative of the allegedly constitutionally deficient Social Media Warrants. (Def.'s Mot. [Docket No. 56] at 4; Def.'s Mot. [Docket No. 63] at 4). Thus, Defendants contend the affidavits submitted in support of the Welters Way, GVM, and Twenty-Three Device Search Warrants, once excised of all information obtained pursuant to the

---

[29] Neither Defendant Luthor nor Defendant Brown challenge the Seven Device Search Warrant, (See Def.'s Mem. [Docket No. 72]; Def.'s Mem. [Docket No. 74]), given none of the seven devices were owned by Defendant Luthor or Defendant Brown. (Id.; Id.).

[30] Though the Defendants are now being prosecuted for financial fraud offenses, Defendant Luthor and Defendant Brown were initially suspected of violating the Mann Act and possibly engaging in sex trafficking. (Def.'s Mem. [Docket No. 72] at 1; Def.'s Mem. [Docket No. 74] at 2–5). Defendant Luthor seemingly takes issue with this, stating he "is [now] indicted on allegations wholly unrelated to the basis for some of the search warrants." (Def.'s Mem. [Docket No. 72] at 2). Defendant Luthor's distinction between the two types of alleged criminal activity for which he was being investigated provides him with no relief. While possessing a search warrant does not "give the executing officers carte blanche as to its execution," Walden v. Carmack, 156 F.3d 861, 873 (8th Cir.1998), when executing a search warrant, law enforcement may seize all evidence "reasonably related to the crime for which the warrant issued," Stepnes v. Ritschel, 663 F.3d 952, 962 (8th Cir. 2011) (quoting Taylor v. State of Minn., 466 F.2d 1119, 1121 (8th Cir. 1972) (per curiam), as well as, evidence of other criminal activity then in plain view. United States v. Rodriguez, 711 F.3d 928, 936 (8th Cir. 2013) ("The plain view doctrine allows officers to 'seize an item if they have a lawful right of access to the item seized and the object's incriminating nature is immediately apparent.'") (quoting United States v. Nichols, 344 F.3d 793, 799 (8th Cir.2003) (per curiam)).

Social Media Warrants, lack a reasonable basis upon which to find that probable cause existed to support their issuance. (Id.; Id.).

As an initial matter, the search warrants are not constitutionally required to demonstrate a nexus between the place to be searched and a specific crime later charged against either Defendant Luthor or Defendant Brown. Rather, an affidavit in support of a search warrant application is constitutionally required to demonstrate a nexus between the place to be searched and contraband or evidence of a crime to be seized. See United States v. Teelez, 217 F.3d 547, 550 (8th Cir. 2000).

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." Teelez, 217 F.3d at 550. However, it is well settled that a court issuing a search warrant may draw reasonable inferences from the totality of the circumstances in making its probable cause determination. See e.g., Technical Ordinance, Inc. v. United States, 244 F.3d 641, 647 (8th Cir. 2001); Massachusetts v. Upton, 466 U.S. 727, 728 (1984). The Eighth Circuit has explicitly held that "[i]t is not necessary for an affidavit to include the name of [any] specific crime [be] alleged. Rather, 'only a probability of criminal conduct need be shown.'" United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007) (internal citation omitted).

For the reasons discussed herein, each of the affidavits submitted in support of the challenged search warrants do satisfy the Fourth Amendment particularity requirement; establish a sufficient nexus between the places to be searched and the evidence of sex trafficking, financial fraud, and healthcare fraud to be seized; and contain a reasonable basis upon which to find that probable cause for sex trafficking, financial fraud, and healthcare fraud existed to support the issuance of the respective search warrants. The Court discusses each of the challenged search warrants in turn.

### a. Social Media Search Warrants

As observed above, Defendant Luthor and Defendant Brown argue generally that the affidavit PI Barrows submitted in support of the Social Media Search Warrants, (Def.'s Exs. 1, 2, 3 [Docket Nos. 56-1, 56-2, 56-3]), did not satisfy the particularity requirement, failed to establish a sufficient nexus between the accounts to be searched and the evidence of sex trafficking and financial fraud to be seized, and lacked a reasonable basis upon which to find that probable cause for sex trafficking and financial fraud existed to support their issuance. (See Def.'s Mem. [Docket No. 72]; Def.'s Mem. [Docket No. 74]). Specifically, Defendant Luthor argues the Instagram Search Warrant "alleged no crime at all," while the Facebook Search Warrant "alleged a tenuous connection to misdemeanor solicitation of adults for sexual services[.]" (Def.'s Mem. [Docket No. 72] at 21). Defendant Brown asserts the Social Media Search Warrants were devoid of "any evidence whatsoever" that Defendants were engaged in forced trafficking, fraud, or money laundering. (Def.'s Mem. [Docket No. 74] at 2–7). The Court finds these arguments to be unpersuasive.

