**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

Criminal No.: 25-CR-88 (1)(ECT/LIB)

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>Vs.<br><br><br>GABRIEL ADAM ALEXANDER LUTHOR (1),<br><br><br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**DEFENDANT LUTHOR'S OBJECTIONS TO REPORT AND RECOMMENDATION** |

## INTRODUCTION

Mr. Luthor timely submits these objections to the Magistrate's Report and Recommendation (R&R) (Doc. No. 79 and 80) pursuant to Local Rule 72.2(b) and 28 U.S.C. § 636(b)(1).

Because the R&R incorrectly concluded that probable cause existed in each of the disputed warrants, and incorrectly found that *Leon* would render any contrary finding academic, Mr. Luthor objects to each of those conclusions of law in the R&R and requests *de novo* review.

1

## FACTS AND PROCEDURAL POSTURE

Mr. Luthor moved to suppress five search warrants. The first is a warrant for all information of any type from four Instagram accounts. Ex. 1. The second is a warrant for all information from three Facebook accounts. Doc. Ex. 2. The third is a warrant to search Luthor's home in Eden Prairie. Ex. 3. The fourth is a warrant for Golden Victory Medical's (GVM) office in Nevada. Doc. Ex. 6. The fifth is a warrant for all information contained on 23 electronic devices. Ex. 5. Defendant withdrew his motion regarding Ex. 4. *See* Doc. No. 72 at F.N. 2.

On December 30, 2025, the Magistrate recommended the Court deny suppression as to all five warrants. Doc. Nos. 79 and 80. Defendant Luthor timely files these objections to those recommended factual findings and legal conclusions. *Id*.

### 1.    The First Warrant: Instagram.

The initial search warrant affidavits are based off citizen informant "tips" about the lifestyle of Mr. Luthor, combined with innocuous social media posts, and routine financial transactions. *See* Ex. 1. The first "tip" came from a hair salon employee who found it odd that two women came in wearing make-up and "club" clothing in the morning. Ex. 1 at 4-5. The second "tip" came from a

woman who interviewed for a healthcare job with Luthor and Brown, and found their lifestyle odd. *Id.* at 6-11. The third "tip" came from a plumbing inspector who opined, without apparent foundation, that a "glassed in solarium room" was "a place to view and pick women." *Id.* at 13.

The search warrants are rife with derision and innuendo. Repeatedly throughout the affidavits, the affiant refers to women wearing "full make-up," which the affiant states was suspicious because it was in the morning in both instances. *See Id.* at 4, 9-10. A large hot tub and shower in an upper-middle class suburban home were somehow suspicious, and the shower referred to repeatedly as a "gang shower." *Id.* at 13. The affidavit makes clear the inspector had never seen such a shower before, but no explanation for why it is called a "gang" shower is offered. *Id.* A Google search for the term returns only results for "communal showers," a less pejorative way of describing a shower with multiple heads.

The affidavit also mocks Mr. Luthor's appearance repeatedly. First, by stating that the "African American man with manicured facial hair and eyebrows" who took an interest in the appearance of his companions must be "in charge" of the women. *Id.* at 5. And second, by quoting a message stating "tell that dude ...to stop using sharpies on his eyebrows," then following it up

3

with the affiant's opinion that "This description of Langford's [Luthor] eyebrows appears to be consistent with photos posted on the Subject Accounts." *Id.* at 11.

Similarly, the trash pull yielded nothing remotely illegal. *Id.* at 14. Instead, it yielded only one contraceptive and one antibiotic prescription for a single adult female. The affiant avers this "may be consistent with commercial sex." *Id.* Of course, it is also consistent with basic feminine care, and large showers are common in spas, gyms, locker rooms, and luxury homes with similar amenities. The first warrant challenged, Doc. 63-1, authorizing Instagram account searches, briefly discussed the business of Golden Victory Medical, and described several small transactions between Luthor and Brown. The warrant ends with a discussion of innocuous Instagram posts, and a boilerplate recitation of Instagram's workings and policies. *Id.*

The first warrant utterly fails to describe any crime, much less probable cause of a specific crime, and the R&R's conclusion to contrary is incorrect and hereby objected to, as discussed further below.

### 2.    The Second Warrant: Facebook.

Just a few days after the first warrant, law enforcement obtained a

4

second warrant for all information from several Facebook accounts. This warrant is nearly identical to the Instagram warrant, with the addition of information about Luthor's phone tolls. The warrant states that "the government obtained toll records of all incoming and outgoing calls to Langford's [Luthor's] cell phone." Ex. 2 at 16.

And here, for the first time, we see any allegation of connection to criminal activity. The only thing allegedly connecting any of this to commercial sex work was a database search that found "Luthor had telephone contact with several women involved in commercial sex work." Ex. 2 at 16-17. The affiant searched a database cataloging websites such as Backpages ads[1] and the phone numbers associated with them, and saw Luthor had communicated modestly with a few. The salacious quotes included in the warrant application(s) are not of conversations Luthor had, but rather are quotes from commercial sex advertisements stored in a law enforcement database that are connected to phone numbers that Luthor allegedly had communicated with in single-digit quantities. *Id.*

---

[1] Counsel notes that on April 9, 2018, the federal government seized and shut down the classified advertising platform Backpage. See United State Department of Justice, Press Release Number: 18 – 427, *Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment.*

This warrant application ends with a discussion of innocuous Facebook posts, and a boilerplate recitation of how Facebook works. The R&R incorrectly found this warrant was supported by probable cause, and also failed in its analysis to address the issue of staleness Defendant raised regarding the aged database data used to connect an unknown phone number's tolls to a few sex worker advertisements.

