UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-88 (ECT/LIB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

GABRIEL ADAM ALEXANDER LUTHOR,
AND ELIZABETH CHRISTINE BROWN,

Defendants.

**GOVERNMENT'S TRIAL BRIEF**

## INTRODUCTION

In this healthcare fraud case, Defendants Gabriel Luthor and Elizabeth Brown successfully schemed to defraud Medicare, Medicaid, and other insurers out of more than $15 million. Luthor and Brown used their neurofeedback-therapy company, Golden Victory Medical ("GVM"), to submit astounding amounts of false medical bills. They repeatedly billed for inapplicable codes and combinations of codes, even after being warned. They submitted bills under the names of providers who did not in fact provide services, and they billed for services that were never provided to GVM's patients. To carry out the scheme, Luthor and Brown preyed on elderly and infirm patients who were less likely to question and pushback.

Luthor and Brown used fraud proceeds to purchase a million-dollar mansion in Eden Prairie, to fund an approximately $350,000 business investment in Africa, and to support Luthor's and Brown's extravagant and expensive lifestyle, complete with beach and ski vacations, a Rolls Royce, and regular bottle service at the club.

For this conduct, Luthor and Brown are charged with six counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of money laundering in violation of 18 U.S.C. § 1957. This trial brief addresses (i) the indictment and the charged offenses, (ii) the factual background of the case, (iii) the evidence expected at trial, and (iv) evidentiary issues.

## DISCUSSION

### I. INDICTMENT AND ELEMENTS OF THE OFFENSE

Defendants Gabriel Luthor and Elizabeth Brown are charged with six counts of wire fraud, in violation of 18 U.S.C. § 1343, which has the following elements: 1) that the defendants voluntarily and intentionally devised or participated in a scheme to defraud another out of money by means of material false pretenses, representations, or promises; 2) the defendants acted with the intent to defraud; and 3) the defendants used, or caused to be used, an interstate wire communication in furtherance of, or in an attempt to carry out, some essential step in the scheme.

Luthor and Brown are also charged with one count of money laundering, in violation of 18 U.S.C. § 1957, which requires proof that: 1) the defendants knowingly engaged in a monetary transaction; 2) the monetary transaction was of a value greater than $10,000 derived from wire fraud; 3) the defendants knew the monetary transaction involved proceeds of a criminal offense; 4) the monetary transaction took place in the United States; and 5) the monetary transaction in some way or degree affected interstate commerce.

As alleged in the indictment, from 2018 onward, defendant Luthor and

defendant Brown carried out a scheme to overbill Medicare, Medicaid, and other insurers for medical services that never occurred through Luthor and Brown's company Golden Victory Medical ("GVM"). Luthor and Brown lied about GVM's services by using medical billing codes to convince insurers that GVM had provided medical services not actually rendered and that had taken place for a longer duration than they actually did. Luthor and Brown's conduct caused a loss of more than $15 million dollars, a portion of which the defendants transacted with through a $400,000 wire transfer.

## II. BACKGROUND

### A. Medical Billing and Medicare and Medicaid

Medicare is a federally funded program that provides health care benefits to people ages 65 years and older, and certain disabled people. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program. Medicare is divided into four parts: coverage for inpatient care (Part A), coverage for medical items and services (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Part B covers outpatient physician services, such as office visits, minor surgical procedures, and diagnostic laboratory services, among other services when certain criteria are met.

To participate in Medicare, a healthcare provider is required to submit an application in which it agrees to abide by the laws, regulations, and program instructions governing the program, including applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Medicare

guidance describing proper billing procedures, rules, and regulations are made available to providers. CMS assigns a unique identifier to each provider called a National Provider Identifier ("NPI"). The NPI is the standard unique health identifier for health care providers.

The Medicare and Medicaid Act of 1965 permits reimbursement only for "reasonable and necessary" medical expenses. 42 U.S.C § 1395y. In the decades since Medicare's enactment, the "reasonable and necessary" requirement has been interpreted by the Secretary of Health and Human Services in numerous national and local coverage determinations, called LCDs and NCDs, that explain "whether or not a particular item or service is covered." *Id.* § 1395ff(f)(l)(B), (2)(B).

Using these administrative interpretations, in the 1960s the American Medical Association ("AMA") created a coding system to facilitate medical billing published in a book titled Current Procedural Terminology ("CPT"). The CPT designated and defined codes that could be used by providers in bills to more easily communicate to insurers which medical services had been provided to the patient and why those services were covered by Medicare; CPT remains the leading authority for medical coding. When a healthcare provider bills a CPT code, they are representing that the service occurred, was medically necessary, and occurred as represented.

