UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-88 (ECT/LIB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

GABRIEL ADAM ALEXANDER LUTHOR,
AND ELIZABETH CHRISTINE BROWN,

Defendants.

**GOVERNMENT'S MOTION FOR JURY INSTRUCTION REGARDING MEDICARE COVERAGE**

## INTRODUCTION

The jury should be instructed on the law of what Medicare does and does not cover. This healthcare fraud trial involves the question of whether the various claims submitted by the defendants to Medicare were covered by Medicare. Answering that question requires an understanding of the relevant law. Specifically, it requires an understanding that Medicare only covers expenses that are "reasonable and necessary." It also requires an understanding of what has been more specifically delineated as covered and not covered by Medicare, as indicated by the Secretary of Health and Human Services through expressions of power expressly delegated to the Secretary by Congress. Most notably, the Secretary has issued national coverage determinations, promulgated regulations, and adopted billing "code sets," to delineate what is and is not covered. The government respectfully requests that the Court issue a relevant jury instruction to the jury at the conclusion of trial.

## ARGUMENT

### I. Congress expressly delegated authority to the Secretary of HHS to make "National Coverage Determinations" about Medicare's coverage and to adopt "Code Sets" governing healthcare transactions.

In passing the Medicare and Medicaid Act of 1965, Congress granted the federal government powerful authority to administer a nationwide health insurance program for the elderly and disabled. Importantly, Congress limited Medicare's coverage to only "reasonable and necessary" medical expenses. 42 U.S.C. § 1395y(a)(1)(A)–(E) (applying the "reasonable and necessary" limitation to treatment of illness and injury, certain vaccinations, hospice care, clinical care, and healthcare research).

Medicare is a complex, massive program—the largest program administered by the United States government. So, rather than prescribe every detail of Medicare in the statute, Congress decided to "empower" the Secretary of HHS "to prescribe rules to 'fill up the details' of [the] statutory scheme." *Loper Bright Enters v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)).

As relevant here, Congress made three categories of delegations to of authority to the Secretary of Health and Human Services:

*First*, Congress expressly delegated to the Secretary the authority to make national determinations as to what particular medical services are covered under Medicare's reasonable-and-necessary standard and its other limitations. *Id.* § 1395ff(f)(1)(B). These "national coverage determinations"—a statutorily defined term—are also known as "NCDs." *Id.* Although NCDs indicate what services are

covered, they are not so detailed to prescribe (or prohibit) any particular billing "code" for a medical service:

> For purposes of this section, the term "national coverage determination" means a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this subchapter, but does not include a determination of what code, if any, is assigned to a particular item or service covered under this subchapter or a determination with respect to the amount of payment made for a particular item or service so covered.

*Id.*

The Secretary's NCDs are collected and published by CMS in a manual that is regularly updated and made available to the public. CMS, *Medicare NCD Manual* (updated in parts between 2023 and 2026), https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms014961.

As relevant in this case, in 2003 the Secretary issued two NCDs governing "biofeedback." First, one NCD states that biofeedback is a therapy that is "not covered" by Medicare "for psychosomatic conditions."

> Biofeedback therapy provides visual, auditory or other evidence of the status of certain body functions so that a person can exert voluntary control over the functions, and thereby alleviate an abnormal bodily condition. Biofeedback therapy often uses electrical devices to transform bodily signals indicative of such functions as heart rate, blood pressure, skin temperature, salivation, peripheral vasomotor activity, and gross muscle tone into a tone or light, the loudness or brightness of which shows the extent of activity in the function being measured. Biofeedback therapy differs from electromyography which is a diagnostic procedure used to record and study the electrical properties of skeletal muscle. An electromyography device may be used to provide feedback with certain types of biofeedback. Biofeedback therapy is covered under Medicare only when it is reasonable and necessary for the individual patient for muscle re-education of specific muscle groups or for treating pathological muscle abnormalities of spasticity, incapacitating muscle spasm, or weakness, and more conventional treatments (heat, cold, massage, exercise, support) have not been

> successful. ***This therapy is not covered*** for treatment of ordinary muscle tension states or ***for psychosomatic conditions***. (See the Medicare Benefit Policy Manual, Chapter 15, for general coverage requirements about physical therapy requirements.)

NCD Manual § 30.1 (Oct. 3, 2023) (emphasis added) ("Biofeedback Therapy").

Another NCD states that biofeedback therapy must be rendered "in an office or other facility setting," and "[h]ome use of biofeedback therapy is not covered."