As previously noted, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). To satisfy the particularity requirement, the place to be searched must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises. United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979); United States v. Thomas, 263 F.3d 805, 808 (8th Cir. 2001); United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005). "[T]he warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." United States v.

Sigillito, 759 F.3d 913, 923 (8th Cir. 2014). "[T]he degree of specificity required will depend on the circumstances of the case and on the type of items involved. This particularity standard is one of 'practical accuracy rather than' of hypertechnicality." Sigillito, 759 F.3d at 923; see Groh v. Ramirez, 540 U.S. 551, 557 (2004); United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir. 1983).

"Typically, a warrant that is not particular enough cannot be cured by the specificity of the affidavit supporting it" because "[s]pecificity is required in the warrant itself in order to limit the discretion of the executing officers as well as to give notice to the party searched." Thomas, 263 F.3d at 808 (citing United States v. Johnson, 541 F.2d 1311, 1315 (8th Cir. 1976)). "However, if the affidavit is incorporated into the warrant, it may cure the particularity defect of the warrant if the affidavit accompanies the warrant and the warrant uses suitable words of reference to incorporate the affidavit." Thomas, 263 F.3d at 808.

On the record now before the Court, the Social Media Search Warrants all satisfied the particularity requirement. The Instagram and Facebook Search Warrants incorporated "Attachment B" which specifically identified the items to be seized to information "that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy), those violations involving [Defendant Luthor], [Defendant Brown], [J.W.], and [B.H.] and occurring after January 1, 2019. (Def.'s Ex. 1 [Docket No 56-1] at 31; Def.'s Ex. 3 [Docket No. 56-3] at 34).[31] In addition to this language,

---

[31] The Email Search Warrant varies only slightly, identifying the evidence to be seized to information "that constitutes fruits, contraband, evidence, and instrumentalities of violations Title 18, United States Code, Sections 1591 (Sex Trafficking by Use of Force, Fraud, or Coercion), 1594 (Conspiracy to Commit Sex Trafficking by Use of Force, Fraud, or Coercion), and 2421 (Interstate Transport for Prostitution), occurring between January 1, 2019, to January 29, 2021[.]" (Def.'s Ex. 2 [Docket No. 56-2] at 27).

"Attachment B" also describes the types of information which would be included in this limited subset of information. (Id. at 31, 32; Id. at 34, 35; Def.'s Ex. 2 [Docket No. 56-2] at 27, 28).

The Eighth Circuit Court of Appeals has found substantially similar language to satisfy the particularity requirement of the Fourth Amendment. Gleich, 397 F.3d at 612; United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008); United States v. Sherman, 372 F. App'x 668, 676 (8th Cir. 2010). In so finding, the Eighth Circuit Court of Appeals reasoned that such identifying language "adequately allowed the police to avoid searching and seizing the wrong items." Gleich, 397 F.3d at 612.

The same is true in the present case. The language in "Attachment B" in the Social Media Warrants provides a constitutionally adequate basis to allow law enforcement officers searching Defendant Luthor's and Defendant Brown's Instagram and Facebook accounts and Defendant Brown's Email account to search and seize the particular information. On the above basis, the Court finds that the Social Media Search Warrants which authorized law enforcement to search the at-issue Instagram, Facebook, and Email accounts satisfy the Fourth Amendment's particularity requirement.

The Court now considers whether the information in PI Barrows' supporting affidavit would have established a nexus between the accounts to be searched and the evidence of sex trafficking and financial fraud to be seized, and provided Magistrate Judge Leung and Magistrate Judge Menendez with a substantial basis upon which to conclude that probable cause existed to issue the Social Media Warrants.

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v.

Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)).