**3.    The Third Warrant: The Home in Eden Prairie.**

Two full years later, on January 9, 2023, law enforcement applied for a search warrant for Luthor's home in Eden Prairie. Ex. 3. This warrant begins by describing the premises to be searched, and its sale and ownership history. Ex. 3 at 6-7. Next, it describes a knock-and-talk officer visit where Luthor answered the door, and Brown and two of Luthor's other girlfriends were present. *Id.* at 8. Next the warrant describes Luthor having a car parked in the driveway, and then transitions into discussion of the Medicare Program generally. *Id.* at 8-9. Nothing to that point approaches alleging probable cause.

Then the application moves on to discussing information obtained from the earlier search warrants, including from Brown's Gmail accounts, and a GVM brochure found therein. *Id.* at 12-13. Because the R&R incorrectly found the first two warrants were supported by probable cause, this information was

not properly excised from the analysis of the warrant for the home.

The next five pages summarize billing records for GVM, presumably obtained from Medicare. *Id.* at 15-20. Next the application discusses information obtained from the prior Facebook warrant, including messages from Luthor about his polyamorous lifestyle. Ex. 3 at 18-19. Another several pages are devoted to discussing interviews with past employees and patients of GVM. *Id.* at 22-26.

Gone almost entirely is any allegation of commercial sex, sex trafficking, or the like, because indeed there had never been any such conduct. *See* Ex. 3. Also, contradicting the earlier warrants, which stated that Luthor and Brown were not familiar with the Kareo software, this warrant is replete with references to their alleged voluminous entries in the program. *See* Ex. 3 at 24.

The information from the interviews with employees, patients, and the billing records are discussed further below, as they are mirrored in the home and office warrants. Because the R&R incorrectly found that the warrant for the home was supported by probable cause, Mr. Luthor objects to this conclusion of law as well.

**4.        The Fourth Warrant: GVM Office in Nevada.**

The fourth warrant Mr. Luthor has moved to suppress authorized the search of GVM's Nevada office, and is Exhibit 6. The affidavit and warrant were signed on January 11, 2023. *See* Ex. 6 at 32. While the first and second warrants purported to investigate commercial sex crimes, the fourth warrant application states: "This warrant is related to the improper billing for services purportedly provided to Medicare beneficiaries by GVM." *See Id.* at 6. This warrant relies on earlier warrants, and retains many of the innuendos and insinuations of the first and second warrants, but also purports to add new information regarding GVM billing. *See Id.* at 16-18. The affidavit begins by explaining what GVM's legitimate business appears to be, then contrasts billing records for GVM with travel itineraries and activities of Luthor and Brown seized from their social media and email accounts with prior warrants to allege that Brown could not have provided services while she appeared to be in Vail, Colorado, with Luthor. *Id.* at 10-11. The affidavit also uses other information gleaned from the prior warrants to allege that Brown is not qualified to provide certain services, or provides them in a manner inconsistent with a particular expert's recommendations. *Id.* at 6-9. This is repeated in the home warrant as well. *See* Ex. 3 at 11-13.

The theory of fraud contained in the affidavit is spelled out, and consists

of stating that the top five clients of GVM were each seen hundreds of times, and that this allegedly "does not follow the neurofeedback guidelines outlined in BROWN's email." Ex. 6 at 20. The affiant is referring to an email sent July 30, 2019 by Ms. Brown, and seized pursuant to an earlier warrant, which stated "we generally expect a positive response within the first 12-15 sessions, if there is to be one. If no improvement is achieved in that time, we would recommend suspending treatment." *Id.* The affidavit goes on to quote the email further as saying "While there are often improvements in the first few sessions, Neurofeedback training usually requires at least 25, and most commonly 3-50 sessions with a small number of follow-up reinforcement sessions for permanent changes to take place." *Id.* Nothing in the email or materials says that for some patients, more than 50 sessions would be improper, or not medically necessary. Instead, the email simply explains what is most common.

The affidavits for home and office claim prior employees confirmed the fraud scheme. However, the only possible allegation of mis-billing consists of one instance of viewing in Kareo (the software the affiant previously claimed the defendants did not know how to use) one patient visit listing services the employee did not provide. *Id.* at 17. That employee did not say another person did not provide the service, nor otherwise state the billing was fraudulent. *Id.*

The remainder of the discussion with the prior employee revolved around the employee thinking Brown's management style was "weird," and complaining about performance targets laid out by Brown. *Id.* at 16-17.

The home and office affidavits claim in general language that former patients were interviewed, and "confirmed" excessive billing, but then the specific examples that are given are only two examples, neither of which is particularly suspicious. The first example, Patient 1, confirmed she received the services, and the only potential allegation of fraud relates to GVM billing her insurance for not only the calls that she answered, but also for those she missed. *Id.* at 18. Other than that, Patient 1 "believes the treatments are helping her" and otherwise confirmed receiving services. *Id.* The second example relates to Patient 2, who called a test "stupid," but otherwise confirmed she received all the services Medicare was billed for by GVM. *Id.* at 19. The only other negative aspect was that someone was "pushy" when she cut back on services. *Id.* There is no confirmation whatsoever by either patient of widespread fraud or excessive billing, nor do they confirm that any services were billed but not provided. No other prior patient examples are given.

The affidavit also relies heavily on allegations made by a prior CEO in a lawsuit against GVM about erroneous coding and documentation, an internal

audit GVM had undertaken of its own accord, and "push back" the CEO received from defendants about the findings of the audit. *Id.* at 11-12. However, these allegations appear to be lifted directly from a civil plaintiff's pleading, and not based on any investigation by the agent, nor interviews with the CEO. *Id.* Allegations in an unverified civil complaint seeking money from GVM should be taken with a grain of salt, at a minimum, if not disregarded entirely.

The affidavit goes on to show that the GVM office is open during business hours, does have staff and patients, and may be conducting "some" legitimate business. *Id.* at 24-34. The affidavit also goes to great lengths to show that Brown and Luthor spent the money earned from GVM on themselves in ways the affiant strongly insinuates disapproval of, such as on luxury cars, trips, and at nightclubs. *Id.* Both the home and office warrants refer to this as "diverting" funds from GVM, but of course, the owners of a business would be expected to take the profits, and to be allowed to spend them as irresponsibly as they want.