A claim for payment from Medicare is submitted electronically using these billing codes and, when appropriate, modifiers to the codes, among other details including the beneficiary's name, the date of service, the beneficiary's diagnosis, and the name and NPI of the provider who rendered the services. When submitting claims

to Medicare for reimbursement, providers certify that 1) the contents of the forms are true, correct, and complete; 2) the forms are prepared in compliance with the laws and regulations governing Medicare, and 3) the services purportedly provided are medically necessary for reimbursement.

Medical services performed by a non-licensed staff member may be billed under a physician or qualified practitioner's NPI only if the qualified provider directly supervised the treatment either in-person or through real-time audio/video virtual presence (direct supervision); or if the procedure is furnished under a physician's overall direct and control (general supervision). There are some medical services, however, that must be rendered by a qualified provider themselves and cannot be billed when conducted by non-licensed staff under direct or general supervision.

Because Medicare Part B receives approximately 1.1 billion claims every year from more than 1.5 million participating healthcare providers it is physically impossible for every claim to be reviewed before it is paid by Medicare. Instead, Medicare relies on provider representations that claims are true and accurate through a "trust-based system."

### B. Neurofeedback

Neurofeedback therapy[1] is a form of treatment that uses real time brainwave monitoring to teach a patient how to self-regulate their mental state. Neurofeedback is conducted through a provider placing sensors on a patient's head and plugging those sensors into a computer, such as a laptop, which broadcasts the patients' brain waves on to a screen so the patient can work to maintain a specific mental state.

Neurofeedback is not covered by Medicare or most private insurers. If coded for billing, Neurofeedback is properly described through CPT 90875 and 90876, which applies to "individual psychophysiological therapy incorporating biofeedback," or CPT 90901, which applies to biofeedback by any modality. CPT 90901, however, is only covered for reimbursement in narrow circumstances such as biofeedback to treat urinary incontinence; Medicare does not cover biofeedback for the treatment of psychosomatic conditions or psychiatric disorders as is contemplated through Neurofeedback therapy. Neurofeedback therapy typically lasts about 20–30 minutes and is not properly billed as a psychological test (CPT 96136); neuropsychological test (CPT 96132); developmental test administration (CPT 96112); neurobehavioral status examination (CPT 96116); psychotherapy (CPT 90833); or other similar mental health services.

---

[1] Neurofeedback is considered a distinct modality of biofeedback that relates to psychosomatic conditions, not physical conditions. Where biofeedback uses sensors to record and provide feedback about biological processes, such as breathing, heart, rate, or muscle tension, Neurofeedback relates to neurological processes.

### C. Background on Brown and Luthor and GVM's Founding

In 2018 Luthor and Brown were in a romantic relationship and living in Las Vegas, Nevada. Brown had bachelor's and master's degrees in nursing and obtained a Nevada license to serve as an advance-practice registered nurse, commonly known as a nurse practitioner. Her license authorized her to focus on family practice, not mental health services. Luthor has no medical training and was convicted in 2010 for financial transaction card fraud.

In addition to Brown, Luthor had multiple other girlfriends including J.W., a fellow co-conspirator. Luthor exerted significant influence over Brown, J.W., and his other girlfriends' lives and dictated their personal and financial decisions. Luthor also told Brown, J.W., and other girlfriends that he a "god" and that each girl had a specific role in service of him. Brown lavished Luthor with praise with constant affirmation that Luthor was "God," "THE Great one," and the designer of the universe with "abilities . . . outside the grasp of human comprehension."

In April 2018, Brown and Luthor formed GVM by filing LLC registration documents with the Nevada Secretary of State and were joined by J.W. who began performing work through GVM. Brown and Luthor were co-CEO's of GVM and Luthor immediately involved himself in GVM's business and decision-making.

### D. Brown and Luthor's Scheme to Defraud Medicare and Other Insurers

Brown and Luthor engaged in a scheme that operated along the following lines: 1) Brown and Luthor identified potential patients, often elderly people confined to their homes or in hospice care, and often through referrals and leads from other

clinics and providers. 2) those patients were targeted and aggressively scheduled for neurofeedback home visits by unqualified, unsupervised, and unlicensed neurofeedback "technicians" three times a week in addition to other unnecessary mental health services that resulted in patients being regularly billed by GVM for five visits in a single week. 3) GVM billed the patients' insurance for medical services not actually rendered, including: psychological examinations; neurobehavioral examinations; evaluations of psychological examinations; evaluations of neurobehavioral examinations; and biofeedback for physical conditions. None of these services were actually performed. Even if they had been performed, most of these services could not be billed at the same time and the length of treatment indicated by GVM's bills far exceeded the actual time spent with each patient. And 4) GVM falsely billed the services under medical providers who did not render or supervise the patient encounter.