> ***This policy applies to biofeedback therapy rendered by a practitioner in an office or other facility setting.*** Biofeedback is covered for the treatment of stress and/or urge incontinence in cognitively intact patients who have failed a documented trial of pelvic muscle exercise (PME) training. Biofeedback is not a treatment, per se, but a tool to help patients learn how to perform PME. Biofeedback-assisted PME incorporates the use of an electronic or mechanical device to relay visual and/or auditory evidence of pelvic floor muscle tone, in order to improve awareness of pelvic floor musculature and to assist patients in the performance of PME. A failed trial of PME training is defined as no clinically significant improvement in urinary incontinence after completing four weeks of an ordered plan of pelvic muscle exercises to increase periurethral muscle strength. Contractors may decide whether or not to cover biofeedback as an initial treatment modality. ***Home use of biofeedback therapy is not covered.***

NCD Manual § 30.1.1 (Oct. 3, 2003) (emphasis added) ("Biofeedback Therapy for the Treatment of Urinary Incontinence").

*Second*, Congress expressly delegated authority to the Secretary to adopt code sets. Specifically, the Medicare Act explicitly directs that "[t]he Secretary shall adopt standards that (A) select code sets for appropriate data elements for [certain specified healthcare] transactions . . . from among the code sets that have been developed by private and public entities; or (B) establish code sets for such data elements if no code sets for the data elements have been developed." 42 U.S.C. § 1320d-2(c)(1) ("Code Sets"). The term "code set" is defined as "any set of codes used for encoding data

elements, such as tables of terms, medical concepts, medical diagnostic codes, or medical procedure codes." *Id.* § 1320d ("Definitions").

The Secretary has exercised this authority to "adopt" a series of "code sets" as "the standard medical data code sets." 45 C.F.R. § 162.1002 ("Medical data code sets"); *see also* 42 C.F.R. § 414.40(a) ("CMS establishes uniform national definitions of services, codes to represent services, and payment modifiers to the codes."). One such code set adopted by the Secretary is "Current Procedural Terminology, Fourth Edition (CPT-4), as maintained and distributed by the American medical Association, for physician services and other health care services." 45 C.F.R. § 162.1002(a)(5), (c)(1).

*Third*, Congress delegated to the Secretary broad powers to prescribe all necessary regulations to administer Medicare. Two statutory sections provide such powers: (i) The Medicare and Medicaid Act directs that the Secretary of HHS "shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under [the Medicare Act]." *Id.* § 1395hh(a)(1). The statute specifically contemplates that the Secretary will exercise these regulatory powers to establish "changes" to "substantive legal standard[s] governing the scope of benefits, the payment of services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits [under Medicare]." *Id.* § 1395hh(a)(2) (stating such changes must occur through promulgated regulation). (ii) Under the broader Social Security Act—of which the Medicare and Medicaid Act is a subchapter—each of the Secretaries of the Treasury, Labor, and HHS, "respectively, shall make and

publish such rules and regulations . . . as may be necessary to the efficient administration of the functions with which each is charged under [the Social Security Act, 42 U.S.C. ch. 7]. 42 U.S.C. § 1302(a).

The Secretary has exercised this regulatory power to promulgate various regulations. For example, the Secretary promulgated rules governing the ability of a non-practitioner or non-physician to provide services "incident to" the services of a physician. 42 C.F.R. § 410.26. The rules say, in part, that incident-to services must be provided under the "direct supervision" of the physician or practitioner:

> ***In general, services and supplies must be furnished under the direct supervision of the physician (or other practitioner).*** Designated care management services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided incident to the services of a physician (or other practitioner). Behavioral health services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided by auxiliary personnel incident to the services of a physician (or other practitioner). The physician (or other practitioner) supervising the auxiliary personnel need not be the same physician (or other practitioner) who is treating the patient more broadly. However, only the supervising physician (or other practitioner) may bill Medicare for incident to services.

*Id.* § 410.26(b)(5) (emphasis added). The term "[d]irect supervision" in an office setting means "the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." *Id.* §§ 410.26(a)(2), 410.32(b)(3)(ii). Supervision may also be completed through "virtual presence through audio/video real-time communications technology," but not with "audio-only" technology, subject

to exceptions for certain surgeries. *Id.*[1]

As another example, the Secretary promulgated a rule on mental-health-related "professional services." 42 C.F.R. § 405.2450. The rule provides that for such services to be "payable" by Medicare, they must be "[p]erformed by" a licensed mental-health professional:

> (a) For clinical psychologist, clinical social worker, marriage and family therapist, or mental health counselor professional services to be payable under this subpart, the services must be—
>
> (1) Furnished by an individual who owns, is employed by, or furnishes services under contract to the FQHC;
>
> (2) Of a type that the clinical psychologist, clinical social worker, marriage and family therapist, or mental health counselor who furnishes the services is legally permitted to perform by the State in which the service is furnished;
>
> (3) ***Performed by a clinical social worker, clinical psychologist, marriage and family therapist, or mental health counselor who is legally authorized to perform such services under State law or the State regulatory mechanism provided by the law of the State in which such services are performed***; and
>
> (4) Covered if furnished by a physician.

*Id.* § 405.2450(a) (emphasis added).

## II. The Secretary's exercise of the Medicare Act delegations have the force of law and are reviewed for "reasoned decisionmaking."