As noted above, the Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." Mutschelknaus, 592 F.3d at 828 (internal quotation marks and citation omitted). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." Hager, 710 F.3d at 836 (citation omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" Smith, 581 F.3d at 694 (quoting Reivich, 793 F.2d at 959). The issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli, 393 U.S. at 419).

Considering PI Barrows' affidavit submitted in support of the application for the Social Media Search Warrants, Magistrate Judge Leung and Magistrate Judge Menendez reasonably concluded that there was a fair probability that evidence of sex trafficking and financial fraud would be found in the Instagram, Facebook, and Email accounts which are the subjects of the Social Media Search Warrants. Put differently, the Court concludes that Magistrate Judge Leung and Magistrate Judge Menendez had a sufficient basis upon which to believe that probable cause for sex trafficking and financial fraud existed to support the issuance of the Social Media Search Warrants authorizing law enforcement to search the contents of the at-issue Instagram, Facebook, and Email accounts for evidence of sex trafficking and financial fraud.

The affidavits contain numerous tips about Defendant Luthor and Defendant Brown's copious personal money transfers; Defendant Brown's use of the suspect email address to issue an NDA to J.R. before a job interview under suspicious circumstances; and Defendant Brown and Defendant Luthor's consistent activity through both posting and commenting on Instagram and Facebook.[32] PI Barrows also attested that, based on her training and experience, individuals often use social media platforms, like Instagram and Facebook, to drive traffic to other sites, gather individuals for a common interest, and/or for marketing purposes. United States v. Mathis, No. 18-cr-18 (1) (DWF/LIB), 2018 WL 4473529, *7 (D. Minn. July 17, 2018), report and recommendation adopted, 2018 WL 4062741 (D. Minn. Aug. 27, 2018) (relying on the affiant's training and experience that "social media items" will provide evidentiary value for a sex trafficking investigation).

The Court finds that PI Barrows' affidavit submitted in support of the Social Media Search Warrants provided a sufficient nexus upon which Magistrate Judge Leung and Magistrate Judge Menendez could have reasonably concluded that the execution of the Social Media Search Warrants would result in a fair probability that evidence of sex trafficking and financial fraud would be found on the suspect accounts to be searched.

The affidavits submitted in support of the Social Media Warrants further provided probable cause that Defendants were engaging in sex offenses. PI Barrows' affidavit included information from different tipsters in May 2019, January 2020, and July 2020, that suspected either sex trafficking, fraud, or that Defendant Luthor was a pimp, with one tip specifically noting that

---

[32] Social Media and Email accounts have continuously been connected to both sex and financial offenses. See Mathis, 2018 WL 4473529 (finding probable cause existed to search "social media items" given the affiant's knowledge, through his training and experience, that sex traffickers often use cell phones and social media to arrange clients); see also Brenizer, 2021 WL 4505193 (upholding a probable cause determination to search email accounts in a financial fraud investigation when the emails were suspected to be used in furthering the alleged scheme).

multiple individuals had identified themselves as Defendant Luthor's girlfriends. United States v. Chappell, No. 09-cr-139, (JNE/JJK), 2010 WL 1131474 (D. Minn. Jan. 12, 2010), report and recommendation adopted, 2010 WL 1131473 (D. Minn. Mar. 22, 2010) (utilizing tipster information that associated the defendant with women believed to be prostitutes as a factor in establishing probable cause). PI Barrows additionally attested to records evidencing Defendant Luthor's and Defendant Brown's suspicious personal Zelle financial transfers, totaling nearly $20,000, with many of the transfers being for $999.99. See United States v. Morris, No. 17-cr-107 (DWF/TNL), 2018 WL 4483630 (D. Minn. May 14, 2018), report and recommendation adopted, No. 17-cr-1071, (DWF/TNL), 2018 WL 3377178 (D. Minn. July 11, 2018) (considering evidence regarding suspicious financial transactions to establish probable cause in a sex trafficking and money laundering investigation). PI Barrows additionally attested to a trash pull at Defendants' residence which uncovered a contraceptive prescription and an antibiotic used to treat vaginal infections. These items, based on PI Barrows' training and experience, may be consistent with commercial sex.