The affidavit also expends several pages discussing how one of Mr. Luthor's girlfriends, J.W., is over a decade younger than Luthor (but still an adult), and may have limited financial independence. *Id.* at 12-13. Nothing actually criminal is alleged, and these several pages are spent essentially

rehashing allegations similar to the 2021 warrants about how Luthor's lifestyle is unchaste. *Id.* The affiant here even refers back to the hair salon and plumbing inspector visits of 2020, and how Luthor was "controlling" of his girlfriends. *Id.* at 12. The affidavit also cites back to the search warrants for Instagram and Facebook. *Id.* at 13. The affidavit vaguely alleges that J.W. does work for GVM for which her payment is unclear, but no crime is alleged, although she is called a victim. *Id.* at 13-4. The affidavit also alleges she received a check for $100,000 from GVM, and then slowly paid some of that over time to the Defendants, while residing in their house, much like one might pay rent. *Id.* The affiant and the R&R found this far more suspicious than it really is.

In essence, the government laid out a theory of fraud consisting of allegations that GVM had some patients who had lots of neurofeedback sessions, which were more than Ms. Brown said in one marketing email would normally be effective, and that GVM had claims denied at a higher rate than average. *Id.* at 7, 12. The rest of the allegations are about the lifestyle of the defendants, which the affiant continued to disapprove of, but ceased to refer to as sex-trafficking or commercial sex by 2023. *Id.* However, the affidavit remained draped in references to Mr. Luthor being a pimp, and dripping with

insinuation that he and Brown must be criminals because they are polyamorous and have unique relationships with each other, as well as others.

The R&R incorrectly concluded that this warrant contained probable cause and Mr. Luthor objects to the same.

### 5.    The Fifth Warrant: 23 Electronic Devices.

The government next sought and obtained on July 19, 2023, a search warrant for everything contained on 23 electronic devices. Ex. 5. This warrant begins by stating the investigation began as related to "sex trafficking and related offenses," and then references the earlier warrants. Ex. 5 at 2-3. The application alleges that "Shortly after the investigation began, a review of bank records determined Luthor and one of his girlfriends [Brown] received millions of dollars into their personal bank accounts from a business account for [GVM], a company operated by Luthor and Brown… ." *Id.* at 3-4.

The warrant then states that during the January warrant execution, Luthor, Brown, and "his girlfriends" were present, and the "females acted strangely around Luthor," by allowing him to decide when to leave and what car to take. *Id.*  The affidavit then details text conversations between Luthor and "his girlfriends," and also conversations just amongst the women, about

how much food and alcohol is appropriate to drink, and other routine daily activities. *Id.* at 5-6. The affidavit confusingly and without explanation alleges "Marco" means "sex." *Id.* at 6-7. The warrant then goes on to discuss how Luthor spent money earned from GVM at night clubs and strip clubs. *Id.* at 8-9. The first eight pages of the warrant do not allege any facts that tend to indicate any crime, whether sex-related, or fraud-related. The first eight pages are entirely devoted to painting Luthor as an unsavory person with a lifestyle the affiant disapproves of, and no crime is alleged whatsoever.

Then the affidavit describes interviewing a former stripper, who worked as Luthor's assistant, and denied any romantic relationship. *Id.* at 10. No crime is alleged.

On the tenth page is the first allegation of a possible crime: Luthor paid prostitutes for services in Las Vegas according to someone with initials JT. *Id.* at 11. However, prostitution is legal in Las Vegas, and JT did not allege Luthor caused anyone to travel for commercial sex, nor that he was in charge of the prostitutes. Rather, he was a customer. *Id.* at 11. So again, no crime is alleged by page 10.

The affidavit next describes an interview with a former stripper named

BM, who stated she moved in with Luthor, quit her job, and had a non-monogamous dating relationship. "BM said she and the other girlfriends had their own private sexual relationships with Luthor." *Id.* at 10. While Luthor provided some money to BM for her bills, no crime was committed nor alleged. *Id.*

Next the affidavit describes a club manager who grooms women, and introduces them to Luthor, and the interviewee IA said "the manager would pimp the women and that Luthor is a client." *Id.* at 12. So, the affidavit alleged a club manager was committing felony crimes, and Luthor was, at most, a misdemeanant and client of prostitutes. *Id.* No dates or specific incidents or transactions are described, and the allegation of misdemeanor conduct by Luthor is vague and uncertain at best in this warrant. *Id.* The remainder of the warrant is boilerplate, and does not allege a crime. *Id.* at 12-17.

This warrant does not contain any of the information related to the GVM billing investigation, and spends eleven pages railing against Luthor's unchaste lifestyle, failing to allege Luthor committed more than a misdemeanor solicitation offense, possibly, in general terms. *Id.* The warrant then requests permission to search 23 devices seized found in his home, without ever alleging a crime, much less a crime to which everything

contained on all 23 devices would be potentially connected.

## DISCUSSION

The question before the Court is whether the totality of the circumstances described in each of the warrant applications fairly described probable cause. Because the affidavits described, at most, a wealthy interracial couple with a polyamorous lifestyle, the warrants fail this test. Below is a statement of the applicable law, followed by a discussion of each warrant. Then the application of *Wong Sun* to various subsequent warrants is discussed. *Wong Sun et al. v. United States*, 371 U.S. 471 (1963). Finally, the inapplicability of *Leon* to save the warrants is discussed. *United States v. Leon*, 468 U.S. 897 (1984).

### 1.    Search Warrant Standard and Probable Cause Analysis.

For a warrant to issue, the Fourth Amendment requires a showing of "probable cause." While that legal term has evolved over time, the requirement itself is not an empty formality. Rather, it is designed to be meaningful, not merely a "rubber stamp for the police." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). Prior to issuing a warrant for search and seizure, a judge must find—typically based upon an affidavit—that there is

probable cause to justify the intrusion. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The issuing magistrate must examine "all the circumstances set forth in the affidavit" to determine whether "there is a fair probability that [contraband] or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal punctuation omitted).