Neurofeedback provided Luthor and Brown with a convenient façade to gain access to vulnerable patients so they could bill insurance for other lucrative services that were never actually provided. Neurofeedback was particularly well suited for this purpose, for several reasons: GVM's version of neurofeedback involved relatively minimal equipment (a laptop and sensors); was non-invasive and thus could be conducted multiple times in a single week; and could be easily conducted inside a patient's home by simply starting a computer program. Moreover, because GVM waived co-pays, patients had little incentive to complain about the fraudulent billing, although some did. Additionally, because GVM targeted vulnerable patients, many

of whom were bedridden or in hospice care, many patients did not have the ability or means to effectively understand or voice concern about GVM's fraudulent billing practices.

In addition to GVM billing for services that simply were not rendered, GVM's fraudulent billing included the following improper coding practices:

(1) *Biofeedback*: GVM billed neurofeedback under 90901, which is only reimbursable for biofeedback used to assist with certain physical conditions, not neurofeedback. Billing this code falsely communicated to insurers that GVM was providing a service it did not actually render.

(2) *Improper Combination of Codes*: GVM regularly included combinations of codes that could not definitionally be billed together because one code was already covered in an umbrella code that covered a broad suite of services. For example, GVM often billed for neurobehavioral-test administration, evaluation, and interpretation (CPT 96116) and a separate code for neurobehavioral test evaluation and interpretation, but not administration (CPT 96132).

To get around the restriction on combining certain codes, GVM falsely billed CPT modifiers such as Modifier 59, which is appropriate only when one service was performed on one part of the body and the other service performed on a different part of the body; a scenario which logically did not apply to the type of services GVM purported to provide. GVM applied these modifiers as a matter of course, not as rare exceptions to the code bundling rules. For example, as shown below, GVM used a modifier for certain services over 95% of the time, and, for psychological tests (CPT

96136) 100% of the time.

## USE OF MODIFIER 59

### SELECT PROCEDURE CODES ON GOLDEN VICTORY MEDICAL CLAIM LINES

DATES OF SERVICE: JUNE 23, 2018 TO JANUARY 18, 2023
(All Jurisdictions)

Medicare

| CPT Code | | Number of Claim Lines with Modifier 59 | Percentage of Claim Lines with Modifier 59 |
|---|---|---|---|
| 96136 | Professional psychological/neuropsychological test administration and scoring, first 30 minutes | 139 | 100.0% |
| 96105 | Assessment of aphasia, with interpretation and report, per hour | 4,073 | 99.4% |
| 96132 | Neuropsychological testing evaluation, first hour | 6,476 | 99.0% |
| 96112 | Developmental test administration | 2,837 | 98.5% |
| 90845 | Psychoanalysis | 5,900 | 95.8% |
| 96130 | Psychological testing evaluation, first hour | 8,230 | 37.4% |
| 96116 | Neurobehavioral status examination, first hour | 8,374 | 36.7% |
| 96138 | Technician psychological/neuropsychological test administration and scoring, first 30 minutes | 7,955 | 34.7% |
| 96158 | Health behavior intervention, individual, initial 30 minutes | 1,799 | 28.9% |
| 96121 | Neurobehavioral status examination, each additional hour | 2,195 | 10.8% |
| 90833 | Psychotherapy with an E/M service, 30 minutes | 1,767 | 10.4% |
| 90785 | Interactive complexity, add-on code | 1,242 | 7.0% |
| | **All other codes** | 402 | 0.4% |
| **TOTAL** | | 51,389 | 20.2% |

(3) *Time Codes*: GVM also improperly billed codes that contained an expected, or mandatory, time of service requirement, many of which ran consecutively—meaning, if a provider billed two services lasting at least 31 minutes in duration, the encounter with the patient must have lasted at least 62 minutes. GVM often billed multiple hours of service they never rendered for a single Neurofeedback session which lasted just 20–30 minutes.

### E. Luthor and Brown's Lavish Lifestyle Fueled GVM's Expansion

In 2019, Luthor, Brown, and J.W. moved home from Nevada to Minnesota, where Luthor and Brown used fraud proceeds to purchase a million-dollar, 9,000 square foot mansion on Welters Way in Eden Prairie, Minnesota. Luthor, however, constantly pushed Brown to expand GVM's footprint to fuel his lavish lifestyle by insisting Brown raise weekly profits and that GVM buy new clinics. This resulted in Brown and Luthor expanding GVM's footprint outside of Las Vegas to open clinics in Stillwater, Oklahoma; Wichita, Kansas; Delray Beach, Florida; and Ponte Vedra, Florida.

Because of Luthor's belief in his elevated status as a purported "god" and creator of the universe, Brown and other members of the scheme closely follow Luthor's commands. Brown then passed his orders along to their co-conspirators as well as GVM staff through demands to increase patient scheduling; select billing codes based on what paid the most (as opposed to an accurate reflection of the services rendered); and bill for services that were never provided or adequately supervised by a medical professional.