The Secretary's exercise of the congressional delegations provided by the

[1] The virtual supervision provisions of the rule were first temporarily added during the COVID-19 pandemic, then were made permanent this year. A timeline showing the various changes to the regulation over the years is available for viewing at eCFR.gov at https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-B/part-410/subpart-B.

Medicare Act have the force of law and are subject to a deferential judicial review. *See Fornier v. Sebelius*, 718 F.3d 1110, 1119–21 (9th Cir. 2013) (concluding the "Secretary's interpretations" of the Medicare statute through NCDs "carry the force of law").

The deferential judicial review is limited to "fixing the boundaries of the delegated authority" and ensuring "the agency has engaged in reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395 (internal quotation marks omitted) (first quoting H. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983); then quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)); *see also Fornier*, 718 F.3d at 1119–21 (granting deference to an NCD).

Judicial deference in this context survived the Supreme Court's overturning of *Chevron* in *Loper Bright*, because of the express nature of Congress's delegations in the Medicare Act. Deference remains the rule when Congress "'expressly delegate[s]' to an agency the authority to give meaning to a particular term"; "empower[s] an agency to prescribe rules to 'fill up the details' of a statutory scheme"; or directs an agent "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.' *Id.* (first quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825); then quoting *Michigan v. EPA*, 576 U.S. at 752).

That is just what Congress has done with Medicare. With each of the statutory delegations identified above, Congress expressly and deliberately directed the Secretary to define terms and fill up the details of Medicare, while leaving the

Secretary with broad flexibility to enact regulations as necessary. Due to Congress's delegations, on judicial review of a Secretary's exercise of authority under the delegation, the Court's role is to determine (i) whether the Secretary's exercise was within the boundaries of the delegated power, and, if so, (ii) whether the Secretary's decisionmaking was reasoned. *Id.*

Notably, the delegations in the Medicare Act do not raise the problems of statutory ambiguity addressed in *Chevron* and re-addressed in *Loper Bright*. In *Loper Bright*, the issue was the meaning of a fishing conservation statute's silence regarding whether fishing "observers" were necessary for "Atlantic herring fisherman." *Id.* at 380. The case did not involve an express delegation by Congress; it was about a gap in the statutory language that allowed reasonable people to disagree as to what Congress intended. *See id.* The relevant agency interpreted the statutory ambiguity to mean yes, the law required observers for the fisherman. *Id.* at 380–82. When a plaintiff sued, because of *Chevron*, the lower courts granted deference toward the agency's legal interpretation. *Id.* at 382–83. But the Supreme Court vacated and remanded, overturning *Chevron*. The Court held that with ambiguous statutory language, courts must still fulfill their responsibility of determining what the law says, "us[ing] every tool at their disposal," because even with ambiguous statutory language, "there is a best reading all the same." *Id.* at 400.

With the relevant Medicare Act delegations, there is nothing ambiguous. Congress's delegations are express. Deference should be granted.

## III. The jury should be instructed on relevant actions by the Secretary pursuant to the Medicare Act delegations.

The government's requested relief is for the jury to be instructed at the end of the trial about the tenets of the Secretary's NCDs, regulations, and code-set adoption, as indicated by the evidence introduced at trial. This can and should be finally determined at the charge At a minimum, based on the above, the government expects that the jury instruction should include the following five statements:

1. Medicare only covers reasonable and necessary medical expenses.
2. Medicare does not cover biofeedback for psychosomatic conditions, and does not cover biofeedback provided at a person's home.
3. The fourth edition of the American Medical Association's Current Procedural Terminology, also known as "CPT" or "CPT-4" is Medicare's official and standard medical data code set for physician services and other health care services.
4. Except as specifically indicated otherwise, a qualified healthcare practitioner may only bill Medicare for services provided by another person incident to the practitioner's services if the other person's services are furnished under the practitioner's direct supervision. In this context, direct supervision requires either that the supervising practitioner be physically present in the same location as the person providing the services, or that the supervising practitioner be continuously present during the services via real-time video-and-audio communications technology (not audio only).

5. Medicare may be billed for the professional services of clinical psychologists, clinical social workers, marriage and family therapists, and mental health counselors only if the service is performed by a person legally authorized by the state in which the service is performed.

If other related legal authority becomes relevant during the trial, the government respectfully requests that the Court include such principles in its final instructions to the jury.

## CONCLUSION

In conclusion, the Court should instruct the jury as to the relevant national coverage determinations, promulgated regulations, and code-set adoptions by the Secretary of Health and Human Services.

Dated: October 23, 2026

Respectfully submitted,

DANIEL N. ROSEN
UNITED STATES ATTORNEY

/s/ *Matthew D. Forbes*
Matthew D. Forbes (NY#5664354)
Matthew M. Paulbeck (NY#5674510)
Assistant U.S. Attorneys
District of Minnesota