 PI Barrows' affidavit submitted in support of the application for the Facebook Search Warrant also included information regarding Defendant Luthor's contacts with women involved in sex work on or about May 3, 2019, May 4, 2019, May 9, 2019, and January 9, 2020. See Chappell, 2010 WL 1131474 (using the defendant's contact with women advertising prostitution services online as a factor in establishing probable cause).

The affidavits submitted in support of the Social Media Warrants additionally provided probable cause that Defendants were engaging in financial fraud. PI Barrows' affidavit noted consistent personal Zelle transfers of varying amounts between Defendant Luthor and Defendant Brown; Defendant Brown's cash downpayment of $315,000 on a $1,049,000 home; Defendant

Luthor's purchase of a 2019 Mercedes Benz for approximately $130,000; and paperwork where Defendant Luthor identified his salary as $999,961 per year. See United States v. Brenizer, No. 20-cr-177 (ECT/HB), 2021 WL 4505193 (D. Minn. Aug. 9, 2021), report and recommendation adopted, 2021 WL 4502338 (D. Minn. Oct. 1, 2021) (establishing probable cause through the consideration of suspicious bank transfers and defendant's extravagant purchases which involved the proceeds of a fraudulent scheme); see also United States v. Miller, No. 20-cr-232 (JRT/BRT), 2022 WL 4127546 (D. Minn. May 31, 2022), report and recommendation adopted, 2022 WL 3644894 (D. Minn. Aug. 24, 2022) (finding probable cause to support a search warrant when the affidavit included incriminating information about the execution of the scheme as well as evidence implicating the defendant in the scheme); Morris, 2018 WL 4483630, at *5 (D. Minn. May 14, 2018) ("[P]ersons suspected of accumulating wealth via criminal means often have evidence regarding possession of valuable assets, financial transactions . . . and evidence that may denote an attempt to conceal the true source of money made via illegal means.").

Based on the totality of the circumstances, the Court finds that PI Barrows' affidavit submitted in support of the Social Media Search Warrants satisfied the particularity and nexus requirements and provided a sufficient basis upon which Magistrate Judge Leung and Magistrate Judge Menendez could reasonably conclude that the execution of the Social Media Search Warrants would result in a fair probability that evidence of sex trafficking and financial fraud would be found in the accounts to be searched and that probable cause for sex trafficking and financial fraud existed to support their issuance.

Therefore, to the extent Defendants' Motions to Suppress seek to suppress evidence flowing from the execution of the Social Media Search Warrants, the undersigned recommends that Defendants' Motions to Suppress, [Docket Nos. 56, 63], be **DENIED**.

### b.  Welters Way and GVM Search Warrants

Defendant Luthor and Defendant Brown next argue that the affidavits submitted in support of the Welters Way and GVM Search Warrants, (Def.'s Exs. 4, 5 [Docket Nos. 56-5, 56-5]), once excised of the information stemming from the previously mentioned alleged unconstitutional Social Media Search Warrants, do not satisfy the particularity requirement, fail to establish a sufficient nexus between the property to be searched and the evidence of financial and healthcare fraud to be seized, and lack a reasonable basis upon which to find that probable cause for financial and healthcare fraud existed to support their issuance. (See Def.'s Mem. [Docket No. 72] at 19–20); Def.'s Mem. [Docket No. 74] at 7, 8).

The Court has already found that the Social Media Warrants satisfied the particularity requirement, established a sufficient nexus between the accounts to be searched and the evidence of sex trafficking and financial fraud to be seized, and contained a reasonable basis upon which to find that probable cause for sex trafficking and financial fraud existed to support their issuance. Therefore, there is no basis upon which to excise references to the results of those searches from the affidavits in support of the Welters Way and GVM Search Warrants. The Court concludes, therefore, that the affidavits submitted in support of the Welters Way and GVM Search Warrants satisfied the particularity requirement, established a sufficient nexus between the properties to be searched and the evidence of financial and healthcare fraud to be seized, and would have provided Magistrate Judge Foster and Magistrate Judge Koppe with a substantial basis upon which to conclude that probable cause for financial and healthcare fraud existed to issue the Welters Way and GVM Search Warrants.

As observed above, to satisfy the particularity requirement, the place to be searched must be "described with sufficient particularity as to enable the executing officer to locate and identify

the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or searching for the wrong items. Gitcho, 601 F.2d at 371; Thomas, 263 F.3d at 808; Gleich, 397 F.3d at 612.