> The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States,* 333 U.S. 10, 13-14 (1948); *see also Steagald v. United States,* 451 U.S. 204, 212 (1981) (warrant necessary because law enforcement "may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty").

**a.    The R&R Incorrectly Concluded the Social Media Warrants**

### Were Supported by Probable Cause.

The R&R incorrectly concluded, that a nexus existed between the non-crimes alleged, and the social media accounts, without articulating any facts to support that conclusion other than the generalized statement from the affiant that criminals use social media to drive traffic elsewhere. Doc. 80 at 35-6. The R&R also incorrectly reaches the final conclusion that these warrants were supported by probable cause *of financial fraud*. Id. at 36. This must be an error, as no allegations of financial fraud are made in the social media warrants. And while Mr. Luthor vigorously disputes that the allegations of commercial sex in the social media warrants are paltry, conclusory, and insufficient, those are the only allegations the Magistrate could have evaluated with regard to the first two warrants.

And Mr. Luthor objects to the conclusion reached by the R&R, as to the social media warrants, that probable cause of "sex trafficking, fraud, or that Defendant Luthor was a pimp, *with one tip specifically noting that multiple individuals had identified themselves as Defendant Luthor's girlfriends.*" Again, no allegations of fraud were made, and a man having multiple women who voluntarily identify as his girlfriends *in no way approaches description of a crime.* It may be atypical. Perhaps even offensive to some. It is not criminal in

18

the slightest, however. Nothing in *U.S. v. Chappell* states that having multiple girlfriends provides probable cause of a crime. No. 09-cr-139, (JNE/JJK), 2010 WL 1131474 (D. Minn. Jan. 12, 2010). In *Morris,* the Defendants were involved in an international sex trafficking ring of young girls to massage parlors in Minnesota, California, and other states, and transferred money to a vast network of people, including in a foreign country, and had no legitimate business. *U.S. v. Morris*, No. 17-cr-107 (DWF/TNL), 2018 WL 4483630 (D. Minn. May 14, 2018), report and recommendation adopted, No. 17-cr-1071, (DWF/TNL), 2018 WL 3377178 (D. Minn. July 11, 2018). Here, by contrast, Luthor had girlfriends, and a business, which the agents visited and observed to have employees, patients, and to be providing the (lawful) services they advertised. Frequent domestic money transfers between two owners of a lawful business who are also romantic partners are not suspicious in the way that transfers between a vast global network of persons unrelated other than by virtue of human trafficking are.

The R&R also incorrectly assigns great weight to entirely normal purchases of a home, and a car, by the couple, with the money made from their shared business. Doc. 80 at 37. Nothing about the cases cited in the R&R support that conclusion. *Brenizer* is similarly inapposite, as it involved one

man using multiple false identities to apply for funds he would then transfer from himself to himself, and making purchases under those false identities. *United States v. Brenizer*, No. 20-cr-177 (ECT/HB), 2021 WL 4505193 at *3 (D. Minn. Aug. 9, 2021).

In contrast to those cases cited by the R&R, here the warrants were plainly unsupported by probable cause, and were based off nothing more than salacious accusations about Luthor's lifestyle. While possibly innocent facts alleged can give rise to probable cause, a court may not "arrive at probable cause simply by piling hunch upon hunch." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004). A possible innocent explanation of suspicious facts does not prohibit reliance on those facts in finding probable cause. *See District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). Instead, courts must look at "the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

The degree of suspicion that should attach to the curious lifestyle described in the Instagram and Facebook warrants was minimal, at best. While Luthor's polyamorous, luxurious, perhaps even obnoxious lifestyle may be repugnant to the sensibilities of an average Minnesotan, that is not a crime. Based off little more than inuendo and conjecture about the lifestyle of Mr.

Luthor, a black man residing with a white woman in the suburbs, the government obtained a series of search warrants for alleged violations *inter alia* of the Mann Act, a law that has its origins in preventing black men from crossing state lines with white women, most notably, the boxer Jack Johnson.[2] And it did so without showing any non-stale connection between Luthor and any crimes, and the only alleged criminal activity he was connected to in the social media warrants was contacting phone numbers associated several years prior with prostitution ads in a law enforcement database.

The government does not now prosecute Mr. Luthor for any violations of the Mann Act, nor for any allegations related to commercial sex, as there was no evidence of such. Instead, Mr. Luthor is indicted on allegations of Medicare fraud wholly unrelated to the entire basis for some of the search warrants. The R&R states that "Defendant Luthor seemingly takes issue with" the difference between the alleged crimes initially investigated, and the crimes charged. Doc. 80 at 30, FN 30. However, this critique misses the forest for the trees. Mr. Luthor does not argue that he has a right to be charged with the same crimes initially investigated, but rather that he has a right to not have his property or accounts seized or searched based on warrant applications that

---

[2] https://www.pbs.org/kenburns/unforgivable-blackness/mann-act

lack probable cause, and which smack of worthless stereotypes and needless derision, without articulating a lawful basis to search.

The first two warrants utterly failed to allege any crime had occurred, and at most alleged that Luthor had a fancy house, fancy car, several girlfriends, and a seemingly legitimate business. The rank speculation about a 'gang shower' and a door or window for 'choosing women' was never connected to any crimes whatsoever in the first warrant. That his girlfriends wore make-up and "sexy" clothes in the morning did not make them prostitutes. That Luthor was given input on how his girlfriends had their hair done does not make him a pimp. This first warrant is so repugnant to the Fourth Amendment it should be entirely suppressed.