As GVM expanded they also hired more neurofeedback technicians so GVM could see even more patients and bill even more services which were never actually provided. Because GVM could not bill services under unlicensed and hastily trained neurofeedback technicians, GVM employees, at Brown's direction, simply selected a qualified provider despite that provider having never rendered or supervised the purported treatments. This fraudulent practice caused the time of services rendered

in a single day by certain providers, namely Brown, to balloon to preposterous levels. For example, on October 16, 2019, GVM billed over 222 hours *in a single day* under Brown's NPI. This 222-hour day was no anomaly; indeed, Brown billed over 24 hours in a single day 314 separate times as referenced in the graphs below.






GVM email and texts include multiple references to this practice including instructions to assign visits to "Liz for billing purposes," or assign all notes to administrative staff so they can be reassigned "to the appropriate provider" who was selected, not based on whether they supervised or rendered the service, but whether the provider's license or credential was most likely to result in payment.

GVM's fraud proceeds funded Luthor and Brown's high-flying lifestyle and provided a motive to keep the fraud scheme going. Luthor and Brown spent over $1.5 million in fraud proceeds improving their Eden Prairie mansion through the construction of an indoor basketball court, basement in-ground hot tub, new addition to the home, and renovation of the outdoor pool complete with a waterfall.

All the while, Luthor spent over $700,000 at night clubs in a four-year span sometimes spending more than $42,000 in a single night, and used fraud proceeds to make extraordinarily expensive luxury purchases including an approximately $400,000 Rolls Royce Cullinan and multiple BMWs. Luthor, as the head of the house, made a point to flaunt his purported wealth by renting expensive box seats at Vikings and Timberwolves games and traveling via private jet and limo service. Luthor, Brown, and GVM's bank records demonstrate that these exorbitant expenses were funded exclusively by fraudulent proceeds generated through GVM's five clinics.

To keep up with this lavish lifestyle, Luthor applied constant pressure on Brown to bring in more money from GVM. Brown and Luthor's messages are replete with Luthor's commands that Brown "find the money, that's the only thing that

matters"; threats to "impose [his] will over every clinic and get to 500k [a week]"; and complaints from Luthor that he needed more luxury services like a private jet, which he mused about during a conversation between Brown and Luther concerning Medicare insurance pay outs.

Although Luthor made great efforts to keep his involvement in the fraud scheme a secret by, for example, instructing Brown to never "give out any info on me" including information about his "City lived, college, high school, travel any of it," and scolding Brown for texting him about GVM's practice of falsely billing services under medical providers which never occurred, Brown and Luthor's electronic devices reveal Luthor's intimate involvement in GVM's fraud. For example, Luthor and Brown's texts show Luthor requesting "all codes we bill for" and discussing with Brown how to "find[] [new] codes" to bill and find "codes to payout more than original amount." Luthor also took notes on various fraudulent codes GVM was billing and the schedules for various Neurofeedback technicians GVM nurse practitioners.

**F. Insurers, Patients, and GVM Employees Pushed Back on GVM's Billing Practices**

By 2021, insurers were warning GVM and frequently denying the company's claims due to the insurers' concerns about overbilling and incorrect coding. For example, in March 2021, Anthem BlueCross BlueShield wrote to Brown,

warning that her "average utilization of CPT codes" was "higher than the expected billing distribution" for similarly situated providers with patients with "a history of Alzheimer's, dementia, and or Intellectual Developmental Disorder diagnosis." Search warrants executed at Brown and Luthor's Eden Prairie mansion and GVM's

Las Vegas clinic, revealed numerous insurance denials, many of which explicitly stated that the services GVM billed were not covered because "it is considered experimental."




Brown and Luthor were also confronted by patients that their billing practices were fraudulent. For example, in November 2021, patient C.M., called GVM and left a voicemail accusing the practice of "fraudulent billing for services that have not occurred." On November 12, 2021, Brown sent a screenshot of the voicemail to Luthor




Luthor and Brown then discussed how to deal with the accusation including a suggestion from Brown to "get ahead of her" and have their biller "call Medicare stating that a "mental health patient called yelling at us" and we "offered to resolve her issue and she refused assistance." Luthor agreed with the plan and the same day Brown texted their medical biller to inform him that C.M. was "unhinged," and to look into which former employee "she received her information from."

The same month, Brown and Luthor hired an outside CEO, B.S., who has an MBA and significant healthcare business experience, to run GVM's day to day operations. Once at the helm, B.S. reviewed the company's records and noticed a high

rate of billing rejections and concluded that either the company was not executing well in its coding and billing functions, or worse, the company's billing practices were inappropriate and possibly illegal.