On the record now before the Court, the Welters Way and GVM Search Warrants satisfied the particularity requirement. The Welters Way and GVM Search Warrants incorporated "Attachment B" which specifically identified the items to be seized within the Welters Way residence and GVM office to "fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1347 (government healthcare benefit program fraud), 1349 (conspiracy), and 1956/1957 (money laundering)," from 2018 to the present. (Def.'s Ex. 4 [Docket No 56-4] at 44; Def.'s Ex. 5 [Docket No. 56-5] at 36). In addition to this language, "Attachment B" also describes the types of information which would be included in this limited subset of information. (Id. at 44–46; Id. at 36–39).

The language in "Attachment B" in the Welters Way and GVM Search Warrants provides a constitutionally adequate basis to allow law enforcement officers searching the Welters Way residence and the GVM office to search and seize the particular information. Gleich, 397 F.3d at 612; Nieman, 520 F.3d at 839; Sherman, 372 F. App'x at 676. On the above basis, the Court finds that the Welters Way and GVM Search Warrants which authorized law enforcement to search the Welters Way residence and the GVM office satisfy the Fourth Amendment's particularity requirement.

The Court now considers whether the information in PI Barrows' and PI Steele's supporting affidavits would have established a nexus between the properties to be searched and the evidence to be seized and provided Magistrate Judge Foster and Magistrate Judge Koppe with

a substantial basis upon which to conclude that probable cause existed to issue the Welters Way and GVM Search Warrants.

Considering PI Barrows' and PI Steele's affidavits submitted in support of the application for the Welters Way and GVM Search Warrants, Magistrate Judge Foster and Magistrate Judge Koppe reasonably concluded that there was a fair probability that evidence of financial and healthcare fraud would be found in the properties which are the subjects of the Welters Way and GVM Search Warrants. Put differently, the Court concludes that Magistrate Judge Foster and Magistrate Judge Koppe had a sufficient basis upon which to believe that probable cause for financial and healthcare fraud existed to support the issuance of the Welters Way and GVM Search Warrants authorizing law enforcement to search the at-issue properties for evidence of financial and healthcare fraud.

The affidavits contain information confirming the Welters Way residence's connection to GVM; evidence of fraudulent billing practices; Defendant Brown's suspect nursing credentials; audit findings uncovering widespread erroneous coding and documentation practices; corroborating information from the former GVM CEO, a former employee, and former patients; bank records establishing lavish expenditures; and confirmation of GVM's Las Vegas, Nevada, address. See Miller, 2022 WL 4127546 (upholding a search warrant to search defendant's business premises supported by an affidavit detailing a widespread scheme of fraud); see also Mathis, 2018 WL 4473529 (establishing probable cause to search a home when the defendant and evidence of the crime at issue were connected to that home).

The Court finds that PI Barrows' and PI Steele's affidavits submitted in support of the Welters Way and GVM Search Warrants provided a sufficient nexus upon which Magistrate Judge Foster and Magistrate Judge Koppe reasonably concluded that the execution of the Welters Way

and GVM Search Warrants would result in a fair probability that contraband or evidence of financial and healthcare fraud would be found in the properties to be searched.

The affidavits submitted in support of the Welters Way and GVM Search Warrants further provided probable cause that Defendants were engaging in financial fraud. PI Barrows' affidavit detailed confirmation of Defendant Brown's and Defendant Luthor's suspicious deposits and bank transfers, including transfers from GVM accounts to Defendant Luthor's personal account totaling approximately $1,300,000, to Defendant Brown's personal account totaling approximately $1,500,000, and to Defendants' joint personal accounts totaling approximately $33,000. See Brenizer, 2021 WL 4505193; see also Morris, 2018 WL 4483630, at *5 (D. Minn. May 14, 2018). PI Barrows additionally attested to J.W.'s suspicious employment relationship with GVM, evidenced through a lack of evidence that J.W. was ever issued a W-2 or Form 1099. See Brenizer, 2021 WL 4505193 (considering the IRS's lack of documentation of a company's payroll and earnings in a probable cause determination).