In the second warrant, the only connection was that a number possibly connected to Luthor had corresponded with phone numbers that were tied in a law enforcement database to catalogued Backpages type ads. No commercial sex is actually alleged, and Backpages, the only specific webpage listed, was taken down in 2018.[3] The warrant was signed in 2021. Three-year-old-or-more information is likely stale. Worse yet, it is stale information that does not

_____

[3] See Footnote 2 supra.

allege a crime. At most, it alleges that a man with many girlfriends may have a phone number that communicated minimally with numbers that were tied to sex-worker ads at some time in the past and apparently three or more years prior. The R&R failed to consider the argument that this three-year-old, tenuous connection to advertisements was stale information. "There is no bright-line test for determining when information in a warrant is stale." *United States v. Pruneda,* 518 F.3d 597, 604 (8th Cir. 2008). Rather, we look to the circumstances of the case, including the nature of the crime involved. *Id.* "[T]he lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." *United States v. Horn,* 187 F.3d 781, 785-6 (8th Cir. 1999). Such is precisely the case here, where the information was three years old and alleged to be ongoing, rendering the information stale. *See also United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010)(18 months not stale because not that old and crime not ongoing).

The government also argued that, even if these initial warrants failed to show probable cause of anything else, then money laundering should save them. However, recurrent electronic bank transfers between two persons living together and co-owning a business hardly creates a fair probability that

money laundering is afoot. Additionally, in these initial warrants, the affiant does not know the source of Luthor's income, and has established no basis in these warrants to believe the electronic transfers are to conceal proceeds of crime. In essence, the government argues that even if the warrants cannot articulate a crime, the relatively modest sums of money transferred by Defendants must be assumed to be proceeds of crime based off nothing besides the existence of the transactions and their amounts. This circular reasoning is flawed, and is precisely the kind of 'piling hunch upon hunch' that is not allowed in the analysis of a search warrant affidavit. Certainly, there was no probable cause of money laundering shown in these warrants.

Similarly, no nexus was shown with the social media accounts to be searched. 'The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.' *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978))). In other words, just because a person is suspected of a crime does not give police the authority to search that person's social media. And here, although the affiant suspected unchaste lifestyles, no crime was described sufficiently to issue warrants, much less with a connection to the social media

accounts. The only 'nexus' shown in these first two warrants, and the only one found by the R&R, is a generalized notion that criminals use social media to 'drive traffic' elsewhere. However, the affidavit does not identify that occurring here at all.

Certain situations demonstrate clear showings of nexus that are not present here, even viewing the facts in the most favorable manner for the government. For instance, sometimes police claim that criminal activity actually occurred at the place to be searched. *See, e.g., United States v. Adams*, 401 F.3d 886, 893 (8th Cir. 2005) (probable cause justified warrant where defendant engaged in drug activity at his house, which was established by earlier electronic surveillance intercepting conversations from telephone number assigned to that house). Another clear-cut scenario is when police know that a crime was committed in another place, but that evidence or fruits of the crime were recently seen in the location to be searched. *See, e.g., United States v. Barfield*, 507 F.2d 53 (5th Cir. 1975) (informant told of his participation in bank burglary and also of subsequent removal of tools and fruits to defendant's residence). Neither situation applies here because nothing ties the non-crimes to the social media accounts and email accounts other than the affiant saying Luthor's social media photos are "consistent" with him using

"Sharpie" on his "eyebrows." Perhaps a crime against fashion, if true, but hardly a violation of federal law.

Failure to provide such nexus information is as fatal to a probable-cause presentation as the failure to describe a crime. *United States v. Frangenberg*, 15 F.3d 100, 102 (8th Cir. 1994) (because the warrant did not indicate how suspect was connected to the place to be searched, it was doubtful that the application provided adequate basis for search). Both failures are present here.

The Instagram warrant alleged no crime at all. At most, the Facebook warrant alleged a tenuous connection to misdemeanor solicitation of adults for sexual services, but that is based off data at least partially from 2018, as that was when Backpages was removed by the government from the internet. Neither approached valid probable cause for issuance of the warrants for blanket authority to seize every shred of data in their social media and email accounts. Everything obtained by virtue of these warrants must be suppressed, as well as excised from the subsequent warrants, and the R&R incorrectly found to the contrary without adequate analysis or basis. Doc. 80 at 38.

While some argument can be made that all the subsequent investigation was born out of the initial, mistaken, morality investigation that failed to

describe any crime whatsoever, at a minimum, *Wong Sun* dictates that the information directly learned from or seized pursuant to these errant warrants cannot be considered or relied upon here, nor in subsequent warrants. *Wong Sun et al. v. United States*, 371 U.S. 471 (1963) (Establishing fruit-of-the-poisonous-tree doctrine.) That information must therefore be excised from the following warrants. These warrants were so devoid of probable cause, that that they were facially invalid. *United States v. Leon*, 468 U.S. 897 (1984).

Mr. Luthor objects to the Magistrate's legal conclusions that the social media warrants were supported by probable cause, that *Leon* good-faith exception would apply, and that the information obtained from those warrants should not be excised from the subsequent warrants.

### b.    A Short Detour to Examine the Poisonous Tree and its Fruits.

The exclusionary rule applies not only to evidence illegally obtained but also to the "fruit of the poisonous tree"—that is, incriminating evidence derived from the initial constitutional violation. *Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)*. This rule is subject to the exception that evidence legally obtained from an independent source should not be excluded. *See Wong Sun v. United States, 371 U.S. 471, 487, 83 S. Ct. 407,*

*9 L. Ed. 2d 441 (1963)*; *Silverthorne Lumber Co. v. United States, 251 U.S. 385,*

*392, 40 S. Ct. 182, 64 L. Ed. 319, T.D. 2984, 17 Ohio L. Rep. 514 (1920)*. "[T]he more

apt question in such a case is 'whether, granting establishment of the primary

illegality, the evidence to which instant objection is made has been come at

by exploitation of that illegality or instead by means sufficiently

distinguishable to be purged of the primary taint.'" *Nix v. Williams, 467 U.S.*

*431, 442, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)* (quoting *Wong Sun, 371 U.S. at*

*488*). As the Eighth Circuit has put it:

> A warrant obtained after an illegal search is not an independent
> source if either of the following are true: "if the agents' decision to
> seek the warrant was prompted by what they had seen during the
> initial entry," and "if information obtained during that entry was
> presented to the Magistrate and affected his decision to issue the
> warrant." In other words, *Murray* asks the following two
> questions, both of which must be answered in the affirmative for
> the warrant to be an independent source: first, would the police
> have applied for the warrant had they not acquired the tainted
> information; and second, do the application affidavits support
> probable cause after the tainted information has been redacted
> from them.