In January 2022, CMS suspended Medicare payments to GVM on suspicion of fraud. CMS sent a formal notice to GVM stating that GVM had “misrepresented services" in bills to Medicare, “submitted claims . . . for services that are medically unnecessary and/or not rendered,” and “submitted claims for telehealth services that are not medically necessary.” As examples, the notice identified five billed services that CMS had found medically unnecessary. Although Luthor and Brown quickly learned of Medicare's suspension notice, they initially withheld information about the notice from B.S. Eventually, B.S. learned of the Medicare suspension and contacted GVM's recently hired general counsel and directed him to engage an independent auditor to review the company's billing practices.

In March 2022, at B.S.’s direction, GVM engaged Health Information Associates (“HIA”), a South Carolina consulting and audit firm, to conduct an audit of GVM's billing practices. HIA completed its audit and delivered its results in an executive summary shared with Brown and J.W. on May 2, 2022, and a formal presentation given to GVM on May 9, 2022, the PowerPoint for which was forwarded to Brown. HIA found that only 9.45% of GVM’s CPT billing codes were accurate compared to an industry standard of 90–95% accuracy. HIA’s report identified repeated errors in GVM's billings, including (i) improperly billing code 90901 for biofeedback even though GVM was providing neurofeedback, (ii) improperly

combining un-combinable codes such as 96112 and 96130, 96116 and 96132, 90875 and presumed-complex codes, and modifier 59 when multiple separate services had not truly been provided; and (iii) improperly billing for timed codes that exceeded the time indicated by the provider documentation.

HIA recommended that going forward GVM should follow authoritative "coding instructional notes," conduct an "ongoing periodic review" of the company's coding, and maintain "ongoing review" of AMA and other coding literature "when each new issue of the publication is received." B.S. responded to HIA's audit by planning to reform GVM's coding practices. On May 16, 2022, he emailed GVM staff, sharing HIA's conclusions and directing updates to the company's coding and billing practices. Sixteen days later, on June 1, 2022, GVM terminated B.S.'s employment and Brown re-assumed the title of CEO.

Meanwhile, in the wake of HIA's report, Brown and Luthor transferred $400,000 in fraud proceeds from a BMO bank account ending x9348 to a US Bank account ending x0504. Those proceeds were then sent overseas to fund a drilling-truck investment in Zambia and the Democratic Republic of the Congo.

**G. GVM Continued its Fraudulent Billing Even After the HIA Audit**

Despite CMS and others warning Brown and Luthor that their billing practices were fraudulent, Brown continued to discuss ways to continue their fraudulent billing undetected. For example, during a July 28, 2022 conversation between Brown and fellow co-conspirators J.W. and C.A., the three discussed ways to circumvent the Medicare pause including a suggestion from C.A. to resubmit "all Medicare claims . .

. under the new NPI" because the new "NPI isn't attached to any investigations—so claims would be paid for sure . . . seems like easy money," to which Brown replied "hmmmmm . . . Actually I think we could only submit new ones."

After B.S. was fired, GVM's outside billing contractor remained concerned about improper billing practices. On June 14, 2022, a staff member with the billing contractor wrote a GVM employee, CCing Brown. He announced certain billing changes: "[T]here are a few CPTs will not bill if service performed by audio only. . . . Henceforth, team will bill according to telehealth type (Audio or AudioVideo)." Brown quickly responded and rejected the proposed change: "All billing codes are to remain the same unless given authorization in writing." The billing contractor's CEO replied to Brown, pushing back on her direction to maintain the status quo coding practices. In support of his position, he cited and attached a document reflecting B.S.'s coding reforms from the company's "old" practices to its "new" practices. Brown wrote back again: "Where is this new coding coming from? Please advise who or what changed the code all together and who's identified these? I am concerned that all coding has been significantly reduced without my knowledge. Who authorized the change in CPT codes?"

On July 9, 2022, Brown relayed her frustration about changes to the coding in a text to Luthor where she accused the biller of not billing "and when they do, they are down coding everything" a reference to the billers selecting codes that more accurately reflect the services rendered, but did not maximize GVM's profits. When Luthor responded "Wtf why," Brown replied "it's so easy to add on in primary care[,]

there are a zillion codes I found." and, again reiterated that they "need new LLC, EIN tax ID and NPI," and she already had "all the codes written down in [her] notebook." This was yet another reference to Brown's plan to circumvent the Medicare pause, not by fixing GVM's coding practices, but by disguising from where GVM's billing originated.

The friction between Brown and the billing contractor continued. On July 25, 2022, the billing contractor's CEO texted Brown and said that the contractor refused to adjust and re-submit denied reimbursement claims where the reason for the denial was failure to obtain pre-authorization. He explained that if "[a]uth has to be obtained prior to service," then "[r]etro auth is not possible." Brown responded, "We need to fight for the money and resend and call the insurances."