The affidavits submitted in support of the Welters Way and GVM Search Warrants additionally provided probable cause that Defendants were engaging in healthcare fraud. PI Barrows' affidavit detailed evidence of Defendant Brown's inability to provide the services GVM would bill for (given her limited nursing credentials); GVM's fraudulent billing practices over several years, including the results of an audit report that cited GVM's widespread coding and documentation errors; Defendant Luthor's and Defendant Brown's pushback on the audit findings in an attempt to avoid civil or criminal penalties; and Defendant Brown's impossible number of patient visits. See United States v. Augustine Med., Inc., No. 03-cr-321(1-8), (ADM), 2004 WL 502183 (D. Minn. Mar. 11, 2004) (using defendants' contradictory statements regarding the services they provide as well as their intent not to disclose fraudulent billing practices to Medicare

to establish probable cause). The affidavit further included information from the former GVM CEO, a former GVM employee, and former GVM patients that corroborated GVM's suspect billing practices.

PI Steele's affidavit submitted in support of the GVM Search Warrant is nearly identical to the affidavit submitted in support of the Welters Way Search Warrant. PI Steele's affidavit additionally included confirmation regarding GVM's Las Vegas, Nevada, office address, as well as investigators belief that devices located within the GVM office had been used in furtherance of the charged offenses given GVM's billing and patient records are electronically generated and maintained.

Based on the totality of the circumstances, PI Barrows' and PI Steele's affidavits submitted in support of the Welters Way and GVM Search Warrants satisfied the particularity and nexus requirements and provided a sufficient basis upon which Magistrate Judge Foster and Magistrate Judge Koppe reasonably concluded that the execution of the Welters Way and GVM Search Warrants would result in a fair probability that evidence of financial and healthcare fraud would be found in the properties to be searched and that probable cause for financial and healthcare fraud existed to support their issuance.

Therefore, to the extent Defendants' Motions to Suppress seek to suppress evidence flowing from the execution of the Welters Way and GVM Search Warrants, the undersigned recommends that Defendants' Motions to Suppress, [Docket Nos. 56, 63], be **DENIED**.

### c. Twenty-Three Device Search Warrant

Defendant Luthor and Defendant Brown lastly argue that the affidavit submitted in support of the Twenty-Three Device Search Warrant, (Def.'s Ex. 7 [Docket No. 56-7]), once excised of the information stemming from the previously discussed alleged unconstitutional Social Media

Search Warrants, also does not satisfy the particularity requirement, fails to establish a sufficient nexus between the devices to be searched and the evidence of sex trafficking and financial fraud to be seized, and lacks a reasonable basis upon which to find that probable cause existed to support its issuance. (See Def.'s Mem. [Docket No. 72] at 26–28; Def.'s Mem. [Docket No. 74] at 14, 15).[33]

The Court has already found that the Social Media Warrants satisfied the particularity requirement, established a sufficient nexus between the accounts to be searched and the evidence of sex trafficking and financial fraud to be seized, and contained a reasonable basis upon which to find that probable cause for sex trafficking and financial fraud existed to support their issuance. Therefore, once again, there is no basis upon which to excise reference to the results of those searches from the affidavit in support of the Twenty-Three Device Search Warrant. The Court concludes, therefore, that the affidavit submitted in support of the Twenty-Three Device Search Warrant, satisfied the particularity requirement, established a sufficient nexus between the devices to be searched and the evidence of sex trafficking and financial fraud to be seized, and would have provided Magistrate Judge Foster with a substantial basis upon which to conclude that probable cause for sex trafficking and financial fraud existed to issue the Twenty-Three Device Search Warrant.

Again, to satisfy the particularity requirement, the place to be searched must be "described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" and to avoid mistakenly searching the wrong premises or searching for the wrong items. Gitcho, 601 F.2d at 371; Thomas, 263 F.3d at 808; Gleich, 397 F.3d at 611.

---

[33] The Government contends Defendant Luthor and Defendant Brown have failed to establish the requisite Fourth Amendment standing for any of the twenty-three devices. (Gov't.'s Response [Docket No. 69] at 17, 18). For the sake of this analysis, the Court will assume for argument only that Defendants have established the requisite standing to challenge the Twenty-Three Device Search Warrant.

On the record now before the Court, the Twenty-Three Device Search Warrant satisfied the particularity requirement. The Twenty-Three Device Search Warrant incorporated "Attachment B" which specifically identified the items to be seized within the twenty-three devices to "fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 2421 (Mann Act), 18 U.S.C. § 1951 (sex trafficking), 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 371 (conspiracy)," from 2018 to the present. (Def.'s Ex. 7 [Docket No 56-7] at 20). In addition to this language, "Attachment B" also describes the types of information which would be included in this limited subset of information. (Id. at 20, 21).