*United States v. Swope, 542 F.3d 609, 613-14 (8th Cir. 2008)* (citation omitted)

(quoting *Murray v. United States, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d*

*472 (1988)*).

All the information obtained directly from the first two warrants, that is

all content from social media and email, are clearly fruit of the poisonous tree and must be suppressed and excised. Mr. Luthor objects to the R&R's contrary conclusion. The more nuanced question is what else must be excised from the subsequent warrants. It appears from the subsequent warrants that much of the subsequent investigation would not have been undertaken if the affiant had not obtained a panoply of communications from the accounts of Luthor and Brown with the initial, invalid warrants. The discovery of the GVM income followed the initial investigation, as did the obtention of Medicare billing records, interviews with third parties, and other information in which Defendant's cannot assert a recognized privacy interest. It appears from the face of the warrants that much, if not all the follow-up investigation would not have been performed if the initial warrants had not been executed and the social media and email accounts obtained, and therefore that information should also be suppressed. If the Court were to agree, then the subsequent warrants would be plainly void of probable cause. Rather than assume the Court will rule as such, counsel will instead argue the remaining warrants while excising only the most direct fruits of the earlier warrants. In no event, however, should the R&R have failed to excise at least that information obtained via the social media warrants from the subsequent warrants.

### c.    R&R Incorrectly Found the Warrants for the Home and GVM Office Were Valid and Supported by Probable Cause.

Mr. Luthor also objects to the R&R's analysis of and the subsequent warrants to search real property locations, and the erroneous legal conclusion that those warrants were also supported by probable cause, and that *Leon* would apply to save them. Doc. 80 at 39-43.

It is axiomatic that Fourth Amendment protections are highest at the threshold of the home. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quotation omitted). "The Fourth Amendment embodies [the] centuries-old principle of respect for the privacy of the home," *Wilson v. Layne*, 526 U.S. 603, 610 (1999). the Eleventh Circuit explained the importance of a person's home in Constitutional jurisprudence:

> Dorothy may have said it best when she said, "There is no place like home." Though we are pretty sure that she was not talking about the Fourth Amendment, she may as well have been. Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion.

*Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015) (footnote omitted)

> [P]rivacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as

understood since the beginnings of the Republic.

*Hudson v. Michigan*, 547 U.S. 586, 603 (2006) (Kennedy, J. concurring).

> One's home is sacrosanct, and unreasonable government intrusion into the home is "the chief evil against which the wording of the Fourth Amendment is directed."

*United States v. Zimmerman*, 277 F.3d 426, 431-32 (3d Cir. 2002) (quoting

*Payton v. New York*, 445 U.S. 573, 585 (1980)).

With the information seized from the 2021 warrants properly excised, the warrant for the home is left with paltry and contradictory allegations about GVM's billing, and who made entries in the Kareo software the affiant previously stated the defendants were unfamiliar with. No connection is made to the home, failing again to establish nexus. Dripping with innuendo and disapproval, the affiant asked the court to issue a warrant for Luthor's home based off very little. No patient said Medicare was billed for services the patient did not receive. The R&R ignored this critical fact, and appeared to find the opposite was true. Doc. 80 at 21, 43. No employee described a crime to the agent. The R&R again stated the opposite. *Id.* The former-CEO lawsuit made salacious allegations, but is a plaintiff's civil complaint, untested by litigation, and should be given no weight. The CEO did not tell the agent those things directly, when lying would be a crime. Instead, the agent lifted the

worst allegations from a civil complaint and then did no follow-up with the person. The R&R ignored or misconstrued these important facts.

Because Ms. Brown should be successful in challenging the seizure of her email as well, the references pulled from her email must also be excised from this warrant. The affidavit is 10% vague descriptions of a possible fraud, but possibly legitimate albeit disorganized business, and 90% trashing the defendants for their lifestyle.

The warrant for the office is similar to that for the home. It is the most detailed of all the warrant applications, but is hampered by the excisions required from the first two warrants, and further hobbled by its vague, uncertain allegations. The contrast between the billing record, and the Vail social media post, for example, must be excised. So too must be the alleged observations of law enforcement while in the Luthor/Brown home.

In both warrants, the Court is left with two people who own a medical business, that is open for business hours, and has patients and employees. The patients confirm they got the services billed, but complain about pushiness. The employees provide the services billed for, but complain about management and training styles. The R&R ignored these exculpatory facts and

misconstrued or inverted them. Doc. 80 at 21, 43. Luthor and Brown have a polyamorous and financially irresponsible lifestyle, and their other girlfriends are emotionally and financially dependent on them to some degree. However, they are not prostitutes and Luthor and Brown are not pimps. There is no commercial sex ever alleged to have occurred by the girlfriends at the behest of Luthor or Brown, nor for the financial benefit of Luthor nor Brown. Thus, all the salacious allegations are wasted ink, that served only to prejudice a reviewing Court against Luthor and Brown for improper, e.g. morality policing reasons.