Meanwhile, because GVM's income stemmed predominantly from Medicare, Brown and Luthor's fraud proceeds dropped significantly, forcing Luthor and Brown to sell off many of their luxury items (including the $400,000 Rolls Royce) and cease using a limo driver and other extravagant services. After the suspension, Luthor often lamented about his inability to afford his luxury lifestyle including a complaint to Brown on September 2, 2022, after Luthor's credit card was denied at a night club, that "[I] litterally [sic] can't get a fucking shot . . . I can't keep living like this."

Brown, for her part, suggested they concoct "a go fund me sob story" to generate new money to account for the lack of fraudulently obtained Medicare payments. The dwindling proceeds from the Medicare pause also caused the defendants to consider even more bold approaches to continuing the fraud including another suggestion from

Brown to start billing patients "under a new EIN and LLC" in an effort to continue their fraudulent billing undetected and thereby bypass the Medicare suspension.

At the end of the summer of 2022, GVM received a detailed and specific insurer warning from BlueCross BlueShield of Oklahoma ("BCBSOK"). On August 7, 2022, a BCBSOK investigator wrote a GVM physician assistant regarding "Inappropriate Billing." The investigator said he reviewed the physician assistant's billing and found serious problems, including that GVM had regularly billed BCBSOK improperly using a combination of 10 codes, including 90901, 96112, 96116, 96130, and 96132. Based on the time requirements in the code definitions, the investigator found it "would take at least 6 hours per patient" per day for the physician assistant to complete all of the billed services. For certain days, the physician assistant billed BCBSOK for more than eight hours of services. This analysis was suggestive of "fraudulent billing," in the investigator's view, because the physician assistant's hours were eight hours a day, and the investigator's analysis did not even include any patient services that may have been billed to other insurers; it only included BCBSOK billings.

The physician assistant forwarded the letter to Brown who quickly requested a phone call with the physician assistant. Brown falsely blamed the billing problems documented in the BCBSOK on B.S. and on GVM's outside billing contractor.

When the outside billing contractor learned of the letter from BCBSOK, the contractor's owner emailed Brown expressing continued concern about GVM billing practices. He proposed that the contractor and GVM develop a joint "plan of action on

resolving [the] coding issues." He said that until then his company would "not submit any new claim to any location with current codes." Within days, GVM terminated the contract for the billing contractor. Despite these many warnings from insurers, auditors, employees, and patients, Brown and Luthor continued to fraudulently bill Medicare and other insurers.

For example, GVM billing records show that from May 3, 2022, the day after Luthor and Brown were briefed by HIA, until the company ceased doing business at the end of 2022, the company billed Medicare the following codes the following number of times:

| **GVM False Claims to Medicare: May 3–Dec. 31, 2022** | | |
|---|---|---|
| **Code(s)** | **Number of Claims** | **Total Amount Requested** |
| 90901 | 479 | Unknown |
| 96112 & 96130 | 95 | $36,480 |
| 96116 & 96132 | 180 | $62,820 |
| 90785 | 1,856 | $20,873 |
| Modifier 59 | 1,050 | $363,976 |

In early 2023, law enforcement executed a search warrant at the Welters Way residence. It became plain that GVM was under investigation and GVM ceased doing business.

Luthor, Brown, J.W., and Luthor's other girlfriends then fled Minnesota and traveled the continent. While in Fresno, California, they fraudulently purchased an RV for approximately $170,000. They financed the purchase with an approximately $151,000 loan from a Nevada credit union. Luthor's application to obtain the loan contained material and intentionally false statements—he falsely stated he was employed by Luthor Studios as a general manager and that he made $180,000 per year. He submitted fake paystubs in support of the application. He also falsely stated that he was a resident of Nevada, which was a condition of the loan, given the Nevada credit union.

## III. EXPECTED EVIDENCE

### A. Testimony

The United States intends to call ten categories of witnesses.

***(i) Medical Billing Company Representatives:*** The government will call representatives from various companies to explain how their platforms are used during the medical billing process. For example, a representative from Kareo, now called Tebra, will testify to how their electronic health record platform is used by medical professionals for note keeping and submitting bills to clearing houses for ultimate submission to an insurance provider. A representative from TriZetto, a subsidiary of Cognizant, will testify to the role of a clearing house and how Cognizant receives billing records from providers and submits them to medical insurers. A representative from Noridian, a regional Medical Administrative Contractor ("MAC"), will testify about how they receive and process health insurance claims sent

from healthcare providers via platforms like Tebra through a clearinghouse like Cognizant for reimbursement from Noridian.

***(ii) Neurofeedback Technicians:*** The United States will offer testimony from neurofeedback technicians employed by GVM during the fraud scheme who will testify that they were unlicensed, hastily trained, and instructed to aggressively meet and conduct neurofeedback on elderly and vulnerable patients multiple times a week to fulfill GVM "quotas" at Brown and other GVM employees' direction. The neurofeedback technicians will testify that they were never supervised by a qualified health professional during neurofeedback sessions and were unaware of how neurofeedback was being billed to insurers.