The language in "Attachment B" in the Twenty-Three Device Search Warrant provides a constitutionally adequate basis to allow law enforcement officers searching the twenty-three devices to search and seize particular information. Gleich, 397 F.3d at 612; Nieman, 520 F.3d at 839; Sherman, 372 F. App'x at 676. On the above basis, the Court finds that the Twenty-Three Device Search Warrant which authorized law enforcement to search the twenty-three devices seized from the Welters Way residence satisfies the Fourth Amendment's particularity requirement.

The Court now considers whether the information in PI Barrows' supporting affidavit would have established a nexus between the accounts to be searched and the evidence of sex trafficking and financial fraud to be seized and provided Magistrate Judge Foster with a substantial basis upon which to conclude that probable cause for sex trafficking and financial fraud existed to issue the Twenty-Three Device Search Warrant.

Considering PI Barrows' affidavit submitted in support of the application for the Twenty-Three Device Search Warrant, Magistrate Judge Foster reasonably concluded that there was a fair

probability that evidence of sex trafficking and financial fraud would be found in the devices which are the subjects of the Twenty-Three Device Search Warrant. Put differently, the Court concludes that Magistrate Judge Foster had a sufficient basis upon which to believe that probable cause for sex trafficking and financial fraud existed to support the issuance of the Twenty-Three Device Search Warrants authorizing law enforcement to search the twenty-three devices for evidence of sex trafficking and financial fraud.

The affidavits contain information confirming the presence of text exchanges regarding potential arrangements for sex between Defendant Luthor and B.H.; evidence of Defendant Luthor's near million dollar personal expenditures within a six-month period; Defendant Luthor's online and in-person involvement with sex workers; and Defendant Luthor's relationship with a "pimp" club manager. Chappell, 2010 WL 1131474, *18 (D. Minn. Jan. 12, 2010) ("[P]rostitutes as well as the people they are working for often times communicate about their illicit activities via their cellular phones[.]"); see Brenizer, 2021 WL 4505193 (finding probable cause to search a phone found pursuant to a search warrant when defendant was suspected of using the device in furtherance of the alleged financial offenses).

The Court finds that PI Barrows' affidavit submitted in support of the Twenty-Three Device Search Warrant provided a sufficient nexus upon which Magistrate Judge Foster reasonably concluded that the execution of the Twenty-Three Device Search Warrant would result in a fair probability that evidence of sex trafficking and financial fraud would be found on the devices to be searched.

The affidavits submitted in support of the Twenty-Three Device Search Warrant further provided probable cause that Defendants were engaging in sex trafficking. PI Barrows attested that the women acted "strangely" around Defendant Luthor, and that Defendant Luthor made decisions

for all the women, including that during the execution of the Welters Way Search Warrant B.H. would leave the home without a winter coat. The affidavit additionally included information from tipsters regarding Defendant Luthor's multiple girlfriends, his association with prostitutes, and his involvement with a "pimp." See Chappell, 2010 WL 1131474 (using the defendant's suspect interactions with women believed to be prostitutes as a factor in establishing probable cause). PI Barrows also attested to concerning text messages between B.H. and Defendant Luthor implying arrangements referring to sexual activity. Mathis, 2018 WL 4473529 (citing the use of cell phones to facilitate sex trafficking in support of a finding of probable cause).

The affidavits submitted in support of the Twenty-Three Device Search Warrants additionally provided probable cause that Defendants were engaging in financial fraud. PI Barrows' affidavit again noted Defendant Luthor's extravagant personal spending of approximately: $453,370.24 at strip and/or night clubs in Minneapolis; $96,381.42 at Minneapolis, Miami Beach and Las Vegas restaurants; $94,708.02 on Tinder and cash transfers via CashApp and Zelle to various women; $42,500 on a 2021 Rolls Royce, making $8,500 monthly payments; and $22,889.90 on Minnesota sporting events. See Brenizer, 2021 WL 4505193; see also Morris, 2018 WL 4483630, at *5 (D. Minn. May 14, 2018).