The R&R's discussion of *Augustine* is inapposite. *See* Doc. 80 at 42 and *United States v. Augustine Med.*, Inc., No. 03-cr-321(1-8), (ADM), 2004 WL 502183 at *7-8(D. Minn. Mar. 11, 2004). In that case, defendants moved for a *Franks* hearing, and the court analyzed alleged falsehoods by law enforcement. *Id.* at *7-8. That case has no bearing on the analysis here. There, the defendants loosely alleged reckless falsehoods by law enforcement. Here, Mr. Luthor does not seek a *Franks* hearing. Rather, he argues the warrants are unsupported by probable cause because they fail to specifically and sufficiently allege criminal activity, and fail to connect those non-criminal allegations to the things to be searched.

These warrants therefore also fail to rise to a fair probability of describing criminal activity afoot that the warrants will uncover. With the fruit of the poisonous tree excised, the warrants for the home and office were so wholly void of probable cause that the *Leon* good faith exception does not apply to prevent suppression. 468 U.S. 897, 922 (1984).

Mr. Luthor objects to the R&R's failure to excise the fruits of the social media warrants from the real property warrants, objects to the conclusion the property warrants were supported by probable cause, and objects to the application of *Leon*.

### d.    Warrant for 23 Devices Was Void on Its Face.

The R&R incorrectly found the warrant for 23 devices was supported by probable cause. Doc. 80 at 43-48. Mr. Luthor lodges the same objections to this analysis and conclusion: the fruits of the prior unlawful warrants should have been excised; the warrants were not supported by probable cause, and *Leon* good faith exception does not apply to save them.

Perhaps the worst warrant of them all, the only allegation of crime in this warrant is that Luthor may have patronized prostitutes, but the warrant seeks to search 23 unconnected devices for evidence related to a fraud investigation.

Inexplicably, this warrant omits all but the most passing reference to the GVM billing investigation, and relies entirely on the salacious, non-criminal allegations about Luthor's immoral lifestyle choices. While the warrant goes to lengths to establish a nexus to the devices, the nexus is not to criminal activity of Luthor, nor his girlfriends. It is unclear what crimes the affiant even thinks she is describing when she writes "Luthor preferred to hang out with 18- to 21-year-old college students." Doc. 63-4. While certainly not wholesome behavior, it simply does not approach a crime. Law enforcement does not need to corroborate every aspect of an allegation, *United States v. Morales*, 923 F.2d 621, 625 (8th Cir. 1991), but here nothing IA said appears to have been corroborated, and no other information about IA or their connection to Luthor is given. While IA's initials are provided, their reason for speaking to law enforcement is unknown, and their reliability and veracity are unstated. *United States v. Knutson*, 967 F.3d 754, 758-59 (8th Cir. 2020). Even if IA is treated as a concerned citizen, and their word is taken at face-value, what they described was so vague, general and non-specific, that it cannot give rise to probable cause, much less probable cause to search 23 phones found in Luthor's home. The R&R incorrectly found to the contrary, and gave improper weight to all the salacious, non-criminal, morality offenses described in the affidavit.

35

The R&R also incorrectly found that messages between Luthor and one of his girlfriends about sex – not commercial sex – was suspicious. Doc. No. 80 at 46. The R&R appears to conflate sex and commercial sex, while only the latter could give rise to probable cause of a crime. This device warrant is entirely about Luthor's unsavory lifestyle, and not at all about fraud, sex trafficking, or other alleged crimes.

At most, the affidavit vaguely describes the possibility Luthor may have committed the misdemeanor crime of paying an adult for sex when the affiant wrote "IA reported that the manager would "pimp" the women and that Luthor is a client." *Id.* However, none of this was corroborated, and no dates, times, locations, amounts, or specific people are described. Only vague and uncertain allegations about an unchaste lifestyle, and possible, vaguely alleged misdemeanors of patronizing prostitutes.

This vague reference to possibly being a customer of prostitutes is a far cry from the initial allegations in the first warrant that Luthor was running a sex-trafficking ring, and does not relate at all to fraud. This warrant is the quintessence of piling hunch on hunch, but worse still, those hunches were about non-crimes. Offenses against morality are not crimes. By dirtying up Luthor's character to an absurd degree, the affiant created the illusion of a

criminal out of an obnoxious, polyamorous lifestyle.

It makes little sense why this final warrant does not include the more detailed Medicare billing information from the warrants for the home and office, but it does not. This warrant is utterly devoid of probable cause, and all information seized from the 23 devices must be suppressed.

The government devoted one paragraph to hypothesizing that Luthor may not have standing to contest the search of the 23 devices. However, they were found in his (and Brown's home), and unlike the warrant for seven devices, nothing indicates that these devices belong to anyone other than Luthor and/or Brown. Defendants had possession of the 23 devices, and have standing to challenge their search. Lastly, the particularity requirement was wholly abandoned with regards to these 23 devices, and Mr. Luthor objects to the erroneous conclusion to the contrary in the R&R as well. A chief evil which the Fourth Amendment was intended to address was the hated "general warrant" of the British crown. *Payton v. New York*, 445 U.S. 573, 583–84 (1980). General warrants gave British officials "blanket authority to search where they pleased" for evidence of law violations. *Id*. at 583 n. 21; *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search

and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown"). The problem posed by general warrants is "of a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976). Further, warrants must state with particularity the place to be searched and the persons or things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284, 1289 (2004). This requirement ensures that searches are not overly broad and that law enforcement has clear guidelines to follow during the search. "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984). This device warrant also violates the particularity clause because it seeks to rummage through nearly two dozen devices without articulating in any way how even a single one of those devices is connected to the allegations in the affidavit. The R&R looked to the prior warrants to connect the devices to a fraud investigation, but this warrant simply does not make those allegations. This warrant only talks about Luthor's lifestyle, then seeks to rummage through 23 unconnected devices, likely representing thousands and thousands of gigabytes of personal data, without even connecting those devices to a single criminal allegation. This the Court

simply cannot allow.

Mr. Luthor therefore objects to the failure to excise the fruits of the prior warrants from the device warrant, objects to the conclusion the device warrant was supported by probable cause, objects to the conclusion it satisfied the particularity requirement, and objects to the misapplication of *Leon* to this warrant as well, as discussed further below.

### 2.   *Leon* **Does Not Save the Warrants.**
#### a.  **Warrants Wholly Lacked Probable Cause/Void on Face.**

Mr. Luthor objects toe the R&R's analysis and conclusions related to *Leon*'s good faith exception as well. Doc. 80 at 49-50. In *Leon v. United States*, the Supreme Court held that the exclusionary rule did not apply when the police obtain evidence by acting in "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916.

The *Leon* "good-faith" exception will not apply for the following four reasons, even though law enforcement applied to a court for a search warrant, which the court issued: (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. *United States v. Ortiz- Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (quoting *Leon*, 468 U.S. at 923) (cleaned up).

*Leon* good faith does not apply to these warrants because the affidavit for each was so wholly lacking in indicia of probable cause that belief in its existence was entirely unreasonable. That unsupported, completely conclusory statements cannot support a probable cause determination is well-settled, well-known, and is a rule of long standing in American jurisprudence. The same is true of morality policing. Police are to investigate crimes, not lifestyles reflecting lawful yet unwholesome liaisons. For these well-settled and well-known reasons, these affidavits presented the issuing judge with no

40

information that could support a probable cause determination and the belief that it did was "entirely unreasonable." The warrants are thus not saved by *Leon* and their fruits must be suppressed.

### b. *Dobbs* overruled *Leon*.[4]

The Leon "Good Faith" Exception, in light of *Dobbs v. Jackson Women's Health Org.,* 142 S.Ct. 2228, (2022) and the Ninth Amendment, is no longer available to prevent suppression. *Dobbs* states clearly that if it is not in the constitution or deeply rooted in tradition, then judicially created doctrines are void. The Ninth Amendment makes clear that those rights retained by the people are not disparaged or diminished by enumeration of others in the constitution. Both would append here to make *Leon* inapplicable.

Historically where an affidavit was insufficient to establish probable cause, suppression of evidence was not warranted "when an officer acting with objective good faith has obtained a search warrant from a judge" and reasonably relies on that judge's determination of probable cause. *United States v. Leon*, 468 U.S. 897, 920-22, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *Leon*

---

[4] Counsel acknowledges that the Court has previously ruled upon a similar argument, and that the Court stated that "*Leon* remains binding precedent" and that the Court was "not at liberty to ignore it where it applies." *United States v. Brown*, 2025 WL 830077 (2025) 24-CR-26 (ECT/LIB). For this reason, counsel has also presented more standard arguments related to the inapplicability of *Leon*.

is thus no longer available to the government as the application of *Dobbs* tells us it should not be. *Dobbs v. Jackson Women's Health Org.,* 142 S.Ct. 2228, (2022).

In *Dobbs* the United State Supreme Court examined due process, holding that *Roe* and *Casey* must be overruled as the Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely. *Id.* at 2242. *Dobbs* reasoned that rights not mentioned in the Constitution must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id. citing Washington v. Glucksberg, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks omitted).* Similarly, there is no good faith exception in the Fourth Amendment, nor was this judicially created doctrine deeply rooted in the Nation's history.

In 1984 *Leon* established the "good faith" exception to the Fourth Amendment exclusionary rule. The *Leon* good faith exception is something defined by the supreme court and is not included in the constitution. *Dobbs* changed this. *Dobbs* is clear that if it is not in the constitution, and it is not deeply rooted in our history, it does not matter what precedent the supreme

court has set.  The "good faith" exception is not "deeply rooted" and is a judge made exception to a constitutional mandate.  The exclusionary rule became part of American jurisprudence with the landmark Supreme Court case *Weeks v. United States*, 232 U.S. 383 (1914). In this case, the Court held that evidence obtained in violation of the Fourth Amendment, which protects against unreasonable searches and seizures, could not be used in federal court. This established the exclusionary rule as a key component of Fourth Amendment protections.  The exclusionary rule did not establish a new protection, it simply examined how this protection would be enforced.  Much different than *Leon* carving out a previously unrecognized exception to the mandates of the Fourth Amendment.

The Fourth Amendment, and the personal rights which it secures, have a long history.  See *Silverman v. United States*, 365 U.S. 505, 511 (1961). Following their passage, however, they became somewhat dormant.  See Gordon S. Wood, Empire of Liberty: A History of the Early Republic, 1789–1815. Oxford University Press (2009). Protecting personal privacy and dignity against unwarranted intrusion by the State is the overriding function of the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 767 (1966).  Based in historic precedents from England and *Boyd v. United States*, 116 U.S. 616

(1886) the Supreme Court held that the Fourth Amendments core is the right to retreat into his own home and there be free from unreasonable governmental intrusion. See *Silverman* at 511. In *Boyd* the United States Supreme Court held that "a search and seizure [was] equivalent [to] a compulsory production of a man's private papers" and as such the search was "an 'unreasonable search and seizure' within the meaning of the Fourth Amendment." *Boyd* looked at precedent form England and based on that precedent explained:

> The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense, it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.

*Boyd* at 630.

The protections of the Fourth Amendment can no longer be abrogated by judge-made law that is not deeply rooted in the fabric of the United States

Constitution.  While Counsel has not found any cases or law review articles supporting the claim that *Dobbs* overruled the good faith exception found in *Leon*, a reading of the case *Dobbs* decision supports this claim. Leon can no longer be a shield to the incompetence of law enforcement.

## CONCLUSION

Mr. Luthor requests the Court sustain his objections, overturn the erroneous findings and conclusions of the R&R, grant his motions, and suppress the fruits of the unlawful searches in this case.

Respectfully submitted,


Dated:      January 20, 2026          */s/ Thomas C. Plunkett*
Thomas C. Plunkett
Attorney No. 260162
Attorney for Defendant
332 Minnesota Street
Suite W1610
St. Paul, MN 55101
Phone: (651) 222-4357
Email: tcp@tp4justice.com