***(iii) GVM Patients:*** The United States will also offer testimony from several of GVM's patients, many of whom will relay that they did not understand Neurofeedback, did not think it was necessary, and were taken aback at how frequently and insistently GVM staff scheduled them for Neurofeedback therapy. Many patients will relay they were unsure what GVM was billing for these Neurofeedback sessions, but some will testify that they were shocked to see GVM billing for hours of service that was never actually provided.

***(iv) GVM Medical Healthcare Providers and Administrative Staff:*** The United States will also offer testimony from GVM's rendering providers and administrative staff who will discuss a GVM culture focused on maximizing profits and scheduling appointments, often at the cost of patient care. GVM providers and staff will also relay that they were unaware of how services at GVM were being billed.

**(*v*) *GVM Medical Billing Professionals:*** The United States will also call several of GVM's professional billers who will testify to their ministerial role in creating "superbills" for GVM to bill to clearing houses such as TriZetto before submission to Medicare and Medicaid. These billers will explain that they were not responsible for determining which codes were appropriate for any given medical service, but were rather tasked with preparing bills to ensure they satisfied the clearinghouses and insurers' technical requirements. The billers will testify that, although they were not responsible for determining which particular codes were appropriate, they were concerned with GVM's billing practices and relayed those concerns to Brown and other members of GVM.

**(*vi*) *GVM Executive Staff:*** The United States will call several members of GVM's executive staff who will testify about their attempts to reform GVM's practices, which were met with resistance and ultimately their termination from the company. B.S., for example, will testify that he hired a third party auditor, HIA, to audit GVM's records so proper reforms could be made. B.S. will testify that he was met with resistance and ultimately terminated from GVM.

**(*vii*) *Insurance Providers and Auditors:*** The United States will also offer testimony from insurance providers and auditors who warned GVM of its fraudulent billing practices including testimony from a representative of Qlarant—the fraud prevention organization that contracts with Medicare—who prepared and served the notice of Medicare suspension on GVM; a representative of HIA who instructed GVM on its fraudulent billings practices; and an investigator form BlueCross Blue Shield

of Oklahoma who instructed GVM of its suspected fraudulent billing practices through a letter to one of GVM's physician assistants.

**(*viii*) *Lifestyle Witnesses:*** The United States will also call a number of witnesses who were personally familiar with Brown and Luthor to testify about their extravagant lifestyle, Luthor's control over Brown and others, and how, prior to meeting Brown, Luthor had little money and worked a service-level job in Minnesota. The United States will also call witnesses that tipped off law enforcement to Brown and Luthor's suspected criminality.

**(*ix*) *Experts:*** The United States will also call the expert witnesses specified in the government's October 5, 2026, disclosure to both defense counsels. As referenced in the disclosure, the government will call Daniel Coney, a Medicare fraud investigator, who will be offered as an expert on the Medicare program and CMS; Medicare program requirements; Medicare billing; CPT codes; and Evaluation and Management Services ("E/M") codes. The United States also intends to offer Dr. Leslie Sherlin as an expert on the historical foundations, current practices, and ethical billing in Neurofeedback, also known as electroencephalogram (EEG) biofeedback.

**(*x*) *Law Enforcement:*** Finally, the United States will cover various law enforcement officials who participated in the investigation, including members of law enforcement that executed search warrants at Luthor and Brown's home and GVM's Las Vegas Clinic. The United States also intends to call two analysts who assisted in the investigation.

**B. Exhibits**

The government's exhibits are expected to fall in four categories:

**(*i*)** ***Company Filings and Public Records:*** The United States will offer several public filings pursuant to Rule 902(4) including LLC filings for GVM and Olympic Medical, an alternative LLC used by Brown and Luthor, and various records from the Nevada Board of Nursing.

**(*ii*)** ***Medical and Billing Records:*** The United States will also offer numerous spreadsheets of medical notes, billing records, and claims data originating from Tebra, TriZetto, Noridian, Qlarant, and other sources, in addition to a large number of financial and bank records. The United States intends to summarize this data through Rule 1006 summaries and Rule 107 illustrative aids as discussed below. The United States will also offer claims and data records relied upon by HIA in its audit as well training materials and audit reports prepared by HIA.

**(*iii*)** ***Text, Email, and Other Communications:*** The United States will also offer a large number of electronic communications including text messages and email originating from Brown's cell phone; email communications originating from warrants to search Brown and J.W.'s Gmail accounts, and other email communications provided from other witnesses in the case. The United States will also introduce notes, pictures, and videos found on Brown and Luthor's electronic devices.

**(*iv*)** ***Media:*** The United States will also offer pictures and videos from the search warrants of Brown and Luthor's home and GVM's Vegas Clinic including

pictures of documents, such as insurance denials, recovered in both locations. The United States will offer other GVM documents, including additional insurance denials, provided by GVM employees or located in Brown or Luthor's devices or email accounts.

## IV. EVDENTIARY ISSUES

The United States has filed the accompanying motions in limine, seeking Orders from the Court permitting the admission of: (a) co-conspirator statements pursuant to Rule 801(d)(2)(E); and (b) wealth evidence and evidence of Luthor's power over Brown and others pursuant to Rules 801 and 803.

### A. Summary Testimony and Charts

The United States intends to call law enforcement agents to testify as summary witnesses in its case-in-chief. "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." *United States v. Ellefsen*, 655 F.3d 769, 780 (8th Cir. 2011) (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980)).

In addition, because this case involves voluminous documentary evidence, including GVM business records, billing records, bank records, and other financial documents, the government intends to offer summary charts into evidence in order to assist the jury. Summary charts are properly admitted when (1) the charts fairly summarize voluminous trial evidence, (2) they assist the jury in understanding testimony already introduced, and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary. *United States*

*v. Spires*, 628 F.3d 1049, 1052-53 (8th Cir. 2011) (citing Fed. R. Evid. 1006). "Also, summaries may include assumptions and conclusions so long as they are 'based upon evidence in the record.'" *Id.* at 1053. The United States also intends to offer illustrative aids pursuant to Rule 107 which will assist the jury in understanding the government's evidence.

**B. Self-Authentication and Admissibility of Business Records Pursuant to Federal Rules of Evidence 803(6) and 902(11)**

The government intends to introduce the following certified business records from the following entities pursuant to Rules 803(6) and 902(11):

- Nevada State Board or Nursing Records
- Kareo/Tebra Data
- Noridian Provider Information and Claims Data
- TriZetto/Cognizant Claim and Remit Results
- Bank of America Records
- US Bank Records
- JP Morgan Chase Records
- Wells Fargo Records
- Square/Cash App Records
- PNC Bank Records
- PayPal Records
- Zelle Records
- TCF/Huntington Bank Records
- Apple Pay Records
- Coinbase Records
- Alliant Credit Union Records
- BMO
- BMW
- Towbin Motorcars
- Mercedes Benz
- Feldman Imports
- TrueAir
- Delta Flight Records
- Sun Country Flight Records
- Spirit Flight Records
- Frontier Flight Records
- Verizon Call Detail Records

- T-Mobile Call Detail Records
- Sprint Call Detail Records
- Executive Title Property Records

Under Rule 803(6), records of a regularly conducted activity are an exception to the hearsay rule when: (1) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11); and (5) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6).

"[W]here a statement is properly determined to be a business record as defined by FRE 803(6), it is not testimonial" and therefore "the Confrontation Clause simply has no application." *United States v. Feliz*, 467 F.3d 227, 231-33, 236 (2d Cir. 2006).

The certifications for many of the above records have already been provided to the defense. The government is disclosing nearly all of the outstanding with certifications with this filing and will disclose any missing certificates in the coming days.

**C. Self-Authentication of Data Copied from Brown and Luthor's Electronic Devices and Brown and J.W.'s Email Accounts**

The United States is providing notice of its intent to offer the extractions of Brown and Luthor's electronic devices and Brown and J.W.'s email accounts without a sponsoring witness pursuant to the self-authentication provision of Federal Rules of

Evidence 902(14), which provides that "data copied from an electronic device, storage medium, or file" may be authenticated through a certification of a qualified person. *See United States v. Carney*, 2026 WL 1235425 *1 (W.D. Ark. May 5, 2026) ("electronic evidence from . . . cell phone is . . . generally admissible under Rule 902 without a sponsoring witness"). The United States acknowledges that the defense may still object to the relevance and/or admissibility of the content of the extraction the governments seeks to introduce, which is specified in the government's exhibit list.

The certifications for these electronic devices and storage medium, which are being provided to both defense counsels with this filing, fulfills the requirements of Rule 902(11).

**D. Self-Authentication and Admissibility of Certified Public Records Pursuant to Federal Rules of Evidence 902(4)**

The government also intends to introduce the following certified copies of filed public records for the following entities pursuant to Rule 902(4):

- GVM LLC Filings with the State of Nevada
- GVM Olympic Medical LLC Filings with the State of Nevada
- Hennepin County Property Records
- Certification Records of Conviction for Gabriel Luthor

Because these documents are official records filed by a public office by law and certified by a custodian that complies with the requirements of Rule 902(1),(2), or (3), they are admissible and self-authenticating under Rule 902(4).

Dated: October 8, 2026

Respectfully submitted,

DANIEL N. ROSEN
UNITED STATES ATTORNEY

/s/ *Matthew M. Paulbeck*

BY: Matthew Paulbeck (NY# 5674510)
Matthe Forbes (NY# 5664354)
Assistant U.S. Attorneys
District of Minnesota