Based on the totality of the circumstances, PI Barrows' affidavit submitted in support of the Twenty-Three Device Search Warrant satisfied the particularity and nexus requirements and provided a sufficient basis upon which Magistrate Judge Foster reasonably concluded that the execution of the Twenty-Three Device Search Warrant would result in a fair probability that evidence of sex trafficking and financial fraud would be found on the devices to be searched and that probable cause for sex trafficking and financial fraud existed to support its issuance.

Therefore, to the extent Defendants' Motions to Suppress seek to suppress evidence flowing from the execution of Twenty-Three Device Search Warrant, the undersigned recommends that Defendants' Motions to Suppress, [Docket Nos. 56, 63], be **DENIED**.

### d. <u>Leon</u> Good Faith Exception

Finally, assuming <u>solely</u> for the sake of argument that any of the affidavits submitted in support of the search warrants now at issue were not sufficient to establish probable cause for any of the searches, the Court concludes that officers relied in good faith on the probable cause determinations of the various neutral and detached Magistrate Judges when executing the Instagram, Facebook, Email, Welters Way, GVM, and Twenty-Three Device Search Warrants.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." <u>Davis v. United States</u>, 564 U.S. 229, 238–39 (2011) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)).

There are four circumstances in which the good-faith exception does not apply:

> the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

<u>United States v. Marion</u>, 238 F.3d 965, 969 (2001).

However, the record presently before the Court shows clearly and plainly that law enforcement relied in good-faith on all of the Search Warrants issued. The circumstances of this

case thus militate against applying any of the limited exceptions to <u>Leon</u> to suppress any of the evidence obtained during the execution of any of the search warrants now at issue.

Defendant Luthor and Defendant Brown lastly contend, however, that the <u>Leon</u> good faith exception has been overruled by <u>Dobbs v. Jackson Women's Health Organization</u>, 547 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022), because <u>Leon</u> is merely "a judge made exception to a constitutional mandate." (Def.'s Mem. [Docket No. 72] at 30–34; Def.'s Mem. [Docket No. 74] at 17–19); <u>Dobbs</u>, 597 U.S. at 231; <u>Leon</u>, 468 U.S. at 913. There is <u>no</u> reasonable basis to override <u>Leon</u> by stretching <u>Dobbs</u> beyond its limits. <u>Leon</u>, is still controlling, and "District courts may not decline to follow [continuing] binding precedent, even if later opinions [even arguably] cast doubt on earlier ones." <u>United States v. Brown</u>, No. 24-cr-26 (ECT/LIB), 2025 WL 830077, at *12 (D. Minn. Mar. 13, 2025) (citing <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997)). Thus, this Court will follow and apply <u>Leon</u>.

Accordingly, none of the affidavits submitted in support of the applications for the search warrants now at issue were so lacking in indicia of probable cause as to render law enforcement's belief in its existence entirely unreasonable, nor were any of the warrants now at issue so facially deficient that the executing officers could not have reasonably presumed the search warrants to be valid. Finally, there is simply <u>no</u> evidence on the record now before the Court to even remotely suggest that any of the issuing U.S. Magistrate Judges wholly abandoned their judicial role or were misled in any way.

## VIII.   CONCLUSION

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Brown's Motion for Disclosure of Confidential Informants, [Docket No. 52], is **GRANTED**, in part, and **DENIED**, in part, as set forth herein;

2.  Defendant Brown's Motion to Preserve Rough Notes, [Docket No. 54], is **GRANTED**, as set forth herein;

3.  Defendant Luthor's Motions for Disclosure of <u>Brady</u>, <u>Giglio</u>, and Impeachment Information, [Docket Nos. 59, 60, 61], are **GRANTED**, as set forth herein;

4.  Defendants' Motions for Early Disclosure of Jencks Material, [Docket Nos. 53, 62] are **DENIED**; and

5.  Defendants' Motions to Produce 404(b) Evidence, [Docket Nos. 55, 58], are **GRANTED**, as set forth herein.

Further, **IT IS HEREBY RECOMMENDED** that:

1.   Defendants' Motions to Suppress Evidence, [Docket Nos. 56, 63], be **DENIED**.

Dated: December 30, 2025                    s/Leo I. Brisbois
                                            Hon. Leo I. Brisbois
                                            